Bx. 4 3 115

B6150841

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

Hosea Williams, John Lewis
and Amelia Boynton, on behalf
of themselves and others
similarly situated,

               Plaintiffs,

United States of America,

               Plaintiff-Intervenor,

   vs

Honorable George C. Wallace, as
Governor of the State of Alabama;
Al Lingo, as Director of Public
Safety for the State of Alabama;
and James G. Clark, as Sheriff of
Dallas County, Alabama,

               Defendants.

Civil Action

No. 2181-N.

FILED

3  1965

R. C. ...N CLERK

Before Hon. Frank M. Johnson, Jr., Judge, at Montgom

Alabama, March 11-12-13-15-16, 1965.

VOLUME I of three volumes.  (This volume contains pages
to 265, inclusive; see Volum
II for pages 266 to 530; see
Volume III for pages 531 to
788.)

INDEX - Witnesses

|  | Dir. | Crs. | Red. | Rec. | Red. | Rec. | Voir Dire |
|---|---|---|---|---|---|---|---|
| **Plaintiffs' Witnesses** | | | | | | | |
| Martin Luther King, Jr. | 25 | 38 | 104 | 106 | | | |
| Amelia Platts Boynton | 119 136 | 141 | 169 | 170 | | | 134 |
| Hosea Williams | 175 | 204 | 242 | 246 | | | |
| Dr. William B. Dinkins | 251 | 256 | 263 | 265 | | | |
| Dr. Edward Aldridge Maddox, Jr. | 266 | 272 | | | | | |
| John Lewis | 288 | 303 | 338 | 341 | 345 | 346 | |
| Early Butler | 347 | 352 | | | | | |
| Margaret Moore | 359 | 367 | 384 | 386 | | | |
| Albert Turner | 397 | 409 | | | | | |
| Paul Simpson | 416 | 418 | | | | | |
| **United States' Witnesses** | | | | | | | |
| Al Lingo | See excerpt transcript filed 3/19/65 | | | | | | |
| Joseph Mark Avignone | 424 | 439 | 450 | 451 | | | |
| Thomas E. Burns, Jr. | 457 | 459 | 462 | | | | |
| John J. Sweeney | 463 | 465 | 467 | 468 | | | |
| James Michael Barko | 472 | 482 | 501 | 507 | | | |
| Phillip S. Snodgrass | 508 | | | | | | |
| Laurens Walter Pierce | 510 | | | | | | 513 |
| Robert L. Frye | 522 | 525 | | | | | |
| Carl Gabel | 541 | 545 | 548 | 548 | | | 544 |
| Frederick Douglas Reese | See excerpt transcript filed 4/2/65 | | | | | | |
| John Carter Lewis | 549 | 555 | 556 | | | | |

ii

INDEX - Witnesses (cont'd)

|  | Dir. | Crs. | Red. | Rec. | Red. | Rec. | Voi: Dir |
|---|---|---|---|---|---|---|---|

**United States' Witnesses (cont'd)**

| Sallie Bett Rodgers | See excerpt transcript filed 4/2/65 |
|---|---|
| George Douglas | 557 | 562 | 566 |
| Leatha Mae Stover | See excerpt transcript filed 4/2/65 |
| James Dobynes | 567 | 572 | 579 | 580 |

**George C. Wallace's Witnesses**

| Alfred C. Harrison | 582 | 587 | | | | | |
| Arthur P. Villadsen | 599 606 | 608 | 619 | 623 | | | 60! |
| Rex Thomas | 624 | | | | | | |

**Al Lingo's Witnesses**

| Al Lingo | See excerpt transcript filed 3/19/65 |

**James G. Clark's Witnesses**

| Stanley Fountain | 276 | 281 | | | |
| Harper Roy Smith | 629 | 650 | 666 | 674 | 679 |
| Asbury Middlebrooks | See excerpt transcript filed 3/30/65 |
| R. E. Etheridge | 682 | 689 | 709 718 | 725 | | | 716 |
| Charles H. Weber | 729 | 737 | 740 |
| Grace Thacker | 749 | 752 | 753 | 754 |
| James A. Hare | See excerpt transcript filed 4/1/65 |
| Thomas L. Pyron | 759 | 764 | 767 | 769 | 770 |
| Billy Mack Bobo | 771 | 774 |

iii

INDEX - Witnesses (cont'd)

|  | Dir. | Crs. | Red. | Rec. | Red. | Rec. | Voir Dire |
|---|---|---|---|---|---|---|---|

Plaintiffs' Witnesses in Rebuttal

  None.

United States' Witnesses in Rebuttal

  John Cloud              See excerpt transcript filed 3/29/65

George C. Wallace's Witnesses in Surrebuttal

  None

Al Lingo's Witnesses in Surrebuttal

  None

James G. Clark's Witnesses in Surrebuttal

  None

INDEX - Exhibits

Plaintiffs' Exhibits

  1 - Photograph.

  2 - Photograph.

  3 - Photograph.

  4 - Photograph.

  5 - Photograph.

  6 - Photograph.

  7 - Photograph.

  8 - Photograph.

  9 - Photograph.

  10 - Photograph.

INDEX – Exhibits (cont'd)

Plaintiffs' Exhibits (cont'd)

11 – Photograph.

12 – Photograph.

13 – Press release.

14 – Press release.

15 – Route diagram for march March 9, 1965.

United States' Exhibits

1 – Photographs (36).

2 – Photographs (19).

3 – Photographs (18).

4 – Photographs (4).

5 – Photographs (3).

6 – Photographs (3).

7 – Aerial photograph, Selma, Alabama.

8 – Movie film.

9 – Registration statistics.

10 – Photograph.

11 – Folder containing defendant Lingo's records.

12 – Folder containing defendant Clark's records.

13 – Orders entered by Judge Daniel H. Thomas.

14 – Photographs.

George C. Wallace's Exhibits

1 – Map of 8th Division, Alabama Highway Department.

2 – List of bridges on U.S. highway 80 between Montgomery and Selma.

Al Lingo's Exhibits

None.

v

INDEX - Exhibits (cont'd)

<u>James G. Clark's Exhibits</u>

1 - Newspaper photograph.

2 - Photographs.

3 - Photographs.

4 - Photographs.

5 - Photographs.

6 - Photographs.

7 - Photographs.

8 - Photographs.

9 - Photographs.

10 - Photographs.

11 - Photographs.

12 - Photographs.

13 - Photograph.

14 - Photograph.

15 - Order entered by Judge James A. Hare, Feb. 3, 1965.

16 - Order of Judge James A. Hare, given to Sheriff Clark.

17 - Order entered by Judge James A. Hare, July 9, 1964.

18 - NOT ADMITTED - Movie film.

19 - Selma parade statute.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

Hosea Williams, John Lewis                :
and Amelia Boynton, on behalf             :
of themselves and others                  : .   Civil Action
similarly situated,                       :
                                          :   No. 2181-N.
                    Plaintiffs,           :
                                          :
United States of America,                 :
                                          :
                    Plaintiff-Intervenor, :
                                          :
    vs                                    :
                                          :
Honorable George C. Wallace, as           :
Governor of the State of Alabama;         :
Al Lingo, as Director of Public           :
Safety for the State of Alabama;          :
and James G. Clark, as Sheriff of         :
Dallas County, Alabama,                   :
                                          :
                    Defendants.           :

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . :

        Before Hon. Frank M. Johnson, Jr., Judge, at Montgomery,

        Alabama, March 11-12-13-15-16, 1965.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

A p p e a r a n c e s:

    For the Plaintiffs:        Gray & Seay
                                 (Fred D. Gray and
                                  Solomon S. Seay, Jr.),
                               Peter A. Hall,
                               Jack Greenberg,
                               Norman Amaker,
                               Charles H. Jones, Jr.,
                               Oscar W. Adams,
                               Demetrius C. Newton,
                               James M. Nabrit, III,
                               Charles S. Ralston.

    For the United States:     Ben Hardeman,
                               John Doar,
                               David Reuben.

2

For George C. Wallace:          Goodwyn & Smith
    (and for Al Lingo                (Maury D. Smith,
    3/11-12)                          Charles M. Crook, and
                                      John S. Bowman).

For Al Lingo:                   John P. Kohn, Jr.
    (from 3/13)

For James G. Clark:             McLean Pitts,
                                P. H. Pitts,
                                J. E. Wilkinson, Jr.,
                                T. G. Gayle.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

(The above-styled case coming on for hearing at
Montgomery, Alabama, March 11, 1965, before Hon. Frank M. Johnson,
Jr., Judge, the following proceedings were had:)

THE COURT:  This is Civil Action 2181-N, Hosea
Williams and others, as plaintiffs, United States as plaintiff-
intervenor, the Honorable George C. Wallace and others, as defendants.
Who appears for the plaintiffs?

MR. GRAY:  Your honor, I appear for the plaintiffs,
along with the following attorneys; my associate, Solomon S. Seay,
Jack Greenberg, Norman Amaker, Charles Jones, Charles Ralston, of
New York --

THE COURT:  Who?

MR. GRAY:  Charles Ralston, R-A-L-S-T-O-N, Peter
A. Hall, of Birmingham, Oscar Adams, of Birmingham, and Demetrius
Newton, of Birmingham.

THE COURT:  Each of those lawyers --

MR. GRAY:  And James Nabrit, of New York; each is a
member of the Federal Bars, and I move their admission for the

3

purpose of participating in this case.

THE COURT:  All right, on that motion each of them will be admitted for the purpose of participating in this case.  On behalf of the plaintiff-intervenor, who appears?

MR. DOAR:  Your honor, John Doar for the United States, and Mr. Hardeman, United States Attorney for the Middle District of Alabama.

THE COURT:  On behalf of the Honorable George C. Wallace?

MR. SMITH:  Your honor, Maury Smith, on behalf of this defendant, also the defendant, Lingo.

THE COURT:  All right.

MR. SMITH:  May I seek at this time and respectfully request permission of the court for permission that Hugh Maddox be permitted to sit at counsel table -- he is not appearing as counsel of record in the case, not for that purpose --

THE COURT:  I understand he is the Governor's legal adviser.

MR. SMITH:  Yes, sir.

THE COURT:  He will be permitted to remain at counsel table.

MR. SMITH:  Thank you.

THE COURT:  Anyone else appearing for Governor Wallace and Al Lingo?  On behalf of James G. Clark?

MR. McLEAN PITTS:  Your honor, this is McLean Pitts,

4

of Selma, P. H. Pitts, of Selma, Mr. J. E. Wilkinson, Jr., of Selma;
Mr. T. G. Gayle is in the case with us, but he is not present today.

THE COURT: All right. Then, gentlemen, this
hearing was scheduled by order of the court upon the plaintiffs'
motion for preliminary injunction and upon the plaintiff-intervenor's
motion for preliminary injunction. There has been filed with me,
or with the Clerk and presented to me as of this morning, a motion
on behalf of the defendant, Clark, to make the preliminary
injunction, as it is phrased in the motion -- I take it they mean
a preliminary restraining order -- permanent.

MR. McLEAN PITTS: Yes, sir.

THE COURT: That is the preliminary restraining order
that was issued by this court.

MR. McLEAN PITTS: Your honor, it was written very
hurriedly; we don't take any pride in our authorship of it.

THE COURT: There has also been presented to me --
and unless there is some objection, we will -- we will hear that
motion at this time, also, along with -- along with the other
motions.

MR. McLEAN PITTS: All right, sir.

THE COURT: There is also presented to me as of this
morning a petition --

MR. GREENBERG: Excuse me, your honor; I am not quite
sure that I understood you. Did you say that you intended to hear
this, along with the other motions, petition to show cause?

5

THE COURT:  No, I haven't gotten to that.

MR. GREENBERG:  I am sorry; all right.

THE COURT:  The motion of the defendant, Clark, to make the preliminary restraining order permanent --

MR. GREENBERG:  All right.

THE COURT:  -- unless there is some objection, we will hear that.

MR. GREENBERG:  Yes, sir; we will hear that.

THE COURT:  Now, there is also presented to me a petition to show cause why Dr. Martin Luther King shouldn't be found guilty of contempt of this court, presented on behalf of the defendant, Clark.

MR. McLEAN PITTS:  Yes, sir; now, there are other persons named in that petition, too.

THE COURT:  Yes; well, let me say this in that regard; that any contempt proceedings or any order to show cause as to why an individual or individuals should not be found guilty of contempt of this court is a matter between the court and the alleged contemptors.

MR. McLEAN PITTS:  (Nodded to indicate affirmative reply)

THE COURT:  It is not a matter between James Clark, and it is no matter that James Clark, as a litigant, has any interest in, so the court will, of its own motion, at this time, without regard to whether or not subsequent proceedings may be initiated,

6

upon order of the court and not upon order of Clark, dismiss that petition by Clark to show cause. Are there any other motions to be filed?

MR. SMITH: None for the defendants we represent, your honor, at this time.

THE COURT: And Mr. Greenberg?

MR. GREENBERG: We have filed a motion to dissolve the temporary restraining order.

THE COURT: Yes, and that motion to dissolve the temporary restraining order will be heard along with the other motions today. Then I take it the defendants, the Honorable George C. Wallace, Al Lingo, and James Clark, join issue in as far as the motion for preliminary injunction and motions for dissolution of the temporary restraining order; am I correct?

MR. SMITH: Yes, sir.

MR. McLEAN PITTS: Yes, that is correct.

THE COURT: And the plaintiffs join issue on the defendant's, Clark, motion to make the preliminary or temporary restraining order permanent?

MR. GREENBERG: That is correct.

THE COURT: All right, then, gentlemen, are we ready to proceed without any further preliminaries?

MR. GRAY: Yes, sir; subject to our witnesses being present.

THE COURT: Then call your witnesses.

MR. GREENBERG:  Just one question, your honor.  The defendants have subpoenaed a large number of witnesses, and it is possible that some of them have been subpoenaed in connection with the defendant's motion to find certain parties in contempt.  If that is true, it would be a convenience if they were released; if they are here for another purpose, of course, then, they will have to stay.

THE COURT:  Well, since they subpoenaed them, it will be their responsibility, and they have the prerogative to keep them or release them.

MR. GREENBERG:  We have also filed a memorandum of points and authorities this morning.

THE COURT:  I have that.  Call your witnesses, gentlemen.

MR. SMITH:  Excuse me, your honor; in behalf of the defendants, Wallace and Lingo, we have subpoenaed representatives of Associated Press as well as United Press International, and I would ask leave of this court, I feel that it is unfair to these representatives that they be placed under the rule; I would ask that they be permitted to remain in the court room; I make this motion.

THE COURT:  We will get to that point when we call our witnesses --

MR. SMITH:  All right, sir.

THE COURT:  -- and when I get ready to put them under the rule --

8

MR. SMITH:  All right, sir.

THE COURT:  -- if you will designate those that you want to be relieved, and we will take it up with opposing counsel.

MR. SMITH:  All right, sir.

THE COURT:  All right, for the plaintiffs, call your witnesses; as your name is called, if you will, please --

MR. GRAY:  William Jones.

MARSHAL:  William Jones, come on around.

THE COURT:  -- answer and come around to the place designated by the Marshal.

MR. GRAY:  James G. -- is he here?

THE COURT:  Yes, he answered.

MR. GRAY:  Oh, I am sorry.  James G. Clark.

MR. McLEAN PITTS:  He is a defendant, your honor.

THE COURT:  Yes.

MR. GRAY:  Tom Lankford; is he here?

THE COURT:  If you will, as your name is called, please answer audibly so we can hear you.

MARSHAL:  Tom Lankford; Tom Lankford.

MR. GRAY:  Ceola Miller.

THE COURT:  Just a minute; did that witness answer?

MARSHAL:  No, sir.

THE COURT:  What is the witness's name?

MR. GRAY:  Tom Lankford.  He is with the Birmingham staff, the lawyer for the Birmingham News called me, and supposed to be one of these news men here, and I told him if either --

WITNESS GIBSON:  Your honor, I represent the News.

THE COURT:  All right; your name, please?

WITNESS GIBSON:  Gibson.

MR. GRAY:  Mr. Lingo.

DEFENDANT AL LINGO:  Here.

MR. GRAY:  James Martin; he has been excused.  Lily --
Addie Lily.

MARSHAL:  Addie Lily.

THE COURT:  All right, now, when you get to these
witnesses that do not answer, if you want the process of the court,
let me know; otherwise, I am going to skip on over it just like you
are doing.

MR. GRAY:  Mr. Wilson Baker; he is the Director of
Public Service of Selma.

MR. McLEAN PITTS:  Your honor, Mr. Wilson Baker was
on duty all night long, and I -- he will be here sometime this
morning; he is on the way here, I know.

MARSHAL:  He had a telephone call a few minutes ago
to this attorney.

THE COURT:  Mr. Pitts says that he will be available.

MR. McLEAN PITTS:  He was on duty all night long last
night.

THE COURT:  All right.

MR. GRAY:  Curtis Reese; I don't think he was served.
I believe, your honor, the others are our witnesses which we know

they are here.

THE COURT:  All right.  Mr. Gray, does that conclude the call of your witnesses?

MR. GRAY:  Dr. King, Mr. Gildersleeve, James Gildersleeve.

MARSHAL:  Gildersleeve.

MR. GRAY:  Reverend C. T. Vivian, Mr. Albert Turner, Mr. John Lewis, Annie Lee Cooper, Hosea Williams, Mrs. Boynton, Dr. Moldovan, Andy Young, Mr. Boom.

MR. HALL:  Dr. Maddox, Dr. Dinkins.

MR. GRAY:  Dr. Maddox, Dr. Dinkins.

MR. HALL:  Mrs. Foster.

MR. GRAY:  Mrs. Foster.

MR. HALL:  We have several other witnesses.

MR. GRAY:  Your honor --

MR. HALL:  F. D. Reese.

MR. GRAY:  Who?

MR. HALL:  F. D. Reese.

MR. GRAY:  Normarine Shore, Wilson Harris, Casey Lee, Viola Jackson.

THE COURT:  All right, are these the plaintiffs' witnesses?

MR. GRAY:  Yes, sir.

MR. HALL:  May it please your honor, there are several other persons in the court room we probably will use, may

use, but I don't know the names as we can ascertain, but this is all we have.

THE COURT: If the rule is invoked, they will be required to remain outside the court room.

MR. McLEAN PITTS: The rule is invoked.

THE COURT: So if you are going to use a witness, you better call them; if they remain in the court room, you cannot use them.

MR. GRAY: Yes, sir.

MR. HALL: This is all we have, know of at this time, your honor; we won't proceed --

MR. SMITH: Your honor, the witness, William Jones, was subpoenaed to produce certain press statements which I have in my file, or he has a copy with him, also; could this witness be placed on call?

MR. GRAY: Yes, sir; and if the defendants will admit, particularly the docket -- the Exhibit 1 to the complaint was issued, and the other -- if I may see the statements, we may be able --

THE COURT: All right, just a minute, gentlemen; we will take that up later.

MR. GRAY: Yes, sir.

THE COURT: These are the plaintiffs' witnesses; if these are the plaintiffs' witnesses, swear them in, Mr. Clerk.

THE CLERK: All witnesses, please raise your right hand.

(Group of witnesses sworn by the Clerk)

THE COURT: All right, now, these witnesses, with the exception of those that may be excused from the rule, with the exception of those that are parties to this case, proper parties and not -- not members of the class, will go into this witness room on my left.

MARSHAL: All witnesses, come this way.

MR. SMITH: Mr. Jones --

THE COURT: We will take that up later, just let them go on; we have to do this in an orderly manner when we have this many witnesses.

MR. SMITH: I see.

THE COURT: After they go in the witness room, if you have others that you did not call, you can call them.

MR. GRAY: Yes, sir; Henrietta Singleton.

MR. HALL: Margaret Moore.

MR. GRAY: Who?

MR. HALL: Margaret Moore.

MR. GRAY: Margaret Moore and Leatha Stover.

THE COURT: All right, I take it of that call you have one additional witness; is that correct?

MR. HALL: This is Margaret Moore; that is all I can --

MR. GRAY: Yes, sir.

THE COURT: Swear this witness.

13

MR. AMAKER:  Excuse me, your honor; the others -- the others are here.

MR. GRAY:  Are they in the court room?

MR. AMAKER:  They are not in the court room; they will be right in.  They are present.

THE COURT:  Mr. Gray, will you call those witnesses in a loud voice, please?

MR. GRAY:  Yes, sir; Henrietta Singleton.

THE COURT:  If you are here, answer.

MR. GRAY:  Leatha Stover.

COURT CRIER:  Here.

MR. GRAY:  That is it, your honor; just these two.

THE COURT:  Swear these additional witnesses; there are three of them.

MR. GRAY:  Here is the other one, your honor.

THE CLERK:  All witnesses, please raise your right hand.

(Group of witnesses sworn by the Clerk)

MARSHAL:  Witnesses will come in this witness room.

THE COURT:  On behalf of the United States, the plaintiff-intervenor, call your witnesses, please.

MR. DOAR:  Your honor, I have several Government witnesses that are not -- have not yet arrived, Government employees. The other witnesses that we have have been called, Reverend Dobynes, D-O-B-Y-N-E-S, Ben Norfleet, John Carter Lewis.

14

WITNESS JOHN CARTER LEWIS:  Here.

MR. DOAR:  Come around, please.  Charles Moss.

WITNESS CHARLES MOSS:  Here.

MR. DOAR:  Freddy Benson.  He may be in that room in there, Freddy Benson.  Mr. Lewis; it is another -- there is another John Carter Lewis.

WITNESS JOHN CARTER LEWIS:  This is John Carter.

MR. DOAR:  All right, that's all the witnesses we have here at this time; the other witnesses --

THE COURT:  Do you have any on call?  This applies to all parties to this case; if you have any on call, it will be your responsibility to keep them out of the court room.

MR. DOAR:  Yes, sir.

THE COURT:  All right, swear these witnesses.

THE CLERK:  All witnesses, please raise your right hand.

(Group of witnesses sworn by the Clerk)

MARSHAL:  Come this way.

THE COURT:  All right, now, is there any reason why we should call the defendants' witnesses separately?  If you will, then, call -- call the witnesses for the Honorable George C. Wallace.

MR. SMITH:  Your honor, the reason I couldn't reply, I don't know what witnesses Mr. Pitts has in mind.  When I call your name, come up.  John Lynch, Rex Thomas, Jack Johnson, Arthur Worthy, Martin Luther King.

MARSHAL:  He is in the other witness room.

MR. SMITH:  He is in the other witness room.  General Harrison, Colonel Shepherd, Mr. Villadsen, Mr. Bates, W. L. Allen.

WITNESS W. L. ALLEN:  Here.

MR. SMITH:  W. B. Painter.

WITNESS W. B. PAINTER:  Here.

MR. SMITH:  Major John Cloud.

WITNESS JOHN CLOUD:  Here.

MR. SMITH:  Major Jones.

WITNESS JONES:  Here.

MR. SMITH:  Those are these defendants' witnesses.

THE COURT:  All right.  Now, on behalf of the defendant, Lingo, do you have any witnesses in addition to these?

MR. SMITH:  No, sir.

THE COURT:  All right, on behalf of the defendant, Clark, will you call your witnesses, please.

MR. P. H. PITTS:  Your honor, in addition to these witnesses, Deputy George Stoves, Hosea Williams, John Lewis, C. T. Vivian, Ralph --

THE COURT:  If they have already been sworn, you need not be resworn.

MR. P. H. PITTS:  Ralph Abernathy, Andrew Young, James Bevel, John Love -- John Love, James Orange.

THE COURT:  Just a minute, please.  Do you have information concerning that witness?

16

UNIDENTIFIED PERSON:  Says he is out of the State in Virginia.

THE COURT:  Has he been served?

UNIDENTIFIED PERSON:  I don't know about that.

MR. McLEAN PITTS:  Just one minute.

THE COURT:  All right, I will address that question to the attorneys; has he been served?

MR. McLEAN PITTS:  Let me check a second.

MR. P. H. PITTS:  I don't have knowledge --

MR. McLEAN PITTS:  If you will, go right on, I will check and come back to him; will it be all right?

THE COURT:  Yes, sir.

MR. P. H. PITTS:  James Orange, L. L. Anderson, A. D. King, Amelia Boynton, Frank Sirocco, James Gildersleeve, Marie Foster, Stanley Fountain.

MARSHAL:  He hasn't arrived yet.

MR. McLEAN PITTS:  That is a Deputy Marshal.

MR. P. H. PITTS:  Bernard Lee, Fred Shuttlesworth. Your honor, we have seven witnesses which we have called which did not answer, but the subpoenaes are still out.

THE COURT:  There are several of them, I don't know whether you have included in that seven these or not, but several of them have already answered --

MR. P. H. PITTS:  Yes, sir.

THE COURT:  -- and been sworn and are in the witness

room.

MR. P. H. PITTS:  Yes, sir.

MR. McLEAN PITTS:  We don't know about some of these subpoenaes --

THE COURT:  All right.

MR. McLEAN PITTS:  -- that we haven't gotten them here yet.

THE COURT:  I take it, then, you will make investigation and present the matter to the court, if you will.

MR. McLEAN PITTS:  Yes, sir.

MR. P. H. PITTS:  Yes, sir.

THE COURT:  All right, swear these witnesses.

THE CLERK:  All witnesses, please raise your right hand.

(Group of witnesses sworn by the Clerk)

THE COURT:  Now, gentlemen, I notice that two of these witnesses are Deputy United States Marshals for this District; any reason why they should not be excused from the rule?

MR. McLEAN PITTS:  No, sir.

MR. SMITH:  We ask they be excused.

MR. McLEAN PITTS:  No, sir.

THE COURT:  All right, swear in -- the witness, Johnson, will be excused from the rule.  Now, there are other witnesses in this group that Mr. Smith asked be excused from the rule, members of the press.

MR. SMITH:  Yes, sir.

THE COURT:  I see one, Mr. Thomas.

MR. SMITH:  Mr. Lynch, also.

THE COURT:  Mr. Lynch; any reason why they should not be excused from the rule; any objection to it?  They will be excused from it, those two witnesses.

MARSHAL:  Deputy Worthy, too.

THE COURT:  Well, I have taken that up; Worthy and Johnson have been excused from the rule, they do not have to go in the witness room.

MR. GRAY:  Your honor, there is also one of our witnesses who is with the Birmingham News, a member of the press, should also be excused from the rule.

THE COURT:  What is his name?

MR. GRAY:  Mr. Gibson.

THE COURT:  Tell that witness, and unless there is some objection --

MR. SMITH:  No objection.

MR. McLEAN PITTS:  We have no objection.

THE COURT:  The witness Gibson, representative from the Birmingham News, is excused from the rule.  All right, now, these other witnesses, let --

MR. McLEAN PITTS:  There is one other officer, Mr. Stanley Fountain, who is a Deputy Marshal for the Southern District.

THE COURT:  When he arrives, he will also be excused

from the rule of sequestration. All right, Mr. Lassiter, do we have additional seats in there for these witnesses?

MARSHAL: No, sir; not in this room.

THE COURT: All right, take these witnesses to the Grand Jury room, or to this jury room, if you have seats for them.

MARSHAL: Yes, sir.

THE COURT: Preferably to the jury room to my right if you have seats for them.

MARSHAL: Yes, sir.

MARSHAL: Judge, I have James Gildersleeve just came in, had a subpoena.

THE COURT: The witness Gildersleeve, I believe called by Mr. Pitts.

MR. McLEAN PITTS: Yes, sir.

MR. P. H. PITTS: Yes, sir.

THE COURT: All right. Now, before we swear this witness, are there any other witnesses in the court room whose names have not been called?

MARSHAL: Freddie Lee Bennett, Jr., just walked in.

THE COURT: Anyone in the court room who has been subpoenaed, but the parties have not called your name, please stand. All right, and your name, please?

WITNESS LEON DANIEL: My name is Leon Daniel; I work for U.P.I. and was subpoenaed by the plaintiffs.

THE COURT: Plaintiffs subpoenaed U.P.I. Mr. Daniel?

20

MR. GRAY: Yes, sir.

THE COURT: You want him sworn?

MR. GRAY: Yes, sir.

THE COURT: Come around. And your name, please?

WITNESS PAUL SIMPSON: My name is Paul Simpson, and I was subpoenaed, F.B.I. brought me a subpoena, told me that I was --

THE COURT: Gibson?

MR. DOAR: Simpson; that is the witness -- just come forward, please.

THE COURT: You want him sworn? Come around, please. Your name, please?

WITNESS M. J. ANDERSON: M. J. Anderson, Administrator of the hospital.

MR. DOAR: That is subpoenaed --

WITNESS M. J. ANDERSON: Subpoenaed by the plaintiffs.

THE COURT: Come around. Are there any others? All right, swear these, swear these additional witnesses.

THE CLERK: All witnesses, please raise your right hand.

(Group of witnesses sworn by the Clerk)

MARSHAL: We don't have room.

THE COURT: All right, these witnesses will go in the witness room on my right and remain until you are excused. Now, gentlemen, you have certain matters to take up, I understand one of which is in reference to documents that were produced --

MR. SMITH:  Yes, sir.

THE COURT:  That were produced by your witness, Jones.
If you will, you gentlemen take this up during the recess that I am
fixing to have for that purpose; and if it is agreeable with you
all, it is agreeable with me that the witness be excused.

MR. SMITH:  Thank you, sir.

THE COURT:  And that announcement applies to any
other witnesses, so that we can proceed in an orderly manner without
any more confusion than is absolutely necessary; if any witness has
been subpoenaed by any party in this case, you have no right from
this point on to excuse that witness unless it is agreeable with all
other parties.  Have your exhibits marked during this -- during
this short recess for identification by the Clerk, if you will,
the plaintiffs at this time; the defendants may have their exhibits
marked at some time later; but in order to facilitate the presenta-
tion of your documentary evidence, have -- have your exhibits marked
for identification purposes with the Clerk so they can be referred
to initially and throughout by their -- by their number for
identification.  Do you have any other matters now that you want
to take up, any party, before we get into the testimony of the case?

MR. GREENBERG:  Your honor, I wanted to ask a
question, really.  The case really divides into two parts; the
motion to dissolve the temporary restraining order is essentially
a question of law, and at this moment I can't think of any testimony
that would be relevant to it.  The motion for a preliminary

injunction, however, is an evidentiary matter on which there would
be testimony.  We had thought, though we certainly would be happy to
proceed any way your honor suggests, that we would first argue the
legal propositions, and then go into the evidentiary matters; but
we are perfectly agreeable to do it any way --

THE COURT:  We will reserve any arguments until we
take the evidence, and then if arguments are appropriate, I will
hear them.  I think possibly all of us are generally familiar with
the rules that are applicable in this case, and we will not be able,
as you say, Mr. Greenberg, to focus any of those propositions or
make any application of them until the evidence has been taken, so
I see no reason for preliminary statements or arguments by counsel.
Any other matter?  All right, court will be in recess for ten
minutes.

(At which time, 9:33 a.m., a recess was had until
9:41 a.m., at which time the hearing continued)

THE COURT:  All right, gentlemen, are you ready to
proceed?  Call your first witness, or start with your evidence.

MR. GRAY:  May it please the court, by agreement we
would like to introduce Plaintiffs' Exhibits 1 through 12, which
are pictures of the Sunday's march.

MR. McLEAN PITTS:  We haven't made any such agreement
with this lawyer --

MR. GRAY:  I am awfully sorry.

MR. McLEAN PITTS:  -- and I haven't even talked to him

or seen the pictures.

        MR. WILKINSON: Haven't seen the pictures.

        MR. McLEAN PITTS: We have made no such agreement with him or seen the photographs.

        MR. GRAY: I am awfully sorry; we took it up with Mr. Smith, and we didn't --

        MR. SMITH: You want Bill Jones to remain here?

        MR. GRAY: Mr. Pitts says he won't agree to them.

        MR. SMITH: You want him to remain, Mack, or would he be on call? That was the idea, to put him on call.

        MR. McLEAN PITTS: I don't care.

        THE COURT: All right, Plaintiffs' Exhibits marked for identification as 1 through 12 have been tendered, and I take it that part of the counsel, or some of the counsel for the defendants have agreed to their admissibility; any objection to them?

        MR. McLEAN PITTS: I -- I made no agreement with him, your honor.

        THE COURT: Well, that is not what I am asking you.

        MR. McLEAN PITTS: Yes.

        THE COURT: Do you have any objection to them going in evidence?

        MR. McLEAN PITTS: Yes, sir; I may have; I don't know. I haven't seen the whole exhibits, see, what I am talking about.

        THE COURT: Do you have 1 through 12?

MR. McLEAN PITTS: This is -- this is something that Mr. John Doar gave me a few minutes ago.

THE COURT: Well, Mr. Clerk, if you will, help Mr. Pitts determine if those are Exhibits 1 through 12 for identification.

MR. McLEAN PITTS: I don't know whether they are or not, I mean I am honest with you.

THE COURT: If you will, help Mr. Pitts determine that by looking on the -- on the sheets and where they are stamped.

MR. McLEAN PITTS: I haven't -- we had -- is that all of them?

THE CLERK: Yes, sir; this is Plaintiffs' Exhibits 1 through 12.

MR. McLEAN PITTS: This is the first time I have seen those, is just a second ago; I want to look through them just a minute, your honor.

THE COURT: All right, call your first witness.

MR. GREENBERG: Dr. Martin Luther King, Jr., please.

MR. SMITH: Pardon the interruption; there is one question about the witness, Daniel, from United Press, I believe, in Birmingham; we have no objection to him being excused from the rule, I don't know whether that was clear or not. He is in the court room. He is your witness; we have no objection to him being excused, that is, defendants, Wallace and Lingo.

MR. GRAY: I thought it was clear that he was excused from the rule.

MR. SMITH:  All right.

MR. P. H. PITTS:  We have no objection.

MR. GRAY:  Thank you.

MR. DOAR:  All newspaper people are excused from the rule.

MR. WILKINSON:  That was our understanding.

MR. DOAR:  That your understanding, Mr. Gray?

MR. GRAY:  Yes, sir.

THE COURT:  Proceed.

******************

MARTIN LUTHER KING, JR., witness for the Plaintiffs, having been duly sworn, testified as follows:

DIRECT EXAMINATION:

BY MR. GREENBERG:

Q    Would you please state your name for the record?

A    My name is Martin Luther King, Jr.

Q    What is your position, Dr. King?

A    I am President of the Southern Christian Leadership Conference and Co-pastor of the Ebenezer Baptist Church in Atlanta, Georgia.

Q    What is the Southern Christian Leadership Conference, Dr. King?

A    The Southern Christian Leadership Conference is an organization working in the civil rights movement that came into being in 1957 to serve as a channel through which local protest organizations in the South could channelize their protest activities; it works for the complete integration of the Negro

in American life through the philosophy and the method of non-violence; this is the basic philosophy that undergirds the Southern Christian Leadership Conference.

Q    Could you explain what you mean by the philosophy of non-violence, Dr. King?

A    Yes, this philosophy says in substance that one must have the inner determination to resist what conscience tells him is evil with all of the strength and courage and zeal that he can muster; at the same time he must not resort to violence or hatred in the process.  It is a way of seeking to achieve moral ends through moral means, and I would say that the basis of the philosophy of non-violence is the persistent attempt to pursue just ends by engaging in creative non-violent approaches and never coming to the point of retaliating with violence or using violence as an aggressive weapon in the process.

Q    Has the Southern Christian Leadership Conference operated in the State of Alabama?

A    Yes, the Southern Christian Leadership Conference has operated in the State of Alabama since its inception.

Q    When was that, Dr. King?

A    That was in the year of 1957.

Q    What is the most recent project in the State of Alabama in which the Southern Christian Leadership Conference has engaged?

A    The most recent project is the project presently taking place in some of the Black Belt counties of the State of Alabama, and

voter registration drive in Selma, Alabama, and Marion in
particular.

Q   When did the project in Selma commence?

A   Well, the planning started around the 17th of December of last
year, but the actual project in terms of a kickoff meeting
started on the 2nd of January of this year.

Q   What was the particular purpose of the Selma project, Dr. King?

A   We have an affiliate organization in Selma, which is one of the
two hundred and seventy-five affiliate organizations that we
have across the South, and our affiliate organization, the
Dallas County Voters League, invited us to aid and assist in
getting more Negroes registered to vote.

MR. McLEAN PITTS:  Your honor --

THE COURT:  Just a minute.

MR. McLEAN PITTS:  Your honor, I think all this
testimony is incompetent, irrelevant, and immaterial to the issues
involved in this case, and I -- just inquiring of the court, are
you trying this under the rule that you will consider all the legal
and competent testimony and will not consider any --

THE COURT:  Yes, in equity cases that is always the
rule, and I will make this comment for whatever assistance and
guidance it may be to you gentlemen in your presentations, that I --
I consider the matter of grievances or alleged grievances that are
-- are being protested to be a material issue, and I will permit
inquiry into that up to a point.

MR. GREENBERG: Yes, I wanted to go into it, your honor, to show this was --

THE COURT: The objection is overruled.

MR. McLEAN PITTS: The point I wanted to -- didn't want to be constantly objecting if the court was trying under that rule; that is all I wanted the record to show.

THE COURT: That will be the rule that is applicable, Mr. Pitts.

MR. McLEAN PITTS: All right, sir.

MR. GREENBERG: Would the reporter please read back how far Dr. King got in his answer to that last question?

THE COURT: Well, he had been invited into Selma by his affiliate organization for the purpose of assisting in getting qualified Negroes registered to vote.

MR. GREENBERG: Thank you.

Q   And was this related to the Alabama voter project, this particular activity of the Southern Christian Leadership Conference?

A   Yes, it was. We had had meetings with our affiliate organizations all over the State, I think in November or maybe early December of last year, and had discussed very seriously the whole matter of voter registration in the State of Alabama and the fact that there were glaring signs of discriminatory practices throughout the Black Belt counties. And when we dealt with the Selma situation, and when we were invited in, they made it clear to

us that they only had some three hundred and twenty Negro
registered voters out of a potential of fifteen thousand, one
hundred and twenty-five, I believe that is, they had that many
Negroes or they have that many Negroes in Dallas County of
voting age, wherein there are some fourteen thousand whites of
voting age and more than nine thousand registered, and these
facts were brought out to us in urging us to make Dallas County
one of the pivotal points of our total thrust into Black Belt.

Q   And so then you proceeded in Selma; and what form did your
participation in the Selma movement take, Dr. King?

A   Well, we started out having mass meetings; we felt that we had
to do something to arouse people all over the community,
realizing that when people have --

        MR. McLEAN PITTS:  Your honor, I object to what he
felt like; it calls for an answer as to what form it was, what type
of people, I just want --

        THE COURT:  Well, I will sustain that objection; it
is not responsive to the question.  The question was what form of
action did the movement take?

Q   Did you hold meetings, Dr. King?

A   Yes, we held mass meetings; we also organized ward meetings
throughout the city and the county.  We were having these ward
meetings all to stimulate the Negro people of Dallas County to
seek to go to the Court House to register.

Q   Did you engage in any other forms of public protest or
encouragement?

A    Yes, we did.  We decided that on the days that the county and

     the State had designated as registration days we would assemble

     at the church, which happens to be the Brown Chapel A.M.E.

     Church, and walk together to the Court House, so that that

     happened to have been every first and third Monday.

Q    And did you -- you held these marches the first and third

     Monday from the beginning of the year, roughly, up until the

     present; is that correct?

A    That is correct.

Q    Did you hold any other parades and demonstrations of a public

     nature?

A    You mean did I lead any?

Q    Well, did the -- did your organization, your affiliate?

A    Yes, all of them were centered around the whole matter of the

     right to vote.

Q    At any point were persons who participated in these marches

     arrested?

A    Yes, many, many times; I think more than three thousand were

     arrested in -- in Selma and Marion together, and I was arrested,

     myself, in one of these periods when we were seeking to go to

     the Court House.

Q    Did you participate in the planning of another march scheduled

     for March 7, 1965?

A    Yes, I did.

Q    And would you describe the planning of that particular march,

     Dr. King?

A   Yes. Well, the plan was to engage in a peaceful, non-violent

walk from Selma, Alabama, to Montgomery, Alabama, where we would

present a petition to Governor Wallace protesting the denial of

the right to vote and the tragic and terrible police brutality

that we had experienced in Selma.

        MR. McLEAN PITTS: We object to that.

        MR. P. H. PITTS: Move to exclude that.

        MR. McLEAN PITTS: We move to exclude that; that is a

conclusion.

        THE COURT: Your motion is overruled; he is testifying

to what he was going to petition the Governor for.

        MR. McLEAN PITTS: All right, we except.

        THE COURT: Go ahead.

Q   What route had you planned for that march to follow, Dr. King?

A   We had planned to walk up highway 80 all the way, with stopping

points along the way, one in Dallas County, one in Lowndes

County, and the last stopping point in Montgomery County, before

getting up to walk for the last day.

Q   Why had you planned to walk rather than to engage in any other

form of demonstration?

A   Well, I think for two basic reasons; first --

        MR. McLEAN PITTS: Wait a minute, your honor; we

object to why the witness did anything.

        THE COURT: I will permit that.

        MR. McLEAN PITTS: All right, sir.

        THE COURT: Go ahead.

Q   Answer the question.

A   Yes.

THE COURT:  This has to do with his planning; go ahead

A   First, we were dealing with, and we continually deal with, the
whole question of poverty in the Negro community, and we had
knowledge of the fact that the vast majority of Negroes in the
Black Belt counties of Alabama earn less than eighteen hundred
dollars a year, so that most of them could not afford automobiles
and we felt that it would be a good thing on the one hand to
deal with those who could not drive because they didn't have
any cars to kind of dramatize their poverty stricken situations;
and, on the other hand, to engage in the kind of self inflicted
suffering that would be involved in walking fifty miles to
continually call attention to the evils and the injustices
that we were facing in Alabama.

Q   Did you have an actual petition to present to the Governor?

A   Yes, we were working on an actual petition to present to the
Governor which would have been presented on yesterday -- on
Wednesday, if we had been able to march through.

Q   And what would that petition have said, if you had reached the
Governor to give it to him?

A   It would have said in substance, and I don't recall the exact
wording of it, but it would have said in substance that we
assemble here to protest the fact that Negroes face notorious
discrimination in the area of the right to vote in the Black

Belt counties of Alabama, and also, we had statistics to
demonstrate this, revealing that in Lowndes County and Wilcox
County you did not have a single Negro registered to vote, and
in other counties the number was very, very small, and then going
on to state that appealing -- appealing to the Governor to set
forth a voter registration plan or structure in the State of
Alabama that would make it possible for everyone to vote without
facing any obstacles. Along with that was the second part
dealing with the fact that we have constantly faced harassment,
intimidation, brutality, and even physical death in an attempt
to vote, or at least protest the fact that we can't vote.

Q    Dr. King, you, yourself, did not participate in any attempted
march on the Sunday in question, did you?

A    No, I did not participate in the Sunday march.

Q    In your capacity as President of the Southern Christian
Leadership Conference, did you receive reports concerning what
occurred on that Sunday?

A    Yes, I did; I was in --

          MR. SMITH:  We object to the reports, now; they are
not material.

          THE COURT:  He is not asking what the reports were;
he asked if he received them; he said he had.

Q    Did you receive them?

A    Yes, I talked with my staff members, I would say, almost every
half hour, every hour, after the march up until midnight, or even

after midnight.

Q    What reports did you receive, Dr. King?

            MR. WILKINSON:  We object to that.

            THE COURT:  I sustain it.

Q    Dr. King, do you and the Southern Christian Leadership Conference
     and your Selma affiliates still desire to engage in a march from
     Selma to Montgomery?

A    Yes, we do; we feel that this is most important to try to get
     over to the State and to the nation what we feel are legitimate
     longings and aspirations, and it would be one way that we would
     be able to express in a non-violent way these aspirations for
     the right to vote and to get rid of the long night of police
     brutality.

            MR. GREENBERG:  I have no further questions for Dr.
King now, your honor.

            THE COURT:  All right.  On behalf of the --

            MR. GREENBERG:  The other parties may examine him.

            THE COURT:  -- plaintiff-intervenor, any questions?

BY MR. DOAR:

Q    Dr. King, you mentioned that your drive centered in Dallas
     County, Alabama, and you have also mentioned Lowndes County and
     Wilcox County; were there any other counties in the Black Belt
     that you were concerned with during the months of January,
     February, and March of 1965?

A    Yes, we worked in Perry County a great deal, and we have started

now working in several other counties, but during that particular

period it was mainly Perry County.

Q    Did -- will you tell whether you had any effort in Hale County?

A    Yes, we started in Hale County; they did not start in January,

but in February.

Q    Did you start in any other counties?

A    Marengo County, Greene County, these are the ones that have

already been started; it is our intention to work in all of

these counties, but at least we have had some activity in these

particular counties.

Q    During your trips to Selma, did you have occasion to observe any

of the procedures of the Dallas County Board of Registrars with

respect to the way applicants were processed?

A    Well, I did not observe the procedures from a first hand point.

Q    I would just like to ask you specifically, I am talking about

the question of speed --

A    Yes.

Q    -- did you observe that, Dr. King?

A    Oh, very definitely.

Q    Would you tell the court what you observed during the months of

January and February?

A    Well, I observed that the process was appallingly slow, and that

people were forced to stand in line a long, long time before

they could even go into the Court House to sign up to get a

number to be processed.  And this slowed up even more, because

people had to come back on the basis of that particular number.
I also noticed that once persons got in to be processed on
registration days that the process was even slower because of
the long form that they had to fill out; so in general, it was
a very slow and continues to be a very slow process.

Q   And could you tell us whether or not that number system was in
effect when you first got to Selma in early January?

A   Yes; as I recall, it started right at that time.  Now, it may
have been in effect earlier.

Q   Did you observe any other practices with respect to the way
Negroes -- what the Negroes were required to do in order to
register to vote in any of the counties in which you worked?

A   Yes; we encountered the problem in all of the counties, but I
guess it came out in more visible manner in Lowndes and Wilcox
County.  When we went there, the Negroes had to have vouchers;
and in those counties where you have no Negro registered to
vote, we had the problem of getting somebody to vouch for them.
We asked white persons to vouch, we talked with the Sheriff, the
Registrars; they said they couldn't vouch for them, so that we
found a real problem, and we still find a problem on the voucher
system.

Q   Did you -- you specifically ask the public officials in those
counties if they would vouch for citizens, Negro citizens, in
that county?

A   Yes, I personally talked with the Sheriff of both Wilcox and
Lowndes Counties and asked them if they would not vouch for

37

Negroes who were registered -- who were desirous of registering to vote. We had some three or four hundred standing out in Wilcox County, and we couldn't get a single person to vouch for them.

Q   During the time that you were in the Selma area during January and February, can you tell me whether or not you spoke about the slow pace of voter registration, complained about that to public officials in that county?

A   Yes, we spoke constantly, and I spoke constantly, to officials about it; I spoke about it in mass meetings, I sought to speak with Sheriff Clark about it, I talked with Mr. Baker about it, the Police Commissioner, and as many people as I had an opportunity to talk with, to point out the fact that this was all too slow, and that it was obvious that discrimination was existing, and that this was a method worked out to, really contrived, to keep the number of Negro voters at very low level.

Q   You personally were in the Selma area from the 2nd or 3rd of January and many days up through the present time; is that correct?

A   That is correct; I have been there a great deal; I would say more than half of my time has been spent there.

Q   Would it be safe to say that this has been your central project since the first of the year, 1965?

A   That is correct; yes, sir.

          THE COURT:  Now, you gentlemen representing the

defendants can proceed in any order that you agree upon; in the
absence of an agreement, just examine in the order that your name
appears in the case.

CROSS EXAMINATION:

BY MR. SMITH:

Q   You say you came to Selma the first of this year, 1965, as
    President of the Southern Christian Leadership Conference?

A   (Nodded to indicate affirmative reply)

Q   And your project generally being voter registration in Alabama?

A   (Nodded to indicate affirmative reply)

Q   In Dallas and surrounding counties; is that correct?

A   That is correct.

Q   Where did you come from?

A   Well, when I first came, as I recall, I came from Atlanta, which
    is my home, and which is the headquarters of our organization.

Q   From the period, January to the present time, approximately how
    much time have you spent in Montgomery and Dallas Counties?

A   To the best of my recollection, I have spent almost half of my
    time, or maybe a little more; I don't know the exact number of
    days, but I think I could be safe in saying that I have spent
    at least half of my time in Alabama, and that would include not
    only Selma, but Montgomery and other counties.

Q   And this is in regard to voter registration drive?

A   That is --

Q   That is the project?

A    That is the main project; that's right.

Q    Are you familiar with Mr. Jack Greenberg?

A    Yes, I am.

Q    What is his position; is he counsel for -- national counsel for
     the N. double A.C.P.?

A    Yes, the N. double A.C.P. Legal Defense and Educational Fund.

Q    Do you have communications between the Legal Division of N.
     double A.C.P. and the organization which you head?

A    Yes, we do.

Q    Are you pretty well informed from time to time what the Legal
     Division is doing and anticipating doing?

A    No, I am not; we -- I am not a member of the Board, and we don't
     have any members of our Board --

Q    Do you know -- excuse me.

A    -- on that Board.

Q    Did you know that a suit was pending in the United States
     District Court for the Southern District of Alabama, Northern
     Division, affecting the Dallas County Board of Registrars in
     January of this year?

A    We were aware of several suits that had been filed.

Q    Were you aware of this particular suit, that affected the Dallas
     County Board of Registrars?

A    Yes.

               THE COURT:  Talking about United States against Atkins

               MR. SMITH:  Yes, sir.

40

THE COURT:  All right.

A    I think I became aware of this particular suit.

Q    When?

A    In January.

Q    In January?

A    Yes; uh, huh.

Q    All right.  Being aware of it, you came, nevertheless, to Selma in regard to the voter registration problem in Alabama, and particularly concentrating in Dallas County --

A    Uh, huh.

Q    -- is that correct?

A    That is correct; uh, huh.

Q    Now, you mentioned, I believe -- and I don't want to misquote you, and that is the reason I am rephrasing the question -- you mentioned that you personally observed the registration process conducted or carried on by the Board of Registrars in Dallas County over the period of January for some time; is that correct?

A    That is correct.

Q    And in your opinion, based upon your personal observation, you found the process to be appallingly slow?

A    That is correct.

Q    And you observed other practices of voter discrimination --

A    (Nodded to indicate affirmative reply)

Q    -- in regard to the registration of prospective qualified voters?

A    Yes, that's right, the vouchers.

Q   Did you report these to the Legal Division of the N. double A.
    C.P.?

A   Oh, yes; we reported all of these.

Q   Who did you report them to?

A   We reported all of these things; I can't say at this point --

Q   Did you report them to Mr. Greenberg?

A   -- because I don't recall; Mr. Young, Andrew Young --

Q   Who -- is he in the Legal Division?

A   -- my assistant -- no, he is my Executive Assistant, and I think
    the contacts were made through him, so I don't recall.

Q   Well, is it your understanding or do you know whether or not
    these practices which you observed in Dallas County were reported
    to the Legal Division, N. double A.C.P.? Do you know that they
    were, or do you?

A   I am pretty sure that they were reported; yes, I am pretty sure
    of that.

Q   Were these practices that you observed reported to the United
    States Justice Department, any representative of the United
    States Attorney General's office?

A   Yes, we talked with -- in fact, I think almost the first day
    that we marched to the Court House, I talked personally with
    two officials from the Justice Department in the Federal Building
    across from the Court House and stated many of these things to
    them, and they said that they would get these -- they would
    relay it to Washington, and I made it very clear that, along

with the problem of being denied the right to vote, we were

facing terrible --

Q    You are not answering my question -- excuse me for interrupting.

A    Uh, huh.

Q    My question simply was did you report it?

A    Well, I did; yes, sir; yes.

Q    You stated that you did?

A    I did; that's right.

Q    Did representatives of either the Justice Department or anybody

connected with the office of the United States Attorney General

tell you that they would file appropriate pleadings or petitions

addressed to the Federal District Court in regard to these

practices which you observed?

A    At that time the men that I talked with only said that they

would get the facts to Washington, and they would be glad to

relay it to the Attorney General.

Q    What did the Legal Division of N. double A.C.P. tell you, if

anything -- I don't know that they did, and I am not trying to

ask a presumptive question, but did the Legal Division of N.

double A.C.P. tell you anything in regard to petitioning the

Federal Court wherein the voter registration question was

pending in Dallas County?

            MR. GREENBERG:  Your honor, I would like to object

to this line of questioning; I don't see its relevance in cross

examination; I don't know where it is going, and I think it is

unduly protracting the case; we object.

       THE COURT:  Overrule; go ahead.

A   I am very sorry?

       THE COURT:  What if anything -- what if anything did the N. double A.C.P. counsel tell you concerning the institution of judicial proceedings?

Q   Yes, sir?

A   Well, at this particular time we were involved in the problem of the large number of people being arrested, and we had to --

Q   I am not -- that is not responsive, but -- I am not trying to be rude to you, but that is not responsive to my question.  Did the -- did the N. double A.C.P. Legal Division tell you anything in response to your reporting these alleged voter discrimination practices?

A   I really don't recall on that particular point.

Q   You don't recall whether they did or not?

A   I would have to talk with Reverend Young about that.

Q   All right; in January when you came to Dallas County, did you know that the United States District Court, in United States versus Atkins, had issued an injunction against the Dallas County Board of Registrars and their successors in office in regard to voter registration and qualifications of voters in Dallas County?

A   No, I was not aware of this.

Q   You didn't know that the -- that such suit had been filed or that the court had assumed jurisdiction of it?

44

A    This I became aware of after -- after January 2.

Q    When did you become aware of the fact that the United States
     Court had assumed jurisdiction of the voter registration matter
     in Dallas County?

A    I -- I am sorry; I don't remember the exact date --

Q    Give us your best recollection?

A    -- but I would say about when I really became a -- seriously, or
     I should say when I -- when it really became a serious part of
     my understanding was when I was in jail, and as I recall --

Q    You still haven't told me when; that is what I am asking you?

A    Yes, I -- as I recall, that must have been about the middle of
     January.

Q    This year, 1965?

A    That's right; I -- I --

Q    So about the time that you came to Dallas County; is that
     correct?

A    Yes, shortly after, about two weeks after, as I recall, now --

Q    All right, now, you mentioned that you practice and adhere to
     the philosophy or method of non-violence; is that correct?

A    That is correct; uh, huh.

Q    And that you do not use or advocate the use of aggressive weapons?

A    That's right.

Q    But did I understand you correctly to say that in regard to the
     voter registration practices in Dallas County you and your
     organization in conjunction and in concert with the local

45

organization in Selma planned mass demonstrations?

A    Well, yes; we planned mass marches of people, potential registrants, to the Court House.

Q    The purpose of these mass demonstrations and marches were to focus the attention of the alleged grievances that you and other people had in regard to the registration practices; is that right?

A    That's right; and -- and to seek to arouse the conscience of the community and the nation on this issue so that somebody would really come to the point and aid us so that we could register and vote without any problems.

Q    How many street demonstrations were conducted in Selma over the period, January to the present time; I am talking about street demonstrations?

A    Yes; I am sorry, I don't know the exact number.

Q    Would you say at least a half dozen?

A    Yes, I would say more.

Q    Or more?

A    More than a half dozen.

Q    And the purpose of these street demonstrations were the same as the mass meetings, so that I am not confusing you or myself, the same purpose to call to the attention of the nation and to the -- all interested citizens of these alleged voter registration grievances; is that correct?

A    Partially; I would say that all along we have had a twofold

46

problem, and we have tried to keep the two together, because we
think they are kind of inextricably bound together, and that is
the police brutality that -- the tragic police brutality that
we have faced.

Q    You are not now being responsive to my question.

            THE COURT:  It is responsive, it is responsive; go
ahead.

Q    You may continue?

A    These were the two reasons, the right to vote and protesting the
police brutality.

Q    Did you or persons in your organization obtain from the Dallas
County Board of Registrars a registration list, a list of people
that had been registered in Dallas County?

A    I think that list was in the hands of the Dallas County Voters
League.

Q    And was the prospective applicants for registration given and
designated numbers for the registration process?

A    Yes, they were given numbers at first; as I recall, they are
still given numbers after signing an appearance sheet.

Q    Why didn't you go to the United States District Court with your
grievances instead of on the streets in Selma?

A    Well, this is a basic philosophy, again, of our movement; we
feel --

Q    Is the philosophy not to use the courts of this nation?

A    No, not at all.

47

Q    Who have assumed jurisdiction of the particular matter which

     you are parading in the streets or in trying to sell to a nation?

A    No, that is not our philosophy; we feel that we must work through

     the courts; we have great respect for the courts, and some of

     our greatest gains have come through the Federal Judiciary, and

     we are the first to acknowledge that; but we think that it is

     necessary, in order to mobilize people, to arouse them from

     their apathetic slumbers and a lack of motivation brought about

     by long years of oppression, that we must give them more

     courage and a sense of participation by having mass demonstra-

     tions and protests in order to call attention to it.  After all,

     in a court situation you involve just a few people, but when

     people en masse can feel a sense of involvement and participation

     they, themselves, have a greater sense of urgency in the quest

     for their own freedom.

Q    Did you know that the actions in voter registration suits of the

     type filed in Selma or Dallas County were class actions, on

     behalf of not only the plaintiffs, but all persons similarly

     situated; did you know that?

A    Yes, we realize that, and I realize that when I --

Q    Anybody that had a grievance could present it to that court

     which had jurisdiction of the voter registration matter --

A    Yes.

Q    -- did you understand that?

A    Yes, I realize that.

Q   But instead of presenting the grievances which you observed to the court through either the United States Justice Department or counsel of N. double A.C.P. or your organization or any other organization, you felt that in the best interest of those whom you represented in the movement which you advocated to take it to the streets?

            MR. GREENBERG:  Object.

            THE COURT:  That is argument.

            MR. GREENBERG:  This is repetitious.

            THE COURT:  That is argument.  Go ahead; don't argue with him; question him, but don't argue with him.

            MR. SMITH:  All right, sir.

Q   Were you on March 9, Tuesday of this week, at eleven o'clock in the morning served with a copy of this court's order dated March 8?

            MR. GREENBERG:  I would like to object to that, your honor; this is a matter concerning which the defendants have filed a suggestion of contempt.  The court has specifically said it is something -- it is not going to be taken up today; it is a matter that is relevant to that other matter.  I think it would conflict with proper hearing of the other matter, and I don't think it should be gone into now.

            THE COURT:  Well, I didn't say that it was a matter that would not be taken up today; I said it was a matter that the defendant, Clark, had no right to petition the court --

49

MR. GREENBERG:  We -- I am sorry.

THE COURT:  -- for a show cause order.

MR. GREENBERG:  In any event --

THE COURT:  It is true that -- that this matter that counsel seeks to commence inquiring into now is not directly involved in the main issue or issues in this case, and I take it that he's getting into whether or not there was a violation of this court's restraining order.

MR. GREENBERG:  Precisely; that is why --

THE COURT:  I will permit it for whatever light it might shed on the attitude and the manner in which the demonstrations have been, and I will permit it on the same theory that I permitted your background inquiries, and I'll also permit it on the theory for whatever information it may give me in connection with whether or not any further proceedings should take place.

MR. GREENBERG:  All right, sir.

THE COURT:  Objection is overruled.

MR. SMITH:  Now, would you please read the question back?

THE COURT:  Whether or not he was served with the order.

MR. SMITH:  Sir?

THE COURT:  Whether or not he had been served with the order; we don't need the question read back.

Q    Had you?

A    Yes, I was served.

Q    And were you served at approximately eleven o'clock on the
     morning of March 9?

A    Yes, I think it was about that.

Q    By the United States Marshal?

A    Yes; uh, huh.

Q    And at that time where were you in Selma?

A    I was at the residence of Dr. Sullivan Jackson on Lapsley Street.

Q    Lapsley Street?

A    That's right.

Q    Did you read the order of the court?

A    I read it very hastily, and then I had it interpreted to me.

Q    Who interpreted it for you?

A    Well, at that time Attorney Clarence Jones was there, and he
     was there in the house, and I had him to interpret the order.

Q    You read it, yourself, later, didn't you?

A    I -- but before that I had it interpret--- I mean I had talked
     with Mr. Greenberg about it, because I was aware of the fact
     that there had been a restraining order, but I hadn't been
     served with that, when I became aware of it I called -- I called
     him.

Q    Now, we are correct about the time that you were served; it was
     about eleven o'clock that morning?

A    That's right, but I knew of the order.

Q    Before you were served?

A    Before I was served; yes.

Q    All right.

A    At least two hours or so before I was served.

Q    Now, after being served with a copy of that order on March 9, did you go to Brown's Chapel Baptist Church on Sylvan Street in Selma?

A    Yes, I did.

Q    About what time did you go to the church?

A    About one o'clock.

Q    About one o'clock?

A    It may have been a little later, one thirty, but it was, I think, between one and one thirty.

Q    Was this a mass meeting at the church?

A    A mass meeting had been in process, but it was mainly a gathering of people who had assembled to engage in -- in a peaceful march.

Q    How many people were there?

A    I would estimate about three thousand on the inside and outside.

Q    Did you talk to them?

A    I did talk to them; yes.

Q    Did you talk to them in regard to marching from Selma to Montgomery?

A    I really don't remember my exact words.

Q    I am not asking for your exact words; I am asking for what in substance you told the crowd?

A    I -- well, I said in substance that on the basis of conscience

52

and on the basis of what I considered morality I had no

alternative but to lead a march --

Q    Did you tell them --

        MR. GREENBERG:  Let him finish.

Q    Excuse me for interrupting.

        THE COURT:  Let him finish.

A    But -- I had no alternative but to lead a march, and I asked

them to join with me and march out of Selma across the bridge,

but I made it very clear if we confronted a human wall that we

would not try to break through a police line.  This is not in

the spirit of non-violence, and I would never advocate that.

Q    Now, when you walked out of the church in Selma and crossed the

bridge, you would be on United States highway 80 east, would you

not?

A    That's right.

Q    Did you walk out of the church with this crowd of people after

the meeting?

A    Yes, I walked out with them.

Q    Did you proceed to U. S. highway 80 east?

A    Yes, I -- we did.

Q    This would have been about what time?

A    This would have been about two o'clock.

Q    Two o'clock in the afternoon?

A    That's right.

Q    Now, did you -- did you approach the bridge on U. S. 80 east?

53

A   Did we approach the bridge?

Q   Yes?

A   Yes, we walked over the bridge.

Q   Did you have approximately the same number of people with you
as were in the church?

A   I would assume so; it was a very long line.

Q   Big crowd of people?

A   Yes, that's right.

Q   All right.  Now, as you reached the bridge on U. S. 80, you
might say at the foot of Broad Street, were you there confronted
with a United States Marshal who read you a copy of this court's
order of the previous day -- excuse me, it would have been of
that morning?

A   Yes, we were confronted with the Marshal.

Q   Did the Marshal read it to you?

A   He read it, he read sections --

Q   Did he read the part of the order wherein the court enjoined you
and others from attempting to march from Selma to Montgomery
until this court had a reasonable opportunity to make a judicial
determination of the rights of the parties to this action?

A   Yes, he read that portion to us.

Q   Now, that would be on the side of the bridge nearest downtown
Selma?

A   That's right; uh, huh.

Q   What did you do after the United States Marshal read you this
order?

54

A    I sim---- simply said --'

Q    Didn't say what you said -- excuse me; I asked what did you do?
     Would you --

A    Oh; I made a statement to the Marshal.

Q    All right; did you go on across the bridge?

A    And then proceeded -- yes; uh, huh.

Q    Did you go across the bridge?

A    Yes, we went across the bridge.

Q    And that is marching in the direction of Montgomery?

A    That's right; it's in the direction of Montgomery.

Q    Is that correct?

A    That is correct.

Q    How far did you go?

A    We went across -- all the way across the bridge, and I would
     think after crossing the bridge we went another five hundred
     feet or so, and there we confronted the State Troopers in very
     large numbers, and they told us we could not proceed beyond that
     point.

Q    Now, this -- did approximately the same number of people continue
     behind you crossing the bridge as were originally in the church?

A    That's right; I -- I would think so.

Q    About three thousand people?

A    That's right; that would be my estimate.

Q    Let me come back to what you wanted to say; what did you tell
     the United States Marshal when he read you this court's order?

A    I simply said I was aware of the order, but that on the basis

     of conscience we felt that we had to walk on.  I just had two

     simple sentences, and we continued.

Q    Did you plan the demonstration in Montgomery yesterday, or take

     any part in it?

A    The demonstration --

Q    On Dexter Avenue?

A    -- in Montgomery?

Q    Yes?

A    No, I did not plan that at all.

Q    Did you have knowledge of it?

A    Yes, I had knowledge of it, but I didn't plan it.

Q    Did you suggest it?

A    I had originally suggested a march on the Capitol yesterday,

     and it would have been the culmination of the walk from Selma

     to Montgomery, but after things didn't work out and the Governor

     issued his ban, I made it very clear to the staff that we would

     have to call it off for Wednesday and wait until after the

     Thursday hearing in order to determine when we would have the

     march in Montgomery, and --

Q    How many people --

A    And we contacted most of the people that had been contacted,

     and the persons who came yesterday were probably people who

     were not notified and who had gone so far in their plans that

     they couldn't call it off, but we had nothing to do with that.

Q    Did any of the people in Selma that you personally knew or knew

by sight participate in the march in Montgomery yesterday?

A    Oh, I am sure there were persons that I knew; I didn't see the

march, but I am sure that there were persons in it, because we

have affiliate organization here in Montgomery, and I am -- I

am sure they participated, but I didn't see any of them; I

wouldn't know --

Q    Did they come from Selma to Montgomery?

A    I don't recall anybody from Selma.  Now, there again, I don't

know, but I don't remember any of our staff members who have

been in Selma, working in Selma, coming to Montgomery.

Q    What was the purpose of the demonstration in Montgomery yester-

day?

A    The purpose --

Q    Was it the same purpose?

MR. GREENBERG:  Objection; he just said he didn't

know anything about the demonstration in Montgomery.

THE COURT:  If he knows, he can answer it; I will

permit it; if you know.

A    I can only go by what I saw in the newspapers and heard on the

radio.

THE COURT:  That wouldn't be proper.

Q    We are not interested in that.  Have you previously organized

and conducted mass marches or demonstrations in Montgomery

County in regard to the voter registration?

A   Yes, earlier in the -- in February, I believe, we had a march
    to the Court House from the Dexter Avenue Baptist Church.

Q   Was this in regard to the voter registration practices --

A   That's right.

Q   -- in Montgomery?

A   Yes.

Q   Did you or any member of your organization have grievances in
    regard to the registration process in Montgomery by the Montgomery
    County Board of Registrars?

A   No, we made it very clear that this was not a protest march in
    Montgomery.  I think the words used were a march of good will
    and to stimulate the Negro citizenry of Montgomery to make use
    of new opportunity that had been provided through the Federal
    Courts, and we wanted to get as many people down as we possibly
    could, and in the two days we got a little more than seven
    hundred, and that was the main purpose.

Q   In the plan of your march from Selma to Montgomery, did you or
    any of your subordinates or anybody in your organization make
    any inquiry into the proposed route or investigate in regard to
    it?

A   No, we didn't make any inquiry with legal o--- I mean with the
    authorities of the State.  We were -- we were very dead serious
    in saying that we planned to walk to Montgomery, and we went
    through a great deal of work and spent a lot of time planning
    the route, the stopping points, the tents, where they would be,

the food problem, we had purchased all of that, and we didn't
have any idea that we would be stopped.  We felt that this would
be a privilege that citizens could engage in as long as they
didn't tie up traffic and walk out on the main highway and --
but on the side of the road.

Q    Did you investigate approximately how many bridges were on U.S.
highway 80 between Selma and Montgomery?

A    Yes; Mr. Hosea Williams, who was dealing with the whole logistics
problem, studied the highway very thoroughly.

Q    That was my question; it was studied?

A    Oh, yes; yes, it was studied, and he reported to me on it, all
of the details.

Q    Did he report to you that bridge -- number of bridges?

A    He reported there were about three bridges, I believe, but that
one could walk across these bridges single file rather than two
or three abreast.

Q    He reported there were three bridges between Selma and
Montgomery?

A    Well, I -- maybe I should say he said there were several; I
don't remember the exact number, he said there were several
bridges, but when I raised the question of getting across the
bridges, he said that in each instance one could walk across
the bridge, but it would have to be one person at a time rather
than two or three.

Q    Did he or anyone in your organization make any investigation

into the traffic count along this proposed route; that is, the
number of cars and trucks that would travel this route daily?

A    I don't think he studied the number of cars, and I guess that
was the reason that we did not plan to walk on the highway, but
on the side of the road.

Q    How did you plan to cross a bridge?

A    I am sorry, I didn't --

Q    How did you plan to cross a bridge?

A    Well, from my understanding, and I observed those bridges once
or twice as I drove from Selma to Montgomery, there is a space
whereby one can walk across the bridge and still not be on the
highway; but as I said, it is just space enough for one person
to go at a time.  Now, there are points on the highway that we
naturally have more room.  I would think that for twenty-five
or thirty miles of the fifty miles you have four lane highways
which are naturally much wider than the two lane highways.

Q    How many people did you anticipate joining in this march as you
originally planned it from Selma to Montgomery?

A    We originally announced between five and eight hundred, and six
hundred and fifty started out.

Q    You started out with three thousand on this past Tuesday?

A    Yes; well, that was because of the new situation that had
developed, and I don't mind saying that we were terribly upset
and all over what had happened Sunday, and this was in part a
protest against that.

Q   On Tuesday of this week, did you receive notice of the
proclamation issued by the President of the United States --

A   No, I didn't.

Q   -- requesting -- excuse me; requesting that you observe the
order of this honorable court?

A   No, I was not aware of the President's statement until after we
returned from the march.

Q   When did you become aware of it?

A   This must have been about four or five in the afternoon.  I had
no knowledge of the President's statement.

Q   Did you tell Mr. Fountain, the United States Marshal, at the
foot of the bridge on U.S. 80 in Selma that you were compelled
to defy this court's order in regard to the march?

A   No, I did not tell Mr. Fountain that; I have not told anybody
that I was compelled to defy a court order, this order.  I
simply said that on the basis of conscience I felt that I had to
march, and I felt that I was doing what was morally right, and
in the situation I was honest to say what was practically right.

Q   I want to read a quote from the Alabama Journal, a newspaper
published in Montgomery, under the dateline of Wednesday, March
10, of this year, wherein it quotes a statement that you made
at the time which we are talking about, and after I read it
would you tell me, please, whether it is true or incorrect or --

        THE COURT:  Whether it is a correct quotation; go

ahead.

MR. SMITH:  Yes, sir.

Q   "King said this is the first time he has ever defied a federal
    court order, and he realized that he might be held in contempt
    of court for his action."

A   Is that the statement?

MR. GREENBERG:  Does that purport to be a quotation?

Q   And preceding that -- let me read so that I won't misquote it;
    the article says, "United States District Judge Frank M.
    Johnson, Jr., had ordered King not to march Tuesday, but King
    said his conscience forced him to defy the unjust order" --

MR. GREENBERG:  I would like to object, your honor;
I would like him to point out what is in quotation and what is not
in quotation marks in that statement.

THE COURT:  I sustain it.

MR. SMITH:  All right, sir.

Q   I show you this newspaper which contains the matters I have just
    read, and there appears in quotation, "The unjust order"; did
    you make that statement?

A   Yes, I did; I made it very clear that I was very upset about
    the order, and I felt that as a result of the order we had been
    put in a very difficult position, generally, and I had been put
    in a very difficult position in particular.  I have nothing to
    do but to be honest about it.  I felt that it was like
    condemning the robbed man for getting robbed and allowing the
    robber to go uncondemned, and I made it very clear that this

order was an order that I was very concerned about and very upset about, but I did not, in spite of saying this, ever say that I was defying the court order. I always try to place it in the terms of acting on the basis of conscience, because I had a very difficult problem, and it was one of the most painful decisions I have ever made, to try on the one hand to do what I felt was a practical matter of controlling a potentially explosive situation, at the same time not defy a Federal Court order.

Q   Did counsel back on Lapsley Street advise you that the attempted march would not be in violation of this court's order; you mentioned you talked to the lawyer about it?

A   The counsel --

Q   Did a lawyer advise you?

A   He said -- he advised that it was an invalid order and that he did not consider the march in violation -- I mean the march as something that would lead to contempt of court; but now, he didn't advise me whether to march or not; I had to make that decision.

THE COURT:   Anything else, Mr. Smith?

Q   Have you conferred with Governor Collins of Florida, the representative of President Johnson, in Selma this week?

A   Yes, I did on the day of the march.

Q   Did you tell him in substance that the situation in Selma was a dangerous one?

A   We had a fairly long discussion, and I -- I don't remember all

63

we discussed. I have talked with him at length on the Selma
situation, before, in Washington.

Q  Did he beseech you in Selma this week not to -- did he ask you
on behalf of the President of the United States of America not
to conduct this march on Tuesday?

A  I don't know if he was speaking for the President or giving his
own personal views --

Q  Did he make the statement to you --

A  -- but he urged me not to march.

Q  He urged you not to?

A  That's right; he did.

Q  Did he admonish you that it was an explosive situation in Selma?

A  He mentioned the fact that it was explosive and that it would be
a tragedy for the whole nation and it would tarnish the image
of our nation if the events of Sunday would be repeated, and I
said to him at that point that, "I agree with you absolutely,
and I think instead of urging us not to march, you should urge
the State Troopers not to be brutal toward us if we do march,
because we have got to march," and I tried to articulate to him
why we had to march, and I really feel that after I talked with
him at length about it he sympathized with my position.

Q  But your conversation with him preceded your visit to the church?

A  Yes, just before; I left immediately after I talked with him.

Q  And your march out on U.S. 80 across the bridge; he talked with
you before?

A   He talked with me before that; yes.

MR. GREENBERG: Do we direct now? I would prefer to do it after each counsel, it would focus better, but as your honor would prefer.

THE COURT: I believe we will let counsel go ahead.

MR. GREENBERG: All right.

THE COURT: Does that conclude your examination, Mr. Smith?

MR. SMITH: Yes, sir.

THE COURT: All right. Dr. King, before we continue with counsel examining you, along this last part of Mr. Smith's examination let me ask you a few questions, please.

WITNESS: (Nodded to indicate affirmative reply)

THE COURT: On Tuesday when -- when you did march, prior to the time you marched did you have any -- any conversation with Governor Collins concerning the extent of your march, how far you intended to march, and where you intended to march?

WITNESS: Yes, I said to him that we felt compelled, as I said earlier, on the basis of conscience, to march, and I said to him at that point that we were aware of the fact at that time that the State Troopers were standing at a certain point across the bridge and that they were there in large numbers, and that they would form a human wall, and I went on to say that we would not ever attempt, on the basis of the non-violent spirit and the non-violent movement, to break through a human wall that had been set up by a policeman. And when I said -- said that, I went on to say that I felt that at

least we had to walk to the point where the brutality occurred Sunday, and not only walk to that point, but to be able to make some kind of witness, some kind of testimony, to have some prayers, because of the numerous religious leaders who had come in from all over the country.

THE COURT: Is it correct to say that when you started to march, and you went across the bridge, you knew that the State Troopers were approximately five hundred feet beyond it?

WITNESS: That's right; we did.

THE COURT: And you did not intend at that time to march past the Troopers; is that right?

WITNESS: That is correct; we --

THE COURT: Had you made any advance preparations for a march from Selma to Montgomery --

WITNESS: I think --

THE COURT: -- in the way of food for that day, in the way of food and trucks and things like that?

WITNESS: No, we didn't. The -- the predominant opinion was that we would not be able to get to Montgomery, so we didn't even prepare for it.

THE COURT: Now, it has been reported to me -- and let me ask you if this is correct -- that after you reached the State Troopers, and while you were there and confronted by the Troopers, that they were pulled away and that their automobiles were removed while you all were still there; is that correct?

WITNESS:  That is correct.

THE COURT:  And then did you go forward, or did you turn and go back to Montgomery -- I mean to Selma?

WITNESS:  We turned around and went back to Selma.

THE COURT:  After the State Troopers had been pulled back?

WITNESS:  That's right.

THE COURT:  And at that point there were no Troopers in front of you --

WITNESS:  That is correct.

THE COURT:  -- between -- on the highway between you all and Montgomery?

WITNESS:  That is correct.

THE COURT:  But you turned and went back to Selma; is that report to me that I have received from the Justice Department correct?

WITNESS:  Yes, sir; that is correct.

THE COURT:  You know why the State Troopers were pulled back at that point to leave the highway open for you?

WITNESS:  No, we -- we don't know; we have been asking questions in my mind, in our minds, but we really don't know. It may be that after confronting them, and we felt that we had to have this moral confrontation with the State Troopers, and they said we couldn't move forward, I made the statement, "Do you mind, sir, if we have some prayers and sing one or two freedom songs?" and then

I said -- I mean he said, "You can have the prayers and songs and go back to the church." This was a kind of tacit agreement --

THE COURT: Now, a tacit agreement between who, between what parties?

WITNESS: Right there with who -- I don't remember the name.

THE COURT: Was Governor Collins there?

WITNESS: No, I am not sure if he was on the scene or not. I am not sure, but I mean with the State Trooper who spoke over the --

THE COURT: All right.

WITNESS: -- system.

THE COURT: Along that same point, let me ask you if there was an agreement between you and -- and Governor Collins, who, as I understand it, was acting as a liaison between you and the State Troopers; is that correct; was he on that day carrying messages back and forth?

WITNESS: Well, when he came in, I think the sequence would be this: He came and said that for many reasons he wished that we wouldn't march, and he urged us not to, and I went through a long discussion, relatively long discussion, about the reasons why I felt that we had to march, and then at that point Reverend Fred Shuttlesworth, who was in the meeting, said to Governor Collins that, "The thing you should do, Governor, if you want to be helpful in this situation, is to go to the Troopers and urge them not to

interfere with our activities today or not to be brutal in any manner.

THE COURT: Subsequent to that time, were you brought a route of march by Governor Collins?

WITNESS: Yes, he brought me a piece of paper with a route.

THE COURT: Before you marched?

WITNESS: Yes. As we --

THE COURT: And who did it purport to come from? According to Governor Collins, the route of march that you and this group were to take last Tuesday?

WITNESS: I am sorry, I really don't know, and I gave it immediately to Reverend Young.

THE COURT: Well, did you march according to the route that Governor Collins brought you?

WITNESS: Yes, it was the same route that they used Sunday, according to Reverend Young; he looked at it immediately, and he said, "This is the same route, I am familiar with this."

MR. McLEAN PITTS: Now, we -- that is all right.

THE COURT: What were you informed with reference to that route, that it was permissible for you to march along that route or not?

WITNESS: Governor Collins said to me when he gave me the paper, he came and said very briefly, "Let me give you this, or this is the route that they would like for you to follow."

THE COURT: They who; did he say?

69

WITNESS:  He didn't say who.

THE COURT:  All right.

WITNESS:  And he said, "I think things will work out all right," and that was all he said.

THE COURT:  Did it have a point on there where the State Troopers were supposed to be?

WITNESS:  I really don't think it did.  As I recall, I looked at it very quickly and gave it to Reverend Young, but I don't recall --

THE COURT:  All right.

WITNESS:  -- it having where the State Troopers were to be, but it just gave around -- I don't remember the name of streets, but it led right on around to the bridge.

THE COURT:  Then as I understand it, on one point did -- did you agree, and did you subsequently carry it out with Governor Collins, that you would stop on your march where the Troopers were?

WITNESS:  Oh, yes; we made it very clear to Governor Collins in our talk with him that we --

THE COURT:  All right.

WITNESS:  -- would not break through the troops, we would have to stop at that point.

MR. GREENBERG:  Please the court, we have -- one of the witnesses, I think, has that so called map.  It is just a few scribbled lines; we are trying to get it so the court can see the whole thing.  Here it is.

THE COURT: Let it be marked for identification.

THE CLERK: Plaintiffs' Exhibit number 15 for identification.

THE COURT: I hand you Plaintiffs' Exhibit 15 and ask you if that is the diagram that Governor Collins gave you on that morning before the march indicating where you could march?

WITNESS: Uh, huh; yes, sir; this is it.

THE COURT: Do you know whether he had been in touch with Sheriff Clark or Lingo or any of their representatives prior to that time?

WITNESS: I -- I don't know, but I assumed that he had been. When he came to me, at the end of our meeting, after we suggested that he -- after we suggested that something be done about curbing the brutality, he did say that they would immediately try to do something about it, and we didn't --

THE COURT: Were you informed by Governor Collins prior to the time you marched that if you stopped where the Troopers were there would be no brutality?

WITNESS: Well, when he came to me, he said simply that, "I think everything will be all right." That was his statement as I recollect, and I assumed by that that he meant that we would be able to march at least to the point where the brutality occurred Sunday and would face the human wall, and that we would be permitted to have a brief period there and go back to the church.

THE COURT: We will take a ten minute recess.

(At which time, 10:55 a.m., a recess was had until 11:03 a.m., at which time the hearing continued)

THE COURT: Further cross, on behalf of the defendant, Clark.

BY MR. McLEAN PITTS:

Q   Did I understand that your organization is the Southern Christian Leadership Conference; is that correct?

A   That is correct.

Q   Is that a corporation?

A   Yes, it is a corporation.

Q   What state is it incorporated in?

A   Georgia.

Q   Georgia; is it qualified to do business in the State of Alabama?

A   We have affiliate organizations in -- in Alabama.

Q   I asked you was that corporation qualified to do business in the State of Alabama?

MR. GREENBERG: That is a legal question; we object, your honor.

THE COURT: I sustain it to that question.

Q   Well, now, when you came -- went to Selma, when you went there, did you find that the Student Non-violent Coordinating Committee was already there?

A   They were there and had been working in the community for some two years, I think.

Q   Better known as SNCC?

A    That's right.

Q    Uh, huh; and what other organizations did you find that was there?

A    I didn't know, other than the Dallas County Voters League, which is the strongest local unit in the City. And as I said, that is an affiliate organization of the Southern Christian Leadership Conference.

Q    Is that the only two that you knew was there, was Student Non-violent Coordinating Committee and the Dallas County Voters League?

A    That's right; those are the only two I was familiar with.

Q    All right; now, are those the only two organizations that have been promoting the mass meetings in Selma?

A    As far as I know; now, there may be other groups.

Q    All right; now, who is in charge of the Student Non-violent Coordinating Committee in Selma?

A    Well, the National Chairman is Mr. John Lewis.

Q    And he has been in Selma; is that correct?

A    Yes, he has been in Selma --

Q    Uh, huh.

A    -- all the -- all this period.

Q    Do you know a man named Sirocco?

A    Yes, Frank Sirocco.

Q    And what connection has he got with it?

A    I know Frank very well, but I don't know his title with the organization; I know he is a staff member of the Student

Non-violent Coordinating Committee, but I don't know the title
that he has.

Q    All right; now, this man, Bevel, do you know him?

A    Very well.

Q    What is his name?

A    Reverend James Bevel.

Q    And where does -- where does he live at?

A    Well, at the present time he is spending most of his time, if
not all of his time, in Selma.

Q    And what --

A    He has lived in Atlanta, but now he is living in Selma.

Q    And what is his connection with you?

A    Well, the Reverend Bevel is the Director of Direct Action of
the Southern Christian Leadership Conference, which makes him a
member of our Executive Staff and one of my closest associates.

Q    Now, how many of your Executive Staff and your closest associates
as you call them -- how many -- will you name the ones that have
been in Selma since January?

A    I would say all of our Executive Staff members on the whole,
Reverend Ralph Abernathy, who is my closest associate in the
Southern Christian Leadership Conference, Reverend C. T. Vivian,
our Program Director -- I mean our Director of Affiliates,
Reverend Andrew Young, Executive Assistant, Reverend Bernard
Lee, one of my Special Assistants, Mrs. Dorothy Cotton,
Director of our Citizenship Education Program, Mr. Hosea

74

Williams, Director of Voter Education and Political Action, and then numerous other staff members; I could name all if you wanted them, but I would say these are the Executive Staff members.  Now, there are other members of our Field Staff, and we have a large number there, it would go --

Q    How many of your Field Staff have been in Selma, in Dallas County, since January?

A    I -- just to take a rough guess, I would -- to make a rough guess, rather, I would say between thirty and thirty-five.

Q    All right; and how many, in your opinion, of the Student Non-violent Coordinating Committee has been in Selma who are not residents of Selma?

A    My impression is that they have had about the same number --

Q    All right.

A    -- between thirty and thirty-five or forty.

Q    And those are the two main organizations that have been operating in Selma; is that correct?

A    That is correct.

Q    What about CORE?

A    CORE, I don't think, has been operating in Selma up to now, but Mr. Farmer, the head of CORE, did come down to participate in the march last Tuesday.

Q    Now, you invited certain people to come to Selma, didn't you?

A    Yes, I -- I did invite --

Q    And among those was the late Malcolm X; wasn't that right?

A    No, I did not invite -- I was in jail when he was in Selma.

Q    But did you ask him to come to Selma?

A    No, I didn't; I couldn't block his coming, but my philosophy
     was so antithetical to the philosophy of Malcolm X, or they --

Q    Well --

          MR. GREENBERG:  Let him answer the questions.

A    -- were so diametrically opposed, that I would never have
     invited Malcolm X to come to Selma when we were in the midst of
     a non-violent demonstration, and this says nothing about the
     personal respect I had with him; I disagreed with his philosophy
     and his methods.

Q    All right; now, Dr. King, you say it is your philosophy that
     you believe in non-violence; is that right?

A    That's right.

Q    And you also say it is your philosophy that if any law or order
     of the court is against your conscience that you can violate
     that law or order of court; is that correct?

          MR. GREENBERG:  Objection; he never said that.

Q    I am asking --

          THE COURT:  Just a minute; that question is argument.

Go ahead.

Q    Well, is that your philosophy?

A    I have said often, and I have tried to write about it, that
     non-cooperation with evil is as much as an evil as cooperation
     with evil, and I think there are times that laws can be unjust

and that a moral man has no alternative but to disobey that law,
but he must be willing to do it openly, cheerfully, lovingly,
civilly, and not uncivilly, and with a willingness to accept the
penalty, with a hope and a belief that by accepting this and
doing it in this way he will be able to arouse a conscience of
the community over the injustice of the law and therefore lead
to the bright day that everybody will set out to change it.

Q    All right; now, when you came to Selma you knew, or you learned
shortly after you got there, that this case of United States
versus Atkins was pending; is that right?  That is the voter
registration case in the United States Court?

A    That's right; I learned about that after --

Q    And you knew -- after you got to Selma, you knew that Judge Dan
Thomas entered a temporary injunction there and specified how
many people were to be registered per day by the Voter
Registration Board, didn't you?

A    That's right.

Q    One hundred; wasn't that correct?

A    That's right.

Q    And you also know that --

          THE COURT:  Was that registered or accept an
application?

          MR. McLEAN PITTS:  Register -- well, no, sir; not
register, Judge, application -- applications made out.

Q    What I am getting at is processed, in other words, it was one

    hundred to be processed by the Board per day; is that correct?

A    Yes, as I understand the order, I think it was amended, as I --

Q    How was it amended; do you know?

A    It is my understanding that later he increased the number that should be processed on any voter registration day.

Q    But he -- but he also very carefully -- that order set forth that they would open up an appearance book there, and that everybody that wanted to register to vote would sign that appearance book and get a number; isn't that correct?

A    That is correct.

Q    And he specified that they would be present, the Board was to publish outside of its office the numbers each day; is that correct?

A    Yes.

Q    And a person wasn't there the first day could come back the second day; isn't that right?

A    That's right; uh, huh.

Q    But if they missed two days straight, they were out; is that correct?

A    That is correct.

Q    Now, do you know how many days the Voter Registration Board in Dallas County had been open before you got there in January?

A    I understand several days; I don't remember how many.

Q    Don't you know that the Voter Registration Board in Dallas County asked for ten additional days in January; don't you know

that as a matter of fact?

A  I understand that; yes.

Q  Uh, huh; and don't you know as a matter of fact that that Board
was open ten days and had only thirteen Negroes apply?

A  Well, that was quite understandable.

Q  All right, you -- you know it, though, don't you?

A  I know that, and I know the reason.

Q  All right, and then you led a march of fifteen hundred people
down there in one day on that Board, didn't you?

A  That's right; yes.

Q  Uh, huh; and prior to the time that you went down there, there
had been other demonstrations sent down there, wasn't there, to
that Board?

A  You -- you mean before --

Q  Before you --

A  -- January?

Q  Yes?

A  Oh, yes; yes, definitely.

Q  Uh, huh; and now, you also say that you know -- knew about this
injunction, this Federal Court injunction; is that right?

A  That's right; uh, huh.

Q  And you knew about Judge Dan Thomas's injunction, didn't you?

A  That's right; uh, huh.

Q  And your lawyer -- does Peter Hall represent you?

A  Yes, he does; uh, huh.

Q  And your lawyers filed a petition with Judge Dan Thomas to allow

you to come to Selma the first time you come there to make a
talk at Brown's Chapel, didn't he?  Filed a petition with Judge
Thomas, didn't he?

A   I am not sure of all of the details of that; I am -- I am --

Q   Well, you knew that there has been a State Court injunction
issued --

A   That's right.

Q   -- against unlawful assemblies in Selma, didn't you?

A   Yes.

Q   And you --

A   Well, we went on --

Q   Wait a minute; and you knew that that had been transferred to
the Federal Court, didn't you?

A   That's right, but there was no ruling on it, I don't think, at
that time.

Q   Uh, huh; but you -- and you -- you knew that your lawyers
petitioned the court to let you come to Selma at that time,
didn't you?

A   I must --

            MR. GREENBERG:  I object to that.

A   I am not sure of that.

            MR. GREENBERG:  There was an application to dissolve
an order and that -- Dr. King is not a lawyer, he doesn't know.

            THE COURT:  He has answered it; he said he wasn't
sure.

Q   All right; now, did you know this; did you -- were you familiar
    with the fact that Judge James A. Hare issued an order
    preventing -- enjoining demonstrators from blocking the entrance
    to the Court House and around the Court House of Dallas County?

A   Yes, I do recall this order, and I don't think we have ever
    done that; I mean we didn't practice that.

Q   You blocked -- you completely blocked every entrance to the
    Court House of Dallas County, haven't you?

A   Well, there have been times we had such a large number, and the
    process is just so slow, that people had to stand somewhere,
    and --

Q   Hadn't you tied up traffic where there could be no traffic
    around that Court House; haven't you?

A   No, I don't think that is true; the day that we had the fifteen
    hundred, they were very orderly, lined up, and even on days like
    the day we had to stand in the rain and Sheriff Clark wouldn't
    allow us to stand in the Court House, we stood out very orderly
    and didn't block any traffic.

Q   And do you -- do you remember -- have you marched on that Court
    House and had demonstrators around that Court House after Judge
    Hare issued his order?

A   You mean around --

Q   Judge James A. Hare; yes?

A   Oh, yes; we had people go down to the Court House.

Q   After his order, and you led marches after that, haven't you?

A    Well, I have led marches on a continual basis, because I thought

     we were moving clearly within the Constitution on that, it was --

Q    And you knew that Judge Hare had enjoined you from coming to

     that Court House and blocking the entrance to that Court House,

     hadn't you?

              MR. AMAKER:  Objection, your honor; the defendant --

     the witness was not named in that order.

              THE COURT:  Doesn't make any difference, asking him

     what he knew; you can answer it.

A    Yes; I have never -- and I have never been down when we blocked

     the entrance to the Court House, because the line always started

     at the steps and went back, I forget the name of the street,

     but we never blocked the entrance, I would say on the whole, on

     the demonstrations, on the marches that I have been on to the

     Court House, the entrances were not blocked.

Q    You mean to tell this court that you have never blocked a front

     -- you and your group have never blocked the Lauderdale Street

     entrance to this Court House, the Dallas County Court House?

A    I don't recall ever blocking the entrance.

Q    But you occupied it all, didn't you?

A    Not all, because we were all pushed to the side, and there were

     periods when we were pushed around through the alley there on

     the side, but I don't remember any time that the entrances and

     exits have been blocked, absolutely blocked.

Q    Now, has it ever been called to your attention that C. T. Vivian

blocked the Court House entrance up there?

A   No, that hasn't been called to my attention that he -- he has led marches down to the Court House.

Q   All right, how many marches would you say altogether have been made to the Dallas County Court House?

A   That would really be a guess; I have no idea of the number.  I could simply say that -- that it has been a fairly large number, but I don't have any way to, at this point, give you the number of marches that have been held since January.

Q   Now, you also were informed by Mr. Wilson Baker, the Director of Public Safety in Selma, that City of Selma had a parade permit statute, didn't you; wasn't you informed of that?

A   On the first day, one day we were marching, Mr. Baker asked if we had a permit to parade, and informed us that if we did not we were moving illegally, and I answered by saying that we were not parading, we were not blocking entrances or egress or ingress that we were not -- we didn't have a band, we were not marching out in the streets, and that there was nothing within what we were doing that could be construed as a parade; but --

Q   You interpreted the statute; is that correct?

A   That's right --

Q   Uh, huh.

A   -- I --

Q   And he informed you that if you marched, that you would be in violation of that parade statute, didn't he?

A    That -- that is correct, that --

Q    All right.

A    That we --

Q    And you were allowed to march, you marched, and you were -- marched some several blocks, and you had to go by the Civic Building, anyway, on the way to the Court House, didn't you?

A    That's right; uh, huh.

Q    And when you got to the Civic Building, the City Police arrested you, didn't he?

A    That's right.

Q    Uh, huh; and then you were charged with violating the City of Selma parade ordinance; is that correct?

A    That's right; uh, huh.

Q    And you stayed in jail how many days?

A    I think we were in five or six days; I don't remember the exact number now, but almost a week.

Q    And you were offered bond, and your bond was set immediately after you were arrested, wasn't it?

A    That's right; uh, huh.

Q    And you refused to make bond, didn't you?

A    That's right.

Q    And Reverend Abernathy refused to make bond, didn't he?

A    That's right; uh, huh.

Q    Now, after you got out of jail, you were thoroughly familiar with the parade statute then, wasn't you?

84

A   I was familiar with the fact that there was a parade statute and

    that we had --

Q   Have you ever made application or any of your organizations to

    the City of Selma for a parade permit?

A   Yes, we have.

Q   When?

A   I don't remember the exact time or the exact day, but we did

    make an application.

Q   For what date?

A   I don't remember the date, but we did get permission, I mean the

    City gave us permission.

Q   And the City Council of the City of Selma never gave you

    permission to march on the streets of Selma, did they?

A   I don't know who gave it, whether it was the -- Mr. Baker or the

    Council at large, I mean the whole Council.

Q   You have never gotten a parade permit from City of Selma in

    writing, have you?

A   Now, I am not sure if we got it in writing, but there was --

    there was a day, and I think it was the day that we carried the

    largest number down, the day that we had some fifteen hundred

    or two thousand people, and that day we had permission to march

    to the Court House, and it was my assumption that we had the

    permit; now, that is the only --

Q   You don't know; is that right?

A   That is the only time.

Q   You don't know?

A   No, I don't have anything in writing on it.

Q   All right, on the day that you said that you were going to march
    to Montgomery, did you have any parade permit that day from the
    City of Selma?

A   No, we didn't have a parade permit that day.

Q   And you -- now, as I understand you now, you came down Water
    Street, didn't you, in the City of Selma?  Isn't that correct?

A   That's right; that's right.

Q   And you got on Water Street down there at the L. and N. Depot
    on Sylvan Street, didn't you?

A   That's right; uh, huh.

Q   And that is some eight or nine blocks east of Broad Street; is
    that correct?

A   That is correct; uh, huh.

Q   And you walked in the middle of the street, didn't you?

A   At first we walked on the sidewalks, and I think we followed the
    sidewalk route until we got to the -- the street, or rather to
    the bridge, and that was when we started walking in the streets,
    and we did walk in the streets coming back from -- from the
    march.

Q   Now, listen, you walked all the way from the L. and N. Depot to
    Broad Street in the middle of Water Avenue, didn't you, and
    with signs, didn't you, now?

A   Well, I don't know what happened behind, but I am saying in the

86

front of the line we walked on the sidewalks until we got to the turn which leads across the bridge, and at that time we spread out a little more, and some were walking in the streets; and coming back from the march we did walk in the streets all the way.

Q    I am going to ask you one more time; you, yourself, marched in the middle of Water Street --

      MR. GREENBERG:  I object.

Q    -- that time from L. and N. Depot to Broad Street, didn't you?

      MR. GREENBERG:  This is not only repetitious, but it is an insulting manner, and I just don't see the point, your honor; he asked it three times.

      THE COURT:  Just a minute; I sustain objection to the manner in which counsel conducts part of his interrogation. All witnesses in this court, regardless of who they are, are to be interrogated with common courtesy.

      MR. McLEAN PITTS:  I am trying to, your honor, but it is a point --

      THE COURT:  Make a little better effort.

      MR. McLEAN PITTS:  Yes, sir; it is a point I do want to get over.

      THE COURT:  All right; all right; let's get along. We will keep order in this court or you will be excluded.

Q    You did go to -- across the River Bridge, you say, when you got out in the street; is that right?

A    That's right.

Q    All right; now, was there any traffic moving on the Alabama River Bridge while you were crossing there?

A    No, no traffic was moving at that time.

Q    And no traffic was coming south and no traffic was going north; is that right?

A    That's right.

Q    And how long did it take you to go from the corporate limits, which is Water Avenue, over to the traffic light and then back to Water Avenue, how --- how much total time elapsed?

A    You mean from the beginning of the march to the place we were stopped?

Q    From the time you got on U.S. 80 at Water Street and Broad Street to the time you got back --

A    Uh, huh.

Q    -- to that intersection, how much time elapsed?

A    I would think about forty-five minutes or so.

Q    Forty-five minutes?

A    (Nodded to indicate affirmative reply)

Q    And during that time there was no traffic at all; is that correct?

A    That's right; that is correct.

Q    Now, you have been on U.S. 80, haven't you?  You have ridden backwards and forwards to Selma?

A    Yes.

Q    And isn't that a heavily traveled highway?

A   Yes, it is heavily traveled.

Q   And it goes through what is known as Big Swamp; Big Swamp, do
    you know where that is?

A   I don't believe I do.

Q   Do you know where a series of bridges are through there, through
    a swamp land?

A   I have been -- I think -- I think I remember passing it.

Q   And there is three bridges right there, isn't it?

A   I am sorry; I don't recall the number.

Q   You don't attempt to tell this court how many bridges it is
    between Selma and Montgomery, do you?

A   No, I really don't know.  As I said, Mr. Williams, our logistics
    man on this, said that there were several bridges, but I don't
    recall the number.

Q   And you -- you say that you were going to walk on the shoulder
    of the road; is that right?

A   That's right; uh, huh.

Q   How wide is the shoulder of the road; do you know?

A   No, I don't know how wide; it is considerably wider in some
    places than in others, but it is my information as it came to
    me that it is possible for persons to walk on the shoulder of
    the road all the way to Montgomery with these slight breaks when
    you must walk across bridges, and one can go across there, as
    I said earlier, one at a time.

Q   Now, let me ask you this; in these meetings that you have been

to, have you advocated at any time the boycotting of the Selma
Bus Lines?

A     I haven't, as I recall, made a specific speech or even statement
on the bus line, itself, but I have endorsed the overall
economic withdrawal program advocated by the Dallas County
Voters League, and in the process I would certainly endorse the
boycott of the busses, and I would take the wisdom and the
judgment of the people of Selma on this, so I have heartily
endorsed, although I haven't made any speeches on it.

Q     And have you been present where speeches were made that
advocated the boycott?

A     Oh, yes; I have heard speeches on that; uh, huh.

Q     Who made those speeches?

A     I don't remember at the present time, and it was in mass meeting,
and I can't recall who -- who made the speech because we have --
we always have several speakers, but I have heard -- I have
heard it in two or three meetings.

Q     Were those people from the Dallas County Voters League or from
your organization?

         MR. GREENBERG: I object.

A     I don't remember.

         MR. GREENBERG: This isn't cross, and seems to be
diversionary; it is time consuming.

         THE COURT: It is getting far afield. I have
permitted some background and some evidence on alleged brutality

and restrictions placed by the law enforcement officers upon their demonstrations, and I will permit some additional examination on the extent of their activities in protesting and demonstrating, and that is the purpose it is allowed for.

        MR. McLEAN PITTS:  That is correct, your honor.

        THE COURT:  Go ahead with it.

Q    As I understand you, there is an active boycott going on; is that right?

A    On the bus --

Q    In Selma, of the bus line?

A    Yes, that is -- that is true.

Q    And there is also an active boycott going on of downtown merchants?

A    That's right; uh, huh.

Q    Uh, huh; and how long has that been going on?

A    I think about a month now.

Q    About a month?

A    Just about a month.

Q    Now, all of that has gone to strain the relationship between the white people and the colored people in City of Selma, haven't they?

        MR. GREENBERG:  Objection.

        THE COURT:  If he knows the answer to that, I will let him answer it.

A    I don't think so; I think these things have brought the community to the point where it has to recognize the fact that

it has a problem.  I think instead of bringing about divided
relations, I think it has caused the community to look at itself,
and this has been the purpose of our whole program.  I think
that the only way you can get the problem solved is to get
people to admit that there is a problem, and we have to dramatize
it by engaging in our non-violent activities, and our boycotts
are never to bring about estranged relations, they are not to
put anybody out of business, they are to put justice in business
and to so arouse a sense of shame within the community of the
silent that they will rise up and see a community responsibility
to stand up against the injustices that exist.

Q    So there is an active boycott in Selma?

A    Yes, there is.

Q    Now, so -- now, let me ask you this; you know Felton Henderson?

A    Felton Henderson?

Q    Yes?

A    Is he working with the movement in Selma?

Q    I meant the Department of Justice attorney, he is a Department
of Justice attorney.

A    Oh, of course; yes, yes; he isn't with the Department of
Justice now, though.

Q    Has he ever conducted any of those meetings?

A    No, he hasn't been to any meeting in Selma.

Q    You -- that was the car, wasn't it, that you rode in from
Montgomery down to Selma, wasn't it; wasn't that the Felton

Henderson?

MR. GREENBERG:  May I renew my objection as to repetitiousness.

THE COURT:  I can understand -- I can understand your desire to get into that; is it pertinent, Mr. Pitts, to this inquiry?

MR. McLEAN PITTS:  Well, the only proposition I am getting --

THE COURT:  I ask you that question as an officer of this court; is it pertinent to this inquiry?

MR. McLEAN PITTS:  The only point I see it is pertinent as to whether he admits it or denies it; that is all I am asking.

THE COURT:  Let's get along, let's get along; you know it is not pertinent.

MR. McLEAN PITTS:  Well, what I am getting at, your honor, is -- is -- here is what I am getting at; he has previously specifically denied it; I just wanted --

THE COURT:  I have -- I have given both sides some leeway in this thing to develop your background, and I understand maybe your anxiety to get into it, but it -- it is not even remotely pertinent to any issue in this case that I can see, is the reason I asked you that question.

MR. McLEAN PITTS:  The point I am getting at is whether or not he denied it -- denies that he did ride in the car down there with Felton Henderson; then it would be a matter that

93

would go to his credibility as a witness.

      THE COURT:  (Shook head to indicate negative reply)
Get along.

Q  You say how many demonstrations --

      THE COURT:  Let's not lose sight of the fact that
this inquiry concerns the petition to have this court adjudicate
their constitutional rights with respect to a proposed march from --
from Selma to Montgomery, Alabama.

      MR. McLEAN PITTS:  All right, sir.

      THE COURT:  And their right to march as a demonstra-
tion and to air their alleged grievances.

      MR. McLEAN PITTS:  As I understand, you limit us
solely to the --

      THE COURT:  I am not limiting you in any way at this
time, other than asking you not to lose sight of the issues in the
case.

      MR. McLEAN PITTS:  All right, sir.

Q  Now, I'll ask you this; did you see -- on this march on this
   day, March 9, did you see any of the Sheriff's deputies anywhere
   there then?

A  I saw the Sheriff; I am not sure about his deputies.  I assume --

Q  Where did you see the Sheriff at?

A  I saw him first as we crossed the bridge.

Q  Where was he?

A  He was out in the -- well, he was on the highway when I first

94

saw him; he was in kind of running the reporters away or back
from --

Q    After you had crossed the bridge?

A    Yes, that was when I first saw him; he may have been around
earlier, but that was when I first saw him.

Q    In other words, there was no big number of Sheriff's deputies
or Posse around there at that date; is that correct; on that
date?

A    I -- I really don't recall.

Q    You didn't see them, did you?

A    I don't remember; I just assumed that they were there, but --

Q    But when you got to the -- you -- do you know where the first
traffic light is on the Montgomery side of the Alabama River
Bridge, which is called the old Montgomery highway?

A    I am not sure; I don't think we crossed -- came to a traffic
light --

Q    The point is --

A    -- across the bridge.

Q    -- you went to that traffic light, and that was where the State
Troopers were; is that right?

A    I am not sure about that, but I am --

Q    And that traffic light is about a quarter of a mile on this side
of the Alabama River Bridge, isn't it?

A    I would think so; if there is a traffic light there, I would
think that is the amount of --

Q    And when you marched, you marched right in the middle of the

95

road, didn't you, from the bridge down to that -- to that traffic

light, didn't you?

A   After we crossed the bridge, we did move out into the middle of

the road, and there didn't seem to be any objection; no one even

sought to stop us or spoke to us about that.  When the march

started that Sunday, there was an attempt to go right on the

shoulder of the road, but a new set of circumstances had come

into being by Monday, and very frankly, we were protesting

grave injustice and terrible brutality.

Q   Now, prior to going out there on that road -- well, wait a

minute; I withdraw that question.  When you got up there to that

traffic light, the only body up there was State Troopers; isn't

that correct?

A   That is right; I didn't see anybody but the State Troopers.

Q   I am talking about law enforcement, now, I am not talking about

other people; that was the only law enforcement agency you saw;

isn't that correct?

A   I think that is correct.

Q   And they were in blue uniforms, were they?

A   That is correct.

Q   Did you see Sheriff Jim Clark there?

A   I saw him one other time, and I -- I don't recall whether it was

at the front of the line -- I mean when we were, the front, or

pass -- as we passed him one more time in the process, I don't

recall where, but I did see him one more time after I saw him

at the foot of the bridge as we crossed that bridge.

Q   But he didn't take any part, so far as you know, out there at that traffic light, did he?  Did he talk with any of you all or read any orders to you or anything, did he?

A   I don't recall seeing him there, but I did see him again after we crossed the traffic light, and when I -- I mean after we crossed the bridge, and when I saw him he was pushing the reporters back.

Q   Let me ask you this; you were present in meetings before this march and when -- did they call for volunteers to make this march; were you present then?

A   You mean on the day that --

Q   Yes?

A   -- the march took place?

Q   Or prior to that?

A   No; when I came to the church, everybody was ready to march.  In fact, the line had started assembling; we had so many people that we couldn't even start getting them in the church, so that we had a number of people out on the playground, and the church was still jammed and packed.

Q   Now -- and you encouraged those people to make that march in defiance of this court's injunction, didn't you?

             MR. GREENBERG:  Objection.

A   I never --

             THE COURT:  I sustain it; that will be up to me to

determine that.

Q    Did you encourage them to do it?

A    I encouraged them to march, and in the process I never said
     anything about defying a court order.

Q    And didn't you -- when you got at the foot of the Alabama River
     Bridge, Mr. Stanley Fountain read that order to you again,
     didn't he?

A    That is correct.

Q    Now, let me ask you this; did you make the statement to anyone
     that this was an unjust order?

A    An unjust law?

Q    Unjust order?

            MR. GREENBERG:  Object.

A    Yes.

            MR. GREENBERG:  That has been gone into quite
thoroughly, your honor.

            THE COURT:  I will permit this counsel, he hasn't
gone into it; overrule.

Q    Did you make that statement?

A    Yes, I made that statement in the process; I don't know to whom
     it was made, we were in very trying, difficult moments at that
     time, and I am sure that I said some things at that particular
     moment that revealed that I was quite upset about this court
     order.

Q    Now -- .  Now, you said -- I want to ask you one more question;
     you said that this order -- that this route they followed was

the same route they followed on the previous Sunday; is that right?

A   That -- that is -- that is the information that came to me. And, your honor, if I can correct one aspect of my testimony, as I thought it through, when the paper came to me, when Governor Collins gave it to me, I gave it first to Mr. Hosea Williams. I said a few minutes ago that I gave it to Reverend Young, but as I thought it, it went first to Hosea Williams and he then gave it to Reverend Young, and it was Hosea Williams that said to me, "This was the route we followed Sunday."

Q   So that you are just testifying to what somebody told you; is that right; to what Hosea Williams told you?

A   That's right; Hosea Williams said --

Q   So you as a matter of fact don't know that that was the route that was followed Sunday?

A   Oh, no; I don't know that; I am just going by what he said.

Q   Now, you have given your support and your encouragement to the violation of the Federal Court injunction --

        MR. GREENBERG:  Objection.

Q   -- or orders with reference to registration procedures, now, haven't you?

        MR. GREENBERG:  Objection.

        THE COURT:  That concerns a matter of law; I take it you are talking about some orders Judge Thomas issued?

        MR. McLEAN PITTS:  Sir?  Yes, sir; I am asking if he

didn't give his support and encouragement to the violation --

        THE COURT:  That will be up to Judge Thomas to determine whether they have been violated; it involves a legal matter. I sustain your objection.

Q   You are --

        THE COURT:  I will let you inquire into it, but that is not the proper manner to do it.

        MR. McLEAN PITTS:  You say you will let me go into it?

        THE COURT:  Oh, yes; I sustain objection to that question as it is phrased.

        MR. McLEAN PITTS:  Oh, I see; all right.

Q   Well, you were familiar with Judge Thomas's court order or decree of injunction with reference to voter registration, wasn't you?

A   Yes, I was familiar with that.

Q   Now, have you ever at any time uttered any words or made any speeches that advocated not complying with that order?

        MR. GREENBERG:  Objection.

        THE COURT:  Overrule.

        MR. GREENBERG:  I think --

        THE COURT:  I will permit that.

        MR. GREENBERG:  -- as a preliminary, your honor, ought he not to tell the witness in what respects?

        THE COURT:  Well, he asked him his preliminary.

        MR. GREENBERG:  What was the particular order he is talking about?

THE COURT: He asked as a preliminary if he was familiar with them; he said he was. I take it the question goes to any and all of them. Overrule your objection; you can answer it.

A     No, I have never made a statement condemning that order; to the contrary, I have said that I felt that the order was a relatively good order -- not all that we wanted to see, but at least it was a step and a start in the right direction. And to demonstrate the fact that I felt that, there was some feeling in the community that we shouldn't even sign the appearance sheet, and I persuaded my associates and others who felt that way that we should sign it; so instead of encouraging disobeying it, I came back in the community and encouraged the leadership to sign the appearance sheet and go along with it, and I think the only problem we face with the order as it stands is the fact that Sheriff Clark just won't allow us to implement it.

Q     Won't allow you to do what?

A     Implement the order; he just doesn't give us an opportunity to implement the order.

Q     Implement the order?

A ·   That's right.

Q     Now, you -- Sheriff Clark has never interfered with anybody going in that Court House and signing that appearance book, has he?

A     I am afraid I have to disagree with you, sir.

Q     Well, can you state the occasions that Sheriff Clark has ever ha

anything to do with preventing anyone from going in there and
signing that appearance book in the --

A   By his very presence, his harsh and brutal and vitriolic
language, his constant intimidation, his physical brutalization
of individuals, all of these things have served to discourage
people from going in there; and the other thing is that he calls
the numbers in a way and with a kind -- in the kind of manner
that discourages people from even hearing the number called.
I have seen many people who didn't even hear the numbers who
were in line, and he obviously didn't want them to hear them.

Q   Do you know -- do you know -- now, let's go -- go back just a
bit; have you ever seen Sheriff Clark, himself, intimidate anyone
down at that Court House while they were trying to sign this
appearance book, is that -- down there; have you ever seen it?

A   No, I mean as they would try to get in; that is where the
intimidation takes place.

Q   Now, that appearance book stays right in the front door, the
main front doors of Dallas County Court House, doesn't it?

A   That is what I understand; I haven't seen it.

Q   And the Board of Registrars has assigned a man to sit there at
a desk with that book, haven't they?

A   That is my understanding; yes.

Q   And you -- all you have got to do is sign your name and -- by
a number, and he hands you a card with a number on it, doesn't
he?

102

A   That's right.

Q   Uh, huh; and have you ever seen Sheriff Clark there interfere with that procedure in any way?

A   Oh, yes; I have seen him interfere with it.

Q   Now, what did he do to prevent that line from going in the Court House?

A   Well, he's done many things; as I said, one is he has tried to discourage people by a show of police force and the abuse of it.

Q   I am asking you --

A   I haven't ever --

Q   -- in your presence now --

            MR. GREENBERG:  Let the witness answer the question.

            MR. McLEAN PITTS:  I want his --

            THE COURT:  Restrict it to your presence; that is

what the question asks for.

A   Yes; every time I have been down there, they have had the Court House so -- I mean on the inside of the Court House so filled with possemen that if a person didn't have great courage and fearlessness that can only come in a group collective situation, they wouldn't even think of going in to register; the whole procedure is to discourage and to frighten people.

Q   Now, do you know that day after day that that book is opened down there, and there won't be four or five people that will walk in there and sign that book with no possemen anywhere around; do you know that?

A   Well, we have had more than twenty-three hundred to sign it.

Q   I am asking you, do you know that day after day that book is open there, and there would be very few people come and sign that book at all with no possemen around at all?

A   Well, I would admit that -- I don't think Sheriff Clark has any opposition to a few Negroes getting registered; I think it is a fact that he is against the large number --

Q   I didn't ask you that.

       THE COURT:  That is not responsive; that is not responsive.

Q   The answer was not responsive.

       MR. McLEAN PITTS:  Sir?

       THE COURT:  The answer was not responsive.

Q   That is not responsive; I am asking you, did you know that that book was open down there day after day and a few people would come in and sign it, and there was no possemen nowhere around?

A   Well, I don't know; I can't really answer that, because I don't know.  Every time I have been around they have had a large number

Q   All right; now, what I want to get at is the times that you have been down there there have been tremendous crowds with you, haven't there?

A   That is correct.

Q   And at that time you would see a lot of deputies and possemen; is that right?

A   That is correct.

104

MR. McLEAN PITTS: That's all.

THE COURT: Redirect, Mr. Greenberg.

REDIRECT EXAMINATION:

BY MR. GREENBERG:

Q   Dr. King, in describing your reasons for going on the Tuesday
    march, the one which you marched to the point of brutalization --

                MR. P. H. PITTS: I object to the use of the word,
"Brutalization"; it hasn't been any evidence other than the statements
that have come from that stand --

                THE COURT: He is paraphrasing what the witness said;
overrule.

Q   The place you call the point of brutalization --

                MR. GREENBERG: I am just trying to describe the place

                THE COURT: All right.

Q   -- you mentioned that you were motivated by a number of matters,
    some of which you described, but among them you said was a
    practical matter which you did not describe; what was the
    practical consideration?

A   Well, I had the practical problem that arose out of the fact that
    there were thousands of people in the Selma community, many of
    whom had come from other sections of the country, but most of
    whom lived in Selma, who were quite indignant and aroused over
    what had happened Sunday, and I felt that as a non-violent leader
    and with a deep passion to keep our whole struggle non-violent
    that it would have been unwise for that development to take
    place with my not being in the leadership; I felt that I had a

moral obligation to the movement, to justice, to our nation, to the health of our democracy, and above all to the philosophy of non-violence to lead that line and keep that walk or the march or whatever we call it peaceful, and I felt that if I had not done it, the pent up emotions, the inner tensions and conflicts that were all latent at some points would have exploded into retaliatory violence.

Q  Move to another matter, Dr. King; there has been some reference to mass marches to the Court House; do you know whether or not the persons in these mass marches were unregistered voters?

A  Yes, they were unregistered voters, by and large.  There may have been some instances when persons who were registered participated, but they went as vouchers and in order to encourage others to register, but I can say that the vast majority of people who have participated in the marches have been unregistered voters of Dallas County.

Q  Now, another matter that was brought to your attention by counsel was the fact that during the first ten days in January only thirteen persons applied for registration; do you know what was the reason for that, Dr. King?

A  I -- I do; I know what I consider the reason, and that is that after people have gone down over and over again to seek to register, they come to the conclusion that it isn't worth it to go any more, and I have met numerous people in Selma and Dallas County who have told me that they have tried as many as

eight times, and yet they have never been able to register. And I think when people have been denied the right to vote for many years they do often lose motivation, and I think it is a role of leadership to arouse motivation and to grapple with this problem of apathy that can come to a people who for years have not been able to register and vote as citizens.

Q  Now, move to another matter that was brought up in cross examination, other questioning, Dr. King; there has been some reference to the counties in which the movement has operated in recent months, and does that include Perry County as well?

A  Yes, it does.

Q  And what form did your operation in Perry County take?

A  It took the same form as Dallas County. Our staff members went into the county, organized the community, started having mass meetings and organized the community for moves toward the Court House in order to register. And hundreds of people turned out on the registration days in Perry County, and of course hundreds of people faced the same problem that we had in Dallas County by being arrested in the process.

   MR. GREENBERG:  I think that's all, Dr. King.

   THE COURT:  Mr. Smith, recross.

     RECROSS EXAMINATION:

BY MR. SMITH:

Q  I believe you mentioned that the citizens in Selma had pent up emotions that in your opinion that could develop into an

uncontrollable situation, yet in spite of that knowledge you directed these people into the streets in masses and numbers that you approximate three thousand?

A  Yes, and I did that feeling and knowing that when you give people an outlet, a way to channelize their resentment and their legitimate discontent, it is much better for them; when you just leave them sitting so often, and you don't allow them to have a march here and there, if you can't do it some way it is coming out in another way, and my whole philosophy has been that it is better to give people a creative, non-violent channel to express their discontent than to keep this pent up feeling there that can explode in violence if you don't give them a chance to march and express this resentment in some way, so this was why I felt ---

Q · Did you give consideration to the other law enforcement problems of bystanders, of people that may be opposed to the demonstrators or marchers?

A  Well, I do, and it is not an easy decision and not an easy life to live when you have to lead a movement constantly facing the fact that you and your followers may face dangers of physical violence, but the non-violent movement says that in order to redeem the soul of the situation, of the nation, you must be willing to suffer and have violence inflicted upon you, but you don't inflict it upon your opponent, and this is why I say that maybe there will be some blood in the State of Alabama before

108

we get freedom, but it must be our blood and not the blood of
our white brothers.

Q   You mentioned you had a prearranged parade route with Governor
Collins, that you had a prearranged point to stop; is that
correct?

MR. GREENBERG:  May I -- I don't know if this is
proper to call this an objection, but I think the characterization,
"Prearranged," is not borne out by the record; it was an exchange
of information --

THE COURT:  Overrule.

MR. GREENBERG:  -- and I don't know of any information
about what you would properly call prearrangement.

THE COURT:  Overrule.

MR. GREENBERG:  Perhaps it is a semantic difference,
but I think it is a difference.

THE COURT:  Go ahead.

Q   In spite of that, why did you say publicly that your conscience
compelled you to march, even if it disobeyed a Federal Court
order?

A   Well, I -- it was my understanding after talking with counsel
about it that this was an invalid order, and secondly, that I
would not be, or we would not be violating any injunction or
could not -- would not be cited for contempt of court if we
made the march.  It was very obvious that this human wall would
be there; we knew that; there was no doubt in our minds at all.

109

And as we discussed the whole matter for four or five hours,
the night before, in the morning about five o'clock, and got
back up in the morning to continue, all of us realized this and
agreed that we wouldn't try to break through that wall, and
consequently, we never anticipated getting to Montgomery, so it
could not be construed as a march from Selma to Montgomery,
because we realized no matter how much we desired to get there,
that this problem of a police force with a show of power and
massive numbers standing there would block us.

Q   The truth of the matter is you made the statement to the press,
you wanted the publicity, didn't you?

A   Wanted publicity?

Q   You made the statement to representatives of the press, and you
wanted the publicity, the statement which you had made; isn't
that right?

A   No, I never make any movement ---

Q   Why did you make it to the press?

A   -- for publicity, and I think -- I think it is a very
degenerate leader who would lead people in a movement like this
merely to get publicity.

Q   If you didn't want publicity, why -- excuse me.

A   I was doing nothing for the publicity; the publicity will come
inevitably.

Q   Why did you make it to the press if you didn't want publicity?

A   I am constantly asked questions by the press, and it is very

110

difficult for me to avoid making statements to the press.

Q   When you were confined to the Selma Jail, didn't you have
stationery printed, "Dr. Martin Luther King, Selma Jail," or,
"City Jail, Selma, Alabama," and sent this out through the
country?

A   No, I -- no, I didn't do that.

Q   You didn't have stationery printed while you were confined?

A   While I was in the jail?

Q   In Selma, City Jail?

A   No, not at all.

Q   Designating your address as City Jail, Selma, Alabama?

A   No, not at all; no, that has never been done.

Q   Where is the Federal Court situated in Selma, the building that
houses them; do you know?

A   In front of the Court House.

Q   In front of the County Court House?

A   That's right; uh, huh.

Q   Directly across the street?

A   That is correct.

Q   The demonstrations which you had planned in Selma in part took
place directly in front of the Court House, both the County
Court or Circuit Court House of Selma and the United States
District Court House in Selma, didn't they?

A   Well, they were -- I am not sure if I understand your question;
they were designed for --

111

Q   I am not asking -- excuse me, now, I am not asking what they
    were designed for.

A   Uh, huh.

Q   Did the demonstrations in part in Selma take place in the public
    street between the United States District Court House and the
    County Court House?

A   That is correct, in the --

Q   Large masses of people out there in front of the Court House
    parading around both the Federal Building and --

A   In front of the County Court House mainly.

Q   -- and County Court House; is that right?

A   The County -- that's right; the County Court House.

Q   This was for the purpose of influencing the Federal District
    Court in Selma, who had jurisdiction of the voter registration
    suit; isn't that right?

            MR. GREENBERG:  Objection, your honor; there is no --

A   No, I don't think --

            THE COURT:  Overrule your objection.  He is asking
you the purpose; you say no?

            WITNESS:  No; that's right.

Q   That was not the purpose of it?

A   No, that was not the purpose.

Q   But matters were pending before that United States District
    Court in regard to the same matters which you were demonstrating
    or protesting about --

THE COURT:  That is repetitious --

Q   -- isn't that correct?

THE COURT:  -- and argumentative.

MR. SMITH:  All right, sir.

Q   On the prearranged stopping point of the parade of this past
Tuesday, was that on the west or east side of the River Bridge
which U.S. 80 crosses?

A   It was on the -- I guess the east side across the bridge.

Q   But as you and the some three thousand people who were marching
in the street approached the bridge, you were there confronted
by United States Marshal who read to you the previous order of
this court --

A   That is correct; uh, huh.

Q.  -- is that correct?

A   That is correct.

Q   But you proceeded from that point to a point across the bridge
and beyond some five hundred feet, did you say?

A   That's right.

MR. SMITH:  I have no further questions.

THE COURT:  Mr. Pitts, further cross examination.

MR. McLEAN PITTS:  Yes, sir; I want to ask him a few
more questions.

BY MR. McLEAN PITTS:

Q   In these marches that you have led down to the Court House, you
testified that those were made up mostly of people who were not

113

registered to vote; is that right?

A    That's right; mostly of people who were not registered to vote.

Q    And as a matter of fact, those marches had in there nonresidents of Dallas County, didn't they?

A    Well, we had staff people in all of the marches to encourage, as I said earlier, and there were some registered voters, Negro registered voters of Dallas County, also there who were to serve as vouchers, so along with the large number of unregistered voters we have always had staff members of one of the two organizations and vouchers who were registered.

Q    Well, now, as a matter of fact, you all brought in from adjoining counties, there were people in adjoining counties that came in and got in some of those marches down to the Dallas County Court House, wasn't there?

A    This may have happened, because as I said earlier, we have been dealing with a twofold problem here, with the denial of the right to vote and with police brutality, and I think we have been protesting police brutality, we have had people from other counties, indeed, we have had many of the young people of Selma, most too young to register, to engage in the activities to protest this.

Q    And you all, your organization and your church and you, have advocated these juveniles staying out of school to take part in these demonstrations, haven't you?

A    Well, I think it has come --

114

THE COURT:  Just answer yes or no, please, Dr. King.

MR. McLEAN PITTS:  Sir?

A   Yes, we have -- we have had students to stay out, and we have given them our support.

Q   And you knew, also, you have been informed since you were in Selma, that there were two city ordinances, one of the city ordinances prohibited any picketing or demonstrations around the Dallas County Court House when the Voter Registration Board was in session; were you familiar with that order?

A   I became aware of this order after we started; we were aware of it.

Q   But -- now, and were you also familiar with an ordinance of the City of Selma that prohibited any picketing or demonstrations around the Dallas County Court House while the Circuit Court was in session?

A   There again, we became aware of this ordinance during the movement.

Q   And on one occasion Sheriff Jim Clark came down when you were there and read an order of Circuit Judge Hare commanding you to leave the court premises, wasn't it?

MR. GREENBERG:  I would like to object, your honor.

Q   Premises --

MR. GREENBERG:  That is a legal proposition that gets involved in such questions as Judge Thomas has specifically given permission to do this kind of thing and has enjoined Sheriff Clark,

and this witness can't be expected to make a judgment as to the effect of one of these orders upon the other and the validity and so forth.

THE COURT:  Your objection is argument; objection is argument; the question is whether or not he did this --

MR. McLEAN PITTS:  Yes, sir.

THE COURT:  -- not the legal implications of it; overrule.

MR. GREENBERG:  I thought the court should be aware of the fact that those municipal regulations don't stand by themselves.

THE COURT:  I am aware of it; go ahead.

Q    You were familiar with those ordinances, weren't you, and you were -- and Judge Hare, you were there when Judge Hare's order was read by Judge -- by Sheriff Clark to the group in front of the Court House to the effect that he had Circuit Court in session and that picketing and demonstrations should cease around that Court House?

THE COURT:  You are asking him if he were aware of that?

Q    Were you there when that order was read on that occasion?

A    No, I was not there; but I was aware of the order, and I heard it read over the radio several times.

Q    And did you leave then after the order was read?

A    I was not there, as I said --

Q    Well --

A    -- but some of my associates did not leave, maybe, but I was not there at a time when --

Q    But you have been there when Circuit Court was in session and when the Board of Registrars was in session; is that right; is that right?

A    That's right.

Q    And you knew about this ordinance, didn't you?

A    That is correct.

Q    And you went there in violation of that ordinance, didn't you?

         MR. GREENBERG:  Objection.

         THE COURT:  I sustain that.

Q    Now, go back to the -- January, when this boycott -- I meant about this voter registrant -- Registrar, when there were only thirteen Negroes registered there for a period of ten days; during that period the Negroes were actively boycotting the Voter Registrars Board, wasn't they?

A    I wasn't aware of that, but this is not within my knowledge.

Q    Now, there is one thing I want to ask you; on the 9th day of this month, was there heavy traffic in the area where you all marched across there, and was the traffic on the streets of the City of Selma heavy?

A    You mean on highway 80?

Q    Yes?

A    I don't recall how heavy it was, because as you rightly said,

it was cut off that particular time.

Q   Well, your -- your marching across that bil--- bridge as you
    did and coming back caused a severe traffic congestion, didn't
    it?

A   Well, the traffic was cut off for the period that we were
    there; that is true.

            MR. McLEAN PITTS:  Wait just a minute.  That's all.

            THE COURT:  Mr. Doar, any further questions?  I
overlooked you.

            MR. DOAR:  I have no further questions.

            THE COURT:  When I went back around.  Anything
further, Mr. Greenberg?

            MR. GREENBERG:  No, your honor.

            THE COURT:  All right.  This witness will be excused
from the witness stand.  We will recess now, gentlemen, for the
lunch hour.  We will recess until one thirty.

            (At which time, 12:10 p.m., a recess was had until
1:30 p.m., at which time the hearing continued)

            THE COURT:  All right, call your next witness.

            MR. GREENBERG:  Excuse me, Judge, just one small
housekeeping matter; Dr. King would like to go to Birmingham to
visit the minister who was struck and is dying of a brain injury.
Mr. Pitts agrees to excuse him, and Mr. Smith agrees to excuse him
so long as he will be back in the morning at the opening of court,
with some allowance for making a plane connection.

118

THE COURT:  I have no objection to it.

MR. GREENBERG:  We have a problem with another witness.  Now, we called as a witness, but did not call a witness, a Dr. Moldovan, who is from New York City, who was present at some of the events that occurred in Selma; we decided we don't want to use him.  He would like to go back, but apparently some of counsel for the defendants do not want to excuse him, and I -- I -- I don't know that they intend to call him or anything, and I wanted your honor's ruling on that.

MR. SMITH:  Yes, sir; we do, Judge.  I want to inquire into why the physician from New York was called to Selma; for that reason would not agree to excuse him.

THE COURT:  I told you beforehand any witnesses that have been subpoenaed and appear cannot be excused except by --

MR. GREENBERG:  He has not been subpoenaed, your honor, if that makes a difference, he was asked to -- he was sworn.

THE COURT:  He has not been sworn?

MR. GREENBERG:  He was sworn.

THE COURT:  Been sworn?

MR. GREENBERG:  He was sworn.

THE COURT:  All right, we will have to keep him. From this point on you are responsible for his attendance and payment.

MR. SMITH:  Yes, sir.

THE COURT:  All right.  Call your next witness.

MR. HALL:  May we use Mrs. Boynton, please?

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

AMELIA PLATTS BOYNTON, a Plaintiff, having been duly sworn, testified
    as follows:

DIRECT EXAMINATION:

BY MR. HALL:

Q    Would you please state your name, residence, and occupation?

A    My name is Amelia Platts Boynton; I live 1315 Lapsley Street,
    Selma, Alabama; I am employed by the Pilgrim Health and Life
    Insurance Company as State Ordinary Supervisor; I also have an
    employment agency and insurance agency located 21 Franklin
    Street.

Q    Is that in Selma, Alabama, also?

A    In Selma, Alabama.

Q    Can you tell us, Mrs. Boynton --

        THE COURT:  Just a minute, please; do we have a
Marshal?  Go ahead.

Q    What is the Dallas County Voters, if you know?

A    Dallas County Voters League is an organization that is over
    twenty-five years old.  Its purpose is to help to train and see
    that Negroes become registered voters.

        THE COURT:  That door will have to remain closed
until we get through with this witness.  All right, Mr. Hall; go
ahead.

Q    Go ahead and -- Mrs. -- Mrs. Boynton?

A    It is an organization that is for the purpose of helping Negroes

to become registered voters, to arouse their interest in becoming first class citizens and to exercise their citizenship.

Q   Who is the members of this organization, Mrs. Boynton?

A   Those who have become registered voters and many others who have tried for a number of times are members of the Dallas County Voters League.

Q   Are all of these Negroes?

A   These are Negroes.

Q   Do they all --

A   They all live in Selma and Dallas County.

Q   Can you describe for us, Mrs. Boynton, the activities of the Dallas County Voters League beginning, let's say, about 1963?

A   In 1963 the Dallas County Voters League, after having tried to get the Negroes to register --

          THE COURT:  Just asked you the activities; he asked you just the activities.

Q   Just the activities?

A   It is -- the activities are to train the citizens, the Negro citizens, how to fill out blanks, how to answer intelligently and correctly the questions on the blanks, how to go down to the Court House and how to register.

Q   Tell us your position in this organization, please?

A   I am on the -- I am a member of the Dallas County Voters League, and the Voters League has a Steering Committee, and I am on the Steering Committee of the Dallas County Voters League.

Q   Can you tell us whether or no the Dallas County Voters League
    is involved with the Southern Christian Leadership Conference
    or any other organization in what is known as the Alabama project?

A   The Dallas County Voters League has invited the South -- the
    Southern Christian Leadership Conference to help it, and we
    have become a part of the Dallas -- of the Southern Christian
    Leadership Conference; consequently, we working together, and
    we are a part of that organization.

Q   Now, when did you extend this invitation to the S.C.L.C.?

A   This invitation was extended last year, either in the late fall
    or in the early part of the winter.

Q   And as a result of this invitation, were there some initial
    meetings in Selma or some other place?

A   As a result of this invitation, a few of us met with some of
    the officials of S.C.L.C. in Montgomery, Alabama, and we asked
    them to please come over into Selma, because it is in the Black
    Belt, and having a large number we wanted them to try to
    speerhead the organization in that section in order that it
    might work out from there.

Q   And you wanted them to help you do what, now?

A   We wanted them to help us to get these people registered and
    become registered voters.

Q   And when you say, "These people," to whom do you refer?

A   I refer to the Dallas County Negroes and Negroes of Selma.

Q   Is there any other organization involved with you in this

project?

A   Yes; since '63 or '62 we have had the Student Non-violent
    Coordinating Committee to come in at our request to help us to
    get the Negroes registered.     •

Q   Now this, then, is what is referred to as the Alabama project;
    is that right?

A   That is the Alabama project, was the three organizations working
    together.

Q   Are these efforts coordinated?

A   The efforts are all coordinated.

Q   I see. Now, with reference to attempting to get Negroes
    registered and voting in Dallas County, what has been done by
    your organization or the other organizations working with you
    in the past two years?

A   In the past two years we have had clinics, we have held the mass
    meetings, we have given instructions, we have taught them how
    to fill out applications, and we have taken them down in large
    numbers and small numbers, also, to register, and we have
    vouched for those who have gone down there.

Q   Have you had any demonstrations?

A   We have had demonstrations.

Q   And will you tell us whether or no your efforts along these lines
    have been encouraged or discouraged by State or county people?

A   The efforts have been discouraged by State and county officials.

Q   And will you tell the court just what has been done to discourage

123

your efforts?

A   It is required in -- in Selma and Dallas County to have a
    voucher to --

            MR. P. H. PITTS:  I object and move to exclude that;
    he has asked her what the officials of Dallas County have -- they
    have no control over the State laws.

            THE COURT:  Well, he asked what they have done,
    whether they controlled it or not; he's asked her what they have
    done.  You can answer from your own personal knowledge; your
    objection is overruled.

Q   Please continue?

A   The -- those who are registered voters will have to vouch for
    those who go down and make an attempt to register.  And there
    have been many blocks put up, or I might say interferences,
    and me personally having gone down there to try to vouch for
    these people as well as a number of people going down having
    been blocked.

Q   Are there other instances; have you been arrested?

A   I have been arrested; I was arrested on the 19th of February --
    of January, 1964.

Q   Is that '64 or this '65?

A   '60 -- '65.

Q   1965.

A   Want me to tell you how -- what happened?

Q   What was the circumstances of that arrest, please?

124

A As a voucher for those who go down, it is customary for me to go

down and stand, and as those people get ready to go, as the

Negroes who are citizens go -- get in the line and go into the

office of the Registration Board, it is my business to go there

and vouch for them, filling out a certain portion of the

application.  On this particular time I went through the side

door, and as I went in -- went into the Court House, there was

an officer who is a Sheriff's deputy standing there, and he

said, "You cannot stand in the hall."  I said, "I am there to

vouch for these who are to be vouched for."  He said, "It

doesn't make any difference" --

   MR. SMITH:  We object to the conversation, if the

court please; hearsay.

   THE COURT:  Overrule; go ahead.

A He said, "It doesn't make any difference, you have to go in the

alley."  I went into the alley, and Sheriff Clark came in and told

me to get out of there, that those were people there who had to

be -- who were going in to register.  I told him again -- I

told him, also, that I was there to vouch for those who were to

register.  He said, "It doesn't make any difference," says, "You

get on back in the Court House."  And when I went back into

the Court House, I said to the person, to this deputy, that,

"Sheriff Clark said I must not stand out here, where am I to

be, you said I am not supposed to stand in here?"  He said, "Go

to the end of the Court House door."  Then I went to the end of