125

the office, or the building, and there is where I sat for
awhile.  In the meantime, realizing that I had -- didn't have
enough money in the -- in the meter, I went out to put money in
the meter.  And as I was coming back, Sheriff Clark said to me,
"Where are you going?"  I said, "I am going into the Court House
in order that I might vouch for these people."  He said, "Well,
you get in that Court House, and you get in there quick."  I
went into the Court House; I started up the steps, in fact, and
when I started up the steps there were perhaps a half dozen
Sheriff's deputies and members of the Posse; they said, "You
cannot come in here."  I said, "Sheriff Clark told me to come
in"; so he said, "Well, I am sorry, you can't come in."  And
when I told him that I just went out to put money into the
meter, he said -- one of them said, "Just go and ask Sheriff
Clark about it."  They came back and said, "He said yes, you
can go in, but you have got to go around the alley."  Then I
had to go all the way back around the side and come in that
half of the building coming back in; I went in because the
people were standing up waiting for me to vouch for them.  At
twelve o'clock one of the deputies who was in the Court House
in the hallway said to me, said to all of us in fact, "It is
twelve o'clock, you can go home, and the office will open at
two."  I went on the outside, and as I went in the out -- on the
outside, my car was parked opposite the Federal Building, I
started down the street, and realizing that there was a rope to

block the pedestrians, and realizing I would have to go so far down before I could cross, I turned around to come back to the intersection of Alabama Avenue and Lauderdale, when as I started down Sheriff Clark said, "Did I not tell you to get in that Court House?" I said, "I have been in the Court House at twelve o'clock." He said, "I told you to get in that Court House and stay in there." In the meantime I was headed toward my office, and I said, "I am going to my office now, it is after twelve o'clock," and he said, "Don't you say anything to me." He ran to me, ran behind me, he grabbed me first by my coat around the waistline, he swung me around, and I continued to say, "I am not" -- he say, "You get in that line"; I said, "I am not in the line, I am on my way to the Court House -- to the office as a pedestrian." So he said, "Don't say anything to me"; he grabbed me then around the neck, and he shoved me for perhaps thirty feet toward the -- practically the length of the Court House, and he turned me -- he told the Sheriffs, "Arrest her, she is under arrest," and I went to jail, stayed there, was given a criminal's number, taken fingerprints.

Q    You were arrested on this occasion?

A    I was.

Q    I want to direct your attention to this previous date again, Mrs. Boynton; were there -- we gather from your testimony there were some Negroes at the Court House for the purpose of registering to vote; is that correct?

A   Yes, there were.

Q   Would you tell us how many Negroes were there, how they were arranged, were they waiting; approximately, in your best judgment, if you know, how many Negroes were there?

A   This was around -- this was dinner time.

Q   When you first --

A   Fifty-five or seventy -- between fifty-five and seventy-five Negroes were standing in line along the sidewalk of the Court House and near the entrance of the Court House on the south side or in front of the Federal Building, between sixty-five and seventy-five.

Q   Were there any Negroes standing in the alley; you referred to an alley just a moment ago?

A   Well, at that particular time I didn't get to the end of the alley to find out.

Q   So you know there were sixty-five or seventy Negroes standing there waiting to be registered?

A   Standing in the line.

Q   And your purpose for being at the Court House was to vouch for these persons?

A   To vouch for them.

Q   Tell us, Mrs. Boynton, is this the only occasion that you have been arrested by county officials or State officials in this voter registration drive in the last two years?

A   This is the first time I have been arrested.

Q    This is the only time?

A    Yes.

Q    Is there any other occasion that you have been confronted by
     Sheriff Clark during your voter registration activities, whether
     you were arrested or no?

A    There were several times that he spoke to me.  Once going through
     the door he -- it is a double door on the south side of the
     building, and he was standing on one side of the door, and as
     I approached the door, he said to me, "You get through that
     other door and go on in there."  Well, I said, "I beg your
     pardon, what did you say?"  He said, "Don't run over me, you
     get in that Court House."  Well, there were two doors, and
     naturally I wasn't going -- I wasn't going to run over him.

Q    Now, on the occasion that the Sheriff did arrest you, I believe
     you testified that he took you by the back of the neck --

A    Uh, huh.

Q    -- or around the waist?

A    Yes.

Q    And did he drag you along the street or push you along the street?

A    He pushed me along the street, along on the sidewalk, until he
     turned me into the hands of his deputies.

Q    Into the hands of -- approximately how far did you say he pushed
     you?

A    Approximately thirty feet.

Q    Good.  Now, did you participate in the march or the walk across

the bridge on Sunday, March 7?

A    Yes, I did.

Q    Will you describe for the court exactly what happened?

A    We left the -- we left Brown's Chapel A.M.E. Church approximately

    three thirty en route to Montgomery, Alabama, to protest to the

    head of the sovereign State the hardship of Negroes becoming

    registered voters.  En route along the way at first we walked in

    groups of six, two by two in groups of six, and as we got to

    Alabama Avenue, Selma Avenue and Sylvan Street, the officers

    that were along the way, some of them were possemen, some were

    deputies, and some were State Troopers.

Q    Will you wait there just one moment; when you say, "Possemen,"

    what do you mean?

A    There is an organized group that the Sheriff has organized, and

    I might say a few years ago there was an article in the paper --

            MR. McLEAN PITTS:  Now, we object.

            MR. P. H. PITTS:  We object to that.

            MR. McLEAN PITTS:  We object to that.

            THE COURT:  Sustain objection.

Q    When you refer to -- when you say, "Possemen," what do you mean?

A    An organized group that is under the supervision of the Sheriff.

Q    This is the Sheriff's Posse?

A    Yes.

Q    Well, go right ahead?

A    And as we -- as we got to -- to Alabama Avenue, we were asked

    to step up, because we were being guided by these law enforcement

officers, and they said, "You don't have to be in case -- in just

twos, but just step up," so we stepped up, and we went on down

to Water Avenue, turned west on Water Avenue, and when we got

to the bridge, we began to walk then on the side in twos. That

is on that -- that is where I walked. And when we got on the

other side of the bridge, possibly a third of a mile or a

quarter of a mile, we were stopped then by an officer, State

Trooper, as the State Troopers were on both sides of us all the

way along until we were stopped. And the State Trooper read a

statement saying that we could not go any further, that we were

to stop there, and all of us must turn around and go back and

must not go any further.

Q    Then what happened?

A    Well, one of our leaders asked could he have a word to say.

Q    You heard this; you heard the --

A    I heard that, myself.

Q    All right, what was his --

A    He asked twice --

Q    What was the reply to this request?

A    The request, the second time he said it, which was right after --

     a matter of moments after the first time, he said, "No, we --

     you cannot make any statement; men, charge on them"; and with

     that --

Q    Just one moment; did the person who made the reply identify

     himself; do you know who that person was?

A   Yes, it was -- I do.

Q   Who was the person?

A   That was Mr. Hosea Williams.

Q   He made the request?

A   He made the request.

Q   Can you identify the Trooper who made the reply?

A   No, I am afraid I couldn't.

Q   Did he identify himself; did he say who he was?

A   I am sure he did, because he --

Q   Did you hear that, you don't recall?

A   No, I don't recall.

Q   All right, go right ahead and tell us what happened?

A   And when he said, "Men, charge on them," I saw these men when
    they put on their gas masks and came toward us; in the meantime,
    I remember having felt one blow, which was this blow here, and
    I remember an attempt to hit me a second time, and in that
    second --

Q   Wait just one moment; how did they come toward you now?

A   They rushed us.

Q   They rushed you?

A   They rushed.

Q   Would you describe what they did before they charged the line
    or came toward the line?

A   They placed their gas masks on; when he said, "Men, charge them,"
    they immediately placed their gas masks on, and this whole line

132

there was along the side from the bridge on up to where we were
rushed to -- the part that I saw, I didn't see behind me, but
that was perhaps twelve or fourteen of them I know I could see,
and they rushed toward us with their gas masks on. I remember
when he hit me the first time, one of them, I can't identify
him, he hit me the first time here, and I held my hands up, and
of course I wanted to throw my cap over my face, and then a
second blow was here, and I remember nothing else. My glasses
were --

Q   You were knocked to the ground?

A   I was knocked to the ground.

Q   You -- from that you became unconscious?

A   I became unconscious.

Q   Mrs. -- I show you what purports to be Plaintiffs' Exhibit 3
    for identification, and ask you to look at it and tell me if
    you can identify it and tell us what it is?

A   This is me.

Q   What -- what do you mean, "This is me"; is that you, actually,
    or is that a picture of you?

A   This is my picture; this is me when I was hit and the blow ---

Q   Just a moment; identify what you are looking at?

A   I am looking a picture; I am looking at a picture.

Q   Is that a picture of yourself?

A   I am looking at a picture of me.

Q   Just one moment -- you know that is you?

133

A    That is me.

        MR. HALL:  Gentlemen?

        MR. SMITH:  We have seen it, but I would like to look

at it.

Q    I show you what purports to be Plaintiffs' Exhibit 2 for

    identification, and ask you to look at it and tell us if you

    can identify it?

A    This is my picture.

Q    A picture of you taken at what time on what occasion?

A    This is the picture that was taken when I was knocked out.

Q    On what day?

A    On the -- on the 9th -- the -- the 7th.

Q    That Sunday, the 7th of March?

A    Of March, 1965.

Q    At or about the time you were testifying to when you had been

    knocked to the ground?

A    This is -- this was the picture that was taken at that time.

Q    Thank you.  I show you what purports to be Plaintiffs' Exhibit

    1 for identification, and ask you to look at it and tell us if

    you can identify it?

A    This is the group that started to Montgomery.

Q    Beg your pardon; that is a group, or is that some -- what is

    that, tell us what you are looking at?

A    This -- this is a group of Negroes who started to march to

    Montgomery on Sunday, the 7th of March, 1965.

134

Q    You mean that is a group or do you mean that is a picture or
     photograph of the group?

A    This is a picture; this is a picture of a portion -- it is not
     the whole group; it is a picture of a portion of the group.

Q    Not the group, itself, but a picture of the group?

A    Yes.

          MR. HALL:  May it please your honor, we are going
to offer into evidence these two pictures marked Plaintiffs' Exhibit
2 and Plaintiffs' Exhibit 3 for identification.

          MR. SMITH:  Objection.

          THE COURT:  Any objection?

          MR. SMITH:  Yes, sir.

          THE COURT:  What is the basis for your objection?

          MR. SMITH:  You haven't offered this?

          MR. HALL:  I haven't offered this.

          MR. SMITH:  These are the two you have offered?

          MR. McLEAN PITTS:  You haven't offered this?

          MR. HALL:  Two; those.

          MR. SMITH:  May I on voir dire ask the witness one
question?

          THE COURT:  Yes.

               VOIR DIRE EXAMINATION:

BY MR. SMITH:

Q    In regard to this Exhibit which is marked Plaintiffs' Exhibit 2,
     is this a photograph of you in a state of unconsciousness?

A   It is, because I remember being knocked out.

Q   Do you state that to the court?

A   Yes, I did.

Q   That this State's Exhibit 2 depicts you in a state of
unconsciousness?

         MR. HALL: May it please your honor, we don't
remember -- well, I withdraw that.

         THE COURT: Go ahead, Mr. Smith; voir dire examination.

Q   Will you state to the court that this State's Exhibit 2 depicts
you in a state of unconsciousness?

A   This is the picture of me, and this is the picture -- this is
the place where I was struck unconscious.

Q   You are unconscious as shown and depicted in this photograph?

A   This is my picture.

Q   Not asking you that; I am asking you whether or not you are
unconscious as shown in this Exhibit, this photograph?

A   Yes, indeed I was.

Q   You were indeed unconscious at that time?

A   I was unconscious; yes.

Q   Is it not a practice or a policy or procedure taught in
demonstrations that demonstrators --

         THE COURT: Now you are going to the weight of it --

         MR. SMITH: Yes, sir.

         THE COURT: -- not to the admissibility; what are
your objections to them?

   MR. SMITH:  I withdraw the objections.

   THE COURT:  2 and 3 admitted without objection.

   MR. McLEAN PITTS:  Wait a minute, I object to it on

I object to it on behalf of the defendant, Clark, on the ground

that there is no connection between the defendant, Clark, and any

of these pictures here.

   THE COURT:  All right.

   MR. HALL:  We will connect it up, your honor.

   THE COURT:  2 and 3 will be admitted; go ahead, Mr.

Hall.

   MR. McLEAN PITTS:  We except.

   MR. HALL:  Thank you, Judge.

    DIRECT EXAMINATION (cont'd):

BY MR. HALL:

Q Mrs. Boynton, I show you Plaintiffs' Exhibit 3, and ask -- ask

  you to tell us what is described in that photograph?

A This -- this picture describes me lying unconscious on the

  ground during the time that we were going from Selma to

  Montgomery on the 7th of March --

   THE COURT:  That is repetitious.

A -- 1965.

   THE COURT:  That is repetitious, Mr. Hall.

   MR. HALL:  Repetitious; thank you very much.  May

it please your honor, we offer into evidence Plaintiffs' Exhibit

1, and I hand it to the defendant.

MR. SMITH:  Is this the same Exhibit you just
mentioned or identified?

MR. HALL:  Yes.

THE COURT:  Any objection to it?

MR. SMITH:  No objection.

MR. McLEAN PITTS:  I don't have any objection to the
picture here.

MR. HALL:  No objection to it?

THE COURT:  Any objection to it, gentlemen?

MR. SMITH:  No, sir.

MR. McLEAN PITTS:  No, sir.

THE COURT:  Number 1 will be admitted in evidence.

Q    Will you look at Plaintiffs' Exhibit 1 and describe what that
     picture shows?

THE COURT:  She already has --

MR. McLEAN PITTS:  We object to that.

MR. HALL:  Your honor, may I say this?

THE COURT:  She has already said what it purports to
depict.

MR. HALL:  Yes, sir.

THE COURT:  That is the group on the march.

MR. HALL:  Maybe so, your honor, but I wanted to
bring on this it was the longest --

THE COURT:  Picture speaks for itself.

MR. McLEAN PITTS:  Picture speaks for itself.

138

MR. HALL: We have no more further argument on that point.

Q    Did you -- were you treated at a hospital after you were picked up on Sunday?

A    I was treated at the Good Samaritan Hospital.

Q    What were you treated for?

A    I was treated for shock, for being gassed, and for bruises, I imagine, because they did put something on my arm and on the back of my neck.

Q    When you say, "Gassed," what type of gas?

A    This is tear gas that was thrown during the time that they advanced on us.

Q    How did the gas affect you?

A    Well, I was unconscious from the -- from the hit, and then the gas got into my stomach, and I had to be gagged, or helped to be gagged in order that I could bring it up.

Q    Did you require considerable medical attention?

A    They gave me first aid from the time I remembered, and during the time I was at the hospital they gave me first aid. Then when I was carried home, some of my friends gave me first aid.

Q    Now, let me ask you this, Mrs. Boynton; directing your attention back to the bridge, as you approached the bridge, going across, did you at this point or at any other point see Sheriff Clark or any of his deputies or any of them, members of his Posse?

A    As we were across the bridge, I remembered having seen men in khaki pants that was used usually by some of the deputies or

possemen.

       MR. McLEAN PITTS:  Now, we object to that as far as being evidence that Sheriff Clark's men, there is lots of folks wear khakis, unless it is shown to be deputies of -- or either the Posse.

       THE COURT:  Overrule.

       MR. McLEAN PITTS:  We except.

       THE COURT:  You can examine her on it.

Q   Go right ahead; did you at any time see Sheriff Clark, himself; you know Sheriff Clark, don't you?

A   I do.

Q   You are a resident of the City of Selma?

A   Yes.

Q   And Dallas County.  You know him when you see him?

A   Yes.

Q   Did you see him on either side of the bridge on Sunday, May -- March 7?

A   I saw him on the other side of the bridge in a car.

Q   When you say, "The other side," do you --

A   That is -- that is en route to Montgomery; it was not in the city, but it was just across the bridge.

Q   After you had crossed the bridge?

A   After we had crossed the bridge.

Q   Then you saw the Sheriff over there in a car?

A   In a car; that's right.

Q    Will you describe for the court his activities at the time you
saw him?

A    I only saw him in the car; the car was moving along towards the
-- well, toward Montgomery.

Q    Did you see any members of this -- his Department on that side
of the bridge, persons you could identify as deputies or members
of his Posse?

A    I couldn't identify them personally, but they were members of
the Posse.

Q    Did you participate in a further march?

A    I did.

Q    Or walk across the bridge after March 7?

A    Yes.

Q    Mrs. Boynton. Will you tell us on what date that occurred?

A    On Tuesday, March 9, I participated in a march to continue the
march to Montgomery; there were perhaps three thousand people
in that group, and I wasn't as near the front as I was in the
first march. We proceeded toward the bridge, and after getting --

Q    Go right ahead?

A    After getting to the bridge -- after getting to the bridge, or
before crossing the bridge, we were told by an officer, the
name of the officer I don't know, in fact I don't know who it
was, but it was an official, that we were not to go across the
bridge, we were not -- we were asked to turn around and go back
to the church. But we proceeded -- I couldn't hear all of the

141

conversation; we proceeded and -- until we got to near the light on the other side of the Alabama River, and it was there we were stopped again by an official who was speaking through a mike, and we were told to turn back, that we were not to go any further.  It was there that we -- that Dr. Martin Luther King asked if he had something to say, and it was there that he told them that, "We would like to have a word of prayer."

Q   You heard this, yourself?

A   I heard that.

Q   All right, tell us what you -- what happened?

A   We knelt, and the two people prayed; one was Reverend Abernathy, and the other was a white minister; then we sang.  And later on when we finished, we turned around and went on back to the church.

Q   Was there any violence on this occasion?

A   There was no violence whatsoever; this was a mixed group.

MR. HALL:  I believe that's all.

CROSS EXAMINATION:

BY MR. SMITH:

Q   You say there was no violence on Tuesday of **this week** --

A   No violence --

Q   -- on the attempted march?

A   -- on Tuesday with reference to the march.

Q   But there had been violence the preceding Sunday, on March 7?

A   There was.  They had the same type of people on both sides when

142

we marched Tuesday as they had Sunday with tear clubs and billy clubs.

Q   You are one of the plaintiffs that filed a complaint in this court --

A   Yes.

Q   -- is that correct?

A   Yes.

Q   And you were served with a copy of this court's order dated March 9 on the morning of March 9, were you not?

A   I was served with the subpoena; I was served en route on this march on the 9th.

Q   When were you -- when were you served?

A   I was served between the church and Alabama Avenue.

Q   Who served you?

A   One of the Marshals, I imagine.

Q   Did you read the order of the court?

A   I did not read it, because when I was hit my glasses were lost, and I did not read it at that time.

Q   Well, I thought you were served before you were hit, weren't you?

A   I had no -- my glasses were lost on Sunday when I was hit by one of the State Troopers.

Q   Well, you didn't know what was in the court's order?

A   I had heard what it was, and I knew I was not supposed to march according to that, because I handed it to someone else and asked them to give me the gist of it; at that time I had already

started, I was en route, to Montgomery.

Q   I am talking about now when you were marching down the streets
in the City of Selma --

A   I was marching down the streets.

Q   -- did you know at that time you were not supposed to march
under the order of this court?

A   Only while I was en route to Montgomery.

Q   Your understanding, then, that you were only prohibited from
marching when you were en route to Montgomery --

A   That is the only time.

Q   -- is that right?

A   That's right.

Q   Well, didn't you just say that on Tuesday, March 9, you
continued the march which had commenced on Sunday, March 7?

A   This was on Tuesday when I received --

Q   I understand that.

A   That was on Tuesday when I received this from the Marshal's hand.

Q   On Sunday, March 7, the attempted march was from Selma to
Montgomery; isn't that right?

A   That's right.

Q   That was -- that was the purpose of the march --

A   That's right.

Q   -- to march from Selma to Montgomery?

A   That's right.

Q   And did you understand the purpose of the march on Tuesday to

144

be a continuation of this march?

A    Not until I received this order.

Q    So you changed your interpretation of what the march was when you received the order; is that what you tell the court?

A    I was en route to Montgomery when I received the order.

Q    Were you walking?

A    Yes, I was, and we had stopped because we had stopped at the intersection, and it was there that a Marshal handed me --

Q    Did you stop walking when the Marshal handed you the order?

A    Yes, I had stopped.

Q    You pulled out of the crowd?

A    No, I did not pull out.

Q    You did not?

A    He handed it to me while I was in the crowd.

Q    While you were in the crowd?

A    Yes.

Q    What did you do then?

A    I said, "Thank you."

Q    Did you continue to march?

A    Yes, I did.

Q    But you knew at that time the court had ordered you not to march

A    No, I hadn't had time to read it.

Q    But I thought you said you knew what was in the order?

A    I read it en route, or had it read to me; I had it read to me en route, a portion of the order.

Q   Did you know at the time you were served what was in the order;

did you know at the time you were served what was in the order?

A   No, I didn't.

Q   You did not?

A   No.

Q   Now, you say the Dallas County Voters League is organized for

helping the people to become voters --

A   Right.

Q   -- in Dallas County?

A   That's right.

Q   And this organization has more or less merged or participated in

the Southern Christian Leadership Conference; is that correct?

A   We are affiliated with it; we are a part of it.

Q   You are a part of it?

A   Yes.

Q   Are you a registered voter in Dallas County?

A   Yes, I am.

Q   When were you registered to vote?

A   Approximately twenty-three -- two or three years ago.

Q   Did you have any difficulty in registering?

A   I had no difficulty at all; I simply took the oath, and I think

I signed my name, and I believe that was all.

Q   Are you familiar with the Federal Court case that was filed in

the United States District Court styled United States versus

Atkins?

146

A    Yes.

Q    Was that filed approximately five years ago?  Or when; I am
     asking you?

A    I thought you asked me how long have I been a registered voter;
     oh, around twenty-five, around twenty-five.

Q    Were you familiar with this Federal Court case?

A    Yes.

Q    How long have you been familiar with it?

A    Ever since it was issued.

Q    And how long ago, in your judgment, would that have been?

A    How long ago what?

Q    How long ago was it before the court issued it?

A    I think it has been issued sometime last year.

Q    Did it enjoin the Dallas County Board of Registrars from
     discriminating against Negroes in the registration process in
     Dallas County?

A    If it did, it wasn't obeyed.

Q    It what?

A    It was not obeyed if -- if the Federal Government had enjoined
     the reg---- the Board of Registrars from discriminating against
     Negroes, it was not obeyed -- obeyed.

Q    Board of Registrars didn't obey it?

A    No.

Q    Did anybody petition the Federal Court in regard to their
     disobedience of the order?

A    Yes.

   MR. DOAR:  If the court please, these matters are
before Judge Thomas in contempt action against the Board; I don't
see how this witness can know all the details of that proceeding.
I think the questions are immaterial.

   THE COURT:  Well, as far as she knows, did anyone
petition Judge Thomas to ask that his injunction be enforced; you
can answer that question if you know.

A    I know the order was asked to be enforced, but as far as the
  legal side of it, I do not know.

Q    You do not know?

A    That is in the hands of the lawyers.

Q    After the court entered the order, did it require a voucher for
  registration?

A    Yes, we still have vouchers.

Q    Still have a voucher?

A    Yes.

Q    Now, you say that the Student Non-violent Coordinating Committee
  was also invited to come to Selma?

A    That's right.

Q    Did this group instruct your group, the Dallas County Voters
  League, how to stage mass demonstrations?

A    The Student Non-violent Coordinating Committee worked with us
  and under our supervision.

Q    They tell you how to protest?

A    We -- they helped us to get our people prepared to register.

Q    Well, you mentioned, though, that you had clinics, and you also --

A    Yes.

Q    -- mentioned that you had mass meetings --

A    Mass --

Q    -- and that you had demonstrations?

A    We had clinics about seven or eight years ago.

Q    That is not my question --

A    It is not if the clinics --

Q    -- my question is, did the Student Non-violent Coordinating
Committee teach your group, the Dallas County Voting League,
how to conduct mass meetings and how to conduct demonstrations?

A    The Student Non-violent -- Non-violent Coordinating Committee
helped us to carry on the program that we had had in teaching
them how to register, how to have clinics, and we took on a new
part, and that is to be able to go down in large numbers to try
to register, because as it had been said, and as you know, they
said we didn't go down enough, so they helped us.

Q    Student Non-violent Coordinating Committee told you you needed
to march?

A    We had -- no.

Q    It didn't?

A    No.

Q    Well, I thought you said you took on a new part?

A    We made the decision, ourselves, with the Student Non-violent

Coordinating Committee.

Q    Did they suggest that you do this?

A    The Student Non-violent Coordinating Committee worked with us on all of these projects.

Q    How did they tell you to conduct the mass demonstration or march?

A    They did not tell us anything; we got together and worked out the programs that we had; they didn't tell us.

Q    Didn't tell you?

A    No.

Q    You worked together?

A    We worked together.

Q    What program did you come up with, as to how to demonstrate?

A    The programs to demonstrate -- and it did not come from -- the objective was first by the student -- not by the organization, by Selma, Dallas County young citizens, who said that they were tired of reading about taxation without representation, and this is what was said by them in a meeting, they were tired reading about taxation without representation, during the Boston Tea Party and what not, and why is it their parents could not register and vote -- "They didn't do anything about it, so we are going to make an attempt to do something about it; we are going to march."

Q    Did they tell you to disobey the law of the City of Selma?

A    I am telling you what they told us.

Q    Well, I am asking you did they tell you to disobey the laws of

the City of Selma?

A    When the City of Selma was -- when it comes down to registering and voting, it is a federal law.

THE COURT: Mrs. Boynton, do you understand that question?  He is asking you --

WITNESS:  No, sir; I don't.

THE COURT:  -- what the Student Non-violent Coordinating officers advised you to do?

A    They didn't advise us to do anything.

Q    In regard to obeying or disobeying city laws?

A    They didn't advise us to do anything.

Q    Did they tell you how to demonstrate?

A    We worked out our program together.

Q    You worked out the program together?

A    Yes.

Q    Well, what was the course of action that you worked out in regard to demonstrating?

A    The course was that we will get together, and we would train these people how to fill out the blanks.

THE COURT:  All he is asking you about is demonstrating, not filling out blanks.

A    Well, we had to go down in large numbers, that is the demonstration he is talking about, because that is the only one I know.

Q    Did you decide to bring in people from Montgomery County and

surrounding counties and from out of the State and from throughout
the nation if you could attract them; was that the plan?

A    That wasn't under the -- under the Student Non-violent
Coordinating Committee.

Q    Was it done under anybody?

A    Yes.

Q    Under whom?

A    It was done under the Southern Christian Leadership Conference.

Q    Dr. King instructed you to do that?

A    It was done under the organization of the Southern Christian
Leadership Conference.

Q    Did Dr. King instruct you to do this?

A    The organization of which we are a part.

Q    Did Dr. King instruct you to do this?

A    This was worked out by the organization.

          MR. SMITH:  Judge, I believe she understands the
question.

          THE COURT:  Do you understand that question?

          WITNESS:  I just -- he said did Dr. King tell us to
do --

          THE COURT:  Answer -- just a minute.

          WITNESS:  The organization --

          THE COURT:  No, just answer the --

A    No.

Q    He did not?

A    No.

Q    Did he, Dr. King, instruct you on the methods of planning a march
     or a mass demonstration and his theory of non-violence and without
     the use of aggressive weapons?

A    In the meeting he made the suggestion.

Q    Suggesting what?

A    That we have non-violent marches.

Q    And call people from wherever you can call them --

A    Yes.

Q    -- to participate in this march --

A    Yes.

Q    -- is that correct?

A    Yes.

Q    Did he instruct you to provoke violence?

A    He instructed us not to provoke violence.

Q    Not to provoke violence?

A    Not to provoke violence.

Q    Did he instruct you to disobey the city laws?

A    He instructed us to try to obey all laws.

Q    All laws?

A    All laws, Federal laws where Federal laws are especially.

Q    Federal Court orders?

A    Laws.

Q    What?

A    Laws, orders, law.

Q    Did he instruct you in the -- in the mass demonstration attempts

     that when dispersements were required or asked of you, that is,

     when somebody in apparent authority asked you to disperse, to

     fall to the street or to the sidewalk --

A    No.

Q    And remain there limp?

A    No.

Q    And be carried to the city jail in a state of limpness, so to

     speak?

A    No.

Q    That is not right?

A    That is not true.

Q    Well, was that practice carried out?

A    I haven't heard of it in Selma.

Q    You haven't heard of anybody --

A    I have not heard of it in Selma.

Q    -- anybody falling to the street?

A    I have not heard of it in Selma, anybody being carried out --

Q    Were you unconscious as shown in this Plaintiffs' Exhibit 2, the

     photograph --

A    I don't remember --

Q    -- or were you falling limp?

A    -- anything that happened; I must have been.

Q    You must have been what?

A    I must have been unconscious.

Q    Limp or unconscious?

A    I must have been unconscious, because I know nothing of what
     happened afterwards.

Q    Do you know Dr. MOLDORAN, of New York, a physician?

A    I have an idea who that is.

Q    When did he come to Selma?

A    I don't know.

Q    Well, what is your idea of who he is?

A    A doctor came to the house to see me after I was taken home, and
     I presumed it was he.

Q    Did somebody in your group call a physician from New York to
     come to Selma in regard to these planned marches?

A    I do not know.

Q    You don't know?

A    No.

Q    You know nothing about it?

A    No.

Q    But a New York physician did come, didn't he?

A    It -- I imagine it was -- it was a -- not a citizen, not a
     physician of the city who came.

Q    Did this New York physician treat you?

A    I don't know who treated me, but he came to the house to see how
     I was getting along.

Q    Isn't it a fact that street demonstrations such as the ones you
     participated in have been planned or considered by you and your

group to be unsuccessful unless there is some act of violence;
isn't that a fact?

A    Isn't it what?  Will you state -- make your statement again?

Q    Isn't it a fact that mass demonstrations which you have
participated in and which you have heard planned are considered
by you and your group to be unsuccessful unless they provoke
violence?

A    I am afraid you are wrong.

Q    They are considered successful whether they do or not?

A    I am afraid you are wrong; we have never had anything like this
to happen before.

Q    Anything like what?

A    Like having tear gas, going to Montgomery and having been stopped
before.

Q    And your group, that is, Student Non-violent Coordinating
Committee, S.C.L.C., and the Dallas County Voters League, do not
advocate violence of any type?

A    We do not advocate violence of any description, form, or fashion.

Q    But you do feel it is proper for you to bring your grievance in
regard to voter registration on to the streets of Selma and
Montgomery and other places in the State of Alabama?

A    Our grievances were to be brought to the Governor who sent the
State Troopers in there with violence.

Q    By marching --

A    The only violence was on their side.

Q  By marching from Selma to Montgomery?

A  Right.

Q  All right, just one minute.  Did you know that the Governor of
   Alabama requested in a public statement that this march which
   was planned from Selma to Montgomery not be conducted because
   it may jeopardize the safety of the marchers as well as the
   motoring public and other citizens in Alabama?

A  Yes, but we had mapped out our plans how we were going without
   jeopardizing the lives of the citizens.

Q  And you planned to do that regardless of the consequences?

A  We were going --

Q  Is that right?

A  -- as pedestrians.

Q  And you continued to march, even though this court on Tuesday,
   March 9, entered an order enjoining you from attempting to march
   from Selma to Montgomery --

A  Yes.

Q  -- is that right?

A  Yes.

Q  You felt compelled to disobey this court's order?

A  Yes.

           MR. GRAY:  Your honor, we object.

           MR. SMITH:  I have no further questions.

           MR. GRAY:  It is argument.

           THE COURT:  Mr. Pitts.

BY MR. McLEAN PITTS:

Q   You say that the Dallas County Voters League has been in existence how long?

A   The Dallas County Voters League has been in existence for over twenty-five years.

Q   Is that a corporation?

A   It is not.

Q   Now, have any white citizens joined the Dallas County Voters League?

A   There are none.

Q   There are white people in Dallas County that can't vote, aren't there?

A   They are invited; if they would like to be a member, we would gladly accept them.

Q   You say that you were served with this court order while you were en route to Montgomery; is that right?

A   Yes, on Tuesday, the 9th, en route to Montgomery.

Q   All right, but as I understand you, you had never got out of the corporate limits of the City of Selma?

A   No, I hadn't.

Q   And as I understand you, you were on Alabama Avenue when the U. S. -- Deputy U. S. Marshal served you?

A   Well, I won't say Alabama Avenue; the group had stopped there, and we were -- I was a good way behind, so I was between the church and Alabama Avenue.

Q   The church and Alabama Avenue, on Sylvan Street?

A   On Sylvan Street.

Q   And that is about two blocks, isn't it?

A   Perhaps.

Q   After you left the church; isn't that right?

A   Perhaps.

Q   So you were served then, and then after the route -- route that you took, you went down to Water Avenue, didn't you?

A   We did.

Q   On Sylvan Street?

A   We did.

Q   Now, when you got on Water Avenue, did you walk on the sidewalk or you walk in the street?

A   I really don't remember; wherever the group was, I walked behind them, walked -- took the same route that they took.

Q   You don't remember where you walked on Water Avenue?

A   I know I walked a portion of the time on Water Avenue on the sidewalk and a portion of the time in the street.

Q   All right; now, as you were going out from the L. and N. Depot -- that is on Sylvan Street, isn't it?

A   Yes.

Q   And that is right at the foot of Water Avenue, isn't it?

A   Yes.

Q   And that is where you got on Water Avenue, didn't you?

A   We -- we walked --

Q    Isn't that right.

A    -- in that direction, and I think it was.

Q    All right, from that point right there up to Broad Street or
     the Edmund Pettus Bridge, you walked right in the middle of
     Water Avenue, didn't you?

A    We were directed by the officers --

Q    I mean, you were in the middle of Water Avenue, weren't you?

A    I am quite sure they directed us --

Q    I am just asking you --

A    Yes, I am sure.

Q    -- were you in the middle of Water Avenue?

A    I guess so, wherever we were directed.

Q    All right, and it was -- and Water Avenue is a pretty heavily
     traveled street in the City of Selma, isn't it?

A    It was cleared by the officers.

Q    It was cleared --

A    Yes.

Q    -- but that is a heavy traveled street in Selma, it is one
     of the thoroughfares, isn't it?

A    I am sure -- I am sure it is.

Q    It is in that wholesale grocery area, isn't that right?

A    That's right.

Q    And wholesale groceries up and down that street, isn't it?

A    That's right; I think so.

Q    And business is carried on up and down that street, isn't it?

A    It is.

Q    Now, and this was on a Tuesday; is that right?

A    It was.

Q    Now, you say that you traveled the same route on a Sunday; is that right?

A    Yes, and I think we were on the sidewalk, though I am not sure.

Q    Uh, huh; now, as a matter of fact, you didn't travel the same route on Sunday, did you; you came down Alabama Avenue to Broad Street and then --

A    Maybe; I said I wasn't sure.

Q    You wasn't sure?

A    Yes.

Q    But you did come down to Broad Street and walk the last block between Alabama and Water on Broad Street on Sunday, didn't you?

A    Well, it could have been.

Q    Uh, huh.

A    I am not sure.

Q    And that is a -- that is in downtown Selma, isn't it?

A    It is.

Q    And U.S. highway 80 is a heavy traveled highway, isn't it?

A    It has sidewalks, though.

Q    U.S. 80 does?

A    Yes, on Broad Street, it has sidewalks.

Q    I didn't ask you -- I said U.S. highway is a heavy traveled highway, isn't it?

A    Yes, it is; yes, it is; definitely.

Q    Uh, huh; now, you say that you had set out to march to Montgomery
     is that right?

A    That's right.

Q    Did you have any clothes with you?

A    Yes, I did.

Q    What kind of bag?

A    I had a change of clothing and in a bag, a small bag.

Q    Where did you have that?

A    I had it under my arm.

Q    Under your arm?

A    Yes.

Q    Uh, huh; and what kind of shoes did you have on?

A    I had on high heel shoes, because I always wear them.

Q    High heel shoes?

A    Yes.

Q    And you were going to walk from Selma to Montgomery with high
     heel shoes on?

A    I do not wear low heel shoes, because I can't.

Q    All right; now, did you know before you left the church down
     there that -- in fact you were requested before you left the
     church not to make that march on Sunday, wasn't you?

A    I don't remember.

Q    Well, I -- you can remember back to Sunday, can't you?

A    Whether I was requested not to make it.

Q     Oh, this group was requested --

A     The group; yes.

Q     -- not to make the march on Sunday, wasn't it?

A     I don't know.

Q     Now, didn't Mr. Wilson Baker, Sheriff Clark, Major Cloud, and
      all of them ask you all not to make that march on Sunday?

A     I was not in that meeting, and I don't know.

Q     Uh, huh; and now, on that date, on that Sunday, you -- you were
      met just about where -- at the end of that bridge, wasn't you,
      on the Montgomery side of the bridge, wasn't you?

A     I think so.

Q     Just a few feet over from the end of that bridge, wasn't you?

A     I think so.

Q     And they told you at that time to disperse and return back to
      Selma, didn't they?

A     It was either Monday or Tuesday, and I don't know which day it
      was.

Q     I am talking about Sunday now?

A     It was either Sunday or Monday, one of those days; I don't know
      which day it was.

Q     And that day, just stood there on that highway, didn't they?

A     I don't know whether that is the day we were stopped or not.

Q     On Sunday, the day --

A     Well, I am not sure it was Sunday, we were met and stopped at
      the -- at the entrance of the bridge.

Q   Yes, and that group continued to march on into those State
    Troopers, didn't they?

A   We didn't think they were vicious; we knew --

Q   Well, they marched on into the State Troopers, didn't they?

A   We stopped when they told us to stop.

Q   And the State Troopers then tried to break you up by each one
    of them grabbing a billy and running into you like that and make
    you go back across the bridge, didn't they?

A   (Shook head to indicate negative reply)

Q   Huh?

A   No.

Q   But you refused to cross it, go back, didn't you?

A   No, you are wrong.

Q   On Sunday, didn't you?

A   (Shook head to indicate negative reply)

Q   All right. Now, let's get back to this incident over at the
    Court House. Now, you state Sheriff Clark arrested you over
    there at the Court House; is that right?

A   That's right.

Q   What were you charged with?

A   I wasn't charged with anything at the beginning. And when we
    were supposed -- after having been in jail for a couple of hours,
    or over to the jail, I was -- we were taken back to the Court
    House, and I think it was that time on, I didn't know what we
    were charged with until that night, and that is criminal

provocation.

Q   Well, now, you -- you called this place the alley back there?

A   Yes.

Q   Now, actually, that is the Court House parking lot, isn't it?
It is cement?

A   I have never --

Q   It is cement throughout, isn't it?

A   I have never seen any cars parked back there.

Q   Never seen any cars there?

A   No.

Q   But that is a cement parking lot, isn't it?

A   I have never seen any cars parked there.

Q   It is cement?

A   It is cemented.

Q   It is cement, isn't it?

A   It is cemented.

Q   And there is a back door that opens into the Court House?

A   Yes.

Q   That is double -- double doors, isn't it, aluminum doors or
door, isn't it?

A   There is a door --

Q   Huh?

A   There is a door that opens in the hall.

Q   Double doors, aren't they?

A   I don't know.

Q    Same size as the doors that open in front on Lauderdale Street,
     isn't it?

A    There is a door that enters into the hall; whether it is double
     or not, I don't know.

Q    All right. Well, now, you could stand right back there in that
     where you enter that door and look right straight through that
     Court House and look out on Lauderdale Street, can't you?

A    That is where -- is why I had to walk around.

Q    Now, the Lauderdale Street entrance is over there by the United
     States Court House, isn't it?

A    That's right.

Q    And the Sheriff's office is right there on the United States
     Court House -- I mean right there where you enter on the
     Lauderdale Street -- I mean the Dallas -- Alabama Avenue
     entrance --

A    Alabama --

Q    -- isn't it -- huh?

A    Alabama entrance.

Q    Alabama, isn't it?

A    That's right.

Q    Well, the Sheriff's office is just after you go through the
     doors on the left; isn't that right?

A    That's right.

Q    Isn't that correct?

A    That's right.

Q   And the Board of Registrars is down the hall on the left, isn't it?

A   It is about midways --

Q   Uh, huh.

A   -- between the doors.

Q   And the way they have been handling that thing is that the line would come up through that parking lot and in that back door and then back around back toward the Alabama Avenue, to the Board of Registrars; ain't that right?

A   I think if I am not mistaken they pass the front door, pass the side door, then go through the back door, and then come on in.

Q   Into the Board of Registrars?

A   That's right.

Q   That is the way the line has been, wasn't it?

A   That is the way it has been.

Q   Until Judge Thomas changed his order; isn't that right?

A   I think so.

Q   And then Judge Thomas changed his order where he ordered this appearance book to be out front and for it to come through the Lauderdale Street entrance; isn't that right; isn't that right?

A   I don't know what entrance -- they come through the Lauderdale entrance.

Q   All right. Now, you do know that that Board of Registrars was open some ten extra days in the month of January, don't you?

A   Yes.

Q    And do you know that during the first ten days there was only
     thirteen Negroes that came down there and signed an applicant --
     that tried to register to vote; is that correct?

A    Yes --

Q    Yes.

A    -- I think so.

Q    You know that, don't you?

A    I think so.

Q    And you know on the eleventh day is when they were -- led
     fifteen hundred down there, and they wanted them all registered
     in one day, don't you?

A    Yes, because they didn't see the notice in the paper, just
     about half --

Q    Didn't see the notice in the paper; is that right?

A    About a half inch in size.

Q    So they wanted all fifteen hundred registered in one day, didn't
     they?

A    Some few read that notice and said they would like to go down
     there, but they afraid of the atmosphere around the Court House
     with the possemen; that is why they didn't.

Q    Did fifteen hundred go down there on the eleventh day?

A    I think so; I hope so.

Q    All right, now -- and since then, since Judge Thomas has said
     that -- since sometime in January this appearance book has been
     out there, hasn't it, where you get a number --

168

A    Yes.

Q    -- and sign up; isn't that right?

A    Yes.

Q    All right; now, at the time you were down there with Sheriff
     Clark, you had been walking backwards and forth in the hall of
     the Court House and all up and down that line, hadn't you?

A    No.

Q    And you do that all the time, every time you go down there, don't
     you?

A    I -- there was but one way to get from where I am standing; I
     have got a place, they say, "Stand here," and it is only one
     way to get to the Registrars' office, that is to go up here to
     the Registrars' office, enter the Registrars' office, vouch for
     the individual, walk back, and stand up here again, and the next
     one walk up there again, vouch for them, go back and stand in
     that place.

Q    Yes, that's right, but you --

A    That -- that really is walking up and down.

Q    What you were doing is going out of the Court House and all over
     the Court House, in and out?

A    That's right -- no; no.

Q    And you got a lot of folks down there?

A    No, I vouched for them in that manner.

Q    All right, the day that Sheriff Clark arrested you, he asked you
     where you were going, didn't he?

A    Yes, he did.

Q    And you called him a white son of a bitch, didn't you?

          WITNESS:  Your honor, I don't know how to curse.

A    You picked the wrong person to say that --

          THE COURT:  Just answer the question; did you or

didn't you?

A    No, I did not.

Q    And you spit at him, didn't you; didn't you?

A    No, indeed, I did not.

Q    All right.

A    Can't say anything to make it stronger.

          MR. McLEAN PITTS:  That's all.

          THE COURT:  Mr. Doar.

              REDIRECT EXAMINATION:

BY MR. DOAR:

Q    Mrs. Boynton, the day you went down there, was a large number

of people -- do you recall how many people the Board of Registrars

processed?

A    Was that when there were fifteen hundred down there that morning?

Q    Yes?

A    I think it was a hundred twenty.

Q    Well, prior to Judge Thomas's order, how many people were the

Board processing?

A    Six and maybe twelve, and one time I think about thirty.

Q    Thirty was the most in any one day?

A    That is the largest.

Q    Thank you.

A    And they weren't all Negroes.

      THE COURT:  Mr. Hall.

      MR. HALL:  No questions on redirect.

      THE COURT:  Mr. Smith.

      MR. SMITH:  No further questions.

      MR. McLEAN PITTS:  I would like to ask her one

further question.

      THE COURT:  Mr. Pitts.

        RECROSS EXAMINATION:

BY MR. McLEAN PITTS:

Q    Did you hear -- on Tuesday did you hear Mr. Stanley Fountain,

    the United States Marshal, read the order of the court?

A    I was too far back; I did not hear it.

      MR. McLEAN PITTS:  All right.

      THE COURT:  Anything further from this witness?  You

can be excused from the witness stand.

      MR. GRAY:  Your honor, may this witness be excused?

      MR. SMITH:  (Nodded to indicate affirmative reply)

      THE COURT:  I have no objection; you can work it out

during this recess; court will be in recess ten minutes.

      MR. McLEAN PITTS:  Wait just a minute; don't let her

go out.

      (At which time, 2:35 p.m., a recess was had until

2:44 p.m., at which time the hearing continued)

THE COURT: All right, now, I understood we were through with this witness.

MR. McLEAN PITTS: I wanted permission to ask her -- Judge, when they asked me whether she could go -- Judge, I am releasing her as far as I am concerned, I just wanted to ask her a couple of more questions before she does leave.

THE COURT: Go right ahead.

Q  Did you have with you on Sunday, this last Sunday, any type of gas mask?

A  Any what?

Q  Any type of gas mask?

A  No, I didn't.

Q  You didn't have any homemade type gas mask with you?

A  No, I didn't.

Q  On Sunday?

A  No, I didn't.

Q  And now, have you or the Dallas County Improvement Association -- is that the name of it -- Dallas County Voters League?

A  That's right; Dallas County Voters League.

Q  At any time advocated the boycotting of the Selma Bus Lines?

A  After we had -- yes; in a way we have -- we did.

Q  Have you done it; have you advocated --

A  I related atrocities of the story on the bus --

Q  Huh -- have you advocated the boycotting of the Selma Bus --

A   In a way, I imagine so; yes.   Yes.

Q   In a way you have?

A   Yes.

Q   And have you contributed any sum to putting on a bus lines that is running a route right in front of the Selma Bus Lines bus?

A   Well, I contribute to the mass meeting.

Q   Do you know who is doing that?

A   Well, I don't know, I don't know exactly, but I imagine that it's somebody --

Q   You don't know?

        THE COURT:   He asked you if you knew.

A   No.

Q   It is not you?

A   No.

Q   And it is three Volkswagens, isn't it?

A   Yes, that's right.

Q   And those three Volkswagens were bought by the Student Non-Violent Coordinating Committee, wasn't they?

A   Well, I don't know; I am glad to hear -- I don't know exactly who, but someone --

Q   Your organization didn't contribute any sum to it?

A   We contribute every night.

Q   Do you know that there is an exclusive franchise granted to the Selma Bus Lines?

        MR. GREENBERG:   Objection.

MR. GRAY: Objection.

THE COURT: You are getting far afield, Mr. Pitts.

MR. McLEAN PITTS: Sir?

THE COURT: You are getting far afield.

MR. McLEAN PITTS: The point I am getting at, your honor, is that -- the point we are trying to get at, there is city ordinance after city ordinance that they have violated, and that is the only point I am driving at; if you think they are too far afield, I will withdraw -- I am trying to prove that there has been utter disregard for the city ordinances and laws in the City of Selma since Christmas by this group.

THE COURT: And for what purpose are you trying to prove that?

MR. McLEAN PITTS: Well, including -- well, including --

THE COURT: What is your point in proving that?

MR. McLEAN PITTS: Yes; the point in proving that is including the orders of this court and other injunctions.

THE COURT: I say what is your point in proving that?

MR. McLEAN PITTS: Just continuous violation of court orders and statutes.

THE COURT: And what is your point in proving that?

MR. McLEAN PITTS: Well, it proves that they violated that --

THE COURT: As far as the issues in this case, what

174

is your point?

        MR. McLEAN PITTS:  The point is, if they would
violate these other orders willingly, and statutes and laws, they
would violate the laws of the court -- the orders of this court, too.

        THE COURT:  Objection sustained.

        MR. McLEAN PITTS:  All right, sir.  In other words,
it's -- it is no way to control it, in other words, law and order,
unless we have obedience to law and order, and that -- that is one
of the points, too, I want to prove it.

        THE COURT:  Any further questions from this witness?

Q  I am handing you here now Plaintiffs' Exhibit number 3, and I
    ask you, you say that was you laying down there on the ground,
    what is this over your head here?

A  That is a plastic cap I had over my head with my glasses on,
    which I have not found either one of them, and when I was hit and
    this was given, I remember this cap fell; well, it was cold,
    and it was standing up, it fell; I remember when it fell.

Q  Did you pull that cap down over your face when you --

A  I remember when it fell, when I was hit on this -- my arm.

Q  Well, did you pull that down over your face when the tear gas --

A  I don't remember; no, I didn't.

Q  -- was used?

        THE COURT:  Anything further from this witness?

        MR. McLEAN PITTS:  That's all.

        THE COURT:  Next witness.

MR. HALL:  Mr. Hosea Williams, please.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

HOSEA WILLIAMS, a Plaintiff, having been duly sworn, testified as
follows:

DIRECT EXAMINATION:

BY MR. HALL:

Q    Will you tell us your name, address, and occupation, please, sir?

A    I am Hosea Williams, of 1165 West Fair Street, Atlanta, Georgia.
I am the Director of the Political Education and Voter
Registration of the Southern Christian Leadership Conference.

Q    As Director of Political Education and Voter Registration, Mr.
Williams, what are your duties?

A    My duties --

Q    And responsibilities?

A    My duties and responsibilities are to assist, bid to stimulate
and promote voter registration in the communities that request
our services, and to operate adult citizenship schools, to --
in -- and to -- rather to cooperate, we have a program that we
coordinate under the political education phase of the voter
registration work with our adult citizenship school program that
is to educate people to their political responsibilities.

Q    Are you a paid employee of the Southern Christian Leadership
Conference?

A    I am.

Q    How long have you worked in your present capacity, sir?

A   Almost a year.

Q   Have you been doing this particular kind of work which you
    testified about here for the Southern Christian Leadership
    Conference --

A   That's right.

Q   -- in Selma and Dallas County, Alabama?

A   That's right; correct.

Q   Have you also worked in other adjacent counties during the
    last year or two years?

A   I worked at adjacent -- other adjacent counties to Selma and
    Dallas during the year of 1965.

Q   During 1965; when did you first begin working in Selma?

A   Our program began around the 2nd of January of this year.

Q   Have you been there more or less ever since?

A   I have spent more than half of my time since January 2 in the
    State of Alabama.

Q   And you have worked in Selma and adjacent counties since that
    time?

A   Selma, adjacent counties, and counties as far as Montgomery.

Q   All right, sir.  Are you familiar with the Alabama project, Mr.
    Williams?

A   Yes, I am.

Q   Did you have any part in evolving this program or this project?

A   Well, I expressed my opinion in the formulation of the program.

Q   You attend the organizational meetings?

A    Some I did.

Q    Can you describe for us what the Alabama project is?

A    Well, it's -- the Alabama -- Alabama project of the Southern
     Christian Leadership Conference evolved out of a meeting of the
     Statewide Coordinating Committee and the Southern Christian
     Leadership Conference and with the Dallas County, which is the,
     we considered a Black Belt, the center of the Black Belt of
     Alabama, being the pivotal point, the program was to register,
     get Negroes registered, and to teach them, to educate them
     politically, carry on a certain type of schooling and other
     activities in the Negro community that would develop a state of
     political awareness in citizens' mind.  Now, once we got involved
     in Dallas County, we found out our primary objective was not
     to register Negroes, but to get the right to register without
     being intimidated, beaten, and jailed.

            MR. P. H. PITTS:  We object, and move to exclude that,
your honor.

            THE COURT:  Overrule; asked him what his project was
designed to do.

Q    Did you formulate programs from time to time to implement your
     initial plans?

A    We did; we had meetings of -- in Dallas County our program was
     more or less coordinated between the Southern Christian Leader-
     ship Conference, the Dallas County Voters League, the Student
     Non-violent Coordinating Committee, and the Dallas County Youth

Group.  And we organized even to wards, and down to the block
workers, and we would have a mass meetings, and as I said, some
various forms of political education, this was the -- when we
first began to orientate the community into the project, and
thereby we set a certain time in which we would have a voter
registration, you know, would kick off our drive in order to
get citizens to go down and -- and register to vote.

Q    Have you had any success of getting people to go down and attempt
to register and vote?

A    We have had success to get citizens to go down and register, go
down for the purpose of registering, we have been most successful.

Q    Have your mass meetings been well attended?

A    Mass meetings have been overflowing.

Q    How often have you had mass meetings since -- during this year?

A    On an average of five times per week.

Q    Have you organized any demonstrations in furtherance of your
program in Selma and Dallas County and other places?

A    We have organized demonstrations protesting the disenfranchisement
of Negroes, and specifically and particularly police brutality
and jailings.

Q    So you are saying that most of your demonstrations have been
organized and carried on in an effort to get the right to vote
and to protest police brutality --

A    That's right.

Q    -- is that what you are saying?

A   That's right, in keeping with philosophy of the Southern Christian
    Leadership Conference, all of our demonstrations have been
    organized in a non-violent, peaceful attitude, and actually been
    carried out in this manner.

Q   Have many people been involved in these demonstrations?

A   Well, I guess; I don't know what you mean by, "Many"; it ranged
    from -- I guess we would say many, my definition of many.

Q   Would you give us your judgment of whether or no many people have
    been involved?

A   Well, our demonstrations have ranged anywhere from a hundred
    persons at this point up to -- well, in Dallas County up to --
    actually demonstrations -- and I want to make this clear for
    the court, I don't consider taking persons down to the Court
    House to register as a demonstration; one day we carried down --
    oh, it was about -- I think about two thousand adults involved,
    and we did not break any laws, we abided, in groups of five --
    so I don't consider this a demonstration. A demonstration is
    when we go down the streets in order to have a prayer vigil or
    something; so the demonstrations probably ranged up to a thousand,
    fifteen hundred.

Q   So you are distinguishing between a demonstration where you have
    a prayer vigil or something else and taking of a large number
    of persons to the Court House for the purpose of signing a book--

A   That's right.

Q   -- or registering and voting?

A   Yes, this is not a protest demonstration.

Q   Let's distinguish as to them further, and will you tell us about
    your success in getting people to go to the Court House in
    Dallas County and in other counties to register and vote, have
    you had any success, but let's confine our attention to Dallas
    at this time?

A   To get citizens to go down, as long as we were in town, and this
    is why we were there, because they did request our services,
    the police brutality in cases they felt were lessened, and to
    get citizens to go down we were successful, we were successful
    to get them to go down to sign the book or to try to register,
    which is not a protest demonstration; we were successful to
    get individuals to go down to protest disenfranchisement and
    police brutality and jailings and et cetera.

Q   Can you give us the dates, specific dates, on which you were
    able to carry large numbers of persons or get them to go to the
    Court House for the purpose of either registering or signing the
    book as prospective registrants?

A   I can give the approximate dates; I can't --

Q   Will you do that, beginning in January?

A   I can't give you the exact date; as I remember, one date that
    we had a large numbers down in order to get numbers, the same
    day Mrs. Boynton was brutalized by Sheriff Clark.

                MR. P. H. PITTS:  Wait a minute, now; we object to --
                MR. McLEAN PITTS:  Wait a minute; we move to exclude

that statement, "Brutalized by Sheriff Clark."

        THE COURT:  It wasn't responsive; direct the
witness's attention to your question.

Q   Will you confine your answer --

A   I believe that was around, oh, I can't say -- it was around
February 7, but I can't give you specific dates, I don't have
them available, I wouldn't trust my memory.

Q   May I ask you this, sir; if Mrs. Boynton says that date was
January 19, would you agree with that date?

A   January 19?

Q   Yes?

A   It was about January, I would -- I would agree with it.

Q   On that occasion were you present when the ---

A   I was with her.

Q   -- when the persons came to the Court House for the --

A   Yes, myself and Mr. John Lewis was leading the line down -- led
the line, rather, down to the Court House.

Q   Will you tell the court who were in that line; were they
prospective registrants or persons --

A   Yes.

Q   -- going down for the purpose of registering?

A   Mr. John Lewis and myself and Reverend Reese, the head of the
Dallas County Voters League, Reverend Anderson, Reverend Lewis,
we had most of the distinguished Negro ministers in that line,
and when we came across -- well, we crossed the street to the

Court House, Sheriff Clark stopped us, and he said, "This is
as far as you go, and you go down the street and go in that
door down the street." I didn't -- I didn't know too much about
the Court House, and Reverend Lewis said, "Well, I see white
people are entering and going in and out of this door, Sheriff,
and I don't see" --

Q    Will you wait just one moment; I asked you if you had persons
in that line who were going to the Court House for the purpose
of registering?

A    This is true.

Q    I didn't -- I didn't quite get your answer?

A    Yes, sir.

Q    Did you have people --

A    This is true.

Q    Will you give us the approximate number of such persons?

A    Well, in that line we -- we had approximately seven hundred
persons in the line, and you only have three hundred registered
voters in Dallas County, to my recollection, only about twenty
members of the Southern Christian Leadership Conference and
the Student Non-violent Coordinating Committee present; so I
would say out of the several hundred at least five hundred were
there for the purpose -- over the age of twenty-one were there
for the purpose of getting registered.

Q    How close did you get to the Court House on this occasion?

A    We got at the corner of the Court House, there is no door, there

    is a door about a half -- down this way and a block along --

    about a -- end of the block in this direction. To our -- in

    other words, when we walked into the sidewalk facing us, it was

    a door about a block away, but there was another door at our

    left about thirty feet away, and this is the door that the

    ministers -- that the citizens of Dallas County were -- desired

    to go into.

Q  Were you permitted to go in this door?

A  We were not permitted to go into, but we were poked with billy

    sticks and cattle prods.

        MR. P. H. PITTS: He didn't asked what happened to

him, your honor; he asked him whether he was permitted to go in

there, he just keeps on --

        THE COURT: I sustain objection; I sustain objection.

You just respond to the questions --

Q  Answer the question, please?

        THE COURT: -- your lawyer --

A  What was the question?

Q  Were you permitted to go in that door?

A  No, we were not permitted.

Q  I believe you said previously that at this point you were

    confronted by Sheriff Clark --

A  This is correct.

Q  -- is that correct?

A  Sheriff Clark and possemen and deputies.

Q    Was Sheriff Clark, himself, there?

A    Sheriff Clark was there, himself.

Q    You know the Sheriff, don't you, when you see him?

A    I know him well, very well.

Q    Did he speak to you?

A    Yes, he spoke to --

Q    What did he say to you?

A    He said, "This is as far as you going, if you going inside of
     Court House, you go down the street"; you want me to elaborate
     on what happened?  The Judge told me --

Q    I want you to say what he told you?

A    All right; he said, "Go down the street," and this point,
     Reverend Anderson said, "Judge, we are citizens of this county,
     and we are desirous to go into this door, white citizens are
     going in and out of this door, you do not challenge them, why
     do you challenge us as taxpayers?" And I said, "Sheriff, we
     are not going," he told me to shut up, that I was an outsider,
     that I had nothing to do with it, and then Mr. Lewis asked him,
     said, "Sheriff, we are only here, not to make trouble, for the
     purpose of helping these people get registered," so he told Mr.
     Lewis, "You are the lowest form of scum upon the face of the
     earth." And then a local minister, Reverend Bradford, spoke
     up and said, "Well, I am a citizen of this county, and I am
     desirous to go through this door." Sheriff Clark says,
     "Preacher, who are you, how long you been here?" So he said,

"Long enough." This irritated the Sheriff terribly, because he
began to tremble.

Q    No, no, no.

A    Okay, what he said. And then Reverend -- he said, "Well, you
can't go through this door, and that is" -- he said it, "And
that is the law." Reverend Anderson, a local minister, at this
point said, "Well, Sheriff, we are citizens of this county, and
we are here this morning to test that law." And then -- after
the conversation he soon became irritated, and that is all.

Q    That the end of the conversation?

A    That is all that was said; that is all that was said.

Q    What was done at this point?

A    Oh, what was done? They began to poke us with the billy sticks
and drive us up against the wall and rushed us all upstairs and
hauled us over to jail some place.

Q    You were carried upstairs; were you carried to a court room?

A    We were carried to -- we were carried upstairs, rushed upstairs,
I were grabbed in the back by one of the deputies which -- and
were drug almost all the way upstairs, and I -- I didn't ask him
outside to turn me loose, because I thought he wanted to
brutalize me some more.

                 MR. P. H. PITTS: Now, your honor, that is --

Q    Were you carried to the court room?

                 THE COURT: Just a minute; just a minute. When an
objection is made, now, you stop.

MR. HALL:  All right, sir.

THE COURT:  That is the only way I can control this trial.  Now, Mr. Williams, you listen to your lawyer's questions, and you just answer what he asked you.

WITNESS:  Yes, sir.

THE COURT:  When he wants to bring it out, he will ask you a question designed to bring it out.  Don't volunteer any more information.

WITNESS:  Thank you.

THE COURT:  Now, get along.

Q    Were you carried to a court room?

A    Correct; was carried to a court room.

Q    Do you know what court room?

A    Court room on the third floor.

Q    Do you know whose court room?

A    I don't.

Q    Did you see a Judge in the court room?

A    We never did see a Judge.

Q    What occurred in the court room?

A    We were told to sit down and -- that was all.

Q    You never saw a Judge; was there any trial?

A    There was no trial; we never saw a Judge.

Q    What happened then?

A    We were carried out to the County Farm, and at Camp Selma, this was in the morning hour, and picked up at Camp Selma about eight that night and carried to Camp Camden, I believe, down

in Wilcox County, Wilcox or Marengo County.

Q    Were you ever told what you were charged with?

A    We were never told what we were charged with; we were not --
never told.

Q    When did you find out what you were charged with?

A    Three -- four days -- three or four days later, three or four
days later, I disremember when we were brought back to -- it
was three days later, I believe. We were brought back to Dallas
County.

Q    And you were subsequently released on bail?

A    Yes.

Q    Mr. Williams, were you a part of the march, or did you have
anything to do with the march, from Selma, or attempted march,
from Selma to Montgomery on March 7, 1965?

A    Mr. John Lewis and I were the leaders of the march.

Q    Did you organize this march?

A    I participating in organizing it.

Q    You participated in organizing the march. But you and Mr.
Lewis, when you said the leaders, you mean you marched at the
head of the column?

A    Head of the column.

Q    Will you tell the court what happened on this occasion?

A    Well, I would like to get some instructions as to what point;
across the bridge --

Q    Start at Brown Chapel, and tell us what happened?

A    Oh.

Q    Tell us very succinctly.

A    At Brown Chapel we lined up, and this was on Sunday, and Mr.

Lewis and I lined up at the head of the line, and we left

Brown's Chapel on Sylvan Street and marched to West -- marched

to Broad, and that is the beginning -- the bridge, I think

that is the city limit, on Broad, that is highway e---- highway

80 east, going into Montgomery, Alabama, and we marched in

groups of five, four, five, or six, so many feet apart, due to

some city ordinance, and after we reached the bridge, we lined

up in twos, two abreast, and two abreast, and we marched on the

sidewalk, the left hand sidewalk of highway 80 crossing the

bridge.

Q    You said you had sidewalk; there is a sidewalk going across the

bridge?

A    Correct.

Q    And the line was on the sidewalk?

A    On the sidewalk.

Q    You didn't get out into the street?

A    We didn't get out in the streets at no time.

Q    Go right ahead?

A    After we crossed the bridge, some two or three blocks we -- well,

about the time we walked off of the bridge, this is on highway

80 east, we saw State Troopers gathering across the road and

saw some deputies of Dallas County, and this was the second

group of deputies -- well, this was the first group of deputies
I remember, because at the beginning of the group -- bridge was
a large group of possemen.  And we continued to walk, and when
we -- I guess were about fifty feet of the State Troopers,
there was a line, a--- completely across the road, there was an
automobile with public address system mounted on it, and I think
the gentleman said that he was Major Cloud and, "This is as
far as you marchers go."  He said that, "This march is not
safe, and the Governor want it stopped, and I am ordering you
to disband, disperse, and return to your church or home."  I
said, "I -- we would like to have a word with you, sir."  He
said, "There will be no talking."  And he said, "Disperse
immediately and -- and go home or -- go to your church or go
home immediately, you have two minutes," and I looked at my
watch, and a few seconds later -- he said we had two minutes,
and a few seconds later, I guess about ten or fifteen seconds
later, he said, "I am telling you the last time to disperse that
march and go home."  I -- I had asked him the second time to
have a word with him, and after one minute and five seconds, he
-- he gave the State Troopers an order to -- to move in and
disperse the crowd.  This was the order to move in and disperse
the crowd.  The State Troopers then took their night sticks,
holding them by the end, and advanced briskly, briskly toward
the group.  And where Mr. Lewis and I were standing at the head
of the line and about two feet away, the whole group of State

Troopers leaped into the line knocking us back, driving us back, and some began stabbing with their billy clubs, once they got us moving some began stabbing with their billy clubs, and some began swinging right and left, and some were swinging over in the pile up viciously, and we went down, and when we went down, after awhile, which they were jabbing us and whipping us with these billy sticks, the Major Cloud gave an order to regroup, I think is the word he used, and they regrouped. And at this time some Troopers that were on the side that did not participate before pulled into the group, and they all began to get these tear gas bombs out, and they marched back alongside the line, this time they did not attack the head of the line, and it was, you know, just seemed like an organized situation, because the first tear bomb -- gas bomb -- tear gas bombs were thrown on us were thrown very lightly, and they tried to throw them, seemingly, between the feet or up under the marchers. And then shortly after the first gas bombs along the line, at the head of the line, went off, they threw a second bombs, and at this -- about -- and at this time I noticed the possemen, the mounted possemen. This is the first time I had seen them riding --

          MR. P. H. PITTS: Your honor, is it possible -- we object to this continuous expose on what happened; I think that his lawyer can ask him questions. He hadn't asked him anything what the possemen did; he asked him what the State Troopers did, and all

191

we can --

THE COURT:  I understood he asked him what happened. You go ahead and interrogate him --

MR. HALL:  We asked him what happened.

THE COURT:  -- in question and answer form, and not narrative form.

MR. HALL:  All right.

Q   Tell me, Mr. Williams, how close were you to the line of Troopers when your column stopped?

A   About approximately fifty, sixty feet.

Q   I believe you said these Troopers were stretched across the road?

A   Correct.

Q   Standing there in single file?

A   Correct; correct -- no; no, not in single file; they were not seemingly in any file, if in file they were two or three deep.

Q   They had some depth?

A   Yes.

Q   Do you have any judgment as to how many State Troopers were there?

A   Approximately eighty.

Q   Now, at this point, did you see Sheriff Jim -- James Clark?

A   Not at this point.

Q   Did you see any of his deputies?

A   Yes.

Q  Were some Sheriff's deputies present?

A  Yes.

Q  Were they standing there with the Troopers?

A  Over at the right, over at our right.

Q  They were standing --

A  Troopers further --

Q  They were standing to the right of your line?

A  That's right.

Q  This was across the bridge?

A  That's right; correct.

Q  About how many Sheriff's deputies did you see?

A  I would estimate twenty, fifteen, I -- I would -- I would come close to saying between ten and twenty.

Q  Did you see any of the Sheriff's Posse at that time?

A  Not at this point.

Q  Now, I am going to show you something, I want you to look at it for me; I show you this document here marked Plaintiffs' Exhibit 5, and ask you if you can identify it and tell us what it is?

A  This is --

Q  If you can?

A  This is -- this was the second attack by the State Troopers.

        THE COURT: He just asked you what it was.

Q  Tell us what this object is you are looking at?

A  Oh, this is the State Troopers attacking the marchers that was

marching Sunday.

Q   Is this a photograph, Mr. Williams?

A   That's right.

Q   And that is a photograph of what?

A   When -- this was just after the -- this was after the second
tear gas was thrown, when the Troopers first lunged back in and
started beating with their billy clubs.

Q   Do you see yourself in this picture?

A   Yes, this is myself, here.

Q   Is this a picture of a -- a group of persons?

A   The crowd was driven back.

Q   Is this a picture of a group of persons?

A   Yes; yes.

Q   Does it include State Troopers and other officers?

A   This would include State Troopers.

Q   And does it include a picture of yourself?

A   Yes.

Q   Do you recognize that picture?

A   Yes.

Q   Is this a true likeness of what happened at the time this picture
was made?

A   This is true; yes.

            MR. HALL:  May it please your honor --

            MR. SMITH:  I have seen it.

            MR. HALL:  -- we are going to offer it into evidence,

Plaintiffs' Exhibit.

194

MR. SMITH:  I have no objection.

THE COURT:  It will be admitted in evidence.

Q   Now, at the time -- how long were you standing there after Major

Cloud spoke to you before you were attacked by the Troopers?

A   A total of about two minutes.

Q   Were you, yourself, struck down?

A   Yes.

Q   You were pushed or struck down to the ground; was John Lewis

standing there by you?

A   Yes.

Q   Reverend John Lewis?

A   Yes.

Q   Was he struck down?

A   That's right.

Q   Did you see him struck down?

A   Correct.

Q   Were there women and children in the line with you?

A   Correct.

Q   Did you see them struck down?

A   Correct.

Q   Did you see the Sheriff's Posse or any of the Sheriff's deputies

across the bridge?

A   Yes, correct; I did.  I saw the possemen, mounted possemen on

horseback.

Q   The Posse was mounted on horseback?

A    Yes.

Q    And you saw them across the bridge?

A    Yes.

Q    Did you see them participating --

A    Yes, I saw them.

Q    -- in the action there?

A    Yes, I did.

Q    What were they doing?

A    They were whipping people with bullwhips and billy sticks and running -- and stampeding Negroes and whites, the marchers, with horses.

Q    When you say, "Stampeding with horses," will you describe for us what you mean; were they riding their horses into the crowd?

A    They were riding their horses into the crowd.

Q    Did you see the horses step on anyone?

A    Yes, I saw one man downed that the horse stepped just across his shoulder, and well, the man later said he was kicked in the head by the horse, and I saw another man when he tried to drive the horse up on the sidewalk and stepped on this man's foot.

Q    Did you see Sheriff Clark on the south or east side of the bridge?

A    I didn't see Sheriff Clark on the east side of the bridge.

Q    How long did you remain across the bridge after you were first attacked before recrossing the bridge and coming to town?

A    Approximately fifteen -- approximately fifteen -- ten or fifteen

minutes.

Q   And then the entire group came back into Selma; is that right?

A   Yes.

Q   Did you come with them?

A   Yes.

Q   Describe for us what happened as you came into Selma; did you --
    when you came across the bridge into Water Street, or Broad,
    this is the first street --

A   Yes.

Q   -- as you come off the bridge coming --

A   We came over the bridge; then I observed -- this is where I
    observed Sheriff Clark, of Dallas County, possemen and
    deputies, and they were seemingly allowing a certain number of
    maybe Negroes, and were hollering, "Go get those God damned
    niggers," and they were coming into us, and, "Kill the niggers
    and them God damned white niggers," and I -- I can describe
    other things that were said if the court would like me to.

Q   Did you hear Sheriff James Clark, himself, say that?

A   I heard Sheriff Jim Clark, himself.

Q   Did you march along with the group who were attempting to cross
    that bridge returning?

A   I did, I tried to usher --

Q   What distance did you go ahead with them?

A   Well, I tried to stay at the rear of the line, to the best of
    my ability, there were some people behind me, but I, too, was

     frightened to death for my life, but I tried to stay as near

     back as possible to the rear, some people would be running up,

     and we would get them in front of us, but others were behind.

Q    Can you tell us how far it is in terms of city blocks from the

     foot of the Edward Pettus Bridge on Broad Street to Brown's

     Chapel on Sylvan Street?

A    Approximately eight blocks.

Q    Approximately eight blocks?

A    I would say approximately eight blocks.

Q    And did you go along with the people to -- the marchers?

A    Seven of them.

Q    You went seven of those blocks?

A    Seven of the blocks.

Q    Were the Sheriff's men present all along the way?

A    They were present and very active in beating --

Q    Would you describe their activities along the way as you

     observed it; you did observe it, did you not?

A    Yes; they would -- in some case they would grab -- they were

     trying to get the whites, though, really more than they were the

     Negroes; they would say, "There is another white nigger loving

     son of a -- get him"; they would jump in there and try to pull

     them out to beat them, and sometimes -- they were on the

     horses would never pull anyone, they would just come along in

     the crowd with their bullwhips and whack them with their billy

     sticks, and whack them on the neck or the head with -- or

shoulders; the ones on foot, they were just running into the crowd and sometimes -- the people were already trotting slowly, really I guess you could say running, say, "Go -- nigger" -- said, "Nigger, go faster, you ain't going fast enough," and start people on the rear pushing further -- would try to push further to the front, and some would fall, and this was continuously for the seven blocks that I observed it.

Q    And women and children were still in that crowd?

A    Women, children, men, white people, Negroes.

Q    Why -- what happened to you after you had gone seven blocks?

A    A lady ran to me and threw a coat and said she had heard Jim Clark, "Get the nigger was leading the line in the black suit," and she was afraid for my life, as I was.

        THE COURT:  Just answer the question; control your witness --

Q    What happened to you?

        THE COURT:  -- control your witness.

Q    What happened to you?

A    What happened -- well, the lady rushed me into a house.

Q    You -- you went into her house?

A    Into her house.

Q    Do you know the approximate location of this house?

A    Yes, it is straight -- well, it's -- it's one block this side of Sylvan Street.

Q    Is a block away from Sylvan Street?

A    It is a block -- it is the street that runs across one block
over from the church -- the street that Brown's Chapel is on,
which is Sylvan Street.

Q    And you did go into the house?

A    Correct.

Q    When you went into the house, did you then look out of the
window at the activity?

A    Correct.

Q    Could you see the marchers and the officers outside?

A    The same thing as I described; I could see it, other than one
thing when Mr. --

Q    Tell us what you saw, not -- what you saw, if you could see it?

A    I saw possemen chasing little children, twelve and thirteen
year old, with billy sticks, swinging at them, hitting them,
as close as they could get to them, and -- and mounted possemen
chasing little children, women, and men; I saw Sheriff Clark
going into this woman's porch and hit this woman, I am -- she
just had walked out the door, and he came around the corner,
and he -- he went on to this woman's porch and whacked this
woman, and this man came out, and he backed away, and a lot of
other possemen ran up, it was just this -- it happened -- this
was a continuous thing as long as any Negro was in -- any
Negro or any white person; I can say there probably wasn't --
none was in the street at any point; they ran people all off
their porches into their homes and beat up against doors, with

200

possemen chasing everyone, as I say.

Q   Do you mean that they were beating people who were not a part
    of the marchers?

A   True; true.

Q   Mr. Williams, approximately how many white people -- about
    approximately how many people were in that line of march with
    you?

A   I say -- I would say -- I say about seven hundred.

Q   About seven hundred; do you have any idea how many of those
    persons were white people?

A   About thirty.

Q   About thirty; were these mostly workers for either S.C.L.C. or
    S.N.C.C.?

A   I would say ten or twelve of them were -- either were workers
    of the Southern Christian Leadership Conference or the Student
    Non-violent Coordinating Committee; the others were interested
    citizens in Selma.

Q   In Selma?

A   Some were Selma, and other citizens that came into Selma.

Q   Well, you are then saying at least ten of your thirty white
    persons were persons who were working with one of the two civil
    rights organizations --

A   Yes.

Q   -- in Selma?

A   Correct.

201

Q   And had they been working in Selma for some time?

A   I am sure some had; I am sure some had for several weeks, that
    is the 1st, 2nd of January.

Q   You did not have a large number of private citizens in this
    particular line of march?

A   White citizens?

Q   I mean white private citizens?

A   No more than twenty or twenty-five; no more than twenty or
    twenty-five.

Q   All right, sir.  Now --

            MR. HALL:  Excuse me, please, your honor.

Q   Directing your attention, Mr. Williams, back to the east side
    of the Edward Pettus Bridge, before we come across back into
    the City of Selma; when -- after you were first stopped and the
    tear gas applied, did the people just stand there or immediately
    turn around and come across the bridge, or were there some other
    reactions?

A   When the last large amount of gas bombs were thrown, the people
    tried to retreat across the bridge.  Then the possemen came
    across beating them, keeping them --

Q   That is -- that is -- I didn't mean to interrupt you; I -- I
    understood you to say the last -- I said when they began, when
    they began to -- let me put my question again; after the line
    was stopped and the Troopers began beating, and then they
    applied the tear gas, did the line just stand there, or did the

people turn around and retreat, or was there some other reaction?

A    They tried to retreat.

Q    Well, which way did they try to retreat; where did they go?

A    Back across -- they tried to retreat back across the bridge, but some were driven out into a field.

Q    You say some were driven into a field?

A    Many driven out --

Q    Are there some woods in that area, too?

A    Yes.

Q    Were any driven into the woods?

A    Driven over near the woods, which is maybe a block from the shoulder of the road; there are some trees in there.

Q    And some of them were driven into the trees?

A    Yes.

Q    How did the officers react to those persons who ran into the trees; did they chase them or let them go?

A    They threw tear gas bombs down there, and some possemen -- mounted possemen chased them.

Q    Mounted on horses chased them into the woods?

A    (Nodded to indicate affirmative reply)

Q    Did you attend this, yourself?

A    I observed this, myself.

Q    Did you see them round up anyone out of the woods?

A    I saw them running and beating people.

Q    You mean they were riding along on the horse --

203

A   Yes, sir.

Q   -- and whipping them from the horse?

A   Yes.

Q   I see.  Now, as we come back across the bridge, and we come
    down the foot of the bridge, the hill, we get to Water Street
    right at Broad, and we come into Selma, I believe you say you
    first saw Sheriff Clark; did the Troopers follow you to this
    point?

A   Troopers did not follow us; Troopers followed us to the bridge.

Q   Were you -- were you able -- were you still in charge of these
    marchers, in charge of this line at this point?

A   I -- myself and Mr. John Lewis.

Q   Was Mr. Lewis with you at this point?

A   Mr. Lewis -- Mr. Lewis was with me up to a certain point; he
    was hit in -- severely in the head with a billy stick.

Q   Did you observe whether or no any persons who had not been a
    part of this marching group were molested as you came into
    Selma?

A   Yes, the first -- yes, very much so.

Q   Can you tell us about any instance?

A   Well, it was over the bridge, it was a bus, yellow bus, with
    about thirty or forty persons, and this -- over at the right,
    this is the first group that the possemen attacked, and one
    man in particular, possemen began to beat with their whips and
    billy sticks, one man in particular had a cork leg.

Q    Were they all Negroes, these five Negroes?

A    These people were Negroes; the possemen started beating this
     man over the head, and he started screaming; he said, "I am
     not a marcher, I am not with you"; they screamed, "You are a
     God damned nigger, though." He would try to run and fall, he
     had a cork leg, and every time he would get up, they would start
     beating him, and they drove him into the line of marchers, into
     the gas.

Q    Was this in the presence of James -- Sheriff James Clark?

A    I didn't see Sheriff Clark across the bridge.

Q    You didn't see Sheriff Clark.  Do you know whether or no Mr.
     Lewis was injured on this occasion?

A    Mr. Lewis was injured right by my side; yes.

Q    Do you know whether or not he was hospitalized as a result --

A    Yes.

Q    -- of such injuries?

A    Yes.

              MR. HALL:  I believe that's all.

              THE COURT:  Mr. Doar.

              MR. DOAR:  I have no questions, your honor.

              THE COURT:  Mr. Smith.

                   CROSS EXAMINATION:

BY MR. SMITH:

Q    You say that you and John Lewis were the leaders of the Sunday,
     March 7, march?

A    Reverend Lewis and I was.

Q    You and he planned it, organized it, and were the leaders of it?

A    We helped plan it.

Q    Well, did you know that on March 6, the day preceding the march, that the Governor of the State of Alabama said that, "Such a march cannot and will not be tolerated"?

A    I was told this by someone, hearsay.

Q    You were informed of that statement by the Governor of the State of Alabama?

A    I was told.

Q    When were you told about it?

A    I can't remember exactly, but I know just before the march someone did tell me this.

Q    Did you have a meeting on the evening of March 6?

A    Saturday evening?

Q    Yes?

A    Yes.

Q    What did you decide to do if you and the other demonstrators were confronted by Alabama State Troopers and ordered to disperse?

A    To discuss the matter with them.

Q    To discuss the matter with them?

A    Yes, try to explain our position.

Q    And to prevail upon them to let you continue to march from Selma to Montgomery?

A    No, just explain our position.

Q    Just explain your position?

A    That's right.

Q    And what was your plan after you had explained your position?

A    We would have to make a decision then; it was not to walk through
     State Troopers.

Q    Was it to disperse?

A    It was to go --

Q    Go home?

A    To go back, if they continued -- if we couldn't get through.

Q    Was to what?

A    It was to go back if we could not continue.

Q    If you could not get through?

A    Yes.

Q    All right; now, on Sunday, March 7, Major Cloud, of the Alabama
     State Troopers, told you and the other leader of this
     demonstration or march that it wouldn't be permitted, didn't he?

A    Yes.

Q    He asked you to disperse, didn't he?

A    Yes.

Q    It was seven hundred people, approximately, in the crowd that
     you led, wasn't it?

A    Yes.

Q    You disobeyed his order, didn't you?

A    No.

Q    Well, you didn't disperse, did you?

A    No.

Q    Was he an officer in uniform?

A    Yes.

Q    Did he identify himself to you as a State Trooper?

A    Yes.

Q    Major with the Alabama Highway Patrol --

A    Yes.

Q    -- or State Troopers?

A    Yes.

Q    And he asked you to disperse?

A    Yes.

Q    And the refusal on your part and the part of others to do that
     prompted the action on the part of Major Cloud?

             MR. GREENBERG:  Objection; he didn't testify they
     refused, he testified he wanted to talk to him.

             THE COURT:  As to what may have prompted Major Cloud
     is not a proper question.

             MR. SMITH:  All right, I withdraw the question.

Q    But it was after the order to disperse was given and the refusal
     on your part and the other demonstrators that Major Cloud formed
     a wedge or ordered a wedge with the State Troopers in holding
     the billy clubs as you have demonstrated in this manner and
     walked or attempted to walk through the crowd of the demonstra-
     tors, wasn't it?

A    You are wrong.

Q    I am wrong?

A    Uh, huh.

Q    Well, did the State Troopers in attempting to disperse the
crowd initially take billy clubs in their hands in the manner
that I am indicating with this pencil, form a wedge, and attempt
to walk through the crowd?

A    You are wrong.

Q    They did not?

A    No.

Q    You didn't testify to that previously?

A    No.

Q    What did you say they did?

A    I say they came to us, and before they got to us they leaped
into us with the sticks, knocking us down, and then jabbed and
beat us, I said before they got to us, and if I may -- we never
refused to disperse; we -- say we had two minutes, we were only
given one minute and five seconds.

Q    Why didn't you disperse?

A    Because we thought at least we had two minutes.

Q    Thought you had two minutes to do it?

A    Yes, sir.

Q    And it was after that that the State Troopers -- did they form
a wedge; am I correct in understanding you to say that?

A    I didn't see the wedge.

Q    You didn't see a wedge?

A    No, it might have been, I -- I just didn't see the wedge; they
      came --

Q    You estimated approximately eighty State Troopers; is that
      correct?

A    Well, altogether, it was some along the side, I was talking
      about all the State Troopers I saw in the area, that includes --

Q    Do you know Mr. Lingo, the defendant seated here?

A    I learned of him, I have been knowing of him by reputation, but
      I learned of him.

Q    Did you see him that Sunday?

A    I did not.

Q    Did you hear him give any order in regard to the State Troopers,
      action they took?

A    I did not; I did not.

Q    You did not?

A    No.

Q    Was he -- you didn't see him there that --

A    Not -- the man -- not Mr. Lingo; I saw Mr. Cloud, the man that
      identified himself, seemed like he said, "I am Colonel Cloud";
      I remember the name, Cloud --

Q    All right.

A    -- "Alabama State Troopers."

Q    You are one of the original plaintiffs --

A    Correct.

210

Q    -- that filed the petition in this cause --

A    Correct.

Q    -- is that correct?

A    Correct.

Q    Were you served with a copy of this court's order entered on March 9 --

A    Correct.

Q    -- enjoining you from attempting to march from Selma to Montgomery?

A    Correct.

Q    When were you served with that order?

A    It was in the -- I believe it was in the afternoon; I don't remember the time exactly, but I believe -- I believe it was sometime after lunch or right around that time.

Q    Where were you when it was served?

A    Beg your pardon?

Q    Where were you when it was served?

A    I believe I was at Brownsville Baptist Church or at Dr. -- I think I was at Brownsville Baptist Church -- not Brownsville, Brown Chapel.

Q    Did you lead the attempted march on Tuesday of this week?

A    No.

Q    Were you there?

A    No, I was at the church.

Q    Did you participate in the attempted march?

A   No.

Q   You didn't leave the church?

A   No.

Q   You stayed in the church?

A   No; no, I was on the outside of the church.

Q   You didn't go in the church?

A   Well, at times; in and out of the church.

Q   Was any discussion in the church about marching from Selma to Montgomery on Tuesday?

A   That is what the meeting was about.

Q   That is what it was about?

A   (Nodded to indicate affirmative reply)

Q   Did they decide to march?

A   Well, I guess you would say the decision was made a couple of weeks ago; they just was talking about logistics.

Q   Did they talk about the proclamation or the statement issued by the President of the United States requesting this group not to march?

A   I didn't know about it; all -- everyone was depending upon the guidance of the persons who were going to lead the march.

Q   Did they talk about this court's order --

A   No, sir.

Q   -- enjoining the proposed march from Selma to Montgomery?

A   First -- they talked about waiting until the leaders of the march arrived to -- to take charge of what was going to happen

Q    You say the Alabama project was a program to get Negroes
     registered to vote?

A    To get Negroes registered to vote.

Q    And that you as Director of Political Education of Southern
     Christian Leadership --

A    Director of Voter Registration and Political Education of the
     Southern Christian Leadership Conference.

Q    At Selma --

A    Correct.

Q    -- is that correct?

A    That is correct.

Q    Were you dispatched to Selma in that official capacity?

A    More or less, to Alabama.

Q    To Alabama?

A    Yes.

Q    With headquarters out of Selma?

A    Well, yes.

Q    Did you know that the Federal Court had jurisdiction of the
     voter registration matter in Dallas County?

A    I really didn't; I probably had heard it discussed, but I am
     not a lawyer, and we do rely upon Dr. King and Reverend Andrew
     Young, plus the Legal Education Defense Fund lawyers of the
     national association to take care of these matters.

Q    Weren't the purposes of demonstrations in the street, marches
     and so forth, to correct discrimination in voter registration

procedures in Dallas County; was that the purpose of it?

A   It was to protest the inhumane treatment of Negroes in Dallas County and the disenfranchisement.

Q   By voter registration process?

A   And Jim Clark and his Posse and deputies.

Q   Was the purpose of your program to eliminate voter discrimination in the application or the registration to become qualified voters in Dallas County?

A   Yes, and surrounding counties; you are correct there.

Q   Why didn't you go to Federal Court with your petition?

A   I am not -- I don't deal in legal ramifications; I have a job, my duties are assigned.

Q   You deal in mass psychology, don't you?

A   My duties are assigned; I deal in voter registration and political education; Dr. King and the Legal Defense Fund handle all the legal matters.

Q   Isn't it also a purpose of the demonstration to appeal to Negroe who have been given the right by Federal Courts to register to encourage them to exercise that right which the Federal Courts has given them or guaranteed them?

A   You are partly right.

Q   Well, in what part am I wrong?

A   Because demonstration is non-violent, direct action, demonstrations is to correct a wrong that a society has denied a Negro in education and not a society tell him, "You can't register and

      vote because you don't have no education," but this same society

      has denied this Negro an education; and also this thing of

      police brutality and intimidation, many Negroes who are qualified

      and know they can go down and register are afraid to go down

      in Dallas County because of Sheriff Jim Clark, his Posse and

      deputies.

Q    Well, why weren't these complaints in regard to Sheriff Clark

      brought to the attention of the Federal Court?

A    They were.

Q    Federal Court ignore them?

A    I don't know just how far -- it is in court now.

Q    And your group felt, and you as Director in the capacity that

      you have mentioned, felt that it was necessary to correct this

      situation in Dallas County to demonstrate in the streets, to

      call mass meetings; is that what you say?

A    We felt that this, coupled with the court, aid from the courts,

      would correct the matter.

Q    Didn't suit you that Negro citizens were complacent, even

      though the Federal Courts had guaranteed the right, and the

      purpose of it was to provoke violence and call their attention --

A    No.

Q    -- to the situation --

A    No.

Q    -- to encourage them to vote?

A    No, not at all.

215

Q    That is not at all true?

A    No, we are non-violent, not violent; we believe in non-violence.

Q    Did you ever think from the law enforcement standpoint, the
     problem that State Troopers or other law enforcement officers
     may have in controlling white people in a community?

             MR. GREENBERG:  Objection, your honor; again, this
is becoming terribly repetitious.

             THE COURT:  I will permit that question; did you
give that any consideration?

             MR. SMITH:  Yes, sir.

             WITNESS:  I didn't quite get --

             THE COURT:  Did you give any consideration to any
difficulties the law enforcement officers may have in controlling
white citizens?

A    We did give -- we give consideration; yes.

Q    But you didn't think that was serious enough to stop these
     mass marches, even though they may result in violence by white
     people inflicted upon Negroes; is that what you say?

A ·  Well, our consideration, in our conclusion of our consideration,
     we felt that the law enforcement officers of Alabama was adequate
     ·  to prevent violence.

Q    Well, isn't it a fact that this group which you led initially
     defied the order of the Governor of this State and a major of
     the State Troopers in asking you to disperse and not to march
     from Selma to Montgomery as you had announced?

A    No.

Q    And isn't it also a fact that this same group, even though you
     didn't participate in it, on Tuesday defied the proclamation
     of the President of the United States in asking them not to
     march --

              MR. GREENBERG:  Objection.

Q    -- or attempting to march from Selma to Montgomery?

              THE COURT:  I sustain it to that question.

Q    Is it also a fact --

              THE COURT:  You want to wait?

              MR. SMITH:  Excuse me.

              THE COURT:  I sustain it to that question; he said
he didn't know anything about the 9th as far as the march is
concerned, so that objection is sustained.

Q    Did the group defy the order of this court or disobey the order
     of this court --

A    No.

              MR. GREENBERG:  Objection; that calls for a legal
conclusion, your honor.

Q    Let me finish -- entered on March 9, a copy of which was served
     on you, enjoining you and other citizens from attempting to
     march from Selma to Montgomery?

A    I don't know --

              MR. AMAKER:  There has been --

              MR. GREENBERG:  Objection.

217

            MR. AMAKER:  There has been an objection; don't
answer.

            THE COURT:  Have you completed your question?

            MR. SMITH:  Yes, sir.

            THE COURT:  Sustained.

Q   Did you disobey the order?

            MR. GREENBERG:  Same objection.

            THE COURT:  Sustained.

            MR. SMITH:  I have no further questions.

            THE COURT:  Recess court, ten minutes.

            COURT CRIER:  Court will be in recess ten minutes.

            (At which time, 3:40 p.m., a recess was had until
3:50 p.m., at which time the hearing continued)

            THE COURT:  All right, Mr. Pitts.

BY MR. P. H. PITTS:

Q   You say that you were one of the principal organizers of the
    march which took place in Selma this past Sunday from Selma to
    Montgomery?

A   Correct.

Q   And you say that you were aware of the order which was issued
    by Governor Wallace?

A   I had heard it.

Q   You had heard of the order?

A   Unofficially.

Q   Uh, huh; and when you started out on this march, did you have

knowledge that the State Troopers were on the other side of the
bridge?

A    No.

Q    You had no knowledge of that?

A    No; I knew the State Troopers were in town and all around, I
didn't know they was at no specific point.

Q    Uh, huh; when was the first time that you had knowledge of it?

A    When I --

Q    When you crossed over the bridge and saw them?

A    Yes.

Q    And you say you walked down to the foot of the bridge and then
walked out about twenty-five or thirty feet and you were ordered
to halt?

A    Further than that.

Q    Uh, huh; but after a certain distance you were ordered to halt
by Major Cloud?

A    Correct.

Q    And he told you that this march was unlawful and that it could
not be tolerated, it was dangerous for all the citizens of the
State of Alabama; is that correct?

A    Correct.

Q    And asked you to disperse?

A    Correct.

Q    And you did not disperse; is that correct?

A    Well, I wish -- I had two minutes, and I used a minute and five

seconds.

Q   You had a minute and five seconds?

A   (Nodded to indicate affirmative reply)

Q   And you were looking at your watch and talking to Major Cloud
    at the same time and telling him that you wanted to talk to
    him?

A   Yes.

Q   Uh, huh; and after this minute and five seconds, you said that
    the Troopers then moved into you holding the billy clubs up
    like this?

A   Yes.

Q   Then you said that they lunged into you?

A   Yes.

Q   And did they jab you?

A   They jabbed; yes.

Q   Did they strike you on top of the head?

A   Yes.

Q   Uh, huh; and did they knock you down?

A   Yes.

Q   And did they run over you?

A   Yes.

Q   And when was the Posse coming in?

A   That was after they -- Posse came in -- first time I saw the
    Posse was after the Major Cloud gave the order to regroup.

Q   Was this while the Troopers were all jabbing you in the --

220

MR. GREENBERG:  Excuse me; let him answer the question; let him answer the question.

THE COURT:  The objection is sustained.  Address your remarks to the court, please.

MR. GREENBERG:  (Nodded to indicate affirmative reply)

Q   Go ahead?

A   When Major Cloud gave the -- the order to regroup, and we were trying to pick up the wounded and console the wounded, and they came back and began to throw tear gas is the first time I observed the Posse.

Q   Uh, huh; and where were you all this time when the Troopers were moving in?

A   I was at the head of the line.

Q   You was at the head of the line?

A   (Nodded to indicate affirmative reply)

Q   Did you get hit?

A   Yes.

Q   And -- but yet on -- on this -- on your direct examination you testified to all these things that you saw, such as Sheriff Jim Clark and his possemen and his deputies, you said that you saw them while the Troopers were moving in?

A   I never did.

Q   What were you doing when the Troopers were moving into you?

A   I don't understand your question.

Q   What -- did you cover up your head?

A    Yes.

Q    Did you fall down on the ground?

A    All of that.

Q    And you are sure that you saw the possemen running these people into the woods, chasing tear gas -- throwing tear gas at them; is that correct?

A    No.

Q    Did you testify on direct that you saw that?

A    No; I never said a posseman had a gas bomb, and this was long after the Troopers attacked us when I saw the -- when the possemen were chasing people.

Q    How long?

A    Ten -- ten, fifteen minutes -- ten -- approximately ten minutes.

Q    Uh, huh; and you stood over there in that tear gas without a gas mask for ten or fifteen minutes?

A    No.

Q    Where did you go?

A    Moving about trying to get back across the bridge.

Q    Trying to get back across the bridge?

A    (Nodded to indicate affirmative reply)

Q    And this was when you saw that?

A    (Nodded to indicate affirmative reply)

Q    When all this was going on?

A    Correct.

Q    And you are sure it was possemen?

222

A   Yes.

Q   All right.  Now, you said that you came back across the bridge;
    is that correct?

A   Correct.

Q   And did you see Sheriff Jim Clark when you came back across the
    bridge?

A   Correct.

Q   And where was he?

A   He was over at the left, not -- when we came off the bridge, he
    was over at the left.

Q   Over on the left hand side?

A   I would say standing near in the vicinity of West Broad and --
    not West Broad, Broad and Waters, at Broad and Waters.

Q   Broad and Water; is that -- was he standing over there near the
    Selma Times-Journal?

A   I don't know where the Selma Times-Journal is.

Q   Over there on the right of the bridge as you are going across
    the bridge?

A   Yes.

Q   Uh, huh; is that where he was standing?

A   Yes; he wasn't standing, he was moving about, and I observed him
    in this area and his moving.

Q   And was anybody -- what were you doing when you were observing
    him; were you running across the bridge, or just what were you
    doing?

A   Well, I observed him, I guess, for a period more than just,
    you know, instantaneously, I was running, sometimes ducking and
    dodging, pulling people in, picking people up.

Q   Uh, huh.

A   I was trying to watch the Sheriff.

Q   Were there a lot of people hollering and carrying on?

A   Yes, a lot of people hollering and carrying on.

Q   Was there a lot of noise; was there a lot of noise?

A   There were noise; I don't know what you mean by "lot of noise,"
    but there were noise.

Q   I mean the Negroes that were coming back across the bridge,
    were they hollering, and you said they were helping, carrying
    some of the wounded, and et cetera?

A   The Negroes were hollering, the white citizens were cheering
    on the side, the possemen were hollering, Sheriff Clark was
    hollering.

Q   Now, and you said Sheriff Clark was standing over here on
    this corner?

A   I didn't say he was -- he wasn't standing any place, I -- I
    saw him moving around in that vicinity.

Q   Moving around, and was it at this time that you heard Sheriff
    Clark say, "Go get the God damned niggers"?

A   That time plus other times as we went on toward the church; I
    heard him say that several times.

Q   How far were you from Sheriff Clark when you heard him say this?

224

A    Varied lengths; I guess the first time approximately from here
     to the wall, the next time as we turned the corner and he ran
     across the street with a group he probably came as close as
     from here to you, on down the streets different times I heard
     him at least -- I heard him say it, I say, approximately four
     times.

Q    Uh, huh; you heard him over all this noise you just testified
     about?

A    And other possemen were cursing, "Get the niggers and the
     white son of a bitch -- the white loving son of a bitches --
     the nigger loving son of a bitches."

Q    And you are sure, you are positive, that you heard Sheriff
     Clark say what you just testified to?

A    Yes; yes.

Q    And you heard him over all this noise that you just testified
     to?

A    Yes; yes.

Q    From here over there to that wall?

A    It wasn't that --

Q    It was that far?

A    It wasn't that much noise; it wasn't any, you know, the degree
     of noise.

Q    Uh, huh; now, were there a lot of white people standing around
     on these corners?

A    Well, there were white people, I don't know what you mean, "A

225

lot," whether you mean twenty or a thousand.

Q   A large -- a large group, two or three thousand, a hundred
     fifty?

A   No; largest group of whites I observed at any one point was
     over on the east side of the bridge, but over on -- I guess
     this would be the west side, the Selma side of the bridge,
     there were clusters of whites at various points along the --

Q   Huh, huh; and were they allowed to come down to the area where
     the bridge was, right there at the foot of the bridge?

A   Well, yes; they were on different corners; I don't remember --
     they were on -- like when we got over -- came --

Q   As a matter of fact, that whole area was sealed off in there,
     wasn't it, by police?

A   No, it was whites in there; it was whites in there.

Q   Law enforcement --

A   No, whites, citizens, white men, I don't know, white men and
     white women; white people were there.

Q   Standing right there by the bridge?

A   Not right by the bridge; the first group I observed is like
     you come over the bridge and turned right on Waters, was across
     -- that would be on, I guess, the west -- well, on that corner.

Q   Uh, huh; but law enforcement did seal off the area up -- you
     know where Carter's Drug Store is?

A   I don't know this; I know where Carter's Drug Store is, sure.

Q   You know where Pilcher-McBryde's Drug Store is in that block?

226

A   Yes.

Q   And that area was sealed off?

A   I don't know this.

Q   All right, okay; and -- and you said that you ran into a house?

A   Yes.

Q   Whose house was that; do you know?

A   I don't know the lady's name.

Q   Uh, huh; was it a white lady or a Negro?

A   Negro.

Q   Uh, huh; and she said that Jim Clark had given orders to get the leaders?

A   One leading the line with the black suit.

Q   Uh, huh; and did you have on a black suit?

A   I did.

Q   What did Sheriff Clark have on that day?

A   His uniform.

Q   His uniform; uh, huh; and what -- what does his uniform look like?

A   I'm afraid I want -- I want to think on that, because I saw him a hundred times that one day.

Q   If you saw him that many times, you ought to know what his uniform looks like?

A   Yes, I -- I am not positive; I think he had on his uniform.

Q   Khaki uniform?

A   Well, he wears --

Q   Green?

A   He wears -- no, he wears beige, usually, beige, two different colors of beige.

Q   Did he have on his hat with the salad dressing as -- as you all refer to it at the mass meetings?

A   I think so.

Q   All right; and he had that on that day, too?

A   Well, he had on a hat.

Q   Uh, huh; did he have on a helmet or a hat?

A   I am not sure of that.

Q   All right; and are you sure that you heard Jim Clark say, "Go get those God damned niggers"?

A   I am pretty sure, I am very sure, I am positive.

Q   You are pretty sure or are you very sure?

A   I am positive.

Q   You are positive?

A   Uh, huh.

Q   But you don't know whether he had on -- what he had on at that time?

A   Well, I can't necessarily describe his exact attire.

Q   Uh, huh; but you can describe what he said?

A   Yes.

Q   And you are positive that it was Sheriff James G. Clark, Jr., that said it?

A   I am positive.

228

Q    Okay. Now, and are you positive he said this at the end of the
     Edmund Pettus Bridge, on the Selma side of the Edmund Pettus
     Bridge?

A    Yes, sir; I didn't see him across -- I don't remember seeing
     Sheriff Clark across the other side.

Q    All right; now, you also said that you saw possemen chasing
     children?

A    Yes.

Q    Uh, huh; and were they chasing them on the horses?

A    Yes, some of them -- some of them were on foot, and some of them
     were on horses.

Q    Where were you when you saw them chasing them?

A    Well, part of the time I was running, dodging and taking cover,
     and gathering people up, doing different things; possemen
     chased us all the way from off the bridge right to the church.

Q    Were the children following the marchers?

A    There were -- there were -- there were persons under twenty-one
     in the march.

Q    Uh, huh; did you advocate taking juveniles out on the highway?

A    No, we didn't.

Q    Did you try to take these juveniles and tell them not to go on
     this march, that it would be dangerous?

A    Well, we did have an age limit on the march.

Q    What was the age limit?

A    I -- I believe it was seventeen.

229

Q    Seventeen?

A    (Nodded to indicate affirmative reply)

Q    And did you inspect these lines before you left to determine if
     anybody under seventeen was in the lines?

A    No, people are usually obedient and cooperative.

Q    They usually say what you -- they usually obey your commands?

A    No, not our demands; it is whatever the group agrees, they
     usually are --

Q    Every group has a leader, and I mean they usually obey the
     leader's demands; is that --

A    We believe in self government, so more -- several people have
     something to say about --

Q    Uh, huh.

A    -- the decision.

Q    Now, when you got back down -- did you go back down to Brown's
     Chapel on Sunday?

A    I finally did.

Q    You finally did?

A    Yes.

Q    Were you down there when the brickbats and garbage can tops
     were thrown at those --

A    No.

               MR. GREENBERG:  There is -- there is no evidence --

               THE COURT:  Objection overruled.

               MR. P. H. PITTS:  There may be.

230

THE COURT: Mr. Pitts, you don't have to argue this;
I have ruled with you.

Q   Did you see that?

A   No.

Q   Did you hear about it?

A   About the -- explain your question again?

Q   Did you have any knowledge of any brickbats or garbage can tops
    being thrown at any law enforcement officials at Brown's Chapel
    on Sunday afternoon?

A   I didn't see any of this.

Q   And you have no knowledge of it?

A   I don't.

Q   All right.  Now, where were you before you came to Selma,
    Alabama?

A   I came to Selma directly from Atlanta.

Q   From Atlanta?

A   (Nodded to indicate affirmative reply)

Q   And how long had you been in Atlanta before you came to Selma?

A   Almost a year.

Q   Almost a year?

A   Just -- yes.

Q   Were you in Savannah, Georgia, at any time?

A   Correct.

Q   And did you lead demonstrations in Savannah, Georgia?

A   Correct.

MR. GRAY: We object, your honor; this is going too far afield.

THE COURT: Well, I don't know how far he wants to pursue it; go ahead.

Q  And what was the purpose of these demonstrations in Savannah, Georgia?

A  To get -- to get -- to attain first class citizenship and to carry on activity that would redeem the soul of America and --

Q  And was there any -- was there any violence in Savannah, Georgia?

THE COURT: I don't believe we ought to get involved in that.

Q  Well, how many -- just how many towns have you been in and led demonstrations?

A  I was in Savannah, and -- and actually, Savannah is the only place I was considered as the chairman or the president of the --

Q  Saint Augustine, Florida?

A  I was not the chairman or president.

Q  Were you -- were you in Saint Augustine?

A  I was in Saint Augustine.

Q  Now, at each of these places you have been, there has always been an outbreak of some sort of violence; is that correct?

A  That there has -- well, I don't -- no, I couldn't say for sure.

Q  There was violence in Saint Augustine, wasn't there?

A  Yes.

MR. GRAY: Your honor, we are going to object.

Q   Now, you say that you are head of the voter registration aspects

of the S.C.L.C.?

A   And education.

Q   Uh, huh; and you say that you went to the Court House one day

with some local ministers and attempted to go in a certain door,

and you were not allowed to --

A   No; went down -- these people went down to get registered; I

went with them.

Q   Uh, huh; was this after Judge Daniel Thomas issued his order

designating which door would be used for voter registration?

A   It was before he issued his order.

Q   All right; and you wanted to go into what is commonly called

as the Sheriff's entrance; is that correct?

A   No; I don't know whether that is correct or not.

Q   The front door, what you call the front door?

A   I don't know whether that is the front door or not.

Q   Well, did you want to go in the Lauderdale Street entrance or

the Alabama Avenue?

A   It is the door across from the Lauderdale and Alabama, it is

on -- the Alabama entrance, I think it is Alabama that runs this

way on --

Q   That is the door you wanted to go into?

A   No; I didn't want to go in any door, the citizens that pay

their taxes were desirous of going in this particular door.

Q   Didn't Sheriff Clark tell them they could go in the Lauderdale

Street entrance -- door?

A   He told them to go in another door.

Q   And which is the front door of the Court House?

A   I don't know it is the front.

Q   And you say that you were arrested --

A   Yes.

Q   -- at that time?  You know the -- the door that has the two big lights up on the outside of it, don't you?

A   I never noticed two big lights.

Q   You have never noticed the lights on the outside of the front door of the Court House as many times as you have been there?

A   Never noticed them.

Q   You know where the elevators are to the Court House?

A   No.

Q   You don't know where they are?

A   No.

Q   How many times have you been to the Dallas County Court House since you have been in Selma?

A   How many times have I been in the Court House or to the Court House?

Q   To the Court House and in the Court House?

A   Well, which one you want me to answer?

Q   Both?

A   I don't know how many times I have been to the Court House; but in the Court House, I have been in the Court House maybe

four -- four times -- four or five times.

Q  Uh, huh; you know which door you are supposed to use for voter
registration, don't you?

A  No.

Q  You do not know after Judge Thomas issued his order?

A  Oh, after Judge Thomas issued his order?

Q  Uh, huh; and that is the front door of the Court House, which
is on the Lauderdale Street entrance; correct?

A  I don't know it was the front.

Q  Now, you said that you were carried upstairs and you were not
carried before any Judge or magistrate; is that correct; after
you were arrested by Sheriff Clark?

A  Well, which arrest you talking -- on some occasions we were
carried upstairs, sometimes we usually entered on the docket
and carried away to the other counties.

Q  I am talking about this particular day you testified to on
direct examination?

A  This particular day --

Q  I believe you testified on direct, if I am correct --

A  Yeah, we were carried upstairs this particular day, we did not
come before a Judge, we were carried -- we were carried to jail
that day, if my serve -- I am sure, without seeing a Judge.

Q  You are positive that you didn't see a Judge?

A  We didn't see -- I didn't see no Judge.

Q  You didn't see Judge Hugh Mallory?

235

A   I didn't see no Judge until we were released.

Q   Until you were released?

A   Yes.

Q   And you are positive of that?

A   Yes.

Q   Now, just one or two more questions; on these lines that you have led down to the Dallas County Court House, is it not true that there have been numerous juveniles in these lines, and also many nonresidents of the State of Alabama and of Dallas County, Alabama?

A   No juveniles have been in any line I have led to amount to anything, nor have I led any lines to the Dallas County Court House with any appreciable number of nonresidents of Dallas County.

Q   Have there been many juveniles taking part in these demonstrations?

A   In some demonstrations juveniles took part, but not no line that I led.

Q   In other words, you didn't lead a line with any juveniles in it then?

A   I won't say any, but not to my knowledge were any in there; I am positive no appreciable number was there.

Q   But as a matter of fact there were many juveniles in these lines every time they came to the Court House?

A   Not every time; sometime there were no juveniles in them.

236

Q    How many marches have you led on the Dallas County Court House?

A    Three.

Q    Three?

A    (Nodded to indicate affirmative reply)

Q    And how many people were in these marches every time?

A    It varied.  One day there was a hundred and ten of us; one day it was a large number, five or six hundred of us; another day it was -- I don't --

Q    Were there many white people standing up on the various corners around Dallas County Court House?

A    No; no.

Q    None?

A    Very few.

Q    Very few?

A    Very few.

Q    Uh, huh; no large groups of them gathered up on the corners?

A    No large groups.

Q    Now, do you have any knowledge of a boycott which is taking place now in Selma, Alabama?

A    No.

Q    You have no knowledge of it?

A    No; I have some knowledge of a withholding -- withholding patronage campaign.

Q    Well, withholding patronage campaign; do you have knowledge of that?

A   Of a withholding patronage campaign, I have heard it discussed, I have not participated in it; I know very little about it, really; I have been giving my attention to the voter registration aspect.

Q   Have you been at mass meeting when this was discussed?

A   Briefly; it has not been -- our mass meetings are usually taken up with voter registration time and dealing with police brutality and so forth, but boycotts very briefly.

Q   Uh, huh; do you know -- do you have any knowledge of a withholding patronage campaign from the Selma Bus Lines?

A   I have heard this discussed very briefly; I heard you mention the busses today; I didn't even know, really, that they had bought little --

Q   Is S.C.L.C. -- is this sponsoring this boycott?

A   No; no.

Q   Is SNCC sponsoring this boycott?

A   Not to my knowledge.

Q   Is the Dallas County Voters League sponsoring this boycott?

A   Well, I can say this, not to my knowledge; I know it is a -- it is an organized part of the movement.

Q   On the part of all three of the organizations?

A   On the part of voter registration and political education, we have tried to stick to the point.

Q   You haven't been -- what you are testifying, you are not directly concerned with the withholding patronage campaign?

A    That is not -- not why I -- my job is dealing with voter
     registration and political education; I try to stick to that the
     best I can.

Q    Now, other -- you keep talking about this inhuman treatment and
     disfranchisement of the Negro citizens of Dallas County, Alabama;
     first, explain to me what you mean by the inhuman treatment?

A    Like one day we were going -- we went into the Court House
     around on the Lauderdale side, the one the Judge said go in,
     we were not going to register and vote, but I was with four
     ministers, five, six -- with seven ministers, we wanted to go
     in and have a meeting with one of the Registrars or one of the
     secretaries there, and the Sheriff met us and said we could --
     we could not even go to the window, and the registration office
     was closed, that is -- we say, "Sheriff, we are not here to
     register." "Well, you get out of here now." We say, "We would
     like to see the Chief Registrar." "He is not in." Says, "We
     would like to see any other Registrar." "Then you have to go
     to the homes and select" -- he ended up cow prodding us and
     jabbing us with billy sticks and drove us clean out of the
     Court House.

Q    When was this?

A    This was the day that they arrested a hundred and fifty-six of
     us, and I think the largest arrest, maybe, in Selma; they
     carried us straight to the Camp Selma, and they carried us down
     and kept us three days in jail with no blankets, went down to

239

sixteen -- well, one fellow told us there, we didn't have a
thermometer, it was sixteen degrees.

MR. P. H. PITTS: That is not responsive to the
question.

THE COURT: You asked him what he meant by inhuman
treatment, Mr. Pitts; overrule.

A   They told us Sheriff Clark --

Q   Go ahead?

A   -- they asked him why we couldn't have -- people eighty-five,
eighty-six years old, we asked the guards there why we couldn't
have some blankets and some mattresses, some something, and they
say, "We are directly under the orders of Sheriff Clark," and
they fed us food, bread and watered peas, for three days,
wouldn't let us make a call to a lawyer, wouldn't let us call
our families and homes, they didn't know where we were, when
he said, "Sheriff Clark" -- we were down at Camp Camden,
Alabama, the fellow who is in charge there, he said, "I have
to take orders directly from Sheriff Clark."

Q   That at Camp Camden, Alabama?

A   Wait a minute, let me be sure of that; they carried us to Camp
Selma, and then they carried us down to -- we were in Camp
Camden, Alabama.

Q   And this is what you testified, then, is the inhuman treatment?

A   This is part of it; I could elaborate further if you wish.

Q   What about the disfranchisement?

240

A   The disfranchisement -- there are Negroes in Dallas County with master's degrees have been down six times, at least six times, to try to become a registered voter, and they have been denied the right to participate in self government and have been forced to live under a system, taxation without representation.

Q   And you testified about you wasn't given any blankets; isn't it as a matter of fact that you were given blankets and mattresses, but they were stuffed down in the commodes at Camp Selma --

A   We were given no --

Q   -- and the plumbing was torn out of Camp Selma; is that correct?

A   No.

Q   That is not correct?

A   I wasn't in Camp Selma but a day.

Q   Uh, huh.

A   I was down at Camp Camden.

Q   All right, was it true at Camp Camden?

A   No.

Q   Was not true?

A   No.

Q   You are absolutely positive --

A   Positive.

Q   -- of that?

        MR. P. H. PITTS:  All right, that's all.

        THE COURT:  Mr. Hall.

        MR. McLEAN PITTS:  Wait just one minute.

241

MR. P. H. PITTS:  That's all, your honor.

THE COURT:  Redirect, Mr. Hall.

MR. HALL:  Excuse me, your honor.

MR. P. H. PITTS:  Just one more -- a couple of more questions, please.

Q (by Mr. P. H. Pitts)  You testified to some bullwhips which were used by the possemen?

A    Yes.

Q    Did you see these bullwhips?

A    Yes.

Q    How long were they?

A    Well, I am a country boy, and I know a bullwhip, I would say they would stretch -- I could strike you with it from here, but they had them balled up, had them, you know, folded like this.

Q    Uh, huh; and you are positive that they were bullwhips?

A    We -- in the -- back in Attapulgus, Georgia, we call them bullwhips.

Q    Uh, huh; how many of the possemen had these bullwhips?

A    I observed -- I know I saw about -- I say five or six; I am sure all of them didn't have them, some did have them.

Q    Uh, huh; you are positive they had these whips?

A    I am positive, I saw them, they hit people with them, they hit down in the crowds.

MR. P. H. PITTS:  That is all.

THE COURT:  Redirect.

242

## REDIRECT EXAMINATION:

BY MR. HALL:

Q    Mr. Williams, do you know Sheriff James Clark?

A    Yes.

Q    Of Dallas County, Alabama?

A    Yes.

Q    And do you see him in this court room; how is he dressed?

A    Well, he has on a blue striped tie now, and he is behind the
     lawyer's head, I can't see him.

Q    Do you -- will you just step down here and show us, will you,
     please, sir; we just want to be sure you know him, there is some
     question about you having seen him; point him out?

A    This is Sheriff Clark with his hand on the seat here, the
     black -- blue sox, black shoes, and striped tie, bald headed.

Q    Bald headed; all right, sir; take the stand.  Now, Mr. Williams,
     on Sunday did you see any of the persons in your line of
     march engage the State Troopers, the Sheriff's deputies, or
     the Sheriff's Posse in any way physically?

A    No, sir.

Q    Either by initiating some physical action or defending
     themselves?

A    No.

Q    Did you see any of the Negroes or white persons who were in
     your line of march with any type weapon or anything that might
     be construed to be a weapon?

A   No.

Q   Did you at any time see either any of the State Troopers, the Sheriff's deputies, or the Posse people, or any of the horses hurt in any way by any of those marchers?

A   No.

Q   I believe you said that you went in the lady's house to dodge -- I mean to take care of yourself, and later on you went on to the church; is that right; after you retreated?

A   Correct.

Q   Would you tell us, did you find anything unusual on Sylvan Street or at the church when you got there?

A   Yes.

Q   What did you find?

A   Well, ambulances were screaming, streaming, taking the injured to the hospital, Sheriff Clark was walking up and down with his billy stick, and three guys followed him, and they had shotguns or rifles, and they were -- they had -- they were running any person they saw on the street, wouldn't let no one come out of the church, wouldn't let no one come in the church, and we were in the parsonage, wouldn't let anyone stand out on the porch or look out a window; in fact, we were upstairs, and he saw us looking out the window, he start screaming, "Get back there, that window," so and so and so, this was this type --

Q   Did you see any State Troopers at this time or later on in

244

Sylvan Street?

A    Yes, State Troopers -- State Troopers were there.

Q    Were they there at the time you returned?  Or were they there later on?

A    Yes, some State Troopers -- some State Troopers were there when I returned to the church, and others came in.

Q    Did you -- did they at any time make a formal formation in Sylvan Street before the church; did they present arms?

A    It was something like present arms; it was a -- it was a type of formation.

Q    Did they have rifles?

A    Yes.

Q    Or shotguns in addition to sidearms?

A    Rifles, and I know -- looked like -- I think it is a gas gun, it has a large barrel, and it looks like a shotgun.

Q    They were fully armed?

A    Fully armed.

Q    They had sidearms, pistols, billy clubs, and the long guns, you don't know which ones they were?

A    Yes, pistols, billy clubs, the regular artillery, handcuffs and so forth.

Q    Let me show you this photograph, sir, here it is, marked Plaintiffs' Exhibit 9, ask you if you can tell us what it is?

A    This is -- this is the general type of order for the next three -- until about five o'clock or six o'clock that afternoon.

Q    Did you observe this; is it a true likeness of what you saw?

A    This is a true likeness, plus not only up and down the streets, but all --

Q    Can you identify this as being a true likeness of what you saw?

A    Yes.

            THE COURT:  This is on the 7th, March 7?

            WITNESS:  Yes.

Q    On March 7?

A    Yes; yes.

            MR. HALL:  Your honor please -- pardon me.

            MR. SMITH:  I have seen the photograph, and we have

no objection.

            THE COURT:  It will be admitted.

            MR. HALL:  Thank you, your honor.

            THE COURT:  Let me see it.

Q    Mr. Williams, do you know how many persons were wounded, treated
     for wounds or hospitalized, the total number of people in
     hospitals and treated for wounds, on Sunday, March 7, in this
     march?

A    The last official count I was given was eighty-seven, the last --

Q    Eighty-seven?

A    -- official --

Q    Of that number, can you tell us how many were hospitalized for
     one or more days?

A    I only know about --

246

Q    If you do not --

A    I know of about twenty that I happen to know --

Q    No guesses --

A    No.

Q    -- but you do know that have been reported to you that there were at least eighty-seven hospitalized or treated for --

A    It was more than eighty-seven; this was the last official count that I took.

           MR. HALL:  I believe that's all.

           THE COURT:  Recross.

           MR. SMITH:  (Shook head to indicate negative reply)

           THE COURT:  Recross.

           MR. P. H. PITTS:  Yes, sir.

                RECROSS EXAMINATION:

BY MR. P. H. PITTS:

Q    Now, I show you here Plaintiffs' Exhibit number 9 which has been introduced into evidence, and ask you if you will point me out a posseman or a member of the Dallas County Sheriff's Department in that picture?

A    There is none.

Q    None in there?

A    In this picture.

Q    You testified that that truly depicted the scene as you saw it down there that afternoon; is that correct?

A    Yes, plus plenty of possemen were there; it just happened to be

247

none in that picture.

Q   Uh, huh; and there were large groups of people in the street?

A   No, not at this time.

Q   I am talking about before?

A   No.

Q   There wasn't large groups of people milling around out in the streets?

A   No; well, at one point when they were trying to get into houses or churches or homes, when we first got back.

Q   You mean to tell me that there were not people, Negro citizens, standing out on the street in front of Brown's Chapel all the way from Brown's Chapel all -- back down to the Baptist church, and white citizens, too; you mean to tell me they were not standing out on the street --

A   It wasn't.

Q   -- right after this occurrence happened at the bridge on your way back, say, for the next hour after you arrived back?

A   No.

Q   At Brown Chapel?

A   No; the only Negroes and white persons I saw was trying to make cover or get in some house and running, the only ones I saw, no one standing still.

Q   And they were not milling around out in that street?

A   No; positively no.

Q   Did you ever see one of those bullwhips uncoiled that you

testified to?

A  Uncoiled?

Q  (Nodded to indicate affirmative reply)  The ones that you said you could hit me with from right there on the witness stand?

A  No, they had them balled up, and they were riding along against the line hitting them.

Q  You are not sure if it was a bullwhip or not, are you?

A  Yes; one hit this close to me, the man rode along beside me with it in his hand.

Q  Uh, huh; and you are positive it was a bullwhip?

A  Yes.

Q  And you said you saw about four or five bullwhips?

A  At least that many, with possemen in the immediate area.

        MR. P. H. PITTS:  That is all.

        THE COURT:  Anything further?  All right, you have any matter you want to take up, gentlemen, before we recess for the day?

        MR. McLEAN PITTS:  Yes, sir; Judge, we have certain witnesses here, we are going to -- I don't know whether they are -- this witness may -- this man here is released as far as we are concerned, I presume -- I don't believe that John Lewis --

        THE COURT:  I can't hear you.

        MR. McLEAN PITTS:  I say I don't believe that John Lewis answered, but we are releasing these witnesses, Hosea Williams --

THE COURT:  You take care of that; you subpoena them?

MR. McLEAN PITTS:  Yes, sir; I was going to release them here in court, but I didn't want to release them without the permission of other counsel.

THE COURT:  Well, take it up with them after we recess.

MR. McLEAN PITTS:  All right, sir.

THE COURT:  Anything further?

MR. HALL:  Your honor please, may this witness, if it is no objection --

THE COURT:  I have no objection.

MR. HALL:  May this witness --

THE COURT:  If you gentlemen agree upon it.

MR. HALL:  Let him go?

MR. McLEAN PITTS:  Let him go.

THE COURT:  Anything else now you want to take up with the court before we recess?

MR. GREENBERG:  (Shook head to indicate negative reply)

MR. McLEAN PITTS:  Judge, what I would like to know is something about we are going to have a good many witnesses from Selma to bring over here; we want some time to call back over there and make arrangements to bring those witnesses over here.

THE COURT:  All right.

MR. McLEAN PITTS:  And by the time they rest their

250

case.

THE COURT:  I will see if I can assist you with that. When do you gentlemen anticipate resting?  We just had three witnesses.

MR. GREENBERG:  It is difficult to say at this point, your honor; I would think that we would run part of tomorrow morning in any event.

MR. AMAKER:  I would think the better part of all day.

MR. GREENBERG:  We might even go into the afternoon.

THE COURT:  Mr. Doar, how many witnesses do you have?

MR. DOAR:  Well, I would not have, I don't think, over six or seven.  We have some F.B.I. Agents that took pictures of this, your honor.

THE COURT:  Yes.

MR. DOAR:  I was going to try to get those stipulated to tonight.

THE COURT:  All right.  Then is it fair --- is it fair to say that the plaintiffs and the plaintiff-intervenor will take up all of tomorrow with their testimony?

MR. HALL:  Yes, sir.

MR. AMAKER:  I think that would be ---

MR. HALL:  That would be fair, your honor.

THE COURT:  Then in response to your inquiry, Mr. Pitts, I would suggest you would be safe in having your witnesses come Monday morning.

251

MR. McLEAN PITTS:  Monday morning.

THE COURT:  Monday morning; they will take up all day tomorrow, Friday, then we will recess tomorrow afternoon until Monday morning.  Anything else?  Anything?

MR. SMITH:  No, sir.

THE COURT:  Recess until nine o'clock in the morning.

(At which time, 4:27 p.m., a recess was had until 9:00 a.m., March 12, 1965, at which time the hearing continued)

THE COURT:  All right, gentlemen, are we ready to resume the taking of the testimony?

MR. HALL:  Yes, sir.

THE COURT:  Plaintiffs?  For the defendants?

MR. SMITH:  Yes, sir.

THE COURT:  Are you ready to proceed?

MR. McLEAN PITTS:  Yes, sir.

MR. WILKINSON:  Yes, sir.

THE COURT:  All right.

MR. HALL:  Dr. Dinkins, please.

MARSHAL:  What is the name?

MR. HALL:  Dinkins, Dr. Dinkins.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

DR. WILLIAM B. DINKINS, witness for the Plaintiffs, having been duly sworn, testified as follows:

DIRECT EXAMINATION:

BY MR. AMAKER:

Q   Will you state your name, please?

252

A    William B. Dinkins, M.D.

Q    What is your residence, Dr. Dinkins?

A    My residence is 2507 Etheridge Avenue, Selma, Alabama.

Q    Are you a practicing physician in the City of Selma, licensed
     by the State of Alabama?

A    I am.

Q    Dr. Dinkins, on Sunday, March 7, was there a first aid set up
     in the City of Selma?

A    Yes, there was.

Q    Where was that?

A    There was a first aid facility set up at the parsonage of the
     Brown Chapel Church.

Q    Can you tell the court approximately how many cases were
     received at the first aid station?

A    We received from between sixty and seventy cases.

Q    Of that number, were there -- was there a number sufficiently
     serious that they were --

               THE COURT:  Received how many?

               WITNESS:  Between sixty to seventy cases.

Q    What -- when -- when those cases came in to you, what did you
     do with the more serious cases?

A    The more serious cases were referred to the hospital from the
     receiving station.

Q    Now, when you say, "The hospital," what hospital are you
     referring to?

A    They were sent to Good Samaritan Hospital.

Q    To the emergency facility?

A    To the emergency facility.

Q    At Good Samaritan Hospital?

A    That's right.

Q    Approximately how many such cases were referred to the emergency facility of the hospital?

A    I would say about a dozen, maybe fourteen.

Q    Of this approximate dozen cases, what were -- how serious were the injuries that were referred?

A    Well, the injuries that were referred, fractures, broken bones, and lacerations, that is where the skin was broken and needed to be sewed up, things that would not be done at first aid station.

Q    I see. Were there cases of severe gas injuries, injuries on --

A    Yes, several, I would say at least two, severe gas cases were referred, also.

Q    But those cases that were treated at the first aid station, persons were treated and -- and sent home?

A    The ones treated at the first aid were treated and released. They were mostly the tear gas in the eyes.

        MR. McLEAN PITTS:  I didn't get that.

        WITNESS:  Those cases that were treated at the station were mostly from tear gas in the eyes.

Q    I see. The injuries that you treated at the first aid station,

254

where were they incurred?

A    Where were they incurred?

Q    Yes?

A    It is my understanding --

        MR. McLEAN PITTS:  Now, we object.

        MR. SMITH:  We object to what his understanding is.

        MR. McLEAN PITTS:  We object to what his understanding.

        THE COURT:  Sustain objection.

Q    Did the patient -- any of the patients that you treated inform
you of the place where the injuries --

        MR. McLEAN PITTS:  We object.

        MR. SMITH:  We object to this, if it please the

court.

        THE COURT:  I sustain it.

Q    Were you -- were there any other physicians in attendance with
you at the first aid station?

A    I was -- I was in charge of the aid station; we had assistance
from other people.

Q    At what time did you go on duty at the first aid station?

A    About noon.

Q    And how long was it until you completed your treatment of the
persons who came there with injuries?

A    Well, I stayed there until about eleven p.m.

Q    Was there another first aid station set up?

A    On Sunday?

255

Q    Yes?

A    Not to my knowledge.

Q    Did you take any medical histories of the persons at the time?

A    No; this was merely receiving and determining whether the cases were serious enough to go to the hospital, or whether to just keep them there; it was more or less a receiving station rather than a treatment station, really.

            MR. McLEAN PITTS:  Judge, we can't quite hear him over here.

A    It was more of a receiving station rather than a treatment station, really; of course, very minor things we treated there.

Q    Did any of the patients that you treated inform you of the place where their injuries occurred?

A    I couldn't say that they did; but I can add this remark, I was listening -- well before patients began coming in I was listening to a portable radio, and from the com--- radio commentator who reports --

            MR. McLEAN PITTS:  We object to that.

            MR. SMITH:  We object, if the court please.

            THE COURT:  That is sustained.

            MR. AMAKER:  That's all.

            THE COURT:  For the Government?

            MR. DOAR:  (Shook head to indicate negative reply)

            THE COURT:  Mr. Smith.

                CROSS EXAMINATION:

256

BY MR. SMITH:

Q    Dr. Dinkins, who is Dr. <u>MOLDERAN</u>; is that correctly pronounced?

A    Moldovan.

Q    Moldovan?

A    Dr. Moldovan is the physician from the Medical Committee on Human Rights.

Q    And where is he from?

A    He is from New York City.

Q    New York City?

A    Yes, sir.

Q    Were other physicians from out of the State of Alabama in Selma on either Sunday, March 7, or Tuesday, March 9?

A    Yes, sir.

Q    How many other physicians from out of the State were there?

A    Well, I couldn't give the exact number; one, two, three, four, five -- at least twelve.

Q    At least twelve?

A    Yes, sir.

Q    Who asked these physicians to come to Selma?

A    I understand some were -- were -- came from the Medical Committee on Human Rights, who were asked by the S.C.L.C., Southern Christian Leadership Conference, to come.

Q    Did Dr. King request that they come to Selma?

A    And I understand that some came voluntarily.

Q    When were they requested to come to Selma, if they were requested?

THE COURT:  You are not asking whether there have been any violations of the Medical Association admission rules or the State admission rules, anything like that?  If that is what you are inquiring into it for --

MR. SMITH:  No, sir.

THE COURT:  -- I am not interested in that in this court proceeding.

MR. SMITH:  I am not asking that, your honor.

THE COURT:  Go ahead.

Q    If you know, when were these physicians from out of State requested to come to Selma?

A    Well, all of them were not requested; some volunteered, just came on their on from --

Q    Were any of them requested to come?

MR. GRAY:  Your honor, we are going to object.

THE COURT:  Do you know the answer to that question?

WITNESS:  I really don't know.

THE COURT:  Well, say you don't know, we will get along.

Q    When did they come to Selma?

A    I do not know when they came to Selma.

Q    You do not know what month they came?

A    No.

Q    Were any of them there prior to Sunday, March 7?

A    Some of them I have seen as far back as a month or better.

Q    They might have been in Selma for as much as a month prior to
     March 7?

A    I won't say continuously, but I have seen them; yes.

              MR. SMITH:  I believe that's all.

BY MR. McLEAN PITTS:

Q    Dr. Dinkins, as I understand you --

              THE COURT:  I believe we have a rule in the court
about standing when you interrogate witnesses.

              MR. McLEAN PITTS:  I am sorry; it is all right.

              THE COURT:  That is all right.

Q    Dr. Dinkins, as I understand you, you went down to the parsonage
     of Brown Chapel Church on Sylvan Street at about noon on Sunday;
     is that correct?

A    Yes, sir; that is correct.

Q    What you testified to?

A    That's right, sir.

Q    And a first aid station was set up in the parsonage; is that
     right?

A    A receiving station was set up in the parsonage.

Q    A receiving station?

A    Yes, sir.

Q    Now, what -- I don't want you to go into all the medical terms,
     but just roughly, what did -- what did you have there?

A    What did we have?

Q    Yes; what type equipment?

259

A   We had mostly --

Q   Roughly; I don't want to go into all the technical stuff?

A   We had --

Q   I meant just roughly what you had?

A   We had just a common first aid facility; boric -- boric acid
    solution and sodium bicarbonate solution for washing out eyes,
    some splints -- well, we really had first aid material, no
    real medical equipment.

Q   Just the ordinary stuff that you would see in a first aid
    station; is that right?

A   The first aid station; yes, sir.

Q   That would take care of fractures until you could get them to
    a hospital, what I was talking about?

A   Merely the first aid.

Q   I meant the first aid end of it, like splints and that kind of
    stuff?

A   Yes, sir; no setting of fractures.

Q   But you had boric acid there for -- you had that for washing
    out your eyes?

A   To wash out eyes; yes, sir.

Q   And you had that there at noon; you set that station up at noon?

A   Yes, sir.

Q   And -- and -- and how many other doctors were there?

A   At that time there were perhaps three there; there were some
    at -- different numbers at different times.

Q   All right; now, at that time no march had started; wasn't that
    right?

A   No, sir; no march was started at noon.

Q   In other words, the station was set up in anticipation of taking
    care of any people that may be injured in the march; is that
    right?

A   The --

            MR. GRAY:  We object.

A   The station was set up --

            THE COURT:  Overrule.

A   The station was set up to take care of what we would expect to
    occur on a fifty mile march; we were not expecting what
    happened.

Q   On the march; is that right?

A   We were just expecting a march.

Q   All right; now, as you had -- I want to know how many, in your
    judgment, in your -- the best of your estimate, how many
    fractures came into that station in -- into the first aid
    station, now --

A   At least three --

Q   -- fractures?

A   -- fractures, at least; I had no x-ray equipment there, but
    just on superficial --

Q   I mean your observation and diagnosis; that's right?

A   I estimated three fractures.

261

Q   Three fractures?

A   (Nodded to indicate affirmative reply)

Q   And now, how many concussions; did you have any concussions in there that you diagnosed?

A   Yes, sir; we had, I would say, five, six perhaps, concussions.

Q   And the rest was tear gas; is that right?

A   The rest tear gas.

Q   Now, did --

A   Well, not the rest tear gas; there were a couple of other things, too; the majority of the rest was tear gas.

Q   All right.  Now, did -- did ambulances -- when these people were brought back, did they go to the hospital with them, or did they bring them to the first aid station?

A   They brought some to the first aid station and some to the hospital, as I understand, it is my --

Q   In other words, some of these people that were brought to the first aid station by ambulances and then the ambulances carried some from the first aid station over to the hospital; am I correct in that?

A   That is correct.

Q   All right; now, who -- when were the arrangements made with you to set up that first aid station?

A   The Saturday night.

Q   Saturday night --

A   Saturday (nodded to indicate affirmative reply).

Q    -- before; is that right?

A    Yes, sir.

Q    And who made those arrangements with you?

A    Well, the arrangements were made during a meeting; there were
     several people present.

Q    And -- well, was it the Student Non-violent Coordinating
     Committee?

A    S.C.L.C.

Q    Huh?

A    S.C.L.C.

Q    Student -- I mean the --

A    Southern Christian Leadership Conference.

Q    -- Southern Christian Leadership Conference?

A    Yes, sir.

Q    They made the arrangements with you; is that right?

A    Yes, sir.

Q    Did they make any arrangements for compensation to you?

A    No, sir.

Q    And -- .  Did you -- did you give any instructions to these
     marchers before they left the church?

A    No, sir; I did not.

Q    Did you talk to them at all at any time about the effect of
     tear gas and so forth and what they should do?

A    I did not.

Q    Did anyone in your presence?

263

A   No, sir.

        MR. McLEAN PITTS:  That's -- that's all.

        THE COURT:  Redirect.

           REDIRECT EXAMINATION:

BY MR. HALL:

Q   Doctor --

        THE COURT:  Just a minute.

        MR. HALL:  Oh, I am sorry.

        THE COURT:  Same counsel interrogate the witness.

        MR. HALL:  I am sorry, your honor.

        MR. AMAKER:  Excuse us a moment, your honor.

BY MR. AMAKER:

Q   Dr. Dinkins, of the cases that you received at the first aid
    station, did you observe any secondary effects of tear gas,
    such as vomiting or something of that sort?

A   Well, later in the day the secondary effects came on,
    vomiting, that -- that is not an immediate effect.

Q   I see.  Can you estimate the number of such persons who
    exhibited these effects?

A   Oh, there were quite a few, maybe fifteen to twenty.

Q   Were there any children treated by you at the first aid station?

A   Yes, we saw children.

Q   Pardon?

A   We saw some children.

Q   About how many?

264

MR. McLEAN PITTS:  I can't hear.

Q    About how many children?

A    That would be difficult to estimate; I didn't keep an age
     record.

Q    In your best judgment, would you say there were as many as
     twenty?

          MR. McLEAN PITTS:  Now, we object to him cross
examining.

          THE COURT:  Do not lead the witness.  If you have a
judgment as to how many children you treated, give him your best
judgment on it.

A    Including up to what age; through teenagers?

Q    When I say children, I mean persons under eighteen years of
     age?

A    Under eighteen --

          MR. McLEAN PITTS:  Wait a minute, your honor -- all
right, that is his definition of children.

          THE COURT:  Go ahead.

A    There were perhaps twenty, twenty-five maybe.

          MR. AMAKER:  That's all.

          THE COURT:  Mr. Doar.

          MR. DOAR:  No.

          THE COURT:  Mr. Smith.

          MR. SMITH:  No, sir.

          THE COURT:  Mr. Pitts.

265

MR. McLEAN PITTS:  Wait just one minute.

RECROSS EXAMINATION:

BY MR. McLEAN PITTS:

Q   Doctor --

MR. GAYLE:  Get up.

MR. McLEAN PITTS:  Excuse me; I am sorry.

Q   Doctor, in your best judgment, what was the youngest person
    that you treated down there?  Out of -- out of this march; out
    of this that was brought there to the first aid station?

A   I think the youngest one was about nine years old.

Q   Nine years old; what was the -- how many -- about how many in
    that age group?

A   I didn't see very many that young; perhaps that was the only
    one nine.

Q   The majority of them were what we call teenagers, high school
    kids; is that right?

A   Yes, mostly teenagers.

MR. McLEAN PITTS:  All right, that's all.

THE COURT:  Anything further?

MR. AMAKER:  No, your honor.

MR. SMITH:  No.

MR. GRAY:  May this witness be excused?

THE COURT:  I have no objection.

MR. McLEAN PITTS:  Yes, we excuse him.

MR. SMITH:  We excuse him.