IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

Hosea Williams, John Lewis
and Amelia Boynton, on behalf
of themselves and others
similarly situated,

            Plaintiffs,

United States of America,

            Plaintiff-Intervenor,

   vs

Honorable George C. Wallace, as
Governor of the State of Alabama;
Al Lingo, as Director of Public
Safety for the State of Alabama;
and James G. Clark, as Sheriff of
Dallas County, Alabama,

            Defendants.

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Civil Action

No. 2181-N.

FILED

JUN 3 1965

R. CLBORN, CLERK

By: _____
    Deputy Clerk

................................................

Before Hon. Frank M. Johnson, Jr., Judge, at Montgomery,

Alabama, March 11-12-13-15-16, 1965.


VOLUME II of three volumes. (This volume contains pages
266 to 530, inclusive; see
Volume I for pages 1 to 265
see Volume III for pages 531
to 788.)


Glynn Henderson,
Official Court
    Reporter.

266

THE COURT:  Witness excused; call your next one.

MR. HALL:  Dr. Maddox.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

DR. EDWARD ALDRIDGE MADDOX, JR., witness for the Plaintiffs, having

been duly sworn, testified as follows:

DIRECT EXAMINATION:

BY MR. HALL:

Q    Will you state your name, occupation, address, please, sir?

A    Dr. Edward Aldridge Maddox, Jr.; Edward Aldridge Maddox, Jr.

Q    And what is your occupation, sir?

A    Physician.

Q    And your residence?

A    1511 Mabry Street, Selma, Alabama.

Q    Do you have an active practice in Selma?

A    I do.

Q    At the present time?  You are a duly licensed physician?

A    I --

Q    Licensed by the State of Alabama?

A    I am.

Q    Dr. Maddox -- Dr. Maddox, were you present in Selma, Alabama,

on Sunday, March 7?

A    I was.

Q    1965?  At that time did you preside over or work in a first aid

station?

A    I worked in the hospitals --

267

Q    In the hospital?

A    -- not in the first aid station.

Q    You did not have a first aid station at all?

A    That's right.

Q    Did you have occasion on Sunday, May -- March 7, to treat any person or persons or see any person or persons who had participated in an attempted march from Selma to Montgomery, Alabama?

A    I did.

Q    How many such persons did you see, Doctor?

A    I would have to estimate a guess on that.

Q    In your best judgment, please, sir, consider it?

A    Oh, I would say roughly about thirty or thirty-five; I might say that I didn't stay at that one hospital all the time; both hospitals.

Q    Which hospitals were you working, Doctor?

A    Well, I was assigned to Good Samaritan Hospital.

Q    And at Good Samaritan Hospital, will you give us, in your best judgment, how many persons you saw there who had participated in the attempted march from Selma to Montgomery, Alabama?

A    Well, that was the figure; actually, I saw eight at other hospital; I guess roughly fifty, I would say.

Q    You saw eight at the other hospital?

A    Yes.

Q    Now, what is the name of the other hospital?

268

A    Burwell Infirmary.

Q    Burwell Hospital; are these the only two hospitals in Selma,
     Alabama, that were treat -- that will admit Negroes?

A    No, there is another hospital that will admit Negro patients.

Q    What is the name of that hospital?

A    Vaughan Memorial.

Q    Vaughan Memorial; do you know whether or no any persons who had
     attempted to march, previously referred to, were admitted by
     Vaughan Memorial?

A    I haven't heard that.

Q    You do not know of your own --

A    I do not know.

Q    Can you tell us, Doctor, of the persons you saw how many were
     admitted to the two hospitals that you visited and worked?

A    I believe we had thirteen admitted to the larger hospital, Good
     Samaritan Hospital, and four were admitted to Burwell Infirmary.

Q    Doctor, do you know what the injuries were for the thirteen who
     were admitted to the larger hospital?

A    Well, most of the injuries we admitted there were more of a
     major type injury; they were head wounds, fractures, and one
     victim with pulmonary distress, which we assumed was gas, tear
     gas.

              MR. McLEAN PITTS:  We object; we object to what he

assumes.

              THE COURT:  Overrule.

A   I didn't see it, sir.

        THE COURT:  Overrule; did you see the -- did you see the patient?

        WITNESS:  I saw the patient.

        THE COURT:  And you doctored him or administered to him upon that assumption?

        WITNESS:  Yes, sir.

        THE COURT:  Overrule your objection.

Q   Doctor, when you saw these persons, were you the -- the -- did you question the persons before admittance to the hospital or during your examination?

A   I didn't; they had people --

Q   Were you present?

A   -- to do that; not --

Q   When anyone was admitted or questioned, you took no histories, no case histories?

A   No, it was just emergency set up, and mostly what I did was when I -- I was the first one on the scene at the hospital, or did you want me to go into that?

Q   You can go right ahead?

        MR. McLEAN PITTS:  We object to any voluntary statement from the witness.

        THE COURT:  I will overrule it; he is inquiring, he wasn't making any statement.

Q   This is all right.  Doctor, do you know the age of the youngest

person that you saw on Sunday at each hospital?

A  I couldn't say exactly; there were some -- one looked to be about thirteen, that was about the youngest one I saw; I didn't question her as to her age, but that was my impression.

Q  Well, could you -- do you have any judgment as to the age of the oldest person you saw on Sunday?

A  About the oldest one I -- I saw on Sunday, I would say was in the age range between thirty-five to forty.

Q  Of the seventeen persons admitted, Doctor, can you give us the sex of these people; were there some women?

A  There were women.

Q  How many of the seventeen were women?

A  May I make a statement there?

Q  Yes, sir.  Make -- let it be responsive to the question?

A  Well, that is the reason why I wanted to do that; I did not treat all of the people, the -- so I was just concerned with the ones that I admitted.

Q  Of those you treated, those you saw, give us the number of women you saw?  At the two hospitals?

A  That were admitted?

Q  That were -- that you saw, whether they were admitted or no?

A  Well, there was several in what we had, sort of a first aid station in the hospital; it wasn't a first aid station, but those that complained of respiratory distress, there was a room full of them, and several doctors were going around administering

to them, and I would have to estimate a guess.

Q    In your best judgment?

A    It would be a guess ---

Q    Let's --

A    -- I would say --

Q    Let's withdraw that question, Doctor.  Of those that you saw
who were admitted, how many of the seventeen who were admitted
to the two hospitals did you see, yourself?

A    I admitted two.

Q    Two persons?

A    I admitted two of the thirteen at Good Samaritan Hospital.

Q    All right, and ---

A    And at Burwell Infirmary I admitted four.

Q    All right, sir.  Now, the two you admitted at Good Samaritan,
what were the sexes of these people?

A    One male and one female.

Q    Do you have any knowledge as to the age of the female?

A    She was in --- I don't have the records with me; she was roughly
around, I would say in her thirties.

Q    All right, sir; now, directing your attention to Burwell, can
you give us the sex of the four persons you admitted at Burwell?

A    Now --

            THE COURT:  Is it important to go into it to this
extent?  Some of them were male; some of them female.

            MR. HALL:  We will withdraw that question.

WITNESS:  All right.

MR. HALL:  Will you excuse me?

THE COURT:  (Nodded to indicate affirmative reply)

MR. HALL:  That's all.

THE COURT:  Mr. Doar.

MR. DOAR:  No questions.

THE COURT:  Mr. Smith.

MR. SMITH:  I don't have any.

THE COURT:  Mr. Pitts.

MR. McLEAN PITTS:  Yes, sir.

CROSS EXAMINATION:

BY MR. McLEAN PITTS:

Q    Doctor, when did you -- when did you go to the -- to these
     hospitals, and when was the arrangement made for you to go to
     these two hospitals?

A    You asking about how it was set up, the arrangements?

Q    Yeah, that's right; when were the arrangements made for Sunday?

A    Well, we had a meeting Saturday evening; we were anticipating,
     if the march had taken place, that there would probably be
     sore feets, blister -- sore feet, blisters, and the people had
     not been screened, and we were anticipating possible heart
     attacks and fainting, and what not, and we just set up on that
     basis.  And of course, we had to set up two or three stations.
     And we had a -- of course, we had the emergency units, the
     ambulances, to go along the line of march, and anyone that

273

would fall out or have trouble was to be brought back to the
Brown's Chapel's -- Brown's Chapel parsonage and in -- that was
a first aid station, and anything that needed suturing,
fractures, or anything of that nature was to go to Good Samaritan
Hospital.

Q    And who all was present at the meeting?

A    I was present, there were some members of a group called the
Medical Committee for Human Rights, a medical group, that were
present.  There were one -- there was one dentist present, and
that is about it.

Q    Now, these people you are talking about, the Committee of Human
Rights, they were up from New York or somewhere like that; is
that right?

A    Yes.

Q    They were doctors from out of State; is that correct?

A    Yes.

Q    Now, when did you -- what time were you supposed to take up
your position at one of these places, or were you just supposed
to stay at home  or on call --

A    Yes, sir.

Q    -- or were you supposed to be at one of these hospitals?

A    No, sir; the arrangements were that I was supposed to stay by
my phone at home, and as soon as anything came into the Good
Samaritan Hospital, they would give me a call, and I was to go
right over.

274

Q   Now, you were assigned to Good Samaritan?

A   Yes, sir.

Q   Well, now, who was assigned to Burwell?

A   Well, I was assigned to both of them, actually, I had to go between both hospitals, because we did have help; after we received help from the rest of the staff of the Good Samaritan, I stayed until the rest of the staff members came, and then I went to Burwell.

Q   What I am trying to get at, aren't you the Chief Physician over at Burwell, what I am -- don't you carry most of your patients to Burwell, what I am talking about, and most of -- you are the main doctor at Burwell, aren't you?

A   I don't believe I am the main doctor.

Q   What other doctors carry -- that is what I am trying to get at?

A   Oh, Dr. Dinkins and myself are about two of the main ones.

Q   That is what I am getting -- you and Dr. Dinkins?

A   Yes, sir; and Dr. Walker, of course.

Q   Main doctors at Burwell, but you all also practice over at Good Samaritan, both of you; is that right?

A   Yes, sir; yes, sir.

Q   And Good Samaritan has a very large staff of white physicians; isn't that right?

A   Yes, sir.

Q   All right; wait just one minute.  Now, you mentioned about ambulances?

A   Yes, sir.

Q   Was an ambulance set up there; was the arrangements made with
    the local ambulance companies, or did somebody bring an ambulance
    in there?

A   With the local ambulance companies, and of course, this group,
    the M.C.H.R. group had their emergency unit.

Q   What is the M.C.H.R.?

A   Medical Committee for Human Rights.

Q   Oh, I see.  That -- they had an ambulance in there, that was a
    Volks station wagon?

A   They called it an emergency unit.

                MR. McLEAN PITTS:  All right.

                THE COURT:  Redirect, Mr. Hall.

                MR. HALL:  We have nothing, your honor.

                THE COURT:  You want to excuse this witness,

gentlemen?

                MR. SMITH:  Yes, sir; excuse him.

                THE COURT:  Any objection to the witness being

excused?  Excused.  Call your next one.

                MR. HALL:  John Lewis, please.

                MARSHAL:  John --

                MR. HALL:  John Lewis; he is right here.  May it

please your honor, could we take this witness back?  We promised

Mr. Fountain --

                THE COURT:  I can't hear you.

276

MR. HALL:  We -- may we take that witness back?  I promised Mr. Fountain, Deputy Marshal from the Southern District, that we would let him come on and -- out of turn, and so he can go.

MR. McLEAN PITTS:  That's right; you agreed to that.

MR. HALL:  We agreed to that.

MARSHAL:  Mr. Fountain.

(Witness Stanley Fountain sworn by the Clerk)

THE COURT:  Whose witness is this?

MR. HALL:  Your honor, we made this arrangement for the benefit of whoever called Mr. Fountain; we don't -- we didn't call Mr. Fountain as a witness; we don't want to elicit anything from him, but we are willing to let them take him out of turn so they can excuse him and go on back to Mobile; we don't want a thing from Mr. Fountain.

THE COURT:  Who subpoenaed Mr. Fountain?

MR. McLEAN PITTS:  I subpoenaed him.

THE COURT:  Are you ready to take him?

MR. McLEAN PITTS:  Yes, sir; I am ready to take him; I thought they were putting him on the stand.

MR. HALL:  No, sir; we don't want anything from him; this is for your benefit.

************************

STANLEY FOUNTAIN, witness for James G. Clark, having been duly sworn, testified as follows:

DIRECT EXAMINATION:

BY MR. McLEAN PITTS:

Q    This Mr. Stanley Fountain?

A    It is.

Q    Mr. Fountain -- Mr. Fountain, are you a Deputy Marshal for the
     Southern District of Alabama?

A    I am.

Q    And did you come to Selma, Alabama, on Tuesday, the 9th day of
     this month?

A    I did.

Q    And what time did you arrive there?

A    Two fifteen.

Q    And who was with you?

A    Deputy Marshal W. F. Armstrong.

Q    And he is also from the Southern District of Alabama?

A    Southern District of Alabama; yes, sir.

Q    Is that right?

               THE CLERK:   Defendant Clark Exhibit number 1 for
identification.

Q    When you arrived there, did you have any paper with you that
     was supposed to be read to a group of demonstrators?

A    No, sir; I did not have the paper with me at the time.

Q    And was that a paper that was issued by this court?

A    It was.

Q    And did you acquire that paper?

A    Well, I was supposed to meet with Deputy Manley from our office

and a deputy from this District, but I -- in the crowd I couldn't find them, so I borrowed a copy to read.

Q    And where did you meet this group of demonstrators at?

A    On the west end of the Pettus Bridge.

Q    The west end of the Pettus Bridge?

A    Selma side.

Q    And that is -- that is right there on Water Street and Broad -- Water Avenue and Broad Street?

A    Right at the foot of the bridge; yes, sir.

Q    Is that right?  And it was right at the foot of the west end of the bridge?

A    Yes, sir.

Q    Now, did you read that order to them?

A    I did.

Q    And I'll hand you here Defendants' Exhibit number 1, and ask you, is that a picture of you in there reading that order, a newspaper picture of you reading that order to that group of marchers?

A    I assume it is; yes, sir; from looking at it.

Q    That is you in the picture, isn't it?

A    (Nodded to indicate affirmative reply)

Q    Is that you in the picture?

A    Yes, sir.

Q    That the paper you are reading to them there?

A    Yes, sir.

                MR. McLEAN PITTS:  We offer this into evidence.

279

THE COURT:  Any objection?  Defendant Clark's Exhibit 1?

MR. McLEAN PITTS:  Yes, sir.

THE CLERK:  Yes, sir.

THE COURT:  It will be admitted.

Q  Mr. Fountain, after you read that order, did you -- did you know any of the persons that you read that order to?

A  I recognized Dr. King; he was the only one.

Q  He was the only one that you knew?

A  That's right.

Q  Is that right?  And after you read that order to them, what did you do then?

A  I read the order to them and told them that I was instructed to read the order but in no way to interfere with their movement.

Q  And did -- did they continue on across the Alabama River then?

A  They did; I backed out, and they went on.

Q  Is that United States highway number 80?

A  Yes, sir.

Q  And do you -- did you leave there, or did you stay there?

A  Well, I stayed in the vicinity, I mean I was --

Q  Do you know about how long it was from the time they went -- left the point where you read the order to them until the time they got back, until the streets were cleared so traffic could move again?

A  Well, I didn't stay there until they all got back; I went on

back to my office in the Federal Building, but I stayed there
thirty or forty minutes, seemed like, and they were beginning
to come back then, I would say thirty to forty minutes.

Q    Was any traffic moving across the Alabama River Bridge?

A    No, sir; not at that time.

Q    Wasn't moving on U.S. 80 at that time at all; is that correct?

A    Yes, sir; that is correct.

        MR. McLEAN PITTS:  That's all -- wait a minute.

Q    I'll ask you this; when you read that order to them, did any
of this group of leaders up in the front, persons in your
vicinity, make any reply to you reading that order?

A    They did; Dr. King.

Q    And what did he say?

A    He said words to the effect, said, "Thank you, Mr. Marshal, we
are aware of the contents of the order," and then he made some
further statement about, "We do feel we have a constitutional
right to march on," and I don't know the details.

Q    That was the substance?

A    And I told -- then is when I told him I was in no way going to
interfere with his march, I was to read him the order, and that
was all.

Q    That was the substance of what took place there; is that right?

A    That is it.

        MR. McLEAN PITTS:  That's all.

        CROSS EXAMINATION:

281

BY MR. HALL:

Q    Mr. Fountain, you are -- will you identify yourself, sir; you
     are a Deputy Marshal?

A    Chief Deputy United States Marshal, Southern District of Alabama,
     at Mobile, headquarters.

Q    Mobile District; and you came up to Selma, Alabama --

A    That is correct.

Q    -- for the purpose of reading this order on Sunday?

A    That is correct.

Q    At whose request, sir?

A    First request from Federal Judge Daniel H. Thomas that we send
     two men to Selma to join with the Montgomery deputies; those
     instructions I passed on to Marshal George M. Stuart, my
     superior, and he instructed me and Deputy Armstrong to fulfill
     the assignment.

Q    I see, sir; now, you -- you came up to Montgomery to cooperate
     with Montgomery Deputy Marshals; is that right?

A    Montgomery?

Q    I mean you came to Selma to cooperate with Montgomery Deputy
     Marshals?

A    In serving process and to read that order.

Q    Did you receive the -- the copy of the order to serve from the
     Montgomery deputies?

A    No, I hadn't located them; I borrowed a copy that had already
     been served.

Q     Well, did you ever locate them and receive copies of the order?

A     Oh, yes.

Q     When was that done?

A     Well, that afternoon.

Q     What -- about what time?

A     Well, I ran across the deputies just a few minutes after it
      was read, and they had served some, as you know, and hadn't
      served some.

Q     I don't know.

A     Whether I actually had one in my hand or not, I don't know
      during the day that I actually had one in my hand.

Q     Did you serve any orders at all?

A     No, I did not.

Q     Who did you borrow the copy that you read?

A     Sheriff Clark.

Q     You got that copy from Sheriff Clark?

A     Well, I ran into Mr. Pitts, and if you want me to explain, and
      he said he didn't know where my deputies were, and I couldn't
      locate them, the crowd was surging, and he got me the copy
      from Mr. Clark, I believe, and I read it and gave it back to
      Mr. Clark and Mr. Pitts, one, I don't know, it was --

Q     When -- of course, when -- whatever you gave back, you gave it
      back to Sheriff Clark --

A     That's right.

Q     -- when you got through?  How did you ascertain that that was

a copy of Judge Thomas -- Judge Johnson's order?

A  Well, it had his signature on it.

Q  You know -- you are familiar with Judge Johnson's signature?

A  Well, of course, at a time like that, I have seen it before, but I really -- it was the order, and I didn't question the signature; I don't know that I could swear that it -- I knew it was his signature.

Q  Was Sheriff Clark there when you read the order?

A  Beg your pardon?

Q  Was Sheriff Clark there when you read the order?

A  No, I --

Q  Where did you see him to get the copy?

A  Over in the middle of the street somewhere; he sent somebody after it, I don't know if Mr. Pitts handed it to me or one of the policemen, who when I read the order, I believe it was a Captain of the Police Department, lent me a microphone, I don't even know his name.

Q  Did you examine the order before you read it?

A  I went through the order and saw -- until I got to the portion -- the court's order forbidding the march from Montgomery -- Selma to Montgomery, and that is the part that I read them.

              MR. HALL:  That's all; thank you.

              MR. DOAR:  (Shook head to indicate negative)

              THE COURT:  Mr. Pitts.

              MR. McLEAN PITTS:  Your honor, I don't want to

284

prolong this examination, examination of this man, but if there is
any question he didn't read your order, if there was any question
there was any substitution, I would like to prove it to the court
he got it from Sheriff Clark.

THE COURT: Well, it is no question about the order
being served, Mr. Pitts, beforehand, I take it; Dr. King testified
he was served with a copy of it, so what difference does it make
whether it was read to him or not?

MR. McLEAN PITTS: I know it, and the implication
was that it probably some other paper was given --

THE COURT: You put the witness on; what difference
does it make whether it was read to him or not? He has already said
he was served with it by a Marshal beforehand.

MR. McLEAN PITTS: Yes, sir.

THE COURT: I don't see that this witness's testimony
adds a thing to the case.

MR. McLEAN PITTS: All right, sir.

THE COURT: Any further examination of this witness?

MR. HALL: No.

MR. McLEAN PITTS: That's all.

THE COURT: You want to excuse him?

WITNESS: Thank you.

THE COURT: Call your next one.

MR. DOAR: Your honor, could I take a matter up out
of order?

THE COURT:  Yes.

MR. DOAR:  We served a subpoena duces tecum on the --
Colonel Lingo, and I understand he has the documents here now.  I
wonder if I could ask the --

MR. SMITH:  Your honor, we object to portions of the
matters called for in the subpoena.

THE COURT:  I will -- you want to take it up in
chambers or in open court?

MR. SMITH:  Makes no difference.

THE COURT:  We will take it up now.  I must see a
copy of the subpoena; I can't follow you.

MR. SMITH:  I have this one; do you have it, Tim?

MR. DOAR:  Colonel Lingo, would you take the stand,
please?  You want to take your documents with you?

THE COURT:  Copy of the subpoena duces tecum filed
with the Clerk of the court?

MR. DOAR:  I don't know; I believe the original was
filed, the one that was served; there is no --

THE CLERK:  There has been no return, Judge.

MARSHAL:  I can get it.

THE COURT:  Yes, I will have to have it.

MR. DOAR:  You like a copy for now, your honor?

THE COURT:  Do you have an extra copy?

MR. DOAR:  I don't have an extra.

THE COURT:  This is your only copy?

      MR. SMITH:  Yes, sir.

      THE COURT:  No, you will need it if we are going to discuss it.  Go ahead.

\*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\*

NOTE:  For testimony of AL LINGO, a Defendant, called as witness
    by the United States, see excerpt transcript filed March 19,
    1965.

\*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\*

      (At conclusion of testimony of AL LINGO, as witness
for the United States, at 9:52 a.m., a recess was had until 10:00 a.m.
at which time the hearing continued)

      THE COURT:  All right, gentlemen, are we ready, then,
to resume the testimony?

      MR. HALL:  Yes, sir.

      MR. McLEAN PITTS:  Your honor, could I ask the court
here, we have Mr. Mike Moseley here who was subpoenaed with another
subpoena duces tecum, and all -- the only thing he's got is just
a jail -- Dallas County Jail record; I would like to let that -- we
had him here all day yesterday, and he is the Chief Jailer in
Dallas County --

      THE COURT:  Well, he --

      MR. McLEAN PITTS:  -- I would like to let him go back.

      THE COURT:  Is that the only reason he has been
subpoenaed?  Who subpoenaed him?

      MR. DOAR:  We did; that is the only reason.

THE COURT:  All right, and do you represent that those are all the records that the subpoena duces tecum calls for?

MR. McLEAN PITTS:  Yes, sir.

THE COURT:  Is there any necessity for putting him on the witness stand, Mr. Doar?

MR. DOAR:  No, sir.

THE COURT:  All right, the records are here.

MR. McLEAN PITTS:  There is one thing here, your honor; he asked for arrest reports, and we have the -- the complete copies of the -- what I am getting at --

THE COURT:  Have you seen them?

MR. DOAR:  No, sir.

THE COURT:  Show them to Mr. Doar, and see if they satisfy his purposes.

MR. McLEAN PITTS:  See, it comes in about triplicate, four sheets, that is what I am getting at.

THE COURT:  If he says they are satisfactory without putting the witness on the stand, it is all right with me to excuse the witness.

MR. McLEAN PITTS:  Will you look these over, then, Mr. Doar?

MR. DOAR:  All right; I am sure they are satisfactory

THE COURT:  All right.

MR. McLEAN PITTS:  Mr. Moseley excused now?

THE COURT:  Not until Mr. Doar says it is agreeable.

288

MR. McLEAN PITTS: All right. Mr. Doar --

MR. DOAR: Let me just look.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

JOHN LEWIS, a Plaintiff, having been duly sworn, testified as
   follows:

DIRECT EXAMINATION:

BY MR. HALL:

Q    State your name, occupation, and address, please?

A    I am John Lewis, National Chairman of the Student Non-violent
     Coordinating Committee, native of Troy, Alabama, and I live at
     Atlanta, Georgia.

Q    Are you one of the plaintiffs in this case?

A    I am.

Q    Would you tell us what you do, Mr. Lewis?

A    I am the Chairman of the Non-violent Coordinating Committee.

Q    Chairman -- you are the National Chairman?

A    Right.

Q    Will you tell us what Student Non-violent Coordinating Committee
     is?

A    The Student Non-violent Coordinating Committee is one of the
     civil rights organizations; it is --

          MR. McLEAN PITTS: Talk -- talk -- have him talk up,
Judge, just a little bit.

          THE COURT: Speak up so all the lawyers may hear you,
please.

289

MR. McLEAN PITTS:  Can't hear over here.

A    The Student Non-violent Coordinating Committee is one of the
civil rights organizations, it is for the interracial --
organization working in the South to bring an interracial
democracy through non-violent, direct action and political
action and political education.  We was organized in 1960, and
we have been working for some months in -- and years in the
State of Alabama.

Q    Have you been working in Dallas County, Alabama?

A    We have been working in Dallas County since January, 1963.

Q    Have you also been working in Perry and Marengo, Hale, and
adjacent counties?

A    We have been working in Perry and other Black Belt counties
near Dallas.

Q    What is the nature of your activities in Dallas and adjacent
counties, sir?

A    Well, since January, 1963, on invitation by the Dallas County
Voters League, we have been conducting voter registration
workshops, clinics, assisting in organizing mass meetings,
encouraging people to go down to the County Court House and
attempt to register to vote.

Q    Has your organization sponsored house to house canvasses, too?

A    We have participated in house to house canvasses, that is,
knocking on doors, making surveys find out how many people
registered, how many people not registered, and encouraging

    people to go down and attempt to register.

Q    Has your organization engaged in any demonstrations, marches?

A    We have engaged in non-violent demonstration, non-violent
    marches to the Dallas County Court House.

Q    As a result of such demonstrations and marches, have you or
    any of your workers been beaten by the police?

A    Well, I have been arrested and also beaten in Dallas County.

Q    Would you tell us about this arrest, how these arrests and
    these beatings -- when was the first one, first arrest?

              MR. SMITH:  We object, if the court please.

              MR. HALL:  Beg your pardon?

              MR. SMITH:  We object to this.

              THE COURT:  To his having been beaten?

              MR. SMITH:  Says when was the first arrest; isn't

related in point of time.  Of course, I guess the answer would tell

us that; I withdraw it until he gives it.

              THE COURT:  He went in January, '63; I will permit

it; overrule.

A    My first arrest occurred in Selma, in Dallas County, at the
    County Court House on September 25, 1963.

              MR. McLEAN PITTS:  Judge --

              MR. SMITH:  We object to this, if the court please.

              MR. McLEAN PITTS:  What I want to object to is that

there are several cases pending before -- he -- I don't think he

is a plaintiff in one of them or not, but there is several cases

291

pending in the Southern District where all of this stuff is gone

into, and the Student Non-violent Coordinating Committee, and I

think John Lewis -- was he one of the plaintiffs?

        MR. HALL:  I think he might be.

        MR. McLEAN PITTS:  I am not sure whether he was or

not, but -- and all this stuff was gone into, and then in addition

to that, in your three-Judge District Court case in Selma, a good

bit of this was gone into.

        THE COURT:  I understand --

        MR. McLEAN PITTS:  That is -- I don't think it

pertains to this march.

        THE COURT:  -- the legal principles that are

controlling in this case presently being heard and before me involve

generally a balancing of rights; as I thought I made clear

yesterday, I was going to permit a certain amount of history on

both sides, as far as the demonstrations and the reasons for the

demonstrations and the extent of any mistreatment that -- that they

complain of, and that is the reason that I am going to admit it.

        MR. McLEAN PITTS:  All right, sir.

Q  Mr. Lewis, did your organization participate in an attempted

    march from Selma to Montgomery, Alabama, on Sunday, March 7,

    1965?

A  We did participate in attempted march from Selma to Montgomery

    on March 7, 1965.

Q  Did you, yourself, participate in this attempted march?

292

A    I did.

Q    Were you one of the leaders of the march?

A    Hosea Williams and I was at the front of the line.

Q    I show you, Mr. Lewis, a photograph marked Plaintiffs' Exhibit
     4, and ask you if you can identify it for us, sir?

A    Yes, I can.

Q    Can you tell us what it is?

A    This photograph is a scene where State Troopers are pushing and
     tramping and beating some of us that was in the line, and I see
     myself is here, and a State Trooper is standing over me.

Q    You see yourself in this picture?

A    Right.

Q    And this is a true likeness of what occurred at that time?

A    It is.

             MR. SMITH:  No objection.

             MR. McLEAN PITTS:  What Exhibit is that?

             MR. HALL:  4, I believe; 4.  Your honor please, we
offer this into evidence.

             THE COURT:  It will be admitted.

Q    Mr. Lewis, I show you a photograph marked Plaintiffs' Exhibit
     5 for identification, ask you to examine it and see if you can
     identify it?

             MR. McLEAN PITTS:  How many more you got?

             MR. HALL:  How many more you got?

A    I can identify this photograph.

293

Q   Can you tell us what it is?

A   It is the line of march is being rushed back, beat down by a
    line of State Troopers; I see Mr. Hosea Williams on the ground,
    and I see where a State Trooper has just hit me, and I have my
    hand up like this.

Q   And this is a true likeness of what happened at that time?

A   It is.

Q   At that place?

A   A true likeness; yes, sir.

            MR. McLEAN PITTS:  That is what Exhibit?

            MR. SMITH:  No objection.

            MR. HALL:  If your honor please, we offer --

            THE COURT:  Plaintiffs' 5 admitted.

            MR. McLEAN PITTS:  That is Exhibit -- what was that?

            MR. HALL:  5.

            MR. McLEAN PITTS:  5.

            MR. GRAY:  5.

            MR. HALL:  5.

Q   Mr. Lewis, were you --

            THE COURT:  Let me see that.

Q   Were you, on Sunday, March 7, 1965, allowed to go across the
    Edward Pettus Bridge in Selma in your attempt to march to
    Montgomery?

A   Yes.

Q   How many persons were in that line, in your best judgment?

294

A    I would say between six hundred and fifty and seven hundred.

Q    Did -- and you and -- Mr. Williams and you, as you have said,
      were in front of the line?

A    Right.

Q    You got across the bridge; is that correct?

A    Right.

Q    In your best judgment, how far across the bridge did you get?

A    I would say we moved about a block and a half or two blocks
      beyond the bridge.

Q    Will you tell the court what then happened?

A    About fifty feet away from the line of State Troopers a State
      Trooper wearing a State Trooper --

Q    May I interrupt you just a moment?

A    Uh, huh.

Q    Do I understand you to say there were some State Troopers?

A    Right; before we crossed the bridge, we could see a line of State
      Troopers.

Q    You did see some State Troopers?

A    Right.

Q    In your best judgment, how many Troopers did you see?

A    Well, I saw many, and it would be very hard and difficult for
      me to --

Q    You have no judgment as to how many?

A    I would say between eighty and a hundred.

Q    Where were these Troopers stationed?

295

A    Some were standing across the highway all the way across; others
     were standing on the side; there was others in the background.

Q    How close did you approach to these officers before your line
     stopped?

A    We were able to move about fifty feet, and at that time a State
     Trooper made announcement on a bullhorn or megaphone, and he
     said, "This march will not continue."

Q    What happened then: did the line stop?

A    The line stopped at that time.

Q    You stopped still?

A    Yes, sir.

Q    You didn't advance any further?

A    We stopped right then.

Q    Then what happened?

A    He said, "I am Major Cloud, and this is an unlawful assembly.
     This demonstration will not continue.  You have been banned
     by the Governor.  I am going to order you to disperse."

Q    What did you then do?

A    Mr. Williams said, "Mr. Major, I would like to have a word,
     can we have a word?"  And he said, "No, I will give you two
     minutes to leave."  And again Mr. Williams said, "Can I have
     a word?"  He said, "There will be no word."  And about a minute
     or more Major Cloud ordered the Troopers to advance, and at
     that time the State Troopers took their position, I guess, and
     they moved forward with their clubs up over their -- near their

shoulder, the top part of the body; they came rushing in,
knocking us down and pushing us.

Q   And were you hit at that time?

A   At that time I was hit and knocked down.

Q   Where were you hit?

A   I was hit on my head right here.

Q   What were you hit with?

A   I was hit with a billy club, and I saw the State Trooper that
hit me.

Q   How many times were you hit?

A   I was hit twice, once when I was lying down and was attempting
to get up.

Q   Do we understand you to say you were hit --

A   (Nodded to indicate affirmative reply)

Q   -- and then attempted to get up and were hit -- and was hit
again --

A   Right.

Q   -- is that correct?

A   (Nodded to indicate affirmative reply)

Q   Can you identify the Trooper who hit you?

A   I am not positive that I could identify the Trooper; from the
picture I -- I can identify the trooper from the picture.

Q   Were you knocked unconscious?

A   I was not knocked unconscious.

Q   Did you see other people around you hit?

297

A  I saw other people that was behind me hit and knocked down; I
   did see them.

Q  Were -- was any words said by the Troopers?

A  Well, the Troopers -- most of them kept saying, "Move back, move
   back, you niggers, disperse," and calling people black bitches
   and son of bitches and things like that.

Q  They did use profanity?

A  Right.

Q  Did you see any of the marchers use any violence at all in an
   effort to defend themselves or to fight the police officers?

A  There was no act of violence or any type of retaliation,
   rather retaliatory acts, on the part of any of the demonstrators.

Q  After you were stopped, at some subsequent time was tear gas
   used by the State Troopers, or some form of gas?

A  Right.

Q  Will you tell us about that?

A  Well, when we were forced back, most of the people in line knelt
   in a prayerful manner; they had back toward the -- Selma,
   kneeling, the line all the way back was almost a spontaneous
   reaction on the part of all the people in the line as far back
   as you could see, and at that time the Major ordered the
   Trooper to put on their gas masks, and they started throwing
   gas, and people became sick and started vomiting, and some of
   us was forced off of the highway and behind some buildings in
   the woods.

298

Q   Did you see Sheriff James Clark on that side of the bridge at
    that time or at any time during this happening?

A   I didn't see Sheriff Clark at that particular time.  On the way
    back into Selma, I saw Sheriff Clark in his car going across
    the bridge.

Q   Going across the bridge?

A   Back into Selma.

Q   You saw James --

A   I saw --

Q   -- Sheriff Clark --

A   -- Sheriff Clark.

Q   -- come across the bridge into Selma?

A   Right.

Q   You saw that?

A   (Nodded to indicate affirmative reply)

Q   Did you see any of the Sheriff's deputies across the bridge?

A   I saw --

Q   At the time you saw the State Troopers?

A   I saw members of the Sheriff's deputy -- I saw some of the
    Sheriff's deputies, I saw at least one rider on a horseback,
    and I know this one very well, because I have seen him in the
    court room many, many times in the County Court House in Selma.

Q   In Selma; you saw this -- this man on a horse on the east side
    of the river?

A   Right; he was on the bridge.

Q    Where the incident occurred, you saw what -- did you see any other
     mounted officers?

A    No.

Q    Officers mounted on horseback?

A    I saw many members of the Posse --

Q    You did?

A    -- that I have recognized from previous occasion riding horses.

Q    Well, what were they doing over there?

A    On the way back and across the bridge, members of the Posse would
     get -- would attempt to make the horse get on the sidewalk, get
     on the -- to the walkway on the bridge, and they would force
     people, they would get between the group of marchers, and they
     would run the horses up near the people, and at one time one of
     the Posses made the horse rear back and start pawing people in
     the back, and they start taking whips and bullwhips, and the
     whips about eight to ten feet long, beating people, and I saw
     one incident, myself, where a member of the Posse start beating
     a Negro woman, she dropped her bag, she lost her shoes and
     everything, she was trying to run, and she sort of turned around
     and stared at the posseman who was beating her, and he said,
     "Get on, you black nigger woman, you."

Q    Were you able, Mr. Lewis, to walk back to the church?

A    Well, I was able to walk back, but with the aid and assistance
     of some of our staff people and other people that was in the line

Q    By aid and assistance, do you mean that they partially supported

you?

A Right.

Q Wrapped their arms around you?

A (Nodded to indicate affirmative reply)

Q So you were able to get on back to the church. Now, did you observe any police activity on the way back to the church?

A All the way back to the church there was hundreds of marchers, people who had been in the march line, women, men, children, that was forced back toward the church. Some was running, because the Posse or riding horses, some running through the streets, were running them down, and people was running for safety toward the church.

Q Did you see any of the Dallas County Deputy Sheriffs?

A I did.

Q At this time?

A (Nodded to indicate affirmative reply)

Q Were they also --

A They were engaged in the same type of activity that the members of the Posse was engaged in.

Q And you went on back to the church. Now, did you at some subsequent time lose consciousness or become ill?

A I did not lose conscious; I arrived back at the church, and I spoke to the group at the church; some of the people had gathered, some of the people had remained at the church; for about two minutes, and while I was speaking I began to feel

301

sharp pains in the head and felt very bad, and I -- at that time
I went next door and was assisted and aided next door in the
parsonage by some members of the medical committee and Dr.
Dinkins, and they recommended that I be sent to the Good
Samaritan, and later an ambulance took me to Good Samaritan
Hospital.

Q   Were you admitted to Good -- and were you hospitalized there;
how long did you stay there?

A   I stayed there from late Sunday afternoon until early Tuesday
morning.

Q   Do you have any knowledge as to the initial diagnosis on your
admittance at Good Samaritan?

A   Well, on -- on Sunday evening they made some x-ray of the --
of my head, and the doctor informed me that it was possible
a fractured skull.

Q   Possibly a fractured skull?

A   Right.

Q   This was ruled out later on --

A   Right.

Q   -- is that correct?

A   I took --

Q   You did not have a fractured skull?

A   Right.

Q   How long were you there at the Good Samaritan Hospital?

A   Until early Tuesday morning.

302

MR. HALL:  That's all.

THE COURT:  Mr. Doar.

MR. DOAR:  Could I see the pictures, your honor?

THE COURT:  The photographs --

MR. DOAR:  The photographs that this witness referred to.

BY MR. DOAR:

Q    Will you take Exhibit 4, Mr. Lewis, and just identify what you
     are wearing and where you are either standing or lying in that
     picture for the record?

A    Well, I am wearing a rain coat, a black suit, I had a -- a camp
     bag on my shoulder, one strap is now off my shoulder, and one
     strap is on my right shoulder.

Q    Are you the person that is on the ground in the lower right
     hand corner of the picture?

A    I am the person on the lower right hand corner of the picture.

Q    Now, would you take Exhibit 5 and locate yourself accurately in
     that picture?

A    I would say that in this picture I am on the shoulder of the
     highway 80.

Q    Are you on the ground, or are you up, standing up?

A    I am on the ground, and at this time I have been hit, and the
     Trooper is attempting to hit me again.

Q    Are you in the center foreground of the picture, or are you on
     the side of the picture?

A   I am on the side of the picture.

Q   Well, in the center of the picture or -- or on the side of the picture; would you --

A   Well, in term of --

Q   In terms of the picture?

A   I am in the center of the picture.

Q   Okay; thank you.  Where were you born?

A   I was born in Troy, Alabama, in Pike County.

Q   In Pike County?

A   Right.

Q   And you are then a native of Alabama?

A   Right.

          MR. DOAR:  Thank you.

          THE COURT:  Mr. Smith.

             CROSS EXAMINATION:

BY MR. SMITH:

Q   You say you are a National Chairman of the Student Non-violent Coordinating Committee?

A   I am.

Q   How long have you held this position?

A   Since June of 1963 I have been Chairman of the Student Non-violent Coordinating Committee.

Q   How long have you known Dr. Martin Luther King?

A   We have -- I have known of Dr. Martin Luther King since 1955; I got to know him in 1958.

Q   Where did you get to know Dr. King?

A   Well, I met Dr. King at mass meetings, and here in the City of
    Montgomery.

Q   Here in Montgomery; and have you been more or less identified
    with the civil rights movement since 1955?

A   Well, I would say that I have been more or less identified with
    the civil rights movement since the spring of 1960.

Q   Since 1960; what is the connection or relationship, if any,
    between the Student Non-violent Coordinating Committee and the
    Southern Christian Leadership Conference?

A   The Student Non-violent Coordinating Committee and the Southern
    Christian Leadership Conference are two separate organization.

Q   They are two separate and more or less distinct organizations?

A   Right.

Q   Is the leadership or the directorate of these organizations
    interlocked in any way?

A   As -- the leadership of both organizations are different.

Q   Different, right; now, when did you come to Selma?

A   I have been in and out of Selma since September of 1963; my first
    time in Selma, I believe I spoke at a mass meeting there in
    July, '63, but I have been in and out since September, 1963.

Q   What was the purpose of your being in Selma in September of 1963?

A   I went there because I was invited by the local citizens of
    Dallas County, the local citizens of Selma, to speak at a
    voter registration rally.

305

Q   Was your talk in regard to the voter registration in Dallas County in September, 1963?

A   More or less.

Q   What was the purpose of your going to Selma, I believe you said in January of this year?

A   I didn't -- I didn't say that I went to Selma in January, '63; staff members of our organization were invited into Selma in January, 1963.

Q   Well, did you go there in January of '63?

A   I did not.

Q   When did you go to Selma?

A   My first --

Q   In this year?

A   This year?

Q   Yes?

A   I think my first trip into Selma this year was on January 17.

Q   January 17?

A   Right.

Q   Since that date to the present date, have you been more or less continuously in and out of Selma?

A   I spent over half of my time in the Black Belt area in and around Selma and Dallas County.

Q   During that period of time, have there been rallies and marches and mass demonstrations of Negro citizens in regard to voter registration in Dallas County?

A    There have been voter registration rallies and voter registration

demonstrations, and also demonstration to protest police

brutality in Selma and Dallas County.

Q    Prior to March 7, that would be Sunday of this week, had there

been violence in these other mass demonstrations?

A    There was violence in a mass demonstration in Marion, Alabama.

MR. McLEAN PITTS:  We object to anything concerning

Marion or Perry County, insofar as the defendant Clark is concerned,

in that he is not the Sheriff of Perry County and has no jurisdiction

in Perry County.

THE COURT:  Overruled; you can answer it.

MR. McLEAN PITTS:  We except.

A    Before March 7 there had been violence in Perry County; there

has been violence in Selma and Dallas County since September,

'63; I have witnessed and seen people beaten in and around Dallas

County Court House in Selma.

Q    Now, in the violence which preceded March 7 of this year, in

regard to the mass demonstration or marches, did it occur on

the streets in Selma?

A    Well, I have seen violence occur on the streets in Selma, on

the part of law enforcement agents.

Q    Have any mass demonstrations or marches been held in Selma

other than on the streets?

A    Most of the demonstration that we have engaged in in Selma have

been demonstration held on the sidewalk, more or less from

Brown's Chapel A.M.E. Church to the Dallas County Court House.

Q    Now, does Selma have areas wherein predominantly members of the
     Negro race live and certain areas wherein predominantly members
     of the white race live?

A    Well, as far as I know the city, there is area where
     predominantly members of the Negro race live, and there is area
     where many white citizens live like that.

Q    That is my question.  Have any of these mass demonstrations taken
     place in the areas of the City of Selma where predominantly the
     Negro citizens live?

A    Well, I would say that most of the demonstration originate in
     the heart of the Negro community; at the heart -- at the heart
     of the Negro community in one part of Selma I guess is Brown
     Chapel A.M.E. Church.

Q    From there do they generally, or have they in the past, prior to
     March 7, proceeded down the public streets into the downtown area'

A    Down the sidewalk to the Dallas County Court House.

Q    Now, prior to March 7, where did the violence occur in the other
     mass demonstrations; did it occur in the areas where the churches
     are located and where predominantly Negro citizens live, or did
     it occur in the streets in downtown Selma?

A    Most of the violence that have occurred, and that was almost all
     of the violence that have occurred during demonstration or
     during voter registration demonstration, have occurred near and
     around the Dallas County Court House.

308

Q   That is in downtown Selma --

A   Right.

Q   -- is that correct?  Now, when these demonstrations prior to March 7 have taken place, did you observe large numbers of white people standing around the streets observing the demonstration?

A   On -- on some occasion there have been a few white people, and other occasion there have been more, but on most occasions there have been relatively few since September, '63, been relatively few white people standing on the streets.

Q   Prior to March 7, have some of these demonstrations attracted large numbers of white people to the downtown area?

A   I think since September, '63, and prior to March 7, that a great many citizens, both Negroes and white, have witnessed the demonstrations.

Q   All right; now, you have had considerable experience in mass demonstrations prior to coming to Selma, had you not?

A   I have been -- I have been involved in a few.

Q   Have you had experience in --

          MR. McLEAN PITTS:  I didn't hear his question.

A   I have been involved in a few mass demonstrations.

Q   Have you -- have you observed crowds of people or masses of people that appeared to be hostile and angry and emotionally pent up, so to speak?

A   From time to time I have observed people who are hostile and who happened to be emotion pent up.

Q    Is it possible, in your judgment, to look at a crowd of people
     or a mass of people or a gathering of people from a distance
     and discern whether or not that is a hostile, angry, explosive
     gathering, as compared to one of peaceful or tranquil meeting?

A    Well, to a degree, yes; and then to another degree, no.  I have
     seen crowds that have been people who are just concerned and
     standing there looking in a very orderly and a peaceful manner;
     on the other hand, I have seen people who are hostile.

Q    In other words, you can tell the difference, can't you?

A    I can -- I cannot tell the difference to that degree, because I
     am not a psychiatrist, psychologist.

Q    Well, I am not asking for a professional explanation, but you
     say that you can -- you have seen crowds, and some looked
     peaceful, and you have seen crowds, and some looked hostile?

A    Well, on occasion I have seen law enforcement people who would
     stand like they are going to protect people, and they look quite
     peaceful, peaceable; but at the same time these people have
     beaten and brutalized people.

Q    Prior to March 7, have you seen white citizens in Selma gathering
     around or enveloping the area where the Negro mass demonstrations
     are taking place that appeared to be hostile and mad, angry,
     emotionally upset?

A    Well, I have not witnessed any large gathering on -- on no
     demonstration that I have been on in Selma; I have not witnessed
     a large gathering of hostile white people in Selma.

310

Q    Well, have you observed any gathering of hostile white people
     in Selma in connection with the street demonstration of the
     Negroes?

A    I have observed --

Q    On how many occasions have you observed it prior to March 7 of
     this year?

A    I have observed members of the Posse, members of the Sheriff --
     members of the Sheriff's deputies, some of the Sheriff deputies,
     as being hostile people during the demonstration.

Q    All right.  Now, you were served with a copy of this court's
     order dated March 9 of this year on the morning of March 9,
     that is when -- I say March 9, I am speaking of Tuesday of
     this week?

A    I was not served until late Tuesday evening after the demonstra-
     tion.

Q    Did United States Marshal Arthur Worthy serve you?

A    I was served by Marshal inside the Brown Chapel A.M.E. Church
     about four or five p.m. on Tuesday.

Q    Was that after the march on Tuesday?

A    Right.

Q    You weren't served with a copy of the order until the march had
     already taken place?

A    That's right.

Q    And that was in the church after the march --

A    Right.

311

Q    -- is that right?

A    Right.

Q    Did you know about the order of this court before you were
     served?

A    I heard or had some -- I heard from someone that there was an
     order, restraining order or injunction.

Q    When did you hear that?

A    I am not sure whether I heard it at the hospital or on my way
     from the hospital, I am not sure; someone just told me that.

Q    That would have been when, in point of time; when on Tuesday did
     you hear about Judge Johnson's order?

A    It could have been eleven or twelve o'clock; I am not too sure.

Q    Before noon that day?

A    Before noon.

Q    Did you know what his order said?

A    I didn't.

Q    Were you told what it said?

A    Well, I heard in effect that it said that it was prohibiting
     the attempted march from Selma to Montgomery; I didn't know the
     exact language or the wording of the order.

Q    See if I understand; you heard that Judge Johnson's order
     prohibited the march from Selma to Montgomery; is that right?

A    Right.

Q    All right.  Now, were you in Brown's Chapel on Sylvan Street,
     I believe at about two o'clock on the afternoon of Tuesday of

312

this week?

A   I am not sure; I spent a great deal of time at Brown's Chapel A.M.E. Church, and I was in and out of the church and next door to the parsonage, so I -- it is possible that I was there around two o'clock.

Q   You and Hosea Williams were the leaders of this march on Tuesday, weren't you?

A   I did not participate in the march on Tuesday.

Q   Were you the leader of the march on Sunday, March 7?

A   I did participate and was one of the leaders of the march on Sunday, March 7.

Q   You didn't participate in the march on Tuesday, you said?

A   Right.

Q   Were you in the church, on Tuesday afternoon?

A   I was in the church late Tuesday afternoon; I was there maybe before some of the people left; I am not too sure about that, but I was there when the people returned from the march.

Q   How many people, in your judgment, were in the church Tuesday afternoon?

A   Oh, I would say eight hundred or nine hundred.

Q   Eight hundred?

A   (Nodded to indicate affirmative reply)

Q   Did you address this group; did you talk to them?

A   I am not too sure whether I spoke to the people in the church; I think I said a few word to the people out --

313

Q    I mean to the crowd, I don't mean talking to somebody?

A    I am not too sure.

Q    Did Dr. King talk to the crowd, address the audience?

A    I believe I heard -- or I am not too sure whether Dr. King
     spoke before the march or after the march.

Q    Was anything said in the church by anybody addressing the group
     about the march on Tuesday afternoon; was it planned there or
     mentioned or suggested?

A    Well, if I may say something here, I was in and out of the
     church, you see, you have a sanctuary, then you have an office,
     and many times I was passing through the sanctuary into the
     church, and I didn't pay that much attention to what was going
     on, because I had no --

Q    Did you --

A    -- well, I was not going to participate in the march, myself,
     and --

Q    If you were going from the church, Brown's Chapel, from that
     point in Selma to Montgomery, how would you go; what street
     would you take?

A    I don't know exactly what street, but I think I can say what
     street that we attempted to take on -- on Sunday.

Q    I am not -- I am not talking about that; I am talking about if
     you were at a point in Brown's Chapel, in Selma, and proceeding
     to a point in Montgomery, Alabama, how would you go; what route
     would you take?

314

A    I don't know; I don't know that much about the city.

Q    You know the names of the streets?

A    I know the name of some of the streets; I don't know that much about the city.

Q    Are you familiar with Broad Street?

A    I do know about Broad Street.

Q    Are you familiar with Sylvan Street?

A    Brown Chapel A.M.E. Church is located on Sylvan Street.

Q    Are you familiar with Water Street?

A    Waters, I believe, run across Broad.

Q    All right; now, does U.S. highway 80, running from Montgomery to Selma, run into and become a part of Broad Street; that is the street that goes right through the downtown section of Selma?

A    Right.

Q    How far is Sylvan Street from Broad Street?

A    I would say from the point of the church --

Q    Yes?

A    -- Sylvan Street would be about eight blocks, I guess, from Broad Street.

Q    Did you leave the crowd of people at the church or did you follow the crowd of people on Tuesday?

A    On Tuesday during the march, I believe I remained next door in the parsonage; at that time I was feeling very bad, and I was still under a doctor's care and -- like I am now, and --

Q    You didn't go up to the bridge?

315

A    I did not.

Q    You stayed completely out of the vicinity of the march on Tuesday; is that correct?

A    Right.

Q    Now, did you remain in Selma on Tuesday of this week; were you there?

A    I did remain in Selma on Tuesday.

Q    Do you know Reverend James J. Reeb?

A    I know -- I know Reverend Reeb; I met him for the first time.

Q    Did he die last evening in Birmingham?

A    From newspaper report and from radio reports, that is what --

Q    Did you see him in Selma on Tuesday?

A    I remember seeing him at the -- at the church or in the parsonage, I am not sure whether it was early Tuesday morning, around noon, late Tuesday afternoon, I am not sure.

Q    Did he participate in the march Tuesday?

A    I am not sure whether he participated in the march; I have no way of supporting --

Q    You don't know?

A    I do not know.

Q    You haven't heard?

A    I heard that he participated; I do not know.

Q    You have heard that he participated in it?

A    I heard --

        MR. GRAY: Your honor, we are going to object.

MR. SMITH:  Cross examination.

THE COURT:  Cross examination doesn't permit that kind of interrogation, Mr. Smith.

Q   Did you observe any crowd of white people in the vicinity of Brown's Chapel on Tuesday or at any other points in Selma on Tuesday at about the same time the marching or the demonstrating was carried on in the street?

A   Well, there was many white people all around on Sylvan Street and all around Brown's Chapel.

Q   Did they appear to be hostile?

A   I don't know, I didn't pay that much attention; I saw a lot of people, I saw priests, nuns, I really didn't pay that much attention to the people, to the face.

Q   Were law enforcement people there to -- or attempting to keep other crowds of bystanders back from the marchers?

A   I wouldn't know.

Q   You didn't see any of that?

A   I didn't see anyone there, didn't see no law enforcement agents.

Q   Did you see any State Troopers there?

A   To the best of my knowledge, on Tuesday I did not; I didn't pay that much attention, because I was not personally that much involved and tried to avoid crowds as much as possible.

Q   Did you make a statement this morning for N.B.C. that was televised nationally?

A   I did not make a statement this morning.

317

Q    Did you make one last evening?

A    I spoke to a group of people last evening.

Q    Did you make it before an N.B.C. television camera?

A    I don't know whether N.B.C. or C.B.S. or A.B.C. or any other
     network was around.

Q    Did you make it before a national television camera?

A    I made it before a group of people that was involved in a prayer
     vigil in memorial, in tribute to Reverend Reeb.

Q    Where were you when you made the statement?

A    I made it in Selma.

Q    Did a group of people hear this statement?

A    They was there.

Q    I mean present?

A    They were there in a prayerful manner, and I am sure that they
     heard the statement.

Q    How many people were there when you made the statement?

A    I don't know.

Q    Well, would you give us your best judgment?

A    I would say a hundred and fifty or two hundred.

Q    A hundred and fifty?

A    Or two hundred.

Q    Did you say this, or this in substance, I could be incorrect in
     my quotation; "This is a revolution, this is a war, a non-
     violent revolution, a non-violent war"; did you say that?

A    I did -- I said that this is a revolution, that this is a war

318

that we are engaged in, that it is a non-violent war where people commit themselves to the philosophy of non-violence, not simply as a technique or as a tactic, but as a philosophy or as a way of life.

Q    How did the crowd of people that were present when you made -- when you made the statement react to the statement that you had made?

A    Well, the people standing there, that was standing there in a prayerful manner, that was standing there with a sense of pride and at the same time with a sense of dignity and with a sense of humility.

Q    What is your understanding of -- of the word, "Revolution"?

        MR. HALL:  Your honor please, we are going to object to this.

        THE COURT:  Sustain it.

Q    Do you know Carl Braden?

        MR. GRAY:  Objection.

        THE COURT:  Overrule.

A    I know of Mr. Braden; I have seen him around.

Q    Where did you last see him?

A    I would say that I do not know; it has been maybe a year or two years since I saw him last.

Q    Where did you last see Mr. Braden?

A    I do not know, have the slightest idea; I travel across this country, and I have been out of the country for some time; I

319

meet many, many people, and I do not keep a tab.

Q   You don't recall where you last saw him?

A   No.

Q   How long have you known Mr. Braden?

A   I have seen him around, I guess the past two or three years.

Q   Where did you first -- I am not trying to put words in your
    mouth; do you know him?

A   I do not know him.  I know -- I know of him, I met him; I
    believe the first time I met him I met him when I was a
    student at Fisk University in Nashville, Tennessee.

Q   When was that?

A   I believe that was in the fall of '61; I am not sure.

Q   What was the occasion for you to meet him?

            MR. HALL:  Your honor please, we are going to object
to all this about Carl Braden, who is not in this law suit.

            THE COURT:  I -- I sustain objection to that question.

            MR. HALL:  Thank you.

Q   That was at Fisk University in 1963, you say?

A   '61, I believe.

Q   '61?

A   (Nodded to indicate affirmative reply)

Q   Since you met him or knew who he was, when did you next see
    him, or my question is, when is the most recent time that you
    have seen Carl Braden?

A   I don't know or have the slightest idea, sir.

Q    Have you communicated with him by telephone?

A    I have no communication with him, never communicated --

        MR. AMAKER:  Your honor, we are going to object to this entire line of questioning.

        THE COURT:  He has answered that question.  I assume that -- that it is pertinent to the inquiry, and he has answered that question, so I overrule your objection to that question.

Q    Do you know James Dumbrowski?

A    I have seen him; I do not know him.

Q    Where have you seen him?

A    I am -- I am not sure; I believe the first time I met him or first time I saw him was at a memorial service or a tribute to someone in D. C.; I am not too sure about that.

Q    Have you ever attended a meeting with him or a meeting in which he was present?

A    I don't think so.

Q    You have not?

A    I don't think so; I do not know; I do not recall.

Q    In his lifetime did you know Malcolm X?

        MR. AMAKER:  Your honor, object to that question.

        MR. HALL:  Oh, boy.

        THE COURT:  I will let him answer it; overrule.

A    I met the late Malcolm X.

Q    When did you meet him?

A    I think the first time that I met the late Malcolm X just before

the march on Washington, the day before -- the same day of the

march on Washington, and I met him in passing, it was August 28,

the morning of August 28, in the Statler Hilton Hotel, and I

said, "Hello, Malcolm," and he said, "Hello, Mr. Lewis," or

something like that.

Q   Since that time have you had any further contact with him, up

until his death?

A   When he was abroad during the last fall, I saw him in -- in

Kenya.

Q   In where?

A   In Kenya, in Nairobi, Kenya, in Africa.

Q   Was this a -- by coincidence that you saw him there, or was it

a prearranged meeting?

A   Just coincidence; we happened to be passing through going to

another country for the independence celebration, and it was

coincidental that we saw Malcolm.

Q   Why were you in Kenya?

A   Passing through on my way to Gambia for the independence

celebration.

Q   How long were you there?

        MR. GREENBERG:  Objection, your honor.

        THE COURT:  Sustain it.

        MR. GREENBERG:  This is so diversionary.

        THE COURT:  Sustain it.

Q   What was the purpose of the mass demonstration in Selma on

March 7?

A    The purpose of the mass demonstration March 7 was simply walking
     from Selma to Montgomery to seek the aid and assistance of
     Governor Wallace in granting the Negro citizens of the Black
     Belt of Alabama and the whole State of Alabama their constitu-
     tional right, their voting right, and to seek an end to police
     brutality.

Q    Did you have knowledge or notice of the statement or proclamation
     of the Governor of this State made on March 6 stating in
     substance that, "This march cannot and will not be tolerated
     or permitted"?

A    On the afternoon of March 6, one of our staff members informed
     me when I was in Atlanta that the Governor had issued an order,
     a ban on the demonstration.

Q    You knew about that on the day it was made?

A    On the afternoon of the 6th.

Q    On the afternoon of the 6th?

A    (Nodded to indicate affirmative reply)

Q    Now, were you a leader of the march on the 7th, the following
     day?

A    I did participate, I guess, as a leader of the march on March 7.

Q    You disregarded the statement or proclamation of the Governor?

A    Well, I felt that the order, the ban by Governor Wallace, was
     an unjust ban, it was an unjust order, and that we had a
     constitutional right to peaceful march from Selma to Montgomery.

Q    Were you aware of the fact that the case of the United States

versus Atkins had been pending in the Federal Court for the
Southern District of Alabama for approximately five years in
regard to voter registration?

A    I had some knowledge of it on March 7; I had some knowledge of
it before March 7; but my knowledge of it is very vague; I
do not keep up with the whole legal operation.

Q    Based on your knowledge or what has been told you, did
discrimination of Negroes continue in the voter registration
process in Dallas County after Judge Thomas issued an injunction
against the Dallas County Board of Registrars?

A    Well, from the information that our office was able to receive
from the Dallas County Voters League and from my own personal
observation in Selma and Dallas County, I think discrimination
of Negro people who were attempting to register to vote was
continuing.

Q    Did you or did anyone else to your knowledge bring this to the
attention of the court or to the Justice Department?

A    I did not, and I have no knowledge of anyone else; I couldn't
really say, I don't know; but I did not.

Q    Isn't it a fact that one purpose of the street demonstration is
to arouse Negro citizens to go down and exercise the rights
which Federal Courts have given them in the voter registration
suits?

A    I would say that one purpose other -- of the demonstration,
whether they be voter registration or demonstration to protest

police brutality, is to dramatize the issue, not only to arouse
the Negro people, but to dramatize that there is a problem, that
people are being denied their constitutional rights, and to call
attention to it.

Q    Do you consider these mass demonstrations to be successful
whether or not violence erupts or occurs as an incident to them?

A    Well, I consider the use of non-violent, massive non-violent,
direct action to be successful whether there -- where there is --
whether the demonstration are non-violent, because the demon-
stration that we are going to engage in are going to be
non-violent.

Q    These demonstrations in Selma since you have been there have on
numerous occasions caused acts of violence?

A    But since I have been in Selma, all of the demonstrations that
I have observed have been strictly and almost totally non-
violent and peaceful.

Q    Non-violent and peaceful on the part of the white community?

A    Well, what I am trying to say here, that as far as the
demonstrators are concerned, the plan of demonstration is
peaceful, orderly, and non-violent, and we are saying if there
is going to be violence, it will not come from those of us who
be participating in the demonstration, in the march.

Q    What you have done or what has been done has on numerous
occasions caused violence, hasn't it?

A    Well, I would say that some people had resisted our efforts to

get the right to vote in Selma and Dallas County, they resisted our efforts to protest police brutality; instead, they engage in more police brutality, they beat more people, they shoot more people, and even kill more people.

Q    Were there any acts of violence, to your knowledge, in Selma, Alabama, or Dallas County, prior to the mass demonstrations on the streets in Selma in regard to the voter registration?

A    I don't know.

Q    You don't know of any?

A    I -- I say I don't know.

    MR. SMITH:  I have no further questions.

    THE COURT:  Mr. Pitts.

BY MR. McLEAN PITTS:

Q    I will ask you one question here; you say they beat more people, they kill more people, and they shoot more people; you are talking about law enforcement officers?

A    Yes.

Q    In Dallas County, I believe you said?

A    Not only in Dallas County, but in the total Black Belt area where we have been involved in the past few months.

Q    All right; now, in Dallas County, Alabama, can you name any person that has been shot by any member of the Jim Clark Sheriff's deputies or his Posse?

A    I cannot name any person that have been shot by Sheriff Clark or members -- some of his deputies or members of the Posse.

Q    As a matter of fact, there has not been one person even fired

     at by a member of the deputies; isn't that correct?

A    Well, I -- I do not know; but I have seen members of the Posse --

     I saw a member of the Posse on Sunday reach for his gun.

Q    I am talking about shooting; has a shot been fired?

A    I do not know.

Q    All right.  So you are not -- but you know of no person that

     has been shot -- shot by any of them -- killed?

A    I do not.

                    THE COURT:  You still restricting it to Dallas County?

                    MR. McLEAN PITTS:  Yes, sir.

A    I do not know of any person that has been shot or killed by a

     member of the Posse.

Q    All right; now, this instance that Mr. Smith asked you about

     this white minister, Reb -- is that his name, Reb?

A    Reverend Reeb.

Q    Reverend Reeb; he was beat up down in the -- near a Negro area

     of the town on Washington Street by four white men that were

     not law enforcement officers; isn't that correct?

A    Well, I do not know who beat him up; I do not know who beat him

     up.

Q    All right; and how many times -- now, let's get back to this;

     how many times have you led marches on the Dallas County Court

     House?

A    I don't know.

327

Q    Huh?

A    I don't know.

Q    Well, in your best judgment?  Since -- since January, now?

A    Oh, since January; well, I would say three or four times.

Q    Now, does that include the month of January?

A    Since January 18.

Q    Since January 18?

A    (Nodded to indicate affirmative reply)

Q    You say you have led three or four marches; is that right?

A    (Nodded to indicate affirmative reply)

Q    Now, how many marches have been marched on the Dallas County
     Court House?

A    I do not know.

Q    As a matter of fact, it has been from three to five per day,
     hasn't it?

A    I do not know.

Q    All right.  Now, what is the largest group of people that you
     got around the Dallas County Court House?

A    Well, I do not know the largest group, but from press report I
     understand that the largest group that went down was about
     fifteen hundred, and on that particular day I happened to be
     out of -- out of Selma.

Q    What is the second largest group?

A    I would say a thousand.

Q    And the smallest group?

A    The people have gone down in twos, threes, fours, and fives.

Q    All right.  Now, that group of people, when they would be down
there, wouldn't there be white people all around on the opposite
side of the street, all these people would march right to the
front door of the Court House, or the Lauderdale Street door of
the Court House, wouldn't they -- I meant Alabama entrance?

A    Most of the white people that I have seen down during the
demonstration have been news men, members of the Posse, and
Sheriff's deputies.

Q    You haven't seen mass of white people standing over on the
corner?

A    I have seen -- I have seen on occasion white people standing on
the corner.

Q    Were you down at the Dallas County Court House -- you knew that
Judge James A. Hare had entered an order of injunction prohibiting
demonstrations around the Dallas County Court House while court
was in session, didn't you?

A    To the best of my knowledge, I think I was out of the city,
perhaps out of the State, during the time that Judge Hare issued
that order.

Q    Was any -- was that order ever served on you?

A    No.

Q    Were you ever present down at the Dallas County Court House when
the Sheriff came out, or one of his deputies, and read this
order of the Circuit Court?

A    No.

Q    You never were; you never heard this order read?

A    No.

Q    You -- now, you did know that the City of Selma also had a
     parade statute; is that right?

A    I heard that.

Q    Required a permit before you get a parade?

A    I heard of the parade statute.

Q    Have you ever made application to the department -- to the city
     for a parade permit?

A    As an individual I haven't, the best of my knowledge, I don't
     know --

Q    Do you know of your organization making any such --

A    Well, I wouldn't know; I believe the Dallas County Voters
     League or other individuals or groups have made such requests.

Q    And you do know that Martin Luther King and a group were arrested
     for violating that parade ordinance, don't you?

A    I heard of that.

Q    Now, have you ever been engaged or did you ever send anyone
     down to picket the Federal Building down in Selma, United States
     Court House?

A    I never sent anyone down to the County -- to the Federal
     Building to picket the United States Court House.

Q    I -- well, to carry signs around it?

A    I never sent anyone down to --

Q   Did your organization do that?

A   Well, I would say that some local citizens from -- local citizens
    of Dallas County and Selma on one occasion, I believe in '63,
    stood on the Federal steps with signs saying, "One man one
    vote," "The Dallas County Negroes want to register and vote," and
    "Let my people register and vote." May I say this; as an
    organization we do not make decision for local people, I do
    not tell people to do this and do that. We believe in group
    leadership; the local people decide for themselves.

Q   But you recommend to them various procedures that they can go
    about to do; isn't that right? Such as toting signs and
    demonstrations and things like that?

A   My participation is more one of service, to be used in any way
    that I can be helpful in the movement.

Q   All right. Now, let me ask you this; how long has Student
    Non-violent Coordinating Committee had its office over there in
    the Sullivan Building in Selma? That is building directly
    across the street from the City Hall?

A   I know where the building is; I have spent some time in there.
    I believe our office has been there since the spring of '63.

Q   Is -- is Frank Sirocco one of the workers of that Student Non-
    violent Coordinating Committee?

A   Frank Sirocco been working with the Student Non-violent
    Coordinating Committee.

Q   And is Carol Lawson one of them?

A    Carol Lawson; Carol Lawson, if I recall, was down in Selma last
     fall working with a literacy program teaching young Negro
     students.

Q    All right; now, who else; would you name who is in Selma that is
     in that Student Non-violent Coordinating Committee who are in
     Selma as workers who are not residents of Selma?

A    You want me to name --

Q    Yes, name them?

A    -- the local -- the staff members of the Student Non-violent
     Coordinating Committee that are working --

Q    Yes, that are in there working with the Student Non-violent
     who are nonresidents of the City of Selma?

A    Well, we have a few people there; we have John Love, Silus
     Norman, Larry Fox, Faye Bellamy, and there is maybe others
     sort of slipped my --

Q    Now, was Wolf Dawson one of them?

A    Wolf Dawson was down in September of '63, was not a staff member,
     not a staff worker for the Student Non-violent Coordinating
     Committee.

Q    What about C. T. Vivian?

A    I believe C. T. Vivian is not a -- is not a staff worker for
     Student Non-violent Coordinating Committee.

Q    Who is he connected with?

A    To the best of my knowledge, he is working with the Southern
     Christian Leadership Conference.

Q   And he is connected with Martin Luther King; is that right?

A   Dr. King is President of the Southern Christian Leadership Conference.

Q   Now, when have you -- were you in Selma -- have you been in Selma since Sunday, since the march on Sunday?

A   Yes, I have been there since Sunday.

Q   All right.  Now, you had the march on Tuesday, didn't you?

A   I did not participate in the march on Tuesday.

Q   I meant you had a march there on Tuesday, one we are talking about, one that crossed the River Bridge and come back; is that right?

A   From my own observation and from press reports --

Q   I withdraw the question; you had a -- I was just trying to get a point of time.  There was a march there coming -- that started out for Montgomery on Tuesday; isn't that right?

A   Yes.

Q   All right; now, when that march got back, was another march immediately planned for night marching there in Selma?

A   I don't know.

Q   Were you there?  At Brown's Chapel?

A   I have been in Selma; I have been at Brown Chapel; as I said earlier, I had very little to do with any plans for any meetings since March 7.

Q   How long have you been at Brown's -- how many times have you been at Brown's Chapel since Tuesday -- Tuesday at noon?

A    I don't know; maybe two or three times.

Q    Is it a fact that the police have had some thousand Negroes
     contained in front of Brown's Chapel from early Tuesday -- early
     Tuesday evening all of Tuesday night, all of yesterday?

A    Well, I understand, and from what I observed --

              MR. GRAY:  Your honor, we are going to object unless
he has personal knowledge; this witness has been in here most of
yesterday.

              THE COURT:  He said what he observed, and I will let
him testify to it; just testify from what you know and from what
you have seen.

A    Well, from what I have observed since late Tuesday, hundreds
     and perhaps thousands, but more or less hundreds of Negro and
     white people, rabbis, ministers, priests, nuns, have been forced
     to live in what I consider a police state, a tactic situation,
     they are surrounded by State Troopers, they are surrounded by
     members of Sheriff's Posse and some of the deputies; they are
     forced to -- in and around Brown's Chapel A.M.E. Church.

Q    You know that in fact the corner of Selma Street and Sylvan
     Street the police have contained this group in front of A.M.E.
     Chapel; is that correct?

A    From what -- this was --

Q    Is that correct?

A    This was -- was the situation on Tuesday.

Q    All right; now, it is a fact that they won't let any white people

334

    from out -- in a car or any type go down there; isn't that right?

A    I don't know; I am not white, and I wouldn't know.

Q    Huh -- and they have turned away groups after groups of white people that have been trying to go down there; isn't that correct?

A    I don't know.

Q    And as a matter of fact, if it had not been -- I withdraw that question. As a matter of fact, the Sheriff, Sheriff's Posse, State Troopers, have been present to protect you people as you were marching down the street; isn't that correct?

A    I don't know.

Q    And isn't it a fact that Captain Wilson Baker, of the Selma Police Department, have advised -- have you met with him?

A    I have seen Mr. Baker on a few occasions, in and around Brown's Chapel since January 18.

Q    Now, you have talked with him on several occasions, now, haven't you?

A    I have seen him; I spoke with him.

Q    And you have talked to him about these demonstrations, haven't you?

A    Well, I have talked with Mr. Baker from time to time when I walking down the street or when I am engaged in a peaceful march.

Q    All right, and he has told you, he's been down there and begged you all to stop these demonstrations because he didn't know how long he was going to be able to contain a certain group of white

people; isn't that right?

A    He never said that to me.

Q    Huh -- and he was telling you all for your own protection you
ought to cut this demonstrating out, didn't he?

A    He never said that to me.

Q    He never told you that?

A    No.

Q    Now, how -- who is in charge of the juvenile end of this
movement that you talk -- that you speak about?

A    What -- in this movement it is a mass movement, and it is no
such thing as discriminating people individually; it is a
people movement, and whether people be young or whether they be
--

        MR. McLEAN PITTS:  Your honor, I ask him to answer
my question.

        THE COURT:  As to who was in charge of the juvenile
part of the movement?

A    No one in particular in charge of juveniles; we have no
juvenile division in the movement.

Q    Do you know that they have been staying out of school?

A    I have heard of reports that people have been staying out of
school.  I have been at the church on school days, and I have
seen people stay out of school.

Q    And do you know that out of Hudson High School, approximately
fifteen hundred students, there would have been thirteen -- over

a thousand absences in one day at that school?

A   I have heard of that; I do not know it.

Q   And do you know that has been continuous since January?

A   I do not know that.

Q   And do you know that the -- have you been told that the -- the courts in Selma and police authorities have been trying to get these children to go back to school?

A   I do not know of that.

Q   All right.  Now, have your -- has the Student Non-violent Coordinating Committee been active in any boycotting in Selma?

A   The Student Non-Violent Coordinating Committee's only -- only function in Selma is more or less of a service function.  From what I gather, the Negro people of Dallas County, the Negro people of Selma, decided that they would have an economic withdrawal.  The people made that decision; the Student Non-violent Coordinating Committee did not make that decision.

Q   Well, do you know of any active boycott that is going on in Selma now, the Selma Bus Lines?

A   I have heard that people are not riding the Selma Bus Lines.

Q   And they were encouraged not to ride it, wasn't they, in mass meeting, wasn't they told not to ride it?

A   To the best of my knowledge, I have not been in a mass meeting where I have heard this.

Q   Well, do you know -- let me ask you this; do you know of any group of squads that have gone down to the bus stations and

337

threatened people that were getting on those busses?

A    I have no knowledge of anything of this nature.

Q    And did you know that the people were having to protect those
busses as they went along the route because of these squads
that were threatening people?

A    I have no knowledge of anything -- this is my first time hearing
anything like this.

Q    And did you know -- I'll ask you this; did the Student Non-violent
Coordinating Committee purchase or furnish the funds for the
purchase of three Volkswagens?

        MR. AMAKER:  Your honor, excuse me; if Mr. Pitts
wants to testify, I suggest he be sworn.

        MR. McLEAN PITTS:  I asked him did he know it.

        THE COURT:  The testimony is the evidence; do you
know the answer?

        WITNESS:  I wouldn't know that.  The Student Non-
violent Coordinating Committee is rather a poor, poor organization;
we can't afford to buy three Volkswagens.

        THE COURT:  Did you purchase those busses?

        WITNESS:  We did not.

Q    You know about those busses, though, didn't you?

A    I have no knowledge of the busses.

Q    All right.  Now --

        THE COURT:  Take a ten minute recess.

        (At which time, 11:15 a.m., a recess was had until

338

11:25 a.m., at which time the hearing continued)

        THE COURT:  Keep your seats, please.  All right, Mr.

Pitts.

        MR. McLEAN PITTS:  That's all.

        THE COURT:  Redirect.

        REDIRECT EXAMINATION:

BY MR. HALL:

Q  Mr. Lewis, I would like to direct your attention to the demon-
    stration in 1963 which you have testified about on cross
    examination, I believe, where there were persons walking around
    the Federal Building and the County Court House in Selma; I ask
    you if you were there on that occasion, were you not; you did
    say so on cross examination; is that right?

A  Right.

Q  At that time and on that occasion, were there persons placed
    on the Federal property with signs?

A  Young people took place -- took position on the steps of the
    Federal Building.

Q  On the steps of the Federal Building?

A  Right.

Q  And what did they do, just stand there on the steps?

A  They stood with signs; some of their signs read, "One man one
    vote," others read, "Let my people vote," "Dallas County Negro
    citizens want to register and vote."

Q  Were they requested to leave these premises by the Federal

authorities or anyone else?

A    I have no knowledge of any Federal officials or Federal
authority requesting them to leave.

Q    Were they arrested there?

A    They were arrested and jailed by Sheriff Jim Clark and members
of his deputies.

Q    And this was a voter registration demonstration?

A    It was a voter registration demonstration.

Q    Mr. Lewis, has most of the demonstrations since January, 1965,
been on behalf of voter registration?

A    Most of the demonstration, almost -- I would say ninety per
cent or ninety-five per cent of all the demonstration in Dallas
County and Selma have been voter registration demonstrations.

Q    There have been some --

A    Some demonstration have been demonstration to protest police
brutality.

Q    So all of the demonstrations have been concerned with either
voter registration or to protest police brutality?

A    Right.

Q    And when you say, "Police brutality," what police brutality was
involved?

A    Well, on numerous occasions --

            THE COURT:  You mean what agency?

            MR. HALL:  Yes, sir; what agency?

A    On numerous occasions since September of --

340

MR. SMITH:  Object to that as not being responsive,
if the court please.

THE COURT:  What agencies, he is asking --

Q   What agencies?

THE COURT:  -- do you have reference to?

A   To the Sheriff's Department, Sheriff Clark, some of the
deputies, and members of the Posse.

Q   I'll ask you, Mr. Lewis, to tell us if it isn't -- if you know
whether or not it is a fact that most of the persons who have
been in lines of march to the Dallas County Court House since
January, 1965, have been persons who were attempting to either
register and vote or --

MR. SMITH:  Object.

Q   -- to sign the appearance --

MR. McLEAN PITTS:  We object to that question; it
has been no voting days, your honor.

THE COURT:  Answer it to the extent of your knowledge;
objection is overruled.

A   To the best of my knowledge, most of the people have been
involved in the marches, in the demonstration, to the Dallas
County Court House have been local citizens of Dallas County
over twenty-one were trying to register and vote, attempting to
register and vote.

MR. HALL:  That's all; thank you.

THE COURT:  Mr. Doar.

341

MR. DOAR:  No questions.

THE COURT:  Mr. Smith.

RECROSS EXAMINATION:

BY MR. SMITH:

Q   Were the demonstrations in September of 1963 that were conducted
    in or near the Federal Building in Selma for the purpose of
    influencing the Federal Court that had jurisdiction of voter
    registration case there?

A   The demonstration that was held on the step of the Federal
    Building in September of '63 was not for the purpose of forcing
    the Federal Court.  Many people have been arrested days before
    that demonstration at the Dallas County Court House carrying
    signs saying, "One man one vote." We moved -- some of the
    people decided to demonstrate on the step of the Federal
    Building to make a witness, to dramatize that people in Dallas
    County, in Selma, Negro people, denied the right to register
    and vote.

Q   What did the signs say?  I don't want all of them; do you recall
    what any of the signs said that the people were holding while
    they were on the steps --

A   Some of the signs --

Q   -- of the Federal Building?

A   Some of the signs said -- yes, some of the signs read, "One man
    one vote," "Dallas County Negroes want to register and vote,"
    "Let my people register and vote."

Q   Did you know at that time that Judge Daniel Thomas had within
    the jurisdiction of his court the voter registration matter
    involving the Board of Registrars of Dallas County?

A   I am not sure.

Q   Were you on the steps of the Federal Building?

A   I was not on the steps of the Federal Building.

Q   Were you there in the vicinity of the Federal Building?

A   I was in the vicinity of the Federal Building.

Q   How near the Federal Building were you?

A   If I recall, I was standing down the street about almost a block,
    at the end of the other block, from the Federal Building.

Q   As a member or the National Director of the Student Non-violent
    Coordinating Committee, have you been given instructions by
    anyone as to how to plan and conduct mass demonstrations of Negro
    citizens?

A   No, I haven't been given any instructions how to plan mass
    demonstrations of Negro citizens.

Q   None whatsoever?

A   None whatsoever.

          MR. SMITH:  All right.

          MR. McLEAN PITTS:  Let me ask -- Judge Johnson, you
are familiar with the Court House in Selma, there is no use to go
into that, is it?

          THE COURT:  Sir?

          MR. McLEAN PITTS:  You are familiar with the fact

343

that the Federal Building is directly across the street from the

Dallas County Court House in Selma, no use going into that -- I say,

you are familiar with that building, aren't you?

THE COURT:  Oh, yes; yes.

BY MR. McLEAN PITTS:

Q   You were familiar and you knew about the decree of injunction

    or order of Judge Thomas, United States Judge, that specified

    that a book was to be put out in front door of the Court House,

    and the Lauderdale Street entrance was to be used, and persons

    desiring to register was to be assigned -- was to sign that

    book and get a number; were you familiar with that?

A   I have some vague knowledge -- vague knowledge of that order or

    decree by Judge Thomas.

Q   Now, since -- and Judge Thomas laid down how they were to get in

    line to register to vote; is that right?  I mean register to --

    to register; is that right?

A   I am not too sure about the specific of the order; I believe as

    much as possible the people who had been involved in the

    demonstration have tried to follow that line of decree by the

    Judge.

Q   Now, since the Judge entered that order, and since the people

    have been signing that book, you all have been continuously

    marching to that Court House, haven't you?

A   To the best of my knowledge, since that order we have been

    bringing or suggesting that hundreds and hundreds of Negroes go

down to carry out the court order to attempt to register to
vote, to sign the book, and I believe since that order more than
twenty-two hundred people have signed the book.

Q   And -- but you have still continued these demonstrations through
the streets of the City of Selma, haven't you?

A   All the demonstration, or most of demonstration, I believe all
of the demonstration, not including the demonstration on March
7, have been directed toward the Dallas County Court House for
the purpose of signing that book.

Q   But you have continued those demonstrators -- answer my question,
now; you have continued those demonstrations after this book
was put out there and this procedure was worked out, haven't you?

           MR. GREENBERG:  Objection.

           THE COURT:  Well, I think it depends on what you
call demonstration; define your demonstration first; sustain it.

Q   Well, marching?

A   We have continued to march down to the County Court House to
attempt to register to vote.

Q   Now, you say, "We"; who is we?

A   The Negro citizens of Dallas County have gone down with some
other citizens, Negro citizens of Dallas County, to encourage
people to stay in line, to sign the book, to wait, to not to
give up.

Q   But you have also -- these march -- this march to Montgomery on
Sunday and the other marches were all after that book was put

out there, wasn't it; Judge Thomas entered that order, wasn't it?

A    Yes.

        MR. McLEAN PITTS:  All right.

        THE COURT:  Anything further from this witness?

        MR. AMAKER:  Just -- yes.

          REDIRECT EXAMINATION:

BY MR. HALL:

Q    Mr. Lewis, where is the office of the Board of Registrars of
    Dallas County located; in what building?

A    The Board of Registrars' office is located in the Dallas County
    Court House in Selma, Alabama.

Q    In the Dallas County Court House; this is where people are
    supposed to go to register to vote?

A    That is where people go and attempt to register to vote.

Q    And the book which has been referred to on several occasions
    where the prospective registrants are to sign is located in that
    Court House?

A    The book, the appearance book, is located in the Dallas County
    Court House.

Q    Excuse me, please.  Mr. Lewis, do you know whether or no Judge
    Thomas's order placing the book there at the Court House for
    prospective registrants to sign specified that the book was to
    be there every day?

A    I am not sure, but to the best of my knowledge I believe the
    order -- it is in that order that the book is to be available

346

for prospective registered voters every day.

MR. HALL:  Every day.  That's all.

THE COURT:  Mr. Smith.

MR. SMITH:  No, sir.

THE COURT:  Mr. Doar.

MR. DOAR:  No, sir.

THE COURT:  Mr. Pitts.

RECROSS EXAMINATION:

BY MR. McLEAN PITTS:

Q    Do you know of any day any book hasn't been there?

A    I don't know.

MR. McLEAN PITTS:  All right.

THE COURT:  Call your next witness.

MR. McLEAN PITTS:  Your honor, I would like to again

ask -- I am through with this witness -- Mr. John Doar; I would like

to excuse Mr. Moseley.

MR. DOAR:  What is the question?

(Mr. McLean Pitts conferred with Mr. Doar in the

court room)

THE COURT:  You need not try to take this.

MR. DOAR:  Sheriff Clark sent him home long ago.

MR. NABRIT:  Mr. Early Butler.

MR. AMAKER:  Your honor, any objection to excusing

this witness, Mr. Lewis?

MR. McLEAN PITTS:  No, sir; he can go.

347

MR. SMITH: I object to excusing him -- excuse me; I am not at this time prepared or cannot agree to excuse him, because he is a party; I will if something develops later that I can, but at this time I would not agree to excuse a party.

MR. DOAR: Can he be excused until Monday?

THE COURT: Are you agreeing not to excuse him solely because he is a party?

MR. SMITH: Your honor, there is a possibility of further cross examination of him.

THE COURT: All right, then, he will remain.

*****************

EARLY BUTLER, witness for the Plaintiffs, having been duly sworn, testified as follows:

DIRECT EXAMINATION:

BY MR. NABRIT:

Q    State your name and address?

A    My name is Early Butler --

THE COURT: Keep your seat, please.

Q    Keep your seat; stay seated.

A    Early Butler, 704 Sylvan, in Selma, Alabama.

Q    Were you in Selma Sunday, March 7?

A    I was.

Q    Did you participate in the march to the bridge?

A    I did.

Q    After the march stopped, where did you go?

A    After the march stopped, we was turned around, we started back,
and some children had got beat and got hurt; we stopped and
taken them to the car and send them to the church that they
could get to the hospital somehow.

Q    And you went to the church?

A    And I left there, and I went to the church.

Q    Where did you go when you left the church?

A    When I left the church about a half hour after then, I went
home.

Q    About what time did you get home?

A    I got home about four o'clock, I -- I say.

Q    And who was at your house at that time?

A    My wife was there and a visiting lady and one kid and my
daughter and her kid and myself and two sister-in-laws of my
wife, one sixty-three and the other one seventy-one.

Q    Now, shortly after you got in the house did something unusual
happen?

A    Something unusually happened; I kept on through to the back
getting ready for dinner, because I were late, and the door
were closed when I went in; I heard such a noise, I come back
out to the front. And I say, "What happened?" The people were
just crowding in the door. I say, "What happening?" They say,
"The people in behind us." I say, "Well, shut the door."

Q    What did you see -- say -- tell the Judge what you saw when you
went to the front door?

A    When I went to the front door, I saw them running them from the
     church.

Q    Saw who?

A    I saw the Posse and our Sheriff, James Clark.

Q    Who were they -- what were they doing?

A    They were beating the children, running them from the church,
     and some was going some way, and it was a man come through my
     house, he pulled the door off the screen latch, the screen
     door, and he fell against the other door and broke the latch,
     and they got in, and when they got in --

Q    Now, who got in your house; how many people and what did they
     do?

A    Well, as much as I could say, it was about six of them come
     in off the street.

Q    Now, go ahead; tell the Judge what happened?

A    And then one was bleeding around the head, so I went to the
     door, I say, "Shut the door"; wasn't nobody shut it; I went to
     the door, shut it, myself. When I got to the door, there
     was two Posses coming up on the porch.

Q    You say, "Two Posses," two of the Sheriff's Clark's Posse
     members; is that right?

A    That's right, coming up on the porch; one was on the steps. I
     said, "Don't come in," I said, "Don't come in, stop there," I
     said, "You can't come in." I said, "You can't come in," and I
     shut the door. And when I shut the door --

350

Q   Did they say anything to you?

A   They didn't say anything to me; but when I shut the door, he --
one of them went back and hollered to our Sheriff, James Clark,
to, "Send me one of them cans of tear gas," and he -- he had a
satchel or something on his side --

Q   Who?

A   -- he went -- Mr. James Clark.

Q   Had what?

A   Such as a bag.

Q   Uh, huh?

A   And he went in that bag and throwed the can to one of his
deputies; he run up to the far window, which on this direction,
and he drawed back; I said, "Don't throw that gas in that
window," and after while he threw it.  Well, I had one of
those sixty-three year old women, she couldn't hear, she was
sitting at the window.  I -- I run in there and manful caught
her and tried to tote her and drug her on out -- out of the --
that room.

Q   What room was that?

A   That was the room with the house facing this way.

Q   Was it a bed room, living room, or what?

A   That is the bed room, and drug her into the living room, and
drug her on the outside; then I went back to Sue Ellen, see
who else was in there, and my wife and that other lady had done
got that other seventy-one year old lady out, and they had got

351

the children out; they were out in the back.

Q    How many -- how many tear gas cans came in your house?

A    One come through the window, it was a tear gas that he throwed
     through there; he throwed one through the first window on the
     other side, he shot one out of that tear gun, and it land over
     on the bed and burnt through the spread on down through the
     mattress.

Q    Now, Sheriff Clark didn't throw that; he gave it to another man?

A    Sheriff Clark didn't throw it; that is correct; he give it to
     another man.

Q    Where were you watching from when all this was going on, when
     you saw him throw it?

A    Where was my wife?

Q    Where were you watching, through the window?

A    I was watching through the low window when he throwed it
     through the -- this -- this first window; well, when he shot it
     through the -- shot it out of that gun through the next window
     where I were trying to get back out -- out the back.

Q    And what door did you and the members of your family go out?

A    Well, they -- all of us went out the back.

Q    Were any possemen in the back?

A    No possemen were in the back; when they throwed it, they left,
     went up -- moved up the street.

                MR. NABRIT:  No further questions.

                THE COURT:  Mr. Doar.

352

BY MR. DOAR:

Q    What is the address of your house?

A    704 Sylvan Street, Selma.

Q    How far is that located from -- how far is that located from
     the Baptist church on Sylvan Street?

A    I would say about two hundred yards.

Q    In which direction, toward the downtown area?

A    It was down Jeff Davis and corner of Sylvan.

Q    You were at the corner of Jeff Davis and Sylvan?

A    Nearby at the corner; I am the second -- the third house from
     the corner of Sylvan --

Q    Uh, huh.

A    -- Jeff Davis.

            MR. DOAR:  Thank you.

            THE COURT:  Mr. Smith.

            MR. SMITH:  No questions.

            THE COURT:  Mr. Pitts, you want to examine this

witness?

                    CROSS EXAMINATION:

BY MR. McLEAN PITTS:

Q    Early, did you see a man out there in front of your house --

            MR. AMAKER:  Just a second, your honor; the witness

has been identified here on the record as Mr. Butler.

            THE COURT:  All right; you are required in this court

to -- to treat all witnesses alike and address them in a proper

manner; that is a rule of the court.

Q    Did you see a man in front of your house with a switchblade knife?

A    I did not.

Q    And did you see a man on your front porch with a switchblade knife?

A    I did not.

Q    Or come in your house?

A    I saw one standing -- I saw one standing on the steps there with his pistol pointed toward the door.

Q    With his fist?

A    With the Posse.

Q    Well, did you see a colored man --

A    No.

Q    -- with a switchblade knife?

A    I did not.

Q    And you -- your house is 704 Sylvan Street?

A    Right.

Q    Now, is that on the east side of Sylvan Street or the west side?

A    It is on the west side, now --

Q    On the west side?

A    -- it is on the side that the sun rise on.

Q    Now -- now, Sylvan Street goes -- a greater portion of Sylvan Street is occupied -- is fronted by the project; isn't that right?

A    That's right.

354

Q    And the A.M.E. Brown's Chapel, what they call Brown's Chapel, that is a -- that is there in the project; isn't that right?

A    Correct.

Q    And that is about half way from Sylvan Street to Jeff Davis, I mean from Sylvan to -- half way; isn't that right?

A    I couldn't say whether it is half way; I know it ought to be something like it.

Q    And this Baptist church you are talking about is on the corner of Jeff Davis and Sylvan; is that right?

A    On the corner of Jeff Davis and Sylvan; correct.

Q    And you are three houses back toward town?

A    I am three houses back, the third house back, toward town.

Q    The third house back; and about how far is your house from the Brown's Chapel?

A    Well, I couldn't say; it's not very far, three houses from the corner, and you said about half way; I couldn't say.

Q    Well, I am talking about you were about three -- you were about three houses from the corner of --

A    Of Jeff Davis.

Q    And that is -- that is where the Baptist church is, isn't it?

A    That is where the Baptist church -- correct.

Q    And then -- then Brown's Chapel is back up on the other side of your house toward Selma, isn't it?

A    That's right.

Q    The Baptist church is on the same side of the street as your

house is on?

A   Correct.

Q   And Brown's Chapel is on the opposite side of the street; isn't that right?

A   No, sir; that is not right.

Q   Well --

A   The Baptist church is across the front of my house; Brown Chapel is on the side my house is on.

Q   Oh, I see.

A   Yes, sir.

Q   Oh.

A   Correct.

Q   So you were across the street; you were on the east side of Sylvan Street?

A   I was on the side the sun rose.

Q   All right.  Now, after -- that afternoon, where were you earlier in the afternoon, say one -- one o'clock, one thirty, two o'clock?

A   Oh, around the church, I guess, getting ready to march.

Q   Did you go on the march?

A   I did.

Q   And when you got back to the church, how long did you stay there?

A   About a half hour.

Q   About a half hour?

A  (Nodded to indicate affirmative reply)

Q  And when you got back there, was there a bunch of Negroes and
   white people all out in front of that church?

A  Oh, some was there.

Q  And a good many, wasn't it?

A  Well, I didn't number them; I know --

Q  And it was automobiles parked on all sides there, and just room
   enough for one car to go through, wasn't it?

A  I wouldn't say that; they were parked on the sidewalk.

Q  Uh, huh; and it was white people milling all around there, too?

A  I didn't -- I didn't pay any attention.  I went in the church.

Q  And finally, after about an hour's time after you got back to
   the church, the police and the Sheriff run everybody off the
   street; is that right?

A  I don't know that; I just seed what happened when I got home.

Q  All right; and you didn't see this man with a switchblade knife
   run in your house?

A  I did not.

Q  And you were looking right at this man here when he took a tear
   gas can --

A  And passed it --

Q  -- out of his knapsack and threw it to a posseman; is that right?

A  Threw it to the Posse.

Q  You were looking right at him?

A  Looking out the window.

Q    Where was he; was he directly in front of your house or where?

A    He was directly in the yard out there near to the street that the cars run, in other words from there to my door --

Q    Wait a minute; where the cars run?

A    The street where the cars go up and down; he wasn't just there at the sidewalk where you would pass, he was down mostly at the street.

Q    Say about the curb line, where the curb --

A    Right out in front of my door in the yard; yes, sir; near the curb.

Q    That is where he was?

A    That is where he was.

Q    Where was the posseman?

A    Two of them was on the porch there at one time, and one of them was on the steps.

Q    Which one did he throw the can to?

A    I do not know him, because all of them look alike.

Q    I know, but was it two of them on the -- on the porch or was it one standing in the yard that caught the can?

A    It was one standing at the steps, and two was on the porch.

Q    Which one caught the can?

A    I does not know him.

Q    I am not asking you the name of the man; I am just asking you was it one of the two men that was standing on the porch that caught the can?

A    I couldn't tell.

Q    Or was it the man on the ground that caught the can?

A    I couldn't tell, because when they got back together, I couldn't tell which one come back.

          MR. McLEAN PITTS: That's all. Wait just one minute, your honor.

Q    Tell me this; did you see any bricks flying through the air down there?

A    Well, I didn't see anything but my door was open, and I closed it and looked out through the window and seed this.

Q    Wait a minute, I mean before when you left the church and when you were around the church, wasn't there bricks and bottles being thrown at the police officers down there?

A    Well, I didn't know, I might have been inside; I went on in the church when I got back.

Q    Don't you know --

          THE COURT: He is asking you what you saw.

A    I didn't see it.

Q    You didn't see no bricks or bottles thrown?

A    No, I didn't; did not.

          MR. McLEAN PITTS: All right, that is all.

          THE COURT: Redirect.

          MR. AMAKER: Just a moment, your honor.

          MR. NABRIT: No further questions of this witness, your honor.

359

THE COURT:  Any further questions by any of you
gentlemen?  You can be excused from the witness stand.  Call your
next witness, if you will, please.

MR. HALL:  Mrs. Margaret Moore, please.

MARSHAL:  What is the name?

MR. HALL:  Moore, Margaret Moore.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

MARGARET MOORE, witness for the Plaintiffs, having been duly sworn,
testified as follows:

DIRECT EXAMINATION:

BY MR. HALL:

Q    Will you state your name, please?

A    My name is Margaret Moore.

Q    Where do you live, Mrs. Moore?

A    I live at 1414 Broad Street, Selma, Alabama.

Q    What is your occupation, Mrs. Moore?

MR. McLEAN PITTS:  What is her address?

MR. GAYLE:  1414 Broad.

MR. McLEAN PITTS:  1414 Broad; is that what it is?

A    Broad Street, Selma, Alabama.

Q    What was your occupation, please?

A    Teaching.

Q    Where do you teach?

A    At R. B. Hudson High School.

Q    You are a high school teacher?

A    That's right.

Q    Mrs. Moore, are you a registered voter in Dallas County?

A    Yes, I am.

Q    How long have you been a registered voter?

A    Since July, 1964.

Q    July, 1964?

A    (Nodded to indicate affirmative reply)

Q    When did you first attempt to register?

A    In 1953 or -- '53 and '54.

Q    How many times did you attempt to register before you were
     registered?

A    I made, oh, any number of attempts, but I was processed between
     ten and twelve times during the period.

Q    And you were rejected each time?

A    Well, I don't know if I was rejected; I was never notified --

Q    You were never --

A    -- until '64.

Q    In January, 1964, was this a notice that you had been rejected
     then?

A    That's right.

Q    That was your first notice that you were rejected?

A    That's right.

               THE COURT:  Rejected first notice?

               MR. HALL:  Yes; January, 1964.

Q    And later on in -- did you receive -- ever receive any other

notice of rejection?

A    That was my last notice of rejection.

Q    Finally you were registered at what date?

A    July, 1964.

Q    July?

A    I -- it was on Thursday, but I don't know the date, but it was either the 7th or somewhere around that.

Q    I see; now, you -- are you either -- are you a worker for either Southern Christian Leadership Conference?

A    No.

Q    Student Non-violent Coordinating Committee?

A    No.

Q    Dallas County Voters League?

A    I am a member of the -- of the Dallas County Voters.

Q    You are a member of the Dallas County Voters League; did you participate in the march on Sunday, March 7, 1965?

A    Yes, I did.

Q    Were you in the act or near the front of the march, of the line?

A    Yes, I was.

Q    And you got across the bridge with the rest of the persons?

A    Yes, I was just about twenty-five back, so I got way up.

Q    Were you, yourself, struck by anyone at any time on this occasion?

A    Yes, I was, many.

Q    Will you tell the court what happened to you with reference to

being struck?

A   I was walking along, when I heard the order to go back, and I turned to look around, and then I heard the -- Mr. Cloud say, "Go back to your church or to your home." And then he said that, "This will -- this march cannot go on."

Q   All right?

A   Then almost in the next breath he said we will have two minutes, and I looked back, and when I looked again, I saw everybody roll -- just a rolling surf, and something, horses and men and policemen and -- not policemen, Troopers, and possemen coming, and I turned around to tell them, "Don't run, stand still, you will get hurt," and when I turned again, three Troopers were standing over me, and one hit me in the neck, the neck -- the nape of my neck and knocked me to my knees, and the other one came around and whacked me on the arm, the third one did not hit me. They went on.

Q   Now, when -- were you hit with the hands of the Troopers or did they use something else to hit you with?

A   They used clubs.

Q   Clubs; you were hit on the back of your neck with a club?

A   And on my arm.

Q   And on your arm?

A   And right in the middle of my back and on my leg; I think the hardest one was on my leg, because I was black until this morning; I guess I am still black.

Q    Were you knocked to the ground?

A    Yes, I was.

Q    Were you made unconscious?

A    No; no.

Q    Did you require first aid treatment?

A    Yes, I did.

Q    Were you --

A    My -- my knees were badly scarred.

Q    They were just scarred; there were bruises and abrasions on any other portion of your body?

A    Yes, there was on my arm and on my -- I don't mean my arm, I mean right in here and on my leg.  Five.

Q    I don't recall whether I asked this question I had in mind; were you hospitalized?

A    No; no.

Q    You were not?

A    Uh, huh.

Q    Were you able to return to work on Monday?

A    Yes, I was.

          MR. HALL:  Will you excuse us, please, just one minute?

Q    After you were knocked down, Mrs. Moore, and you sat there on the ground, you were not unconscious?

A    No.

Q    Did you observe what was happening around you?

A    Yes.

Q    Will you tell the court what you saw?

A    I saw Mrs. Boynton and Mrs. Foster at the upper end of the
     highway, and a girl and a boy not too far on this side of me;
     a policeman passed by and asked us to get up and go up there
     and help Mrs. Boynton, and we -- I was afraid it was a trick,
     and I wouldn't go. And just about the time they got there and
     was -- they were trying to help her, I looked back toward the
     bridge, and when I looked down there, the people who were on
     their -- some of them were on their knees, and some of them were
     running all out in the field, and when they got a -- rounded all
     of these up, horses and Troopers and what not ran all across
     the field and brought them back, and they were all on their
     knees, and just then about twelve cans of tear gas was thrown
     into that group; and the children were all excited, and they
     started beating them. I heard screams, and then I looked to --
     back to this end, and these people who were trying to help Mrs.
     Boynton and trying to get her back to consciousness, tear gas
     was thrown right at her feet. And I thought surely they were
     going to miss me --

Q    Go ahead?

A    -- but they didn't miss me; they threw some right at my feet.
     And I moved in the opposite direction, because I watched for the
     fumes, and they pushed it back to me again.

Q    Mrs. Moore, are you a native Selmian?

A    Yes, I am.

Q    And are you widely acquainted among the school teachers there in Selma, Dallas County?

A    Yes, I am.

Q    You have a wide acquaintance there; do you know if many of them have attempted to register and vote?

A    Oh, yes.

Q    Are all of them registered?

A    Oh, no; no; no.

Q    Have many of them been rejected?

A    Numbers have been rejected; nearly all have been down, but have been rejected.

Q    Has it been difficult up to now for a Negro to register and vote in Dallas County, Alabama?

A    Yes, it has; even when I went the last time, I had to have a voucher, I had to pass a test that I am sure just the ordinary person couldn't have passed.

Q    Now, I am directing your attention to the march of -- of Sunday, the attempted march on Sunday, March 7; after the incident which you have testified about occurred, did you then come back across the bridge into Selma?

A    I came back, but I was brought back in an ambulance.

Q    You weren't able to walk back?

A    Huh, uh.

Q    Were you picked up at the place of your knockdown by this

ambulance; will you tell us just how you got into the ambulance and how you got back into Selma?

A    Well, really a white girl called me, and I was excited, because all around me were white and had been beating me and jeering at me, and I was afraid to go, so she came over there and picked me up and put me in the ambulance, and then they put the other folks in, and we started across home.

Q    So you came back across the bridge into Selma?

A    Yes.

Q    Then what happened after you got to -- in the ambulance and came back to the church; did anything occur, anything unusual?

A    Well, all along the street the people kept jeering at the driver and saying ugly things and calling her ugly names.

Q    Were these white persons along the street?

A    Yes, they were.

Q    Was this before he got back into Selma or after he got into Selma?

A    After he got back -- she; it was a girl.

Q    A girl was driving?

A    Uh, huh.

Q    I see; and did they have some difficulty getting you -- were you taken to Brown's Chapel or to a hospital?

A    I was taken to Brown's Chapel.

Q    Have any difficulty getting to the church after they got back in the city limits?

A     Well, some cars were parked in the way, and she had to kind of

      wait for them; other than that --

Q     Was there any difficulty from the police officers or from the

      Sheriff's Posse or deputies?

A     Not at the -- no; no.

Q     And you went back to the church and received first aid?

A     That's right.

                    MR. HALL:  That's all; thank you.

                    THE COURT:  Mr. Doar.

                    MR. DOAR:  No, sir.

                    THE COURT:  Mr. Smith.

                        CROSS EXAMINATION:

BY MR. SMITH:

Q     The march on Sunday afternoon of this past week, March 7, took

      place at about what time?

A     I can't be exact, but it was after two thirty, I believe.

Q     Would you say it would be between two and four o'clock, Sunday

      afternoon just past?

A     I believe -- I believe I would.

Q     It would fall between that time?

A     I believe so.

Q     How long have you lived in Selma?

A     All my life.

Q     Where did the -- where did Major Cloud, of the Alabama State

      Troopers --

A    Uh, huh.

Q    -- stop the march --

A    As near --

Q    -- on Sunday?

A    As nearly as I can get it, it is right under that traffic light
     is where they had this barricade, I believe, I am not sure;
     the -- I couldn't say exactly where, but I believe all the cars
     came across that, you know, where the Old River Road branches
     out.

Q    Well, that is called Water Street, isn't it; Water Street is
     one side --

          MR. McLEAN PITTS:  No.

A    That is across the bridge.

Q    Across the bridge?

A    Yes.

Q    In other words, it would be on the east side of the river; is
     that right; on the side of the river nearest Montgomery, I will
     say --

A    That's right.

Q    -- is that right?

A    That's right, sir.

Q    How far from the bridge did Major Cloud, the State Trooper,
     first confront the crowd?

A    You see, he was talking through a megaphone -- megaphone, I
     think.

Q    Were the State Troopers out in the highway?

A    We -- one or two, but all of them were across the road, they were flanked across the highway.

Q    The State Troopers were?

A    The State Troopers were flanked across this way, and the men on horseback were right over there, and the possemen were right--

Q    In your judgment, how many State Troopers were there?

A    Oh, it looked like -- looked like hundreds to me, but I was so excited, it may not have been that many.

Q    Approximately how many marchers were there?

A    I guess maybe about between four and six hundred.

Q    Between four and six hundred marchers?

A    I believe.

Q    All right.  Now, you testified, I believe, that Major Cloud gave the order for the marchers to disperse --

A    (Nodded to indicate affirmative reply)

Q    -- and go home; is that right?

A    Go to church or to home.

Q    Go to church or to home; now, when he gave this order, where was Major Cloud?

A    He was at the head of the line.

Q    Was he in the middle of the road?

A    I -- I couldn't see him; I couldn't see him.

Q    You couldn't see him?

A    I could just hear him.

370

Q   Were the marchers in the middle of the highway?

A   No; no, we were on the side of the highway; we were on the left
    hand side, because we were marching to face the cars.

Q   Were all of them on the left hand side or --

A   All of the marchers were, but there was a busload of Negroes on
    the other side.

Q   All right.  Now, you say that Major Cloud, when he gave the
    order, said, "I will give" -- or in substance, "I will give you
    two minutes to disperse and go to the church and to your home";
    is that correct?

A   That is correct.

Q   How far were you from the head of the -- of the crowd?

A   I guess maybe there were twenty-five groups ahead of me.

Q   Could you overhear the conversation between any of the marchers
    at the front and Major Cloud?

A   I couldn't; I could hear only Major Cloud.  I imagine -- he
    said, "I have no word with you," so I imagine somebody must have
    asked him could they have a word with him; I could hear him.

Q   Did he say, "I will give you two minutes," and take his watch
    out?

A   I couldn't see him.

Q   You couldn't see him?

A   No.

Q   You mentioned that there were crowds of white people who were
    not law enforcement people that were jeering?

371

A    That's right.

Q    Where were they?

A    They were on the other side or the right hand side of the road, of the highway.

Q    Marchers were on the left hand side?

A    That's right.

Q    And the white people were on the right hand side?

A    That's right, sir. These that were jeering were on the right hand side; there were some in buildings on the left.

Q    What were they saying, the white people on the right hand side?

A    They were youngsters, I imagine too young to be deputized, I imagine, but they said -- oh, they said every ugly thing you can think of.

Q    Did they use profanity?

A    Told them to get me up and get me away from there, if they couldn't do it, let them do it.

Q    Did any of them curse?

A    I heard cussing, but I couldn't swear they were the ones doing it.

Q    How many, in your opinion, how many white people were over there on the right hand side of the road jeering?

A    I guess about forty or fifty youngsters.

Q    About forty or fifty; were they boys and men?

A    They looked more like youngsters than men; but however, they could -- they could have been men; I don't know.

372

Q    Did they look like teenage boys?

A    They did.

Q    Any of them have any weapons?

A    If they did, I didn't see them.

Q    Sticks or bottles or --

A    I didn't see anything --

Q    Didn't see anything?

A    -- and they didn't move out of that spot, so I couldn't -- I couldn't say.

Q    All right.  Now, you mentioned that a State Trooper struck you?

A    I --

Q    I believe you said three of them?

A    Four, to be exact, struck me.

Q    Four?

A    Struck me, but one didn't strike me, and then another one that cursed me, so didn't strike me, either.

Q    Did they strike you with a billy club or a stick --

A    (Nodded to indicate affirmative reply)

Q    -- police stick?

A    Uh, huh.

Q    Did they strike you in the head?

A    No; no, didn't strike me in the head.

Q    How did they strike you with a billy stick or the club?

A    Well, the first one struck me just like this, at the back of my neck, and I fell to my knees; then the next one struck me right

373

here, and I fell on over.

Q    Hit you with it?

A    That's right.

Q    Now, you said you were not hospitalized?

A    No.

Q    But you did leave the area in an ambulance; is that right?

A    That's right.

Q    Now, I believe you said that as you drove or the ambulance --
     as the ambulance proceeded down the street, there were crowds
     of white people along the street?

A    Uh, huh.

Q    Large numbers of them?

A    (Nodded to indicate affirmative reply)  In little --

Q    All of them had turned out for it, hadn't they?

A    I think it was -- I think it was thought to have been a Roman
     Holiday, and lots of them were there to see the sights.

Q    Just practically all the white people in Selma had gathered
     there around the area of this march?

A    Well, I don't think they let them come beyond the River Bridge,
     but some had already gotten over there before we got there.

Q    How many people -- how many white people along the parade route
     or the march route would you estimate?

A    Every building was filled, and every corner was -- just like --

Q    Were they jeering and saying ugly things to the marchers?

A    Some of them said something, but most of them didn't say a word;

374

they just looked and shook their heads.

Q    In your judgment were the white people who were standing by
     hostile and mad and emotionally upset about the marchers?

A    Yeah, they -- they looked as if they were real filled with hate.

Q    Filled with hate?

A    That's right.

Q    Did you see any of the bystanders -- as you came in the ambulance
     did you see any of them with sticks or bottles or any kind of
     weapon in their hands?

A    No -- you mean white people?

Q    Yes?

A    No, I didn't see any.

Q    White people?

A    Huh, uh; I didn't see it, but they could have had, because I
     kept trying to revive Mrs. Boynton, and I don't know what they
     had, because I just look out every now and then when they would
     -- when they would holler so loud at this little lady driving
     the bus -- driving the ambulance.

Q    And you said when they hollered at her, they cursed her?

A    Many of them cursed her.

Q    The white people cursed the driver --

A    The white people.

Q    -- of the ambulance?

A    That's right.

Q    Many of them did?

375

A    Many of them did; uh, huh.

Q    In your judgment was this a pretty explosive situation?

          MR. NABRIT:  Objection, your honor.

Q    Sunday afternoon?

          THE COURT:  Overrule; you can answer it.

A    What do you mean by explosive?

Q    Could a lot of people have gotten hurt, white people and Negro
     citizens?

          MR. NABRIT:  Object, your honor, about what could
have happened; that is opinion question.

          THE COURT:  Asking her opinion; she was there, she
has testified; I will permit it; objection is overruled.  Do you
understand that question?

A    Do you mean that Negroes would have hurt white people?

Q    No, I don't mean that at all.

A    Well, if the white people had not bothered Negroes, it would
     have been peaceful, they would have gone back to the church
     without any incident.

Q    If the white people had bothered the Negroes?

A    If the white people --

Q    Wait a minute; wait a minute.

A    If they had bothered Negroes, I don't know.

          MR. NABRIT:  Objection again; that is a speculative
question.

          THE COURT:  That is getting off too speculative, Mr.

Smith.

        MR. SMITH:  All right, sir.

Q    I want again -- maybe you have said; I want your opinion and judgment as to how many white people were in the area of the marchers this past Sunday afternoon?

        MR. NABRIT:  Objection, until he defines the area.

Q    In the -- within a block of the marchers?

A    Really, all the -- all the buildings that we passed were filled, and on the side were whites.

Q    People standing on the sidewalk?

A    But I -- on the sidewalks on the opposite side --

Q    Yes?

A    -- on the far side, but I couldn't tell how many it was, because they had instructed us to look forward and march forward; I could just see them before I got to them, but not enough to tell how many, because it was just gobs of them, I thought.

        MR. SMITH:  I believe that's all.

        THE COURT:  Mr. Pitts.

BY MR. McLEAN PITTS:

Q    Did you -- in this march on Sunday afternoon, you came from Sylvan Street to Alabama Avenue and thence to Broad Street; is that right?

A    That's right.

Q    So you entered Broad, you got on Broad Street, which is also U.S. 80; isn't that right?

A    That's right, sir.

Q    And you entered Broad -- Broad -- Alabama Avenue is one block
     north of Water Avenue, isn't it?

A    That's right.

Q    And you had -- and on the corner of Alabama Avenue, on the
     north -- both of the north corners of Alabama Avenue and Broad
     Street, there is two drug stores, Tillman and Pilcher-McBryde;
     isn't that right?

A    That's right, sir.

Q    The police had everything blocked out from that point back to
     the Alabama River Bridge, didn't they?

A    That's right, sir.

Q    And there was a big crowd of white people behind the police lines
     on Tillman's corner and on Pilcher-McBryde; isn't that right?

A    That's right.

Q    And there were a few scattered people in the block between
     Alabama Avenue and down to Water Street when your -- when you
     were going out; isn't that right?

A    That's right.

Q    Now, when you came back -- no, withdraw that question.  When
     you got across the River Bridge, there is a lot of businesses
     over there, aren't there, on both sides of that?

A    That's right.

Q    And it is -- there is a road on the outside of U.S. 80 on each
     side that goes to those businesses, isn't it, for -- from the

bridge all the way down to the traffic light -- to the traffic

light; isn't that right, the old --

A   That's right.

Q   -- the Old River Road you are talking about?

A   That's right.

Q   Now, was it or was it not cars just lined up on both sides of

that in front of those businesses out there?

A   You know, I really don't know, because I couldn't see; I saw

a few cars right out at the boulevard, police cars, and then I

saw cars lined all the way across the highway 80, but I didn't

get up to there to see if they were on the other side.

Q   In fact it -- there was a big group of white people out there

who were not law enforcement officers; isn't that right?

A   That's right; on the left -- on the right.

Q   Well, they were on both sides, wasn't they?

A   Yes, they were on both --

Q   Over there where Lehman's Pontiac is, over there where those

tractor companies, and where --

A   They were in Lehman's Pontiac; they weren't on the sudden side

there.

Q   And there where the Glass House -- you know where that is, don't

you?  Drive In up there?

A   I got about thirty -- I got about thirty feet from Lehman Pontiac

Q   Lehman Pontiac?

A   That's right.

Q  All right.  Now, that was where you were, then, when you got

hit; is that right?

A  That's right.

Q  And you were in this island between U.S. 80 and the road that

runs in front --

A  To the left.

Q  -- in front of Lehman Pontiac; that's right?

A  That's right.

Q  All right; now, when you went back across the River Bridge --

I meant after the -- after the ambulance got you --

A  Uh, huh.

Q  -- and carried you back across the River Bridge --

A  Uh, huh.

Q  -- I am asking you whether or not that crowd of white people

was one block down below there had moved up to Water Avenue,

and there was a big crowd of people at the foot of the Alabama

River Bridge at Water Avenue?

A  Well, I -- I couldn't say, because I was so excited at that

point, Mrs. Boynton had one of those agues, and I had to take

my coat off, and by the next time I looked up, we on Water

Avenue.  Now, I don't know if they were standing at the River

Bridge or if they were still at Pilcher-McBryde's and --

Q  All right.

A  I can't say.

Q  But you saw groups of white people all along the route --

380

A    Yes, sir.

Q    -- that you went?

A    After I looked back out of the window.

Q    All right, who were not law enforcement officers?

A    That's right.

Q    All right.  And they were hollering at the --

A    Driver.

Q    -- driver?

A    Uh, huh.

Q    Then after you got back down to Brown's Chapel, you were carried into the first aid in the pastor's parsonage, in the parsonage?

A    After I got back to the church, I went into the church; when I got out, I went into -- I went into the parsonage first, and then I went into the church.

Q    Now, how long did you stay in the church?

A    Oh, until they -- just until service was over, I stayed there the rest of --

Q    How long did the services last?

A    How long did it last?

Q    Yes, I am talk -- you said you stayed there until the services were -- I didn't know any services were going on in Brown's Chapel that afternoon, you --

A    You know, after they got back from the march, they had service, and I couldn't be -- I mean, I can't tell in terms of hours, because --

381

Q    All right.

A    -- because the fumes of the gas were so --

Q    The point is, you didn't get back to the street in front of Brown's Chapel -- you go out in front of Brown's Chapel?

A    Yes, I stood out there on the parson's porch.

Q    All right, that is what I am trying to get; now, did you see any bricks and bottles being thrown down there?

A    I didn't see any bricks or bottles being thrown, but Captain Baker said that they were throwing them; I didn't see them, but he said they were throwing them.

Q    He is the Safety Director of the City of Selma; is that right?

A    That's right.

Q    And did he come down there and ask people to stop throwing bricks, and a megaphone and talking, did he try to get them to stop?

A    I don't know, because he didn't -- he didn't let us stand on the porch long.

Q    Where were you when he told you that?

A    I was standing on my parsonage porch.

Q    He told you to get in the house?

A    Get inside.

Q    Because bricks and rocks were being thrown; is that right?

A    He said, "Get in the house, we can't protect you out here."

Q    "Can't protect you out here"; now, have you talked to Mr. Baker from time to time; have you had -- have you been present when

he was talking with the demonstrators down there at Brown's
Chapel?

A  No.

Q  Do you know on several occasions -- have you heard him on several
occasions tell that police officers were trying to protect these
people?

A  I can't say that I have.

Q  Now, you are a teacher at the R. B. Hudson High School; is that
right?

A  That's right, sir.

Q  Do you know what encouragement has been given by the Student
Non-violent Coordinating Committee or the Southern Christian
Leadership Conference or any of these organizations in this
movement that has been going on in Selma encouraging juveniles
to remain out of school?

A  I know nothing of it.

Q  You know that the Hudson High School has been operating -- that
it has been a sixty-two per cent delinquency over there, didn't
you, I mean in the attendance?

A  I couldn't help but know that, because they send it out over
there.

Q  And there is a sixty-two per cent delinquency; isn't that right;
in attendance?

A  Uh, huh; possibly thereabouts.

        MR. NABRIT:  Object, unless he establishes a period

of --

Q   Since this all -- this movement started?

        MR. NABRIT:  That is not specific.

        THE COURT:  Overrule.

Q   Is that right?

        THE COURT:  She can answer it if she knows.

Q   There has been a big nonattendance of students since this
movement started, hasn't it?

A   There has been a -- we always have a lot of them, because we
have a lot of students, but we had more after January -- after
February 1.

Q   Were you in the march on Tuesday?

A   Yes, I was.

Q   Now, how many days have you haven't been to school?

A   I haven't missed any days except yesterday they asked me to come
here --

Q   Tuesday?

A   -- and today.

Q   Tuesday?

A   I did not miss Tuesday; I hadn't missed a day.

Q   What time did you leave the school on Tuesday?

A   I left the school when school was out, just before school was
out.

Q   And what time did that march took place?

A   About three thirty, I imagine; I am not sure.

384

MR. McLEAN PITTS:  All right.

THE COURT:  Anything further from this witness?
Redirect.

REDIRECT EXAMINATION:

BY MR. HALL:

Q  Mrs. Moore, you testified about crowds of whites you saw along
   the way, jeering whites?

A  Uh, huh.

Q  Did you say they were jeering, and you heard cursing?

A  Yes, I did.

Q  And there was police activity in the area; what was happening
   at the time you -- was this while you were marching out across
   the bridge or while you were coming back that you saw this?

A  Coming back.

Q  Coming back?

A  Uh, huh.

Q  You didn't see these large crowds going out across the bridge?

           MR. McLEAN PITTS:  Wait a minute; we object to that;
he is testifying.

           THE COURT:  Do not lead the witness, please.

           MR. McLEAN PITTS:  We object to that.

           MR. HALL:  Thank you, your honor.

Q  When did you see them?

           THE COURT:  You can answer that.

Q  Tell us when you saw the large crowds that you testified about?

A   I saw crowds at all times, but not specifically; you see, I

am coming and looking in front of me.

Q   Yes?

A   And I just saw the crowds to the side --

Q   You saw --

A   -- and in the windows, store windows and store openings.

Q   Let's see if I understand you; are you testifying what people

you saw along the street or people you saw inside of buildings

or windows or something -- let's see if we can distinguish these

crowds of people; did you along the way see some crowds of people

at any time?  If so, tell us when and where?

        THE COURT:  Talking about white people?

A   Yes, I --

        THE COURT:  Talking about white people?

        MR. HALL:  Sir?

        THE COURT:  Talking about white people?

        MR. HALL:  Yes, sir.

Q   Crowds of white people along the way?

A   Yes, I saw them.

Q   Where was this, and at what time?

A   They were on the opposite side of the street when they were on

the street, and in the windows and doors, or when they were on --

when they were on the side with us.

Q   Did you see the police chase any of them at all?

A   White people?

386

Q   Yes, ma'm?

A   No.

Q   Did you see the police, the Sheriff's deputies, or the Troopers
    throw any tear gas at them?

A   Oh, no.

Q   Did you see them --

A   No.

Q   -- beat up any of the white people you are talking about?

A   No; huh, uh.

                MR. HALL:  That's all; thank you.

                THE COURT:  Recross; Mr. Smith.

                    RECROSS EXAMINATION:

BY MR. SMITH:

Q   Did you testify in the voter registration suit in Federal Court
    in regard to the number of times that you had attempted to
    register?

A   In October?

Q   Whenever it was?

A   Yes.

Q   Have you at any time testified in Federal Court --

A   Uh, huh; yes, I have.

Q   -- in Selma in regard --

A   Huh, uh.

Q   Where were you when you testified?

A   Right here, upstairs.

Q   Here in Montgomery.

            MR. SMITH:  All right; thank you.

BY MR. McLEAN PITTS:

Q   Were you -- were you in the march on Saturday before the Sunday
march, the one you are talking about, on the Court House?

A   On Saturday?

Q   On Saturday before last Sunday, on last Saturday?

A   No; no; no, I was over here.

Q   On last Saturday?

A   That's right.

Q   All right.  Now, were you in the group of teachers that marched
down to the Court House?

A   Yes, I was.

Q   And you went down there after the Court House was closed, didn't
you?

A   Yes.

Q   Late in the afternoon, didn't you?

A   Yes.

Q   Is that right?

A   That's right.

Q   Uh, huh; and Mr. -- and Sheriff Jim Clark advised you all that
-- that the Court House was closed, didn't he?  At the Lauderdale
Street entrance, I mean, didn't he -- I mean Alabama Street
entrance, didn't he?

A   That's right.

Q   Were you up front where you could have heard what took place?

A   I was up front.

Q   And Mr. -- and Sheriff Clark went back in, and you all insisted on going in the Court House after it was closed, and took Mr. Edgar Stewart, who is President of the School Board, and Mr. Pickard to come out there and try to talk to you all to ask you to leave, didn't you?

        MR. NABRIT:  Objection; compound question, there is two or three questions in one.

        THE COURT:  You need not argue your objections; I will call on you if I want any grounds, that is a standing rule in the court; objection is sustained.

Q   Well, did Mr. Pickard and Mr. Stewart come out there and address that body?

        WITNESS:  May I explain, do a little explaining?

        THE COURT:  Well, your lawyers, or the lawyers that conducted the direct will do that; as long as you can, you just answer the questions that this lawyer asks, and if you get to where you cannot answer it, say so; if you get to where you think you need to explain your answer, after you give your answer you may explain it.  Now, do you understand the question?

        WITNESS:  I understand.

A   When we went to the Court House, people were in the Court House, and it was not closed when we first got there.  And he said that the office was closed, the voter registration office, and

389

that he would -- that we -- our leader asked to go in and see

for themselves, just pass -- all we wanted to do was pass through.

Q    Your leader wouldn't take the word of the Sheriff that the

Voter Registration Board was closed, did he -- would he?

A    He took his word that it was closed, but he just wanted to walk

through the Court House, since it was open.

Q    Well, Mr. Edgar Stewart had to come out there, didn't he?

A    Yes, he did; I -- I -- somebody, I guess it was --

Q    You know Mr. Edgar Stewart?

A    No.

Q    The President of the School Board?

A    I know Mr. Pickard.

Q    And he was there; he was there, wasn't he?

A    That's right.

          MR. McLEAN PITTS:  All right.

          THE COURT:  Any further redirect?

          MR. HALL:  That's all; that's all, your honor.

          THE COURT:  All right.  We will recess for noon,

then, gentlemen.  Do you have any matter you wish to take up before

the noon recess?

          MR. DOAR:  I have one matter, your honor.

          THE COURT:  All right.

          MR. DOAR:  I would like to -- I understand that the

plaintiffs are almost through with their case, and does the court

wish that the United States then proceed?

THE COURT:  Yes.

MR. DOAR:  I would request leave to get a projector in the court room --

THE COURT:  All right.

MR. DOAR:  -- for the purpose of showing film.

THE COURT:  You can have that done during the --

MR. DOAR:  During the noon recess?

THE COURT:  During the noon recess; that's right. Just keep it back out of the way until we get to where we are going to use it, and I will take a recess long enough -- when we get to where we -- we are going to put it up, I will recess the court long enough for it to be put up if we -- when we reach that point.

MR. McLEAN PITTS:  I take it you will entertain objections to any moving pictures; is that correct?

THE COURT:  I will entertain objection to any evidence before it is admitted.

MR. McLEAN PITTS:  At that time.  Now, Judge, we have -- we haven't brought any witnesses over here, relying on the fact that possibly we are going to take all day today.

THE COURT:  Well, Mr. Smith and his witnesses and evidence come before yours.

MR. McLEAN PITTS:  Yes, sir; and we were relying on this, we thought we would wait, if you were going to be in session on Monday, we would make arrangements to have our witnesses here on Monday.

391

THE COURT:  Well, wait until recess time this afternoon, then I will determine if we are going to hold court tomorrow, if so how long, and whether or not it will be necessary for you to get some of your witnesses here.

MR. McLEAN PITTS:  All right.

THE COURT:  You will be given adequate notice.

MR. McLEAN PITTS:  All right.

MR. SMITH:  May I ask, do you expect to use all afternoon?

MR. DOAR:  I don't think we will use all afternoon; no.

MR. McLEAN PITTS:  You think we should be ready then to go forward?  Do you have any idea as to the time?

THE COURT:  Since it is indefinite to that point, I say yes, get ready.

MR. NABRIT:  Is there any objection to excusing Mr. Early Butler and Mrs. Moore?

MR. McLEAN PITTS:  No, not as far as I am concerned.

MR. DOAR:  I would like to keep Mrs. Moore here.

MR. McLEAN PITTS:  You would like to keep her?

MR. DOAR:  Yes, sir.

THE COURT:  Any objection to those two witnesses, Mr. Smith?

MR. SMITH:  No, sir.

THE COURT:  All right.

MR. DOAR:  Keep Mrs. Moore.

THE COURT:  Any other matter?  Let me ask this, in connection with some of this voter testimony or attempts to register that started coming in this case: I understand, I think, the history of -- of the case in the Southern District, United States against Atkins, and I understand what Judge Thomas found and said in -- in that case in 210 Federal Supplement, succinctly and to the point that I am interested in now, he said the evidence in the case did establish and he made a finding of pattern and practice of discrimination against Negro people in the past, prior to the time that -- that he was hearing the case, but he said he found no such discrimination at that time, and he refused to issue the injunction.

MR. McLEAN PITTS:  (Nodded to indicate affirmative reply)

THE COURT:  Upon appeal, the Fifth Circuit Court of Appeals reversed him insofar as his refusal to issue the injunction is concerned.  They made no additional findings of pattern and practice and discrimination from the evidence; am I correct to that point?

MR. DOAR:  You are correct.

MR. McLEAN PITTS:  Yes, sir.

THE COURT:  Now, I understand that Judge Thomas -- now, that Fifth Circuit opinion is in 323 Federal Second; I understand that Judge Thomas has, since that time, and possibly

393

recently, made additional findings in -- in the United States
against Atkins; is that correct?

MR. DOAR:  That is right; February 4.

THE COURT:  Do those additional findings relate to
a pattern and practice of discrimination that may now exist?

MR. DOAR:  It relates to a pattern and practice of
discrimination that existed at the time he held the hearing, in
October, 1964.

THE COURT:  Mr. Doar, will you -- will you get me
a copy of Judge Thomas's orders that have been entered since the
remand of that case to him by the Fifth Circuit?

MR. DOAR:  There has been three orders entered.

THE COURT:  Will you get copies of them for me --

MR. DOAR:  Yes, I will.

THE COURT:  -- please?  That is a Southern District
case, and they aren't reported as far as I know, but I have some
knowledge that additional orders have been entered, and I would like
to see those orders so that I may intelligently, or attempt to do
it intelligently, determine whether or not it is necessary for me
to hear any evidence on this discrimination to vote in this case.
It may be; it may not be.

MR. McLEAN PITTS:  That is the orders we have been
talking about here, where he went into detail about the line and
the book and all that.

THE COURT:  If he says it is three of them, I would

like to see them, please.

MR. DOAR:  We also are prepared to offer testimony with respect to the records of the Board up through the 15th of February.

THE COURT:  Well, I would like to see those opinions before -- before I get to the point of being required to rule on the admissibility of -- of evidence as to pattern and practice for discrimination by a Board of Registrars in another District, when that is not one of the primary issues before me in this case.

MR. DOAR:  We are -- we wouldn't offer the evidence for that purpose, had no intention --

THE COURT:  It wouldn't be admissible for that purpose, but it may not be necessary to go into it to any degree; it will depend upon what Judge Thomas has found from the evidence that he has taken in that case in these three supplemental opinions and orders.

MR. DOAR:  Is the court also familiar with the court's -- Judge Thomas's ruling in the Perry County case?

THE COURT:  Mayton case?

MR. DOAR:  Yes.

THE COURT:  That has been published.

MR. DOAR:  Choctaw County?

THE COURT:  No, that has not been published, as far as I know; but the Mayton case, United States against Mayton, 335 -- well, that is a Fifth Circuit -- that is the Fifth Circuit version

of Mayton.

    MR. DOAR:  Judge Thomas's orders; I refer to Judge Thomas's orders in that case?

    THE COURT:  If it is -- if it hasn't been published in Federal Supplement, I do not have it.

    MR. DOAR:  I would like to present that to the court.

    THE COURT:  I would like to have it, and I would like to have any other orders that have been entered with reference to voting rights cases in the Selma area.

    MR. DOAR:  That would -- that would --

    THE COURT:  And as the witnesses have referred to it, in the Black Belt area.

    MR. ADAMS:  We have some evidence with reference to Marion on that particular point of voting, your honor.

    THE COURT:  Well, we will -- I need these -- I need these unpublished findings and judgments of that court over there before I know and can determine how much of that is necessary to hear in this case.

    MR. DOAR:  All right, sir.

    THE COURT:  If you will, get them for me.  Anything else? Mr. Pitts?

    MR. McLEAN PITTS:  No, sir.

    THE COURT:  Mr. Smith?

    MR. SMITH:  No, sir.

    THE COURT:  You gentlemen?  Recess until one thirty-five -- one forty-five.

(At which time, 12:35 p.m., a recess was had until 1:45 p.m., at which time the hearing continued)

THE COURT: Next witness for the plaintiffs.

MR. ADAMS: Albert Turner.

MR. AMAKER: Your honor, just before we call our next witness, there are a couple of matters. Before the recess the court was inquiring about seeing copies of any orders or opinions involving the voting situation, generally, in the Black Belt counties. On January 23 of this year Judge Thomas, in case of Boynton versus Clark, issued a temporary restraining order in which he included certain findings of fact of a recent date; I have a copy of that opinion here with me. And that opinion and order was later amended the next following week, which I will be happy to give to -- to leave with the court.

THE COURT: I requested Mr. Doar as amicus to get all of those for me; if you will, channel it through him.

MR. AMAKER: I will channel it through him. There is one other matter. We subpoenaed a Mr. Leon Daniel of the Birmingham Post-Herald. We do not intend to use him; I wonder if it would be all right --

MR. McLEAN PITTS: We have already agreed he can be released; I have already agreed to that; we have agreed.

MR. AMAKER: All right.

MR. ADAMS: Albert Turner.

*****************