<u>ALBERT TURNER</u>, witness for the Plaintiffs, having been duly sworn,

    testified as follows:

DIRECT EXAMINATION:

BY MR. ADAMS:

Q   Would you state your name, please?

A   Albert Turner.

Q   Where do you live?

A   Route 1, Box 8, Marion, Alabama.

          MR. McLEAN PITTS:  Where; what?

          MR. GAYLE:  Marion.

Q   Route 1?

A   Route 1, Box 8, Marion.

Q   How long have you lived in Marion, Alabama?

A   Twenty-eight years; twenty-nine, now.

Q   How old are you; how old are you?

A   Twenty-nine.

Q   You have lived there all of your live?

A   That's right; all of my life.

Q   And what kind of work do you do?

A   Well, I am a bricklayer by trade, but I -- I have recently signed

    with S.C.L.C.

Q   All right.  Now, you are President of the -- a -- an organization

    in Marion, Alabama; is that correct?

A   That's right.

Q   What is the name of that organization?

A    Perry County Civic League.

Q    How long has that organization been in existence, Mr. Turner?

A    Well, it was started in 1962, early part of '62; I don't know exactly no date or nothing, but early '62.

Q    Can you tell us the reason for its formation?

A    Well, basically --

          MR. McLEAN PITTS:  We object to reason for the organization.

          THE COURT:  Overrule.

Q    Answer; you may answer?

          MR. GAYLE:  We except, your honor.

A    Basically, it was formed for the purpose of helping Negroes or encouraging Negroes to become registered to vote; that was the main objective.

Q    All right.  Now, is this organization in any way affiliated with the Southern Christian Leadership Conference?

A    It is; it is an affiliate of the Southern Christian Leadership Conference.

Q    And has it sponsored any type activities in Perry County, so far as registration and voting is concerned?

A    It has.

Q    What activities has it sponsored, so far as registration and voting is concerned, since its formation in 1962?

A    Well, first of all, in 1962 we had quite a problem trying to become registered, and with the help of the Federal Government we

399

received a temporary injunction against the Registrars in Perry
County, and this injunction enjoined the Registrars from
discriminating --

        MR. SMITH:  We object to this, if the court please.

        THE COURT:  I will read the injunction; go ahead.

Q   All right, he is familiar with that.  Mr. Turner, will you tell
us, if you know, how many Negroes are registered to vote in
Perry County?

        MR. McLEAN PITTS:  We object to that; that is not
the best evidence.

        THE COURT:  Overrule; if you know.

        MR. McLEAN PITTS:  We except.

A   The last thing I saw, the newspaper --

        MR. SMITH:  We object to what he saw in the newspaper.

A   -- was two eighty-eight.

        THE COURT:  That will be stricken.

        MR. ADAMS:  All right.

Q   Do you know, have any independent knowledge, about how many
Negroes are eligible to vote in Perry County?

A   From two seventy-five to three hundred -- oh, you say eligible?

Q   Yes?

A   Eligible; oh, it's five -- five thousand and two hundred Negroes
eligible to vote in Perry County.

Q   Does that -- do you also know how many actually do vote, Negroes,
in Perry County?

400

A    Oh, from two seventy-five to three hundred.

        THE COURT:  Are these figures set out in the Mayton decree?  Are they, Mr. Doar?

        MR. DOAR:  Yes, sir; they are.

        THE COURT:  All right, let's get along.

        MR. ADAMS:  All right.

Q    Mr. Turner, did your organization on February 18 sponsor a demonstration in Marion, Alabama, so far as registration and voting is concerned?

A    It did.

Q    Would you tell the court what the nature of this demonstration was?

A    Well, we formed the --

        MR. McLEAN PITTS:  Your honor, I hate to keep interrupting, but I want to object to anything -- insofar as the defendant, Clark; I ask that it be limited to other defendants, other than --

        MR. ADAMS:  We will tie the defendant, Clark, up with this.

        MR. McLEAN PITTS:  -- in Perry County.

        THE COURT:  Well, I will hear it; and if it doesn't apply to Clark, I won't consider it as to Clark.

        MR. McLEAN PITTS:  All right.

        THE COURT:  But I will hear it; I can't tell until I hear the testimony.

Q    You may testify?

A    Would you ask your question again, now?

Q    The nature of --

        THE COURT:  The purpose of the demonstration.

Q    -- the demonstration on February 18 in Perry County, in Marion, in Perry County?

A    That night we attempted to demonstrate, and we lined up in twos, marched out of the church for about fifty feet, twenty-five to fifty feet away from the church door, and there we was halted by the high Sheriff of the county, and we walked up to him; in fact about it, we just walked up to him and stopped. And when we stopped, then the Chief of Police for the City came up and told us this was unlawful assembly and to disperse and go back to our church or go back home. And as soon as he said that, then he retreated from us and went back to his car and got on the loudspeaker, and he said over the loudspeaker that, "This is an unlawful assembly, break up, go back home." And about this time State Troopers was a ring -- ringed the whole circle, and they started advancing from the lower end of the street, and they was moving up to where we had stopped, and also backed up -- Mr. Loftis was also backed up by a group of State Troopers where we stopped, and before Mr. Harrison had a chance to announce the second time for us to break up and go back into the church --

        MR. McLEAN PITTS:  Wait a minute, your honor; I

402

object to before Harrison had a chance to --

        MR. GAYLE:  That is conclusion.

        MR. McLEAN PITTS:  -- to announce the second time, because if Mr. -- if he knows that Mr. Harrison made a -- what I am talking about, he don't know Mr. Harrison was going to make a -- another announcement.

        MR. ADAMS:  He is testifying to that, Judge.

A    This is what I am saying now, he was making an announcement; before he got a chance to get through making it.

        MR. McLEAN PITTS:  That is different.

A    That is what I said.

Q    That is what he said; go ahead and testify?

A    Before Mr. Harrison got a chance to get through making that announcement on the loudspeaker, the State Troopers had advanced, and they walked up to Willie Bolden, a worker from S.C.L.C., who was also leading the line with me, and they asked Mr. Loftis if this was an outside agitator, and Mr. Loftis told them, "Yeah, this is an outside agitator," and two or three Troopers grabbed the man, pulled him out of line, and started whipping him, Sheriff threw him the other crowd of State Troopers who was backed up behind them and carried him to jail. And at this time Reverend Dobynes said, "Kneel to pray on the streets," and while he was attempting to pray, two or three Troopers walked up and grabbed him and asked Mr. Loftis, said, "Ain't this one of them outside agitators, too?"

And he said, "Yeah," and then he started clubbing Reverend Dobynes right there on the ground, and they drug him from this spot to the jail. And about this time all the Troopers had kind of gathered in on the whole line, and they had come from out in the street in various points, so a group went down back to the church steps, which was about twenty-five feet, I guess, from where we was standing, and there they pulled George Baker, a white S.C.L.C. worker, off of the steps, and they started whipping him, and brought him right on by me, on through the crowd, on to the jail. And then they pulled a fourth worker --

        MR. SMITH: Excuse me for interrupting; a worker you say, "They" --

Q    Are you referring --

A    They referred to State Troopers.

Q    -- to State Troopers or what?

A    State Troopers.

        MR. SMITH: All right.

Q    All right.

A    State Troopers. And the State Troopers pulled a fourth S.C.L.C. worker out of the line then, and this worker was about middleways in this line from where we had stopped and -- and the church, itself, and they pulled this boy out the line; I don't know his name.

Q    Let me -- let me condense some of this, Mr. Turner; do you know how many persons who were in this demonstration were injured by

State Troopers of the State of Alabama?

A    Well, I don't know how many was injured by State Troopers; I mean, now, actually speaking, I don't know as anybody --

Q    How many did you see that was struck by State Troopers?

A    At this particular point?

Q    Anytime during this demonstration on February 18 in Marion, Alabama?

A    I wouldn't have seen over four or five people actually struck.

Q    All right, where were they struck?  On their bodies, that I am talking about?

A    Now, these I saw, they were struck in the head.

Q    All right, struck in the head --

A    Yes.

Q    -- with what?

A    Well, they was hit with clubs or whatever you -- the sticks they carry.

Q    Now, how do you know these were State Troopers?

A    I just going by their dress; it was dressed like Troopers.

Q    What kind of dress or uniform were they wearing that night?

A    Well, they had on the blue uniforms and the hats, the hats they use, blue hats.

Q    And this is the uniform you understand is the uniform of the State Troopers --

A    Yes.

Q    -- is that correct?

A   That's right.

Q   Now, is this the same night that a Jimmy Lee Jackson was killed?

A   That's right.

Q   Did you actually witness this shooting?

A   No.

Q   Did you actually see him in the church at Perry County and in
     Marion, Alabama, the night of this demonstration?

A   Yes, I saw him in the church.

Q   Now, was Sheriff James Clark, of Dallas County, in Perry County
     at that particular time?

A   I was told he was.

          MR. McLEAN PITTS:  I object to what he was told.

          MR. GAYLE:  We object.

          THE COURT:  I sustain it; it will be excluded.

          MR. ADAMS:  We except, your honor, on the ground --

          THE COURT:  You need not state your ground.

          MR. ADAMS:  All right.

Q   Now, Mr. Turner, has any of the people in your organization, or
     have any of the people in your organization gone from Marion to
     participate in demonstrations in Dallas County?

A   Yes, they have.

Q   All right, the -- the persons from Marion, were they participants
     in the demonstration that occurred in Selma on March 7?

A   Yeah, they was.

Q   How many of Marion people were in the demonstrations in Selma on

406

March 7?

A    Around a hundred and fifty.

Q    Do you know how many were in that demonstration on March 7; how many Negroes and whites were in the demonstration on March 7 in Selma, Alabama?

A    No, I couldn't give you actual figure on that.

Q    Could you give an estimate?

A    Oh, it was more than five hundred.

Q    Were you in that particular demonstration?

A    Yes, I was.

Q    Where were you in the line on that particular day in the demonstration?

A    I was the second man, I was the next man from the front; in other words, two peoples was in front of me.

Q    And who were those two people?

A    Hosea Williams and John Lewis.

Q    And were you struck by State Troopers on that particular occasion

A    No, I wasn't.

Q    Did you see any other people struck that were in the demonstration?

A    Yes, I did.

Q    Have you conducted demonstrations in Selma -- I mean in Marion, Alabama, on behalf of your organization against discrimination in voter registration?

A    Yes, I have.

Q   How many such demonstrations have you conducted?

A   Maybe a dozen.

Q   Is that your best judgment?

A   Yes, that is a close estimate.

Q   All right, now, the first demonstration that you made against voter registration of your organization in Marion, Alabama, was on February 2; is that correct?

A   That's right.

Q   Tell -- were there any people arrested in that demonstration?

A   No, no one was arrested.

Q   All right, now, on February 3, was there another demonstration?

A   Third -- let me see; no, it wasn't a demonstration that day.

Q   What happened on February 3?

A   Well, on February 3, after school was out, we had a group of childrens came back to meet in Little Rising Star Society Hall, and in that meeting they decided to go and retest the cafes that had been opened to them the day before, and they went to the Corner Cafe, about fifteen students, and they attempted to receive service there, but they was refused. And as they were refused to be served there, they was later arrested and jailed that night. And after they was jailed, then people started gathering in town, and before the night was over, we had a good number of people, maybe three hundred people, gathered that night, and we had a mass meeting. And in that mass meeting we decided that we would demonstrate to let the people know that

we didn't appreciate the fact that the students was arrested for

trying to be served at the lunch counter, and that was our

decision that night.

Q    Well, did you demonstrate on -- in that particular -- on the

next day?

A    Yeah, we demonstrated the next day.

Q    Were there any persons arrested?

A    Yeah, peoples was arrested the next day.

Q    How many people were arrested?

A    About eight hundred.

Q    All right, now, was there at that particular time any order or

injunction against demonstrations at Marion or in Perry County?

A    No, it wasn't.

Q    You had no notice of any ban from the Governor; is that correct?

A    No.

Q    Had you notice of any injunction from any Federal Court?

        MR. ADAMS:  That's all.

        THE COURT:  Mr. Doar.

BY MR. DOAR:

Q    Mr. Turner, in connection with your work as a head of the

Voters League in Perry County, could you tell the court just

what assemblies and activities you engaged in after Judge Thomas

entered his first decree; were you -- let me withdraw that.

Were you able to get registered by the Board of Registrars after

Judge Thomas ruled the first time in Perry County?

A    No, we wasn't.

Q    What did you do then?

A    We did sit down and wrote longhand letters to Judge Thomas,
     a hundred and seventy-five, and in these letters we requested
     that Judge Thomas would give us the right to register, and we
     also tried to let him know what type qualifications we had in
     these letters.

Q    And did -- was that done under your direction and under the
     direction of the Perry County Voters League?

A    Yes, it was.

Q    Subsequent to that, do you know whether or not other Negro
     citizens in Perry County wrote letters to Judge Thomas?

A    Yeah, other people wrote letters to Judge Thomas following that.

Q    And those letters all were written after Judge Thomas made his
     first decree?

              MR. WILKINSON:  We object to that, may it please the
court; letters written to Judge Thomas hasn't got any bearing in
this case.

              THE COURT:  If you know, you can answer it -- well,
it may have.

A    Yes.

              MR. DOAR:  Thank you.

              THE COURT:  Mr. Smith.

                   CROSS EXAMINATION:

BY MR. SMITH:

Q    Do you know of your own personal knowledge that the letters that

were written to Judge Thomas --

A    I do; I carried them to him.

Q    You carried them to him?

A    That's right; gave them to the Clerk.

Q    Did anybody advise you to carry these letters to Judge Thomas?

A    No, they didn't.

Q    You did that, so to speak, on your own?

A    We was advised of our rights, and then we acted after our -- we found out what our rights were.

Q    Who advised you your rights in regard to carrying letters to Judge Thomas?

A    They didn't give us no rights in carrying the letters to Judge Thomas; they says that --

Q    Who advised you -- excuse me, who advised you of your right to carry letters to Judge Thomas?

A    I said they didn't give us no advice on our rights to carry them they give us advice on the right to write them.

Q    Who gave you the advice or -- in the matter of writing the letters?

A    We got it from the Federal Government.

Q    From the Federal Government?

A    Agents and whatever -- investigators or --

Q    Representatives -- any representatives of the United States Justice Department?

A    They -- they told us what our rights were under the 1962 Civil Rights Law, and we then subsequently decided to write these

411

letters after we found out that it was possible to write them.
Now, these men working for the Justice Department let us know
that the 1962 Civil Rights Law did give us the right to write
to Judge Thomas to become registered after there had been a
practice of discrimination found, then we wrote the letters,
and I carried the letters to Judge Thomas, myself.

Q    That was on the advice of representatives or people from the
United States Justice Department; is that right?

A    What was on advice; what you mean?

Q    Writing and carrying the letters to Judge Thomas?

           THE COURT:  He has already said the carrying wasn't,
the authority to write was.

           WITNESS:  That is what I am trying to say.

           MR. SMITH:  I didn't understand that.

Q    Now, did you participate in a demonstration in Selma in the
month of September, 1963, on the steps of the Federal Building
which houses the United States District Court in Selma?

A    No.

Q    You did not?

A    (Shook head to indicate negative reply)

Q    You mentioned that you had conducted or organized or that you
were the leader of approximately a dozen demonstrations that
were carried on in Marion; is that correct?

A    Now, state your question again?

Q    Well, I am just asking that I will be correct; did --

412

THE COURT:  That is correct.

MR. SMITH:  All right.

THE COURT:  That is correct; the record shows that is what he said.

WITNESS:  Yeah.

Q   Were you present at any of these demonstrations?

A   You mean was I actually in every one of them?

Q   No, I am not asking whether you were in them, but I am asking if you were present when the demonstrations were carried on in Marion?

A   Yeah, I was at the church where they originated from in all of them, I am sure of that; in other words, I was there before they demonstrated, I wasn't in every demonstration, itself.

Q   Did the demonstrations on each occasion originate in the church and go out into the public streets?

A   That's right.

Q   Did each demonstration attract any number of white people?

A   No, each one didn't.

Q   Did some of them?

A   Well, yeah, some of them did.

Q   Did some of them attract large numbers of white people?

A   We never did really have large numbers of people in none of our demonstrations, not --

Q   How many people did they attract, in your judgment?

A   I don't think we ever had a hundred people just standing around

413

looking at us.

Q  Did you ever encounter any trouble or difficulty between the
white people who were bystanders when you were marching in the
streets?

A  Yeah, we had trouble that night.

Q  Did some of them have rocks or bottles or bricks or any kind of
weapons that they might have used to -- to injure the
demonstrators?

A  I -- well, I ain't seen nobody with nothing, myself.

Q  But you say you did have some trouble?

A  Yeah.

Q  What was the trouble that you saw, between the white bystanders
and the demonstrators?

A  Nothing more than heckling.

Q  Heckling?

A  Yeah.

Q  Did they use profanity?

A  I have never seen -- yeah; I have never seen a demonstrator
actually get hit from a bystander, if that is what you want to
know.

Q  All right, that is all I want to know.

A  Yeah.

                    THE COURT:  Mr. Pitts.

BY MR. McLEAN PITTS:

Q  This Corner Cafe you talked about down there, that is -- that is

414

right there cater-cornered across from the Court House and
right in downtown Marion, isn't it?

A   Yeah, it is across from the Court --

Q   Huh?

A   It is across from the Court House there in downtown Marion.

Q   And it is owned -- and it is owned and operated by a lady known
as Mrs. Middlebrooks, isn't it?

A   That's right.

Q   Now, did you go down there on February 3?

A   No, I have never been there.

Q   Did you go down there; were you there when --

A   I have never been to the Corner Cafe.

Q   Well, you just testified that --

A   That I have never been to the Corner Cafe.

Q   I am asking you this; didn't you just testify --

A   No, I didn't.

Q   -- that that bunch of students went down to the Corner Cafe and
was refused service?

A   I wasn't no student.

Q   Well, didn't you just testify to that?

A   I said students went, but I have never gone.

Q   All right, so you didn't go, yourself?

A   No, I have never been there.

            MR. McLEAN PITTS:  Now, we move to exclude that
testimony.

415

A    That's right; I have never been to the Corner Cafe.

THE COURT:  Did you see the students going?

WITNESS:  Yeah, I saw the students going.

THE COURT:  Motion is overruled.

Q    I tried to get that out.

A    You didn't ask me that, though.

THE COURT:  You didn't ask him that.

Q    Did you see it, that -- you say you saw it?

A    Yeah, I saw it.

Q    Now, prior to that date, as an actual fact, Mrs. Middlebrooks had served something over fifty Negroes, hadn't she?

A    I don't know nothing about that.

Q    Huh?

A    I don't know that.

Q    Prior to that date?

A    I say I don't know it.

Q    All right, now, what time afternoon was it?

A    When?

Q    When they went down there to get service?

A    It was in the afternoon after school was out.

Q    About what time?

A    Oh, around four, something like that.

Q    And Mrs. Middlebrooks was closing her cafe, wasn't she?

A    I don't know that.

Q    Well, did you see them try to kick the door down?

A    I didn't see that.

Q    And did you -- you didn't -- you didn't see that?

A    No, I didn't.

              MR. McLEAN PITTS:  All right, that's all.

              THE COURT:  Any redirect?

              MR. ADAMS:  None.

              THE COURT:  Recross?

              MR. NEWTON:  Call Paul Simpson.

                **************

PAUL SIMPSON, witness for the Plaintiffs, having been duly sworn,

    testified as follows:

                DIRECT EXAMINATION:

BY MR. NEWTON:

Q    State your name, please?

A    My name is Paul Simpson.

Q    Where you live?

A    I live in Marion, Alabama.

Q    What is your address in Marion, Alabama?

A    Post Office Box 71.

Q    I call your attention to on or about February 18, 1965, the time

    of a night demonstration in Marion, Alabama, were you present at

    Marion, Alabama?

A    Yes, I was present.

Q    Were you present at the Zion Methodist Church?

A    Yes, I was present at the Zion Methodist Church.

Q   Do you know Dallas County Sheriff James Clark?

A   Yes, I do.

Q   Will you point him out in this court room, please?

A   There he is, right there. (Pointed)

Q   On the night of February 18, 1965, did you see Dallas County James Clark in Marion, Alabama?

A   Yes, I did.

Q   On how many occasions?

A   On two occasions.

Q   Where did you first see Sheriff Clark?

A   I first saw Sheriff -- Sheriff Clark when we left the church starting on our march, and then him and T. O. Harris, Sheriff Clark --

Q   Now, just a minute; by T. O. Harris, do you mean the Chief of Police, Mr. T. O. Harris, of the City of Marion?

A   Chief of Police of Marion, T. O. Harris, and Sheriff Clark came up to the line, and Jim Clark --

Q   Just a minute --

A   -- Sheriff --

Q   -- you saw him there at the line?

A   At the line.

Q   All right, did you see Sheriff Clark do anything while there?

A   He grabbed George Baker and pulled him out of the line, and I don't know what Chief of Police T. O. Harris was doing, but he -- but Jim Clark, Sheriff Jim Clark, hit him behind the neck

418

with his left hand.

Q    Hit him behind the neck with his left hand; had he made a fist

of his hand?

A    No, he had not; it was open handed.

Q    Open handed like across the neck?

A    Yes, sir.

Q    You saw this in Marion, Alabama?

A    In Marion.

Q    On February 18, 1965?

A    Yes, sir.

Q    The same Sheriff Jim Clark who is sitting here?

A    Yes, sir.

                    MR. NEWTON:  That's all.

                    THE COURT:  Mr. Doar.

                    MR. DOAR:  No questions.

                    MR. SMITH:  No questions.

                    THE COURT:  Mr. Pitts.

                        CROSS EXAMINATION:

BY MR. McLEAN PITTS:

Q    Where was -- you say this demonstration was going on, you were

marching?

A    Yes.

Q    And where was that in reference to the Court House?

A    In front of the church.

Q    Huh?

419

A    In front of the church.

Q    A church; church faces the Court House, doesn't it?

A    Yes.

Q    Now, how far had you gotten from the church?

A    Who, me?

Q    No, when you saw -- when you say you saw Sheriff Clark pull
     that man out of the line?

A    I was standing up on the steps of the church.

Q    And how -- and where was -- where was T. O. Harris and Jim
     Clark?

A    Directly in front of me.

Q    Directly in front of you?

A    There were people in between us.

Q    Now, how far was it from you to them?

A    About the distance from me to you.

Q    Uh, huh; and you say that you saw this man here, Jim Clark,
     Sheriff of Dallas County, pull George Baker out of the line
     and hit him; is that right?

A    Yes.

Q    Well, did T. O. Harris take him?

A    I didn't understand your question?

Q    Did Chief T. O. Harris take him?

A    I don't know, I was being shoved off of the top of the steps
     then.

Q    You didn't see -- you didn't see Policeman Harris take him at

420

all?

A   He was -- he was there beside him, behind him.

Q   Well, was he arrested?

A   I don't know.

Q   You don't know what happened to George Baker?

A   I don't know; I saw him the next day.

       MR. McLEAN PITTS:  That's all.

       THE COURT:  Next witness.

       MR. AMAKER:  Your honor, are -- we have Mr. -- one more witness who we asked Mr. Smith to secure for us, he is the Governor's Press Secretary, Mr. Jones; I understand from Mr. Smith that he is on his way over here.  He has not yet arrived.  We would like to make him our last witness.  We can let the Government go forward until he does arrive, at which time we would like to ask the court's permission to put him on as soon as he comes.

       THE COURT:  What is the nature of the testimony you seek to elicit from Mr. Jones?

       MR. GRAY:  Merely to prove, your honor, two press releases made through the Governor's office, one banning the night marches --

       THE COURT:  Do you have copies of them?

       MR. GRAY:  We have copies of them.

       MR. SMITH:  Your honor, we have no objection.

       THE COURT:  Have you shown them to counsel?

       MR. SMITH:  No, sir.

421

THE COURT:  Have you seen them?

MR. SMITH:  Yes, sir; we have.  We secured them for him; we have no objection to them.

MR. GRAY:  Counsel for the Governor and Mr. Lingo agrees, but counsel for Mr. Clark did not agree; that is why we are asking to have him here.

MR. McLEAN PITTS:  Let me see them.  Judge, point is he got up here and said I made an agreement yesterday that I hadn't made, that is -- that is where I disagreed.

THE COURT:  He tenders those now to see if they may be admitted as being writings or press releases made by the Governor at the time indicated thereon.

MR. SMITH:  Yes, sir.

THE COURT:  The times on them?

MR. SMITH:  These were statements made by the Governor carried in a press release.

THE COURT:  Are the times written on them?

MR. SMITH:  Yes, sir.

MR. AMAKER:  Your honor, while -- while -- we have two witnesses in the -- sequestered here that we would like to have released and have excused.  Now, I brought the matter up with the opposing counsel, Mr. -- and Mr. Pitts in each case declined to do so.  I would like the court to -- to indicate that from this point on we don't consider them our witnesses and the court so state, if he wants to keep them they are his witnesses.  This is Mrs. Cooper

422

and Mr. Turner, who just testified on the stand.

THE COURT:  All right.

MR. AMAKER:  We don't -- unless he wants to excuse them --

MR. McLEAN PITTS:  Who is that, Turner; who is -- I didn't --

MR. AMAKER:  The Turner who just testified and Mrs. Cooper, who we -- we have never called, don't intend to call.

MR. McLEAN PITTS:  The point is, they are here today, we don't know, we may want to ask them some more questions later on cross examination; I don't want them to come tomorrow, I will say that.

MR. AMAKER:  I just wanted you to understand they were tendered today.

MR. McLEAN PITTS:  I have no objection to those two orders of the Governor.

THE COURT:  Then give them Exhibit numbers, if you will.

THE CLERK:  Plaintiffs' Exhibits 13 and 14.

THE COURT:  All right.

MR. SMITH:  Mr. Jones is here, your honor; I assume we can excuse him.

THE COURT:  Just a minute.  Plaintiffs' Exhibits 13 and 14 have been admitted in evidence by stipulation and agreement of the parties, each of them reflecting press releases purporting

to be, and I take it that they are --

        MR. SMITH:  (Nodded to indicate affirmative reply)

        THE COURT:  -- admitted that they are statements of Governor George C. Wallace on the days indicated?

        MR. SMITH:  That is correct; yes, sir.

        THE COURT:  Is it so stipulated?

        MR. GRAY:  Yes, sir.

        MR. McLEAN PITTS:  (Nodded to indicate affirmative reply)

        THE COURT:  All right, any reason for Mr. Jones to remain?

        MR. GRAY:  No, sir.

        MR. SMITH:  You can be excused.

        THE COURT:  All right, they will be admitted in evidence under that stipulation.

        MR. GRAY:  Plaintiffs rest.

        THE COURT:  Plaintiffs rest.  Case with the intervenor-plaintiff, United States.

        MR. DOAR:  I would like to call Joseph Avignone, A-V-I-G-N-O-N-E.  Get Exhibit 1.

        THE CLERK:  Plaintiff-Intervenor Exhibits 1 through 6 marked for identification.

        THE COURT:  What are they?

        THE CLERK:  All photographs.

        THE COURT:  Six folders?

424

THE CLERK:  Yes, sir.

THE COURT:  All right.

MR. DOAR:  Your honor, this witness has not been

sworn.

THE CLERK:  Please raise your right hand.

(Witness Joseph Mark Avignone sworn by the Clerk)

MR. McLEAN PITTS:  This witness been in court?

THE COURT:  Have a seat, please.

MR. McLEAN PITTS:  Your honor, we invoked the rule,

I question his --

THE COURT:  Have you been in the court room?

WITNESS JOSEPH MARK AVIGNONE:  No.

THE COURT:  Go ahead; go ahead.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*

JOSEPH MARK AVIGNONE, witness for the United States, having been

duly sworn, testified as follows:

DIRECT EXAMINATION:

BY MR. DOAR:

Q   Will you tell the court your full name, please?

A   Joseph Mark Avignone.

Q   For whom are you employed?

A   I am a Special Agent with the F.B.I.

Q   Mr. Avignone, will you speak up in a loud, clear voice so

everyone can hear you; where are you employed?

A   With the F.B.I., the Federal Bureau of Investigation.

Q    In what city?

A    Mobile, Alabama.

Q    Have you -- how long have you been employed as a Special Agent
     of the Federal Bureau of Investigation?

A    Since September of '64.

Q    In connection with your duties as a Special Agent for the F.B.I.,
     were you on duty in Selma, Alabama, on Sunday, the 7th of March,
     1965?

A    Yes, I was.

Q    And were you -- on the afternoon of that day were you performing
     official -- an official assignment for the Federal Bureau of
     Investigation?

A    Yes.

Q    And what was that assignment that afternoon?

A    The assignment was primarily photographic surveillance of any
     incident that would have occurred.  More specifically --

Q    More specifically?

A    -- I was in an airplane flying over the vicinity of the river
     boundary of Selma, over -- over Broad Street, Sylvan Street, in
     this region.

Q    Then were you also flying over highway 80?

A    Over highway 80; yes.

Q    East of the Pettus Bridge?

A    That is right.

Q    And were you piloting the plane, or were you a passenger?

426

A    I was a passenger.

Q    And how many cameras did you have?

A    I had two cameras.

Q    And during the course of that afternoon, did you take a number
     of pictures?

A    Yes.

Q    Did you take them with both cameras or with just one camera?

A    Both cameras.

Q    I would like to show you what has been marked for identification
     as Plaintiff-Intervenor's Exhibit 1, and ask you if you can
     identify it.

               MR. McLEAN PITTS:  Those the same ones?

               MR. DOAR:  They are.

Q    Just generally?

A    Those are the pictures.

Q    And who took those pictures?

A    I took those pictures.

Q    Now, are those all the pictures you took that afternoon, or are
     they just some of the pictures you took?

A    They are just some of the pictures that I took of that afternoon.

Q    Will you tell the court how, in the ordinary course of your
     business as a Special Agent of the F.B.I., the pictures are
     developed?

A    We have been handling this -- under these circumstances I -- I
     have been processing the film, myself.  I have taken the

427

processed negative and made what is called a contact sheet, which is simply a contact of the roll of film, and this provides a means of selection of the photographs to be printed.

Q   And then all of these pictures represent one picture on the contact sheet, that includes all of the pictures that you took that day?

A   That is correct.

Q   Now, are those pictures arranged in chronological order?

A   These pictures are arranged in chronological order, to the best of my ability.

Q   And when you say the best of your ability, is that taking into consideration that you were using two cameras?

A   That is the reason for that; yes.

Q   And can you fix the time between which the pictures were taken?

A   Yes, I would say that they were taken between two thirty, p.m., and roughly three fifteen, p.m.

Q   And looking at the first picture in the -- in the Exhibit, what does that portray?

A   This is a picture of the cars and general scene of highway 80.

Q   Which -- in relation -- where in relation to the Pettus Bridge?

A   Oh, the Pettus Bridge would be at the upper portion of the picture.

Q   And when you say cars, are those -- do you know whether those are official cars or private cars?

A   They are Alabama Highway -- or Alabama State Trooper cars.

Q    And taking a look at the last --

A    I mean not all of them, but I mean the ones that are parked
     along the highway; there are many other cars in the picture
     parked off around restaurants or buildings and so forth.

Q    Take a look at the last picture in that series; what does that
     portray?

A    That was a picture taken after my return to Selma; it was taken
     from the ground, and it was taken in front of or in the area
     of Brown's Chapel.

Q    Now, leaping back, when was the -- was the second to last picture
     an air shot?

A    Yes.

Q    And where is that taken?

A    Well, now, this would be the -- I believe that is Water Street
     and Broad Street.

Q    And on which end of the bridge is that taken?

A    That would be on the Selma side, the city side.

Q    Now, in connection with some of those pictures, I ask you whether
     or not there are included in Exhibit 1 a blowup of the eleven by
     fourteen picture that is -- a blowup of one or more of the
     eleven by fourteen pictures that is contained within Exhibit 1?

A    Yes, that picture -- there are.

Q    Is it fair to illustrate that to say that the second or the
     third from last picture in the book is a picture of the corner
     of Water and Broad and the second to last picture in the book is

a blowup of that picture?

A    That is correct.

Q    Now, some of the pictures in the -- in the -- in Exhibit 1 are
     not of the highway, but are fields; where were those fields?
     With respect to the bridge?

A    Yeah.  No, I am trying to -- I am trying to think of the
     directions, because I -- I keep referring to this as --

Q    Well, assume that the road runs north and south?

A    If the -- the road -- the bridge is running north and south
     and the end of the bridge heading out of the city is the
     northern end -- is the southern end -- or which end is that?

Q    It is the southern end of the bridge.

A    Well, then that --

        MR. DOAR:  Is that right?

        MR. McLEAN PITTS:  Well, at that point, yes; it is
really the east.

        WITNESS:  Right.

        MR. DOAR:  Montgomery -- the highway at that point
is running north and south.

        THE COURT:  If you refer to it as the Montgomery side
and Selma side, I believe you will get along a little better.

Q    All right, on the -- taking the Montgomery end of the bridge,
     where were the fields that are shown in those pictures?

A    If I was headed toward Montgomery, they would be on the right.

Q    And were there some on the left, too, that you took?

A    Yeah, I believe there was a picture there, one picture there, I
     think.

              MR. DOAR:  I would like to offer in evidence Exhibit
-- Plaintiff-Intervenor's Exhibit 1.

              THE COURT:  Any objection?

              MR. SMITH:  Which is Exhibit 1; that the entire --

              MR. DOAR:  It is all the pictures that are --

              MR. McLEAN PITTS:  Is this the same as that, John?

              MR. DOAR:  Yes.

              MR. SMITH:  I have no objection.

              MR. McLEAN PITTS:  We have no objection.

              MR. DOAR:  You have no objection?

              THE COURT:  All right, how many photographs in that
folder?

              MR. McLEAN PITTS:  Is that the same as this one over
here?

              MR. DOAR:  Exactly.

              MR. McLEAN PITTS:  I was just looking through them.

              MR. SMITH:  May I ask -- excuse me, Judge -- about
the last photograph, and I think you mentioned that while you may
have been present -- did you take this photograph --

              WITNESS:  Yes, I did.

              MR. SMITH:  -- or -- you did, you took these pictures?

              WITNESS:  That's right.

              MR. SMITH:  No objection.

431

MR. McLEAN PITTS:  You asking about the picture on the street; did you ask him about the picture on the street?

MR. SMITH:  Yes, he said he took them.

MR. McLEAN PITTS:  That the one you are talking about?

MR. DOAR:  I believe there are thirty photographs.

THE COURT:  All right.

MR. DOAR:  There may be -- I haven't counted them; shall I count them?

THE COURT:  No; number 1 is admitted in evidence. Anything else on direct from this witness?

MR. DOAR:  I would like to see this other picture. Could I --

MR. McLEAN PITTS:  Huh?

MR. DOAR:  Could I look at that one?

MR. McLEAN PITTS:  Made the -- the same group?

MR. DOAR:  Yes, but I -- .

Q    I would like to ask you to look at the pictures which begin with number 308, and it is numbered at the back of the picture --

MR. DOAR:  -- in the lower corner, your honor.

THE COURT:  All right.

Q    And those -- running through those pictures showing the members of the Dallas County Mounted Posse.

MR. DOAR:  Your honor, the parties have agreed that this aerial map can be used to illustrate the location of some of the pictures or for any other purpose.

THE COURT:  Does it have an Exhibit number?

MR. DOAR:  No, I would like to have it marked.

432

THE CLERK:  Plaintiff-Intervenor's Exhibit number 7.

THE COURT:  You say for any other purposes?

MR. DOAR:  That is my understanding.

THE COURT:  Then I take it it is admitted in evidence?

MR. McLEAN PITTS:  As far as I am concerned; yes, sir.

THE COURT:  Plaintiff-Intervenor's number 7, being an aerial photograph of the City of Selma --

MR. DOAR:  City of Selma.

THE COURT:  -- is admitted in evidence.

MR. McLEAN PITTS:  It is not all of the city, but it is most of the city.  You know who made that picture?

MR. DOAR:  No, it was made several years ago; I don't know, I think it was.

MR. McLEAN PITTS:  101st Airborne?

MR. DOAR:  No, I don't know.

MR. McLEAN PITTS:  Huh?

Q  Now, could -- Mr. Witness, could you step to the -- to Exhibit 7, Plaintiff-Intervenor's Exhibit 7, and point out to the court -- step back so the -- the area of the picture where the pictures of the Mounted Posse and the field are taken; can you do that?

A  This is difficult on this particular photograph; it was in this region, I mean it is difficult to get specific; it was this side of the highway, and it was in -- in this area.

Q  You are circling an area that is just to the -- to the left of the end of -- of the printed mark, "U.S. highway 80," you are

    circling an area about the size of two inches in diameter; is

    that fair?

A   Yeah.

Q   Now, I want to direct your attention to one more picture here,

    and that is --

            MR. McLEAN PITTS:  Which picture is that he's

testified to there?

            MR. DOAR:  He's testifying to --

            MR. McLEAN PITTS:  Keep asking him questions about it?

            MR. DOAR:  He is testifying to these pictures that

run from 308 on.

            MR. McLEAN PITTS:  This -- he is -- this is off the

record, on the other side of this field?

            MR. DOAR:  Uh, huh.

            MR. McLEAN PITTS:  Uh, huh.

Q   Showing you what is marked within the Exhibit as Exhibit --

    picture A-10, and can you point on Intervenor's Exhibit 7 the

    area of the map that this picture was taken?

A   I just know that it was on the other side of the highway, and it

    would have to be in -- well, it is difficult to tell from this

    photograph exactly where it is, but it is going to be somewhere

    in this region.

Q   That is just opposite where your other pictures were taken --

A   Little further.

Q   -- except on the other side of the highway?

A    Yeah, it's -- it's a little -- I would say it was a little bit

    further toward Montgomery, and again the scale --

           MR. McLEAN PITTS:  Off the record, he is wrong.

           MR. DOAR:  No, that's right.

           MR. McLEAN PITTS:  He is wrong.

           MR. DOAR:  Right there.

           MR. McLEAN PITTS:  I know where the field is.

           THE COURT:  They were all taken in that general area,

aren't they?

           MR. McLEAN PITTS:  There it is right there.

           WITNESS:  I say it was --

           MR. DOAR:  Well, that is all right.

           WITNESS:  It was on the other side of the highway.

           MR. McLEAN PITTS:  Messed the whole road up, see

down here, it is tore up, see.

           WITNESS:  Uh, huh.

           MR. DOAR:  That is all the questions I have.

           THE COURT:  All right.  You wish to examine him,

for the plaintiffs?

           MR. DOAR:  Your honor, could I ask one more question?

           THE COURT:  (Nodded to indicate affirmative reply)

Q    Did you also take some pictures of a -- from the 10th of

    February?

A    Yes, I did.

Q    And what were those pictures of?

435

A    It was a series of pictures of a demonstration at the Dallas
     County Court House and the subsequent march that followed.

Q    Will you tell the court about what time of day that demonstration
     occurred and what you observed with respect to that march?

A    The demonstration occurred sometime after two thirty.

               THE COURT:  You said February 10; that is the date
you mean, is it?

               MR. DOAR:  That's right.

               THE COURT:  All right.

A    The demonstration occurred sometime after two thirty.  The
     demonstrators started to -- it appeared as if they were
     beginning to disperse, or some of them were beginning to leave
     the scene, and it was sometime around, oh, between a quarter
     to three, three o'clock, that Sheriff James Clark came to the
     head of this group, and there -- there was an element of
     confusion in -- in -- at this point as what was happening.  I
     was just sort of following along.

Q    Well, what happened?

A    It -- he seemed to -- he appeared to be leading them somewhere.
     I did not know whether -- whether they were under arrest or --
     I mean, as I say, there was an element of confusion.

Q    Just tell us what happened?

A    The marchers were led by Sheriff Clark and the -- some of the
     Sheriff's office deputies and possemen down -- I guess it would
     be east on Alabama Street, and they turned right on what would

be an extension of Sylvan, and then they went out river road,

which is a general term, the -- the demonstrators were

apparently being forced to march sometimes at a rapid pace,

sometimes at a fast walk. The -- the possemen were observed

to have -- well, they were equipped with both night sticks and

the electric cattle prods. On several occasions they were seen

to -- well, it was a case of forcing the marchers with either

the -- with the cattle prods. The march continued until they

reached a bridge on what would be this river road. At this

point one of the Sheriff's cars turned sort of diagonally across

the bridge and stopped all traffic. We were detained there for

a few minutes, and then we were allowed to continue. There was

a radio message heard over the Alabama Highway Patrol frequency,

which is the same as the Sheriff's office, stating, "Don't use

the prod so much," words to this effect, or, "Tell the men not

to use the prods so much." The march continued past the bridge,

and it was difficult to actually state who had control of it

at -- at -- at this point, the marchers seemed to be spreading

out. There were several marchers that were observed by the

side of the road in an apparent state of being winded from the

running. Another message was heard over the Sheriff's -- excuse

me, over the Alabama Highway Patrol frequency, and this stated,

"If they want to drop out, let them."

      MR. McLEAN PITTS: Your honor, wait just one -- I

have to object to this message unless he identifies that message as

coming from someone.

       THE COURT:  It is coming -- he is identifying it as coming over the Highway Patrol and the Dallas County Sheriff's radio frequency; is that correct?

       WITNESS:  That is correct.

       MR. McLEAN PITTS:  What I am getting at, unless it comes from someone; I was objecting to it on Jim Clark's part unless it was -- unless it was heard to come from his office, what I am getting -- or from him.

       THE COURT:  He is not saying where it came from --

       MR. McLEAN PITTS:  All right, sir.

       THE COURT:  -- he is just saying it came over that frequency.

       MR. McLEAN PITTS:  All right, sir.

       THE COURT:  Overruled; go ahead.

A   The -- the marchers -- this -- this march reached a point approximately half a mile, three quarters of a mile, past the bridge, and now, I -- I was back from this, in a car a hundred yards, possibly two hundred yards, and I -- I can't state -- all the marchers suddenly left the road.  Now, whether this was at --

Q   You don't know how that happened?

A   No, I don't.  And they seemed to congregate around a farm house.

Q   Now, how -- how far was that farm house from the Court House?

A   It was over two miles.

Q   I would like to show you Intervenor's Exhibit 5, and ask you if

you recognize the pictures?

A    Yes, I do.

Q    And who took those pictures?

A    I took them.

Q    Are those pictures clear and accurate representations of the
     demonstration in front of the Court House that day and the march
     that was led by Sheriff Clark and the members of the Dallas
     County Posse and his deputies?

A    Yes.

Q    And the two pictures are taken -- the second and third pictures
     are taken along the line of the march; is that right?

A    That's right.

             MR. DOAR:  I would like to offer in evidence
Plaintiff-Intervenor's Exhibit 5.

             MR. SMITH:  No objection.

             MR. McLEAN PITTS:  No objection.

             THE COURT:  It will be admitted.  Let me see them.

Q    Could you tell the court approximately how many young Negroes
     were in that demonstration?

A    I -- I would estimate it at over two hundred.

             MR. DOAR:  Over two hundred; thank you.

             THE COURT:  Does that conclude the direct?

             MR. DOAR:  Yes, sir.

             THE COURT:  Plaintiffs.

BY MR. NABRIT:

Q    Officer, what was the approximate time period that elapsed

between the time the march started and the time that the

demonstrators went into the -- around the farm house two miles

away?  The best you can remember?

A    I -- I am going to have to -- I am stating times at either end;

I am saying it began sometime around two forty-five and it is

ending sometime around a quarter after three, twenty after three.

Q    Would you describe the demonstrators in terms of their age, sex,

race, general description of the group?

A    It was both male and female, and I would estimate of high school

age.

Q    And were they all or almost all Negroes?

A    All or almost all; yes.

Q    To what extent did you see them running or trotting?

A    This -- this was in spurts.  The pace was -- it was a fast walk,

and it would at times go into a trot, that would be a good term

to use, and that would be -- that would be it.

MR. NABRIT:  Would you indulge me a moment, your honor

THE COURT:  Yes.  Mr. Smith.

MR. NABRIT:  One more question.

Q    About how many children did you -- young demonstrators did you

see drop out of the march along the wayside?

A    Specifically -- I mean probably around ten or twelve.

MR. NABRIT:  Thank you; you may question.

CROSS EXAMINATION:

BY MR. SMITH:

Q    In response to plaintiffs, you mentioned a demonstration; which

demonstration are -- are you referring to February 10 or March 7?

A    In which -- according to which question?

Q    Well, I mean the questions that were just propounded to you, I didn't understand which demonstration you -- you were testifying to -- in regard to?

A    He was talking -- the one that I was continuing on was February 10.

Q    February 10.  Now, on March 7 -- and in regard to the photographs which are identified as Intervenor's Exhibit 7 --

          THE COURT:  No.

          MR. SMITH:  Am I incorrect?

          THE COURT:  1.  The photographs?

          MR. SMITH:  Yes, sir.

          THE COURT:  1.

Q    Exhibit 1, you mentioned that --

          THE COURT:  Is that right, Tim?

          THE CLERK:  Yes, sir.

Q    You mentioned that these are some of the photographs which you had taken on March 7; is that correct?

A    That is correct.

Q    How many additional photographs did you take; do you have any opinion?

A    I think a total of around sixty-five or seventy.

Q    Approximately how many are included in this Exhibit?

A    I did not count them.

441

Q    You didn't count them?

A    No.

Q    Did you develop all of the photographs taken on March 7?

A    Yes, I did.

Q    Are all of them readable; that is, can -- did they develop
     properly so that you can determine what they depict?

              MR. DOAR:  Here they are.

Q    Do any of the other photographs taken on March 7 show the
     condition of traffic at the Pettus Bridge on U.S. 80?

A    The condition of traffic at -- before or after, during what --

Q    While you were taking them, while you were from the aerial
     vantage point where you took the photographs, did any of them
     show the condition of traffic at or near the Pettus Bridge on
     U.S. highway 80?

A    I am still not sure I understand your question.

Q    Did it show any cars out on U.S. highway 80?

A    Yes, sir.

Q    Did any of the photographs?

A    Yes.

Q    They did?

A    There are photographs there that show cars on highway 80.

Q    All right.  Now, did you observe -- independent of the
     photographs, did you observe the general condition of traffic on
     U.S. 80 at the time of the march or demonstration?

A    I -- I am -- I just want you to clarify a point; when you are

talking about -- about traffic, you are talking about automobiles

Q   That's right?

A   They were stopped.

Q   As distinguished from pedestrians?

A   Right.

Q   Talking about automobile traffic; how many automobiles were stopped, in your judgment?

A   That is difficult to say.

Q   Did it create, in your opinion, a traffic congestion?

A   Stopping the cars?  Yes.

Q   The cars were congested over some widespread area?

A   It -- well, I am -- I am -- do you want this in some sort of estimate of feet?

Q   That's right?

A   Half a mile, possibly.

Q   That's right.

A   I would say that as guess from the air, about a half a mile.

Q   About a half a mile.  Now, this congestion for the half mile area, would it have been -- where would it have been, in the direction of Montgomery --

A   That's right.

Q   -- or on Broad Street, which would have been to the west?

A   No, it would have been in the direction of Montgomery on highway 80.

Q   Did you observe traffic on the Selma side of the Pettus Bridge?

443

A    No, I didn't.

Q    You did not?

A    No.

MR. SMITH:  I believe that's all.

THE COURT:  Mr. Pitts.

BY MR. McLEAN PITTS:

Q    Did you -- you say it went about a half a mile east toward
     Montgomery; is that right?  From what point, you mean from where
     they stopped, the traffic was stopped?

A    From the -- yes, from -- from where the State Troopers were
     blocking the highway.

Q    All right.  Now, did it go back as far as the entrance to Craig
     Air Force Base?

A    I am -- I am stating a half a mile because -- this was a very,
     very rough estimate from the air; I did not feel it was a very
     good vantage point to be judging it.  No, it didn't -- I cannot
     say that I could see the entrance to Craig Air Force Base, which
     is several miles out, but I still say that it is roughly a half
     a mile.

Q    How far is Craig Air Force Base from there?

A    I could not identify Craig Air Force Base like that from the
     air, I don't think; I mean --

Q    I am not asking you to do that; you -- you have been to Selma
     and assigned to Selma, haven't you?

A    Yeah.

444

Q   Huh?

A   Yes.

Q   You know how far it is from Craig Air Force Base; you have been

    out to Craig Air Force Base, haven't you?

A   Yes.

Q   You know where the entrance to Craig Air Force Base is --

A   Yes.

Q   -- on U.S. 80?

A   Yes.

Q   You know that?

A   (Nodded to indicate affirmative reply)

Q   Now, what I am asking you is how far is it from Selma out to

    that point?

A   I believe it is around three miles.

Q   Three miles; and how far is it out there to where the drive in

    theatre is right there where the L. and N. Railroad crosses?

A   I don't know.

Q   You don't know that distance?

A   No, I don't.

Q   Now, traffic was back of that point, wasn't it, back to where

    the Camden highway intersects?

A   I was oblivious to it if it was.

Q   Huh?

A   I was oblivious to it if it was.

Q   Now, did you see any trucks stopped on the highway?

445

A    I do not recall.

Q    Busses?

A    I don't recall.

Q    Do you know how long traffic was held up?

A    No.

Q    Well, how long were you up in that airplane?

A    Approximately an hour and fifteen minutes.

Q    All right, sir; now, where did that plane go out from?

A    Craig Air Force Base.

Q    It was a Government plane; is that right?

A    I don't know.

Q    Who was the pilot of that plane?

A    Colonel Ault.

Q    And he is Commander of Craig Air Force Base?

A    I believe so.

Q    All right, sir; now, I want you to look here, I reckon this
     is picture A-310, and that is the area that you testified to
     that was up where the old highway is and which is east of the
     bridge; is that correct? What I am talking about is it's --
     that when you go across the Pettus Bridge coming toward
     Montgomery, this area in here would be right to your left;
     isn't that right?

A    If I am going toward Montgomery, the area would be to my left
     as I cross the bridge.

Q    Right to your left; is that right? This is what, an old

446

road down there, a paved road?

A    It appears to be.

Q    Yeah; all right, sir; now, in this -- this picture you see here,
     do you see some possemen on horses in that picture?

A    I would like to see a blowup of that right there.

Q    Uh, huh; uh, huh; well, I'll ask you this; do you see some
     helmet men in this area?  Some men with helmets on?

A    That appears to be one; I don't know.  Yes.

Q    All right, do you see some of the marchers?

A    Yes.

Q    And you see some of the knapsacks and stuff that was -- got
     packs on their backs and things, don't you, from that picture?

A    Well, now, this is -- I wouldn't want to name them from this
     picture what they are.

Q    All right; well -- and these big white things in here you see
     are horse trailers; isn't that right?

A    They look like horse trailers.

Q    Uh, huh; and now, all these people that accumulated in here,
     these marchers, they are just standing around there; is that
     right?  Milling around in that area?

A    Milling around; yeah.

Q    All right; now, after that picture was taken, you proceeded to
     take these pictures here; is that right?

A    That's right.

Q    So these marchers here were the group that was gotten together

and brought back across the bridge; is that right?

A    That's right.

Q    And these horses are going along the side of them; is that right?

A    That's right.

Q    Now, do you see any bullwhip there?

A    No.

Q    Those folks -- huh?

A    No.

Q    And those horses at that point right there may be at a fast walk is about all; is that right; they are not galloping?

A    It's --

Q    Look at their tails?

A    Yeah; yeah.

Q    Now, then you come on over, and that was on the bridge, wasn't it, that is a picture A-311, isn't it?

A    Right.

Q    All right; then you turn over here to A-312, and this is a picture -- is this picture taken coming back?

A    No, this would be toward Selma, correct? That -- I believe --

Q    No, sir.

A    -- they are headed in this direction, aren't they?

Q    I will have to take it down and look at this to tell you. I know where this road is right here, a little -- off the record -- I mean I don't know whether -- I tell you, I think that is going to Selma, I think; I think it is; I am not sure, I think

448

    that is that way.

A   I think it's the --

        MR. NABRIT:  The horses are coming in this direction.

A   I think Selma is in this direction.

Q   It may be, I am not sure; I know where this road is right here,
    that road.

A   Uh, huh.

Q   Well, you see -- you see horses here; is that right?

A   Right.

Q   How many can you count?  That is one.

A   I think that is two, three, four, five, I believe.

        MR. DOAR:  I would like to object to the question,
your honor; the picture speaks for itself.

        THE COURT:  Sustain objection; picture speaks for
itself; I can count them.

        MR. McLEAN PITTS:  All right, sir.

A   There are at least five in that picture.

Q   All right, sir.  Now -- but these people are walking along, and
    the horses are out in the road; is that right?

A   In that picture.

Q   All right, sir; now, you come on over here, and this picture
    here, which is -- is A-215, that picture is -- is made going
    back, they are walking back toward Selma there; is that correct?

A   That is correct.

Q   And you see the horses, one horse in that picture; isn't that

right?

MR. DOAR:  Objected to on the ground --

THE COURT:  Sustained.

MR. DOAR:  -- the picture speaks for itself.

THE COURT: ·Sustained.

MR. McLEAN PITTS:  I think we have got a right to examine him; they are talking about bullwhips and things here.

WITNESS:  Did I say anything about bullwhips?

MR. McLEAN PITTS:  No, you haven't, but I want to prove it by him it is not in there.

THE COURT:  I don't need any argument.  I have already ruled on it; objection sustained.

MR. McLEAN PITTS:  All right, sir.

A    This -- and this.

Q    What is that?

A    This is a blowup of this picture, see that?

Q    I see; I see; I see what you are talking about; that is all right; all right; yeah; uh, huh.  All right.  Well, now, this picture right here, which is A-314, was that taken out of a plane?

A    Yes.

Q    What kind of camera were you using, a telescopic camera, on that?

A    Yes.

Q    And this is on the Water -- this is on the Selma end of the bridge; is that correct?

450

A    That is correct.

Q    All right.  Now, here is a picture that you said you made on the
     ground, it was taken down there by the church; is that right?

A    That's right.

Q    Did you see any bullwhips on those horses down there then?

A    No.

Q    Did you see a rope on any of them?

A    You mean the reins?

Q    No, I mean the regular cow rope, you know, lasso type rope?

A    No.

Q    Lariat -- huh?

A    No.

Q    All right, sir; and you saw these horses?

A    I took the picture.

          MR. McLEAN PITTS:  Okay, I think -- is there anything
else you want to ask him -- that's all.

          MR. NABRIT:  Officer --

          THE COURT:  Just -- just -- just a minute, please.

          MR. DOAR:  I don't have any questions, your honor.

          THE COURT:  Go ahead.

          MR. NABRIT:  I had inquired, your honor.

          THE COURT:  Go ahead.

               REDIRECT EXAMINATION:

BY MR. NABRIT:

Q    Officer, could you tell from your observation in the plane or

451

your observation of the photograph, either one, whether or not the traffic backed up on route 80 was being blocked by police or Highway Patrol vehicles or persons on foot?

A   Yes, the traffic was blocked by the -- I guess the cars were parked in the road, the Alabama State Troopers' cars.

Q   Is it your testimony that the Alabama State Trooper cars were parked on highway 80 blocking traffic coming into Selma, and is that --

A   That -- if I -- can I see one of those pictures -- I believe that was the case.

　　　　　MR. McLEAN PITTS:  Here is the picture.

A   No, I can't state whether it was the actually the Troopers or the Troopers' cars that were blocking the traffic, but it was either one or the other.

　　　　　MR. NABRIT:  Thank you, sir.  No further questions, your honor.

　　　　　RECROSS EXAMINATION:

BY MR. SMITH:

Q   Did you take any photographs of the area in question on Tuesday of this week, March 9?

A   No -- you mean from the air?

Q   Yes?

A   No.

Q   Well, did you take any from any other vantage point?  You say from the air; does that mean you took some on the ground?

452

A    Yeah, I am trying to think of -- this was at -- you are referring
     to the march on Tuesday?

Q    This -- Tuesday of this week, March 9?

A    Right; yes, I believe I did; I am sure I did.

Q    Aerial photographs?

A    No; ground.

Q    Ground shots?

A    Ground shots.

Q    How many pictures did you take on Tuesday?

A    I don't know; I haven't developed them; I don't know.

Q    Did you observe the traffic condition on Tuesday of this week
     in the area of the march at the vicinity of Pettus Bridge?

A    The traffic was blocked out highway 80 towards Montgomery; it
     was backed up.

Q    Do you know whether or not any aerial photographs were made of
     the area on Tuesday of this week by any other person?

A    I believe in -- I believe I read in the paper that one of the
     press were up; I saw a plane flying over and --

Q    Did your office make any, is what I am asking; excuse me?

A    No; I don't know of any.

               MR. SMITH:  All right, that's all.

               MR. McLEAN PITTS:  Wait just a minute.

Q (by Mr. Smith)  Would the photographs that you took on Tuesday show
     the condition of traffic?

A    I don't -- I don't remember; as -- as I stated, I haven't

453

developed those yet.

Q   And from your recollection of what you were taking, you don't
    recall whether or not it would show any condition of traffic?

A   It -- it could; I shot a -- I remember specifically a picture of
    the Troopers as they were across the highway, and conceivably
    you could see something in back of them, but that is the only
    picture of recollection -- from recollection that I remember
    taking in that direction.

          MR. SMITH:  Judge, I think we would like to see these
photographs; I don't know whether we have the right to ask them to
develop them.

          THE COURT:  I won't require him to do that.

          MR. SMITH:  All right, sir.

          THE COURT:  Anything else from this witness?

BY MR. McLEAN PITTS:

Q   Have any of them at all been developed, any pictures?

A   Pardon?

Q   Have any of those that you took on Tuesday at all been developed?
    I am talking about the negative part of them?

A   No.

Q   Huh?

A   No; no.

Q   Do you have the film?

A   (Nodded to indicate affirmative reply)

          MR. McLEAN PITTS:  Judge, we'd like to have the film

454

and have it developed.

   MR. DOAR: Your honor, the pictures can be developed; we will see that they are developed.

   THE COURT: I won't require them to do it for you.

   MR. McLEAN PITTS: You won't require them to deliver the film to us to develop it, or let the State laboratories develop it?

   THE COURT: No, sir; nor would I require you to give yours to them and let them develop it.

   MR. McLEAN PITTS: All right, sir.

   THE COURT: Anything further from this witness?

   MR. DOAR: No, sir.

   MR. McLEAN PITTS: I want to ask him just one more question; I will be through in a few minutes.

   THE COURT: Go right ahead.

Q When did you make arrangements with Colonel Ault to fly you up and down this road along -- for that Sunday?

A I didn't.

Q Well, who made the arrangements?

A I actually don't know; someone -- someone in the office made arrangements.

Q Well, have you been in Selma or Mobile, I meant your ordinary course of your work, I am talking about, assignment?

A My ordinary assignment is Mobile, but I haven't barely seen it; I have been in Selma most of the time, so I suppose --

Q    That is what I am trying to get at; now, when did you get orders
     to go out to Craig Air Force and get in that plane with Colonel
     Ault?

A    I was in Mobile on Saturday night, and I heard it over the phone
     from one of the other agents that -- or Saturday sometime, and
     I heard -- one of the other agents told me about it, that the
     arrangements had been made and I was coming back on Sunday.

Q    Who is your immediate superior?

A    Who is my --

Q    Your immediate superior; do you have a squad boss or is it a
     Special Agent in Charge?

A    Are you referring to right now or at that --

Q    Yeah; right now or on -- no, on that day, on Sunday, is what I
     am talking about?

A    On that day?

Q    Yes?

A    I believe that Robert Frye would have been in charge of that.

Q    He was in charge of the squad; is that right?

A    Well, the terminology, but -- no, but yes, he was in charge of
     the office; yes.

Q    He is resident Agent in Selma, isn't he?

A    Right.

Q    That's right, and did you get any orders -- did you get the
     orders from him or from the Special Agent in Charge in Mobile;
     that is all I am trying to find out from you?

MR. ADAMS:  I object to this, your honor; I think it
is irrelevant.

THE COURT:  I will permit it.

Q    That is --

THE COURT:  Talking about your telephone conversation,
I reckon.

Q    I am just asking whether he got it from Special Agent in Charge
in Mobile or from Robert Frye?

A    I -- as I stated, that I -- I heard this from another Agent
initially, and who was in Selma; I called Selma Saturday evening
to find out what the situation was, and it was another Agent
that initially told me this, and then I came back on -- on
that -- now, I -- in the meantime I had spoken to both the
Special Agent in Charge in Mobile and to the -- Resident Agent
Frye, and I don't really remember who I spoke to first --

MR. McLEAN PITTS:  All right, that's all.

A    -- and where.

MR. McLEAN PITTS:  Wait just one -- that's all.

THE COURT:  Ten minute recess.

(At which time, 3:12 p.m., a recess was had until
3:20 p.m., at which time the hearing continued)

THE COURT:  All right, Mr. Doar.

THE CLERK:  Please stand and raise your right hand.

(Witness Thomas E. Burns, Jr., sworn by the Clerk)

***************

457

THOMAS E. BURNS, JR., witness for the United States, having been

    duly sworn, testified as follows:

DIRECT EXAMINATION:

BY MR. DOAR:

Q   Will you tell the court your full name, please?

A   My name is Thomas E. Burns, Jr.

Q   And, Mr. Burns -- you may sit down.

A   Thank you.

Q   What is your occupation?

A   I am a Special Agent with the Federal Bureau of Investigation.

Q   Will you keep your voice up so everyone in the court room can

    hear you?

A   Yes.

Q   Where are you assigned?

A   I am presently assigned to the Mobile Division.

Q   Were you in Mobile on the 10th of February -- February --

    excuse me; were you in Selma on the 10th of February, the 7th

    of March, 1965?

A   That is true.

Q   Were you on official duties on those two days?

A   I was.

Q   And did you, in connection with your official duties, take

    certain pictures?

A   I did.

Q   On those two days?  And have you before you some of the pictures

which you took on those two days?

A    That is correct.

Q    And could you tell me what the -- looking at the corner of the
     picture, is that Plaintiff-Intervenor's Exhibit number 6 and
     number -- Plaintiff-Intervenor's number 3?

A    Plaintiff's Exhibit 6 and number 3.

Q    And number 6 -- Intervenor's Exhibit 3 is the pictures taken on
     March 7 and Exhibit 6 the pictures taken on February 10.  Now --

               THE COURT:  Have you gentlemen seen them?

               MR. McLEAN PITTS:  No, sir.

               THE COURT:  You have copies?

               MR. DOAR:  I gave them to you the other day; those
     are the same ones you saw the other day.

               MR. SMITH:  I haven't seen them.

               MR. McLEAN PITTS:  I just --

               MR. DOAR:  I had -- I thought they saw them; they
     were available for them.

               MR. McLEAN PITTS:  I have seen them; I didn't know
     this was the batch that you -- that is okay, I have seen these here,
     Judge.

               THE COURT:  All right.

               MR. McLEAN PITTS:  I thought it was about some of
     these other -- which batch?

               WITNESS:  These.

               MR. McLEAN PITTS:  Yes, I see them.

459

Q    Are those pictures arranged chronologically in point of time?

THE COURT:  You have already looked at them, have you, Mr. Burns?

WITNESS:  Yes, sir.

THE COURT:  Do you know whether they are or not?

WITNESS:  Yes, I am just -- they are in chronological order; this is Exhibit number 3.

THE COURT:  All right.

MR. DOAR:  I would like to offer -- offer Exhibit number 3 and Exhibit number 6 in evidence.

THE COURT:  Any objection, gentlemen?

MR. McLEAN PITTS:  No objection as far as I am concerned.

MR. SMITH:  No objection.

THE COURT:  3 and 6 are admitted.

MR. DOAR:  That's all the questions I have.

THE COURT:  For the plaintiffs.

MR. NABRIT:  No questions, your honor.

MR. SMITH:  No questions.

THE COURT:  Mr. Pitts.

CROSS EXAMINATION:

BY MR. McLEAN PITTS:

Q    This picture here is 2 -- B-201, who is that white man there?

A    This -- yes, this man is Bill Lyons, he is a photographer.

Q    Photographer?

460

A    Right.

Q    Press photographer?

A    Exactly.

Q    All right, was that --

THE COURT:  That in 3 or 6?

WITNESS:  That is Exhibit number --

MR. McLEAN PITTS:  Let's see, Judge; I don't know.

THE COURT:  May I see the two Exhibits that were just admitted, Mr. Burns.

MR. McLEAN PITTS:  Just give them to the Judge here.

WITNESS:  Right.

MR. McLEAN PITTS:  I can't tell.

WITNESS:  That is number --

MR. McLEAN PITTS:  Which one is that?

WITNESS:  -- number 3.

THE COURT:  Thank you.

Q    Is it 3?

A    (Nodded to indicate affirmative reply)

Q    This is number 6?

A    Well, let me see; yes.

Q    Now, let me ask you, these pictures that you got here in Exhibit number 3, they were taken on Sunday; is that correct?

A    That is correct; 7th of March.

Q    Huh?

A    The 7th of March.

461

Q    And did you see the traffic that was on U.S. 80 on that date?

A    No, I did not.

Q    U.S. 80 is a heavily traveled highway; is that right; coming in
     -- that artery right in there?

A    I suppose so; it is.

Q    Uh, huh; do you know how far the cars were backed up on that
     street?

A    I do not.

Q    Did you go down in Selma and see the congestion that was caused
     in Selma by this traffic?

A    No, sir.

Q    Did you see many white people in Selma on the corners as you
     went up the street?

A    On which side of the bridge?

Q    On the Selma side of the bridge?

A    No, sir.

Q    You didn't see any?

A    I saw some; I saw possemen.

Q    Well, now, did you see -- what about back there -- you know
     where Tillman Drug Store is, one block from the river?

A    Yes.

Q    And Pilcher-McBryde?

A    Yes.

Q    And didn't -- didn't the City Police cut off traffic at that
     point, and didn't allow any pedestrians to come past that point?

462

A    I don't recall, sir.

Q    Did you -- and wasn't it three or four thousand white people
     there on that corner?

A    I don't know.

          MR. McLEAN PITTS:  Uh, huh.  Joe, you want anything?
That's all.

          THE COURT:  Mr. Doar.

          MR. DOAR:  I have no further questions.

          THE COURT:  Any other questions from this witness?

          MR. NABRIT:  One question, sir.

               REDIRECT EXAMINATION:

BY MR. NABRIT:

Q    The last picture in Exhibit 3 is marked B-218, and there is a
     female in the center of the picture; you know who she is or if
     she is a child?

A    I do not know.

          MR. NABRIT:  That's all, your honor.

          THE COURT:  Next witness.

          MR. DOAR:  Mr. Sweeney; Sweeney.

          THE CLERK:  Have you been sworn?

          WITNESS JOHN J. SWEENEY:  No, I haven't.

          THE CLERK:  Please raise your right hand.

          (Witness John J. Sweeney sworn by the Clerk)

               ****************

463

JOHN J. SWEENEY, witness for the United States, having been duly

sworn, testified as follows:

DIRECT EXAMINATION:

BY MR. DOAR:

Q    Will you tell the court your full name, please?

A    John J. Sweeney.

Q    Will you speak up in a loud voice where everyone in the court

room can hear you; where do you live?

A    Mobile, Alabama.

Q    What is your occupation?

A    I am a Special Agent with the Federal Bureau of Investigation.

Q    Were you on duty in Selma, Alabama, on the 7th of March, 1965?

A    I was, sir.

Q    Were you assigned to take certain photographs on that afternoon?

A    Yes, sir.

Q    And did you take certain photographs that afternoon?

A    I did.

Q    Before you are two Exhibits, Intervenor's Exhibit number 2 and

Exhibit number 4; have you examined those two Exhibits?

A    Yes, sir; I have.

Q    Did you take those pictures?

A    I took those photographs.

Q    Are the pictures arranged chronologically?

A    They are, sir.

Q    Are they fair and accurate representations of what they purport

to be?

464

A    Yes, they are.

        MR. DOAR: I would like to offer them in evidence.

        MR. McLEAN PITTS: We haven't seen them; we would like
to have an opportunity to see them.

        THE COURT: (Nodded to indicate affirmative reply)

        MR. McLEAN PITTS: May I inquire as to what date --
was this Sunday you were talking about?

        MR. DOAR: Yes, sir.

        WITNESS: Sunday; yes, sir. Yes.

        MR. McLEAN PITTS: Excuse me, I didn't -- I am sorry.
Turn the thing around, got some here this way and some that way. It
is okay on number 2 as far as I am concerned. Have you seen it,
Mr. --

        MR. SMITH: I have no objection to either of them.

        MR. McLEAN PITTS: Okay on number 4 as far as I am
concerned; I have no objection.

        THE COURT: 2 and 4 are admitted in evidence.

Q    Mr. Sweeney, directing your attention to the time in the after-
    noon after the State Troopers released tear gas on highway 80
    east of the Pettus Bridge on the Montgomery side of the Pettus
    Bridge --

A    Yes, sir.

Q    -- did you observe the Negroes that were in the march start back
    across the Pettus Bridge?

A    Yes, sir; I did.

465

Q   And did you observe whether or not there were any members of the
    Dallas County Posse along with these marchers as they went
    across the bridge?

A   Yes, sir.

Q   And what did you observe, if anything?

A   Well, they were urging the last of the group back across the
    bridge with horses and prodding them with their clubs, and I
    observed one man reach on several times and hit into the group.

Q   What was he hitting with, do you know?

A   His night stick or billy club or --

Q   This was a man on a horse?

A   A man on a horse, sir; yes.

Q   Was this a member of the Dallas County Posse?

A   Dallas County Posse; right.

            MR. DOAR:  That's all the questions I have, your

honor.

                CROSS EXAMINATION:

BY MR. McLEAN PITTS:

Q   Do you know -- do you know who that was?

A   No, sir; I don't.

Q   Did you see -- did he have a whip?

A   I did not see a whip, sir; no.

Q   Did you see any whip on those horses?

A   No; I didn't see any whips at all in evidence anywhere, sir.

Q   And those possemen that were on horses was equipped with night

sticks; is that right?

A    Pardon, sir?

Q    I say, the riders on those horses were equipped with night sticks; is that right?

A    Right, sir; yes, the ones I saw.

Q    All right, sir; now, have you had -- how long you been with the F.B.I.?

A    Oh, about seventeen and a half years, sir.

Q    Have you had any experience in the larger cities, say, in Detroit and New York and Chicago?

A    Not quite that large, sir; no.

Q    Have you been to those cities?

A    I have been through them; surely.

Q    Do you know that police -- that horses are used to a great extent in policing in those cities?

A    Yes, I believe they do.

Q    That is an effective way of policing large groups of people, isn't it?

A    I don't know how effective, sir, but it is used, I know.

                MR. McLEAN PITTS: It is used; all right, sir.  That's all.

                THE COURT: Mr. Smith.

                MR. SMITH: No questions.

                THE COURT: For the plaintiffs.

                MR. NABRIT: Yes.

467

REDIRECT EXAMINATION:

BY MR. NABRIT:

Q   Mr. Sweeney, in response to Mr. Pitts' question, did you say the
    riders were equipped or that they whipped people?

A   No whips at all, sir, that I saw; struck with clubs.

Q   The riders struck --

A   Right.

Q   -- pedestrians with clubs?

A   Right, sir.

            MR. NABRIT:  What did you do with the photographs?

            MR. DOAR:  Here.

            MR. NABRIT:  Oh.

            MR. DOAR:  I think that is the one you want; it is

a copy of it.

Q   Mr. Sweeney, picture marked S-202-A and S-202, there are a
    number of men appearing to wear -- who appear to be wearing
    helmets?

A   (Nodded to indicate affirmative reply)

Q   Do you know if they are members of a law enforcement agency?

A   I believe those are members of the Dallas County Posse, sir; yes.

Q   Did you see any persons, any members of the demonstration group,
    who were injured or appeared to be injured lying on the roadway
    or --

A   Yes, I have photographs here, sir, of several people lying on
    the road.

468

Q   Were there Highway Patrolmen standing nearby?

A   Yes.

Q   Did you see any Highway Patrolmen or other law enforcement
    officers attempt to render aid or first aid or treatment to the
    injured persons?

A   I don't think so, sir; I didn't see any.

    MR. NABRIT:  I have no other questions.

    THE COURT:  Any further examination?

    MR. GAYLE:  Let me ask Mr. Pitts one question.

    MR. McLEAN PITTS:  I want to ask him about one.

    WITNESS:  All right.

      RECROSS EXAMINATION:

BY MR. McLEAN PITTS:

Q   This picture he asked you about --

A   On the other side.

Q   -- with these helmet men -- which number was that?

A   Right here, I believe, this one in the large one, I believe.

Q   Which is --

A   202.

Q   -- 202; now, that is the area -- that building is in there is
    what is known as Selma Times-Journal; that is a newspaper, isn't
    it?

A   I believe that is the Selma Times; yes, sir.

Q   When you come across the Pettus Bridge, that building is to your
    left?

469

A    As you are coming back into Selma; right.

Q    Back into Selma?

A    Right.

Q    This is Water Street?

A    That is Water Street --

Q    Where these cars --

A    -- right there, sir.

Q    All right, sir; now, this -- that car right there is Deputy
     Sheriff's car, isn't it?

A    I believe it is the Deputy Sheriff's car; it could possibly be
     a patrol car, but I --

Q    Now, were you -- did you go back down into Selma, back toward
     Alabama on Broad Street?

A    In these photographs here, you mean, sir?

Q    Yes?

A    I believe the only one I had was that other -- I ran out of film
     and reloaded, and I got the first on the other sheets I had with
     those four other -- in the other folder.

Q    Well, I am not asking you so much about that as the fact did you
     go back down to Alabama Avenue, you know, that is the street that
     passes by between United States Court House --

A    Right, sir.

Q    -- and the Court House -- and the Dallas County Court House?

A    Right, sir.

Q    You know where Tillman Drug Store is down there?

470

A    Yes, sir.

Q    Those two drug stores; it is a fact that the police were cutting off traffic right there and wasn't letting any traffic cross that bridge; isn't that right?

A    Yes; that's right, sir.

Q    And it was a large accumulation of white people down there; wasn't that right?

A    When I left, we came through; we were with about the first part of the march, sir; there weren't too many at that time, but possibly they built up.

Q    Going across or coming back?  I mean --

A    First coming across as the march started, sir, before they went across the bridge.

Q    And when they came back, there were three or four thousand people down there, wasn't it?

A    Now, I -- as soon as I come across the bridge, I turned right on Water Street there, sir.

Q    I see; did you see any white people?

A    I didn't see any there.

Q    Did you see any white people along the streets as you went?

A    No, I did not; not at that point.

Q    Not at that point?

A    (Shook head to indicate negative reply)

Q    You -- on past there, did you see many?

A    No, I didn't pay any attention; I was quickly turned around the

471

corner, and the Posse broke up about half way down and came back,
and we just drove down the street from there.

Q   Well, now, were you there, right there at that point, and one
block west of there -- east of there, now, the way you were
going --

A   All right, sir.

Q   -- did you see that, did you see a Negro attack a city police
officer down there?

A   No, sir; I did not.

Q   Did you see them make an arrest of a Negro there?

A   No, sir; I didn't.

            MR. McLEAN PITTS:  That's all.

            MR. GAYLE:  Mac -- just one minute; excuse me, your
honor, may I ask him?

            MR. McLEAN PITTS:  That's all.

            WITNESS:  That's all?

            THE COURT:  (Nodded to indicate affirmative reply)
Next witness.

            MR. DOAR:  Mr. Barko; Barko.

            THE CLERK:  Have you been sworn?

            WITNESS JAMES MICHAEL BARKO:  Pardon?

            THE CLERK:  Have you been sworn?

            WITNESS JAMES MICHAEL BARKO:  No, I have not.

            THE CLERK:  Please raise your right hand.

            (Witness James Michael Barko sworn by the Clerk)

472

THE COURT:  Have a seat, please.

****************

JAMES MICHAEL BARKO, witness for the United States, having been duly

sworn, testified as follows:

DIRECT EXAMINATION:

BY MR. DOAR:

Q    Will you tell the court your full name, please?

A    James Michael Barko.

Q    Mr. Barko, where are you -- where do you live?

A    I reside in Mobile; I am currently in Selma.

Q    What is your occupation?

A    I am a Special Agent of the Federal Bureau of Investigation.

Q    And how long have you been a Special Agent?

A    Since September 14, 1964.

Q    And were you in Selma, Alabama, on the march on March 7, 1965?

A    Yes, sir; I was.

Q    Were you on -- performing official duties on that day?

A    Yes, sir; I was.

Q    And did you -- were you assigned to observe a march of Negro

citizens from Brown's Chapel in Selma to Montgomery, Alabama?

A    Yes.

Q    And would you tell the court just about what time the group

left Brown's A.M.E. Church?

A    There were two separate attempts to leave Brown's Church.  The

first attempt began about two o'clock, and was turned back by

473

Wilson Baker; the group of marchers then returned to the church
and to the playground adjacent to the church to regroup.  The
second march began approximately two thirty.

Q   And did that march leave that area?

A   Yes, it did.

Q   And about how many people were in that march?

A   It was later -- it was counted by Agents to be approximately six
hundred fifty.

Q   And how did they march as they left that area in Sylvan Street?

A   They marched two by two in an orderly fashion.

Q   Were they on the sidewalk or were they in the street?

A   They were on the sidewalk.

Q   And could you tell the court the route that they took in the
downtown area of Selma to get to the Pettus Bridge?

A   Yes, sir; I can.  They left Brown's Chapel, which is on Sylvan
Street, the -- marching down the left side of Sylvan Street,
turned right on Alabama Avenue, down to Broad Street, turned
left on Broad Street, and went across the Edmund Pettus Bridge.

Q   Now, will you tell me whether or not any of the marchers were
carrying anything?

A   Yes, they were; they were carrying camping equipment and other
clothing for apparently an overnight stay.

Q   Now, as they came across the Pettus Bridge, where were you?

A   I was in a Bureau car with Agent Sweeney following the lead
marchers, who I believe were Hosea Williams and John Lewis.

Q    And were you continuing along right along with them as they --

A    Yes, sir; I was.

Q    Toward Montgomery?

A    Yes, sir.

Q    Now, as you came over the top of the Pettus Bridge, what did you see?

A    When I approached in the car the -- at the top of Edmund Pettus Bridge, the peak, I should say, of the bridge, I saw a line of Troopers approximately two or three hundred yards from the edge of the bridge heading toward the bridge which heads toward the side of the bridge which faces Montgomery; that would be the -- on highway 80 east.

Q    And would you tell the court whether or not the traveled portion of the highway, the shoulders of the highway, were blocked off by State Highway Patrol?

A    Yes, they were; both sides of the highway, of highway 80, were blocked off.

Q    Now, are there -- is there what is known as service roads on each side of highway 80 as you -- as you go east toward Montgomery?

A    Yes, there are.

Q    And were these intersections into the service roads, were they blocked off?

A    Yes.

Q    And who blocked them off?

A    They were blocked by State Troopers' cars.

Q    Now, did you see any white people, civilian citizens, in that
     immediate area?

A    Yes, I did.

Q    And approximately how many white persons did you see?

A    Somewhere between seventy-five and a hundred.

Q    And about what time did this line of -- this march, the front of
     the line, get to the point where the Troopers were?

A    I would estimate it was about three o'clock.

Q    And was there any announcement made by the Troopers to the line
     of march?

A    Yes, there was.

Q    And where were you when this occurred?

A    I was diagonally across from the -- both the marchers and the
     Troopers on the right side of the road.

Q    Were you inside the police line on highway 80?

A    I was between the line of Troopers and the bridge, on the right
     side of the road.

Q    When you say, "The right side of the road," are we speaking
     now of the service road or highway 80?

A    We are speaking of highway 80.

Q    And then what happened?

A    The head Trooper announced to the marchers over a loudspeaker
     that the march could not and would not continue.  He then
     instructed them to disperse, to go home or go back to the church,
     and again repeated that the march could not and would not

continue.  He then said that he would give the marchers two
minutes to disperse.

Q    And then what happened?

A    And then of the forty or fifty Troopers who were facing the
marchers, a section of these Troopers moved forward, I would
say about twenty of them, moved forward toward the line of
marchers, the front of the line.

Q    And then what happened?

A    They were wearing gas masks and moved forward with their night
clubs or billy sticks, holding them like so, holding their
sticks.

Q    You are holding --

A    With both hands.

Q    -- both of your hands up at the shoulder level?

A    Yes; they approached the front of the marchers in this manner.

Q    And then what happened?

A    They -- when they got immediately next to the marchers, they
began to shove the marchers backwards toward the bridge.

Q    And then what did you see?

A    I saw a number of Negroes fall down and were, I could say, run
over or stepped on by the Troopers in their -- in their attempt
to push the marchers back.

Q    Did you see any of the marchers being struck by the Troopers
with their night sticks?

A    I saw a number of the marchers being pushed vigorously backwards

and being jabbed with the blunt end of the night stick.

Q   And about how far in distance on that road did that continue?

A   This continued for approximately twenty yards.

Q   And after that happened, then what took place?

A   Then the -- the section of Troopers which had advanced halted
    and decided to -- or I should say turned, turned their backs on
    the marchers and apparently started to regroup the march -- they
    walked back to -- started to walk back to the original line from
    which they came.

Q   Now, let me ask you this; at that time was there any type of
    demonstration or commotion or noise from these white onlookers?

A   Yes, there was; they were cheering and jeering loudly.

Q   And then what did the Negro marchers do?

A   Negro marchers then proceeded to sit down, some also knelt.

Q   And were they on that grassy part or grassy area that separates
    the highway 80 from the service road?

A   Yes, they were; they were not on highway 80, but they were as
    close to highway 80 as they could get without being on it,
    immediately adjacent to it.

Q   Then what happened?

A   As they began to sit down and some kneel, the -- the Troopers
    then turned, the section of Troopers that had initially advanced
    were joined by the other Troopers which had remained behind,
    and they moved forward; three or four began to roll gas grenades
    at the front line of the Negro marchers.

Q    Then after the gas grenades were rolled forward, what did the
     Troopers do?

A    They then began to spread out all along the line of marchers.

Q    And did they move into the -- to the kneeling and sitting Negroes

A    Not immediately; it was a few seconds, I would say ten seconds
     passed when a sufficient amount of gas had been released.

Q    And then what happened?

A    Then they moved forward into the crowd --

Q    And what --

A    -- of marchers.

Q    What did they do when they moved into the crowd?

A    They began pushing and striking the marchers.

Q    Were they swinging their clubs?

A    Yes, they were.

Q    Could you tell me about how many gas grenades you saw being
     released?

A    I would say at least fifteen.

Q    And as the gas was released, what did the Negro marchers do?

A    They scattered in all directions, but the majority of them ran
     toward the grassy section on the left side of the road.

Q    And what if anything did the Troopers do?

A    The Troopers proceeded to follow them.

Q    When you say, "Proceeded," what do you mean?

A    They pursued those who were running.

Q    And what were they doing in pursuing them?

A    A -- a number of them were striking.

Q    Striking who?

A    The Negroes.

Q    With what?

A    Their night sticks.

Q    And did you see any of the Negroes fall to the ground?

A    Yes, I did.

Q    And what was the crowd of whites doing?

A    They were again cheering.

Q    Did you see anything -- what did the -- what happened to the -- the bundles and suitcases and packages that the Negroes were carrying?

A    Yes; they were abandoned at all spots along the road as they ran.

Q    And then what happened next?

A    Well, as the confusion began to subside, a large -- the majority of the marchers began to return over the bridge.

Q    Now, are you -- the majority of the marchers began to go over the bridge?

A    Yes.

Q    What were the other marchers doing?

A    Some were on the right side of the road; I saw one or two being pursued by a man on horseback who I believe was a Posse member.

Q    And what was the man on horseback doing as he was pursuing that marcher?

A    I -- all I saw was he was chasing the -- the marcher.

Q    And how many of the Mounted Posse were in action at that time?

A    I would -- I couldn't say.

Q    Then what happened?

A    Well, as the -- the march began to disintegrate, and most of the marchers were returning over the bridge, and most of the gas grenades or almost all of the gas grenades had been released, the possemen on horseback moved toward the end of the line, at a gallop.

Q    And then what happened?

A    They spread themselves at about intervals of fifty or so feet across the bridge as far as I could see.

Q    And then did you observe what these possemen did with respect to the marchers?

A    Yes, they did; they -- yes, I did; I saw them, a few -- a few of them striking the Negro marchers on the head and the back.

Q    And what if anything did they do with their horses; how did they handle their horses?

A    A number of times they drove their horse on to the sidewalk of the bridge.

Q    Now, were any of the marchers in highway 80 or on highway 80 or were on the sidewalk next to this highway 80 on the bridge?

A    No; all of them as far as I could see were on the sidewalk of the bridge.

Q    Were they all moving back across the bridge?

A    Yes, they were.

Q   There were no more of the Negroes just standing or stationary on the bridge once the procession started back toward the church?

A   Not that I could see; no.

Q   Well, how long did the -- did this action by the Mounted Posse continue on the bridge?

A   I saw two men on horseback who I believe were possemen continue to do this all the way across the bridge.

Q   Then was that at -- close to the end of the line in the march?

A   It was directly at the end of the line.

Q   And what would those two Posse members, those Mounted Posse, do?

A   They would move on to the sidewalk with their horse, pushing the last two, three, or five marchers who were not either moving fast enough or running fast enough and from the horse strike the marchers, the fleeing marchers.

Q   And would they have -- what did they have to strike with?

A   They had their night sticks.

Q   And did this occur all the way across the bridge?

A   Yes, it did.

Q   To the west end of the bridge, or the Selma end of the bridge?

A   Yes.

Q   And as they -- was -- as they came off the bridge, was there a group of white citizens standing around at the Selma side of the bridge?

A   Yes, there was.

Q   And what was that group doing; what was that group doing?

482

A    When the possemen regrouped, they were soundly applauded by the
     white people.

Q    And then did you go down to the -- to the Sylvan Street later
     on that afternoon?

A    Yes, I did.

Q    And was the Dallas County Mounted Posse and the other members of
     the Posse down there that afternoon?

A    Yes, they were.

Q    And were they there in large force, large numbers?

A    Yes, I -- I saw most of the -- the men on horseback at the
     Brown's Chapel.

          MR. DOAR:  That's all the questions I have, your

honor.

          THE COURT:  For the plaintiffs.

BY MR. NABRIT:

Q    BARKHOLTZ, you say?

A    Barko.

Q    Mr. Barko, were there some of the marchers, perhaps a half
     dozen or so, who were left behind on the ground at the point of
     the original confrontation?

A    I saw a few of them, yes, left behind.

          MR. NABRIT:  That's all, your honor.

          THE COURT:  Mr. Smith.

               CROSS EXAMINATION:

BY MR. SMITH:

Q    Were you in Selma on Tuesday?

A    Yes, I was.

Q    Of this week?

A    Yes.

Q    And prior to Sunday, March 7, how long had you been in Selma?

A    Since about January 7, with the exception of a few week ends.

Q    Then you were in Selma on Saturday, March 6?

A    Yes.

Q    Were there any demonstrations on that date?

A    Yes, there were.

Q    Where did the demonstrations take place on Saturday?

A    They occurred in front of the Dallas County Court House.

Q    Did you observe white crowds at these demonstrations?

A    Yes, I did.

Q    Would you estimate the size of the crowds on Saturday?  I mean
     the white crowd?

A    Of what, the combined crowd?  There were Negroes directly in
     front of the Federal Building; you want me to estimate those, too,
     or just the whites?

Q    If you will, estimate both; first of all, would you estimate the
     number of Negroes?

A    Over four hundred.

Q    Now, will you estimate the white crowds?

A    About two hundred.

Q    Now, as a law enforcement officer, can you judge or get the
     sense or the attitude of a crowd as such?

484

MR. NABRIT:  Objection, your honor.

THE COURT:  Overruled; answer it if you can.

WITNESS:  Am I directed to answer that?

THE COURT:  Yes, if you can.

A    If you are asking me am I an expert at judging --

Q    No.

A    -- the size of a crowd, I am not.

Q    I am asking, based on your experience in law enforcement, can you as a law enforcement officer judge the sense or the attitude of a crowd of people?

A    No.

Q    You cannot.  Did you notice anything among the white people on Saturday, March 6, that indicated hostility or anger or emotions?

A    I did not directly notice it, but I heard about incidents that occurred, one in particular, during this march on Saturday.

Q    Were there any conflicts that you saw, yourself, on Saturday between the white crowd and the Negroes demonstrating?

A    Any direct conflict?

Q    Yes?

A    No, I -- I did not see any direct conflict.

Q    You did not see any?

A    No, sir.

Q    All right.  Now, you say that you were in Selma on Tuesday of this week, March 9?

A    Yes.

485

Q    Did you see the -- a crowd of Negroes in the Brown Chapel on
     Sylvan Street -- I believe I am correct in calling it Brown
     Chapel?

A    Yes, it is the Brown's Chapel.

Q    The church on Sylvan Street?

A    Yes, I did.

Q    In your judgment, how many people were in the church?

A    I have, during my stay in Selma, learned from news sources and
     from other Agents that there are -- the capacity of the church
     is approximately seven hundred, seating capacity, between six
     hundred and seven hundred, seating capacity.

Q    Was the church filled on Tuesday?

A    I believe it was; I did not go inside.

Q    Were any persons outside of the church?

A    Yes, sir; there were.

Q    Now, this would have been approximately what time?

A    This was going on for the entire morning.

Q    The entire morning of --

A    The crowd was increasing; yes, sir.

Q    -- March 9?

A    Yes, sir.

Q    Do you know Dr. Martin Luther King by sight?

A    Yes, I do.

Q    Did you see him come to the church?

A    I am not sure.

Q    Did you see him in the church?

A    No; I definitely did not see him in the church.

Q    Did you see him about the church?

A    I believe I did.

Q    All right; can you give us some estimate of the time that you saw Dr. King around the church?

A    No, I cannot.

Q    Did you observe any white bystanders in the vicinity of the Brown Church?

A    Yeah.

Q    Brown Chapel?

A    (Nodded to indicate affirmative reply)

Q    Now, did the bystanders -- were they there continuously, or did they more or less come and go?

A    I could say that it is true, they were both -- both parts of that statement are true; there were some of them were there continuously, some of them came and went.

Q    In number, what would you estimate the largest group to have been

A    I was not there the entire time the crowd was forming, so I -- I couldn't answer that.

Q    While you were there?

A    Over fifteen hundred.

Q    Over fifteen hundred?

A    Yes, sir.

Q    White people?

A    No, combined; Negro and white.

Q    Combined; now, can you break it down, or I believe you have given
     us an estimate as to the Negroes, can you give us an estimate
     as to the number of white people?

A    I could not, because both white and Negro were inside the church;
     I saw --

Q    I am speaking now of the white bystanders around the church?

A    I would say over a thousand, combined.

Q    Over a thousand?

A    (Nodded to indicate affirmative reply)

Q    Did you observe any acts of hostility from the white crowd?

A    No, I did not.

Q    Did you observe any acts of hostility from the crowd of people
     within and around the church?

A    No, I did not.

Q    Did you follow the crowd of people from the church up to the
     Pettus Bridge on Tuesday?

A    Yes.

Q    Could you give us an estimate as to the number of people that
     were participating in the march from the church to U.S. highway
     80?

A    I could not do that, because I was at the front of the line.

Q    You were at the front?

A    Yes, sir.

Q    You have no opinion as to how many were marching?

488

A    No.

Q    Now, did you go to any point in the vicinity of the Pettus Bridge
     on U.S. highway 80 east?

A    Yes, I did.

Q    To what point did you go to?

A    I continued across the bridge with the line of marchers to a
     point again about two hundred yards on --

Q    Did you observe the marchers -- on Tuesday, of course, we are
     speaking of --

A    Yes.

Q    -- as they approached the Pettus Bridge?

A    Yes, I did.

Q    Did -- do you know United States Marshal Fountain?

A    Yes, I do.

Q    Did you see him at the Selma side of the bridge?

A    I saw him in that vicinity; yes.

Q    That was vicinity?

A    Uh, huh.

Q    Now, do you know John Lewis?

A    Yes.

Q    Do you know Hosea Williams?

A    Yes.

Q    Did you see them leading the march?

A    I believe they were in the front or near the front of marchers
     with Dr. King.

Q   Did you -- my next question, did you see Dr. King -- and you

say they were with Dr. King; is that correct?

A   Yes.

Q   Did you hear the United States Marshal read Judge Johnson's

order?

A   There was a group surrounding apparently the U. S. Marshal; I

was in the car immediately next to this group, so I did not

visibly see the U. S. Marshal reading it, nor did I hear him,

but the best of my judgment, he was reading it -- reading

something; yes.

Q   Now, after the United States Marshal read whatever he was

reading, what did the marchers do?

A   They moved aside.

Q   The marchers moved aside?

A   Yes.

Q   They did; they did not continue --

A   No, sir.

Q   -- is that correct?

            THE COURT:  Talking about Marshals or marchers?

            MR. SMITH:  Excuse me, I said marchers.

            WITNESS:  Excuse me, I thought you said U. S.

Marshals.

            MR. SMITH:  I can understand that.

A   The marchers continued; yes.

Q   Marchers continued to where?

A    Across the Edmund Pettus Bridge.

Q    All right; now, to what point across the bridge?

A    I would say up to that -- to the point where there is a structure
     for highway signs which --

Q    How far from the end of the bridge?

A    Oh, about two hundred yards

Q    Were any State Troopers up there?

A    Yes, there were.

Q    How many would you estimate?

A    Over a hundred and fifty.

Q    Did the State Troopers confront the marchers?

A    Yes.

Q    What happened?

A    The marchers -- leaders of the march began to pray.

Q    Began to pray?

A    Yes.

Q    Did they kneel?

A    Yes, they did.

Q    Were they in the street?

A    I believe they were.

Q    Were they blocking traffic -- I am sorry, I withdraw the
     question.  Now, on Sunday, March 7, you mentioned there were
     crowds of whites cheering --

A    (Nodded to indicate affirmative reply)

Q    -- as the law enforcement officers dispersed the crowd by running

    into the crowd of marchers and using the billy sticks; is that

    correct?

A    They cheered when the marchers -- when the -- the main group of

    marchers returned from the gas, the clouds of gas, I should say.

Q    Where were these crowds of white people standing?

A    They were standing in front of the Glass House and the Chick-N-

    Treat and the -- scattered throughout the -- part of the Kayo

    Gas Station, the pavement part.

Q    Were they boys?

A    There were men, women, and boys of school age, high school age,

    I would say.

Q    Did you recognize any of them?

A    No, sir; I didn't.

Q    You say that they soundly applauded in certain other instances?

A    (Nodded to indicate affirmative reply)

Q    Now, would this be the same group or a different group of white

    bystanders?

A    I couldn't definitely answer that.

Q    Now, the white group that cheered that you have mentioned were

    on the Montgomery side of the bridge; is that correct; on Sunday?

A    Yes.

Q    Did you observe any white group on the Selma side of the bridge?

A    Yes.

Q    Would you estimate the size of the white group on the Selma side

    of the bridge on Sunday?

492

A   I think that would be impossible to do, because they were lined all along Broad Street.

Q   Would you say it was more than a thousand?

A   No, sir.

Q   You would not. Do you have any judgment -- could you say that there was as many as five hundred?

A   I had no reason to -- to check the size of the crowd; I was watching the marchers.

Q   Did you see any acts of hostility either emanating from the white crowd or coming from the marchers?

A   No, sir.

Q   Any exchange of words or cursing or --

A   The best of my knowledge; no, sir.

Q   None that you heard?

A   None that I know of; right.

Q   Did you see any State Trooper actually strike any one of the marchers on Sunday?

A   Yes, I did.

Q   Now, that was during the tear gassing?

A   Yes.

Q   Prior to the tear gassing, you did not see a State Trooper strike any one of the marchers?

A   Depending on your definition of the word, "Strike."

Q   All right?

A   If to push vigorously would mean to strike, then yes.

Q   Now, when Major Cloud first confronted the marchers, did he give
    the leaders of the group or those that were nearest to him two
    minutes to disperse?

A   If Major Cloud was the Trooper on -- talking on the loudspeaker,
    yes.

Q   Is he the one -- did you notice that he had the rank of major?

A   No, sir.

Q   You did not.  Was he in a Highway Patrol uniform?

A   Yes, he was.

Q   And using the public address speaker?

A   Yes.

Q   Now, you stated that he said, "The march cannot and will not be
    tolerated"?

A   Yes, or words to that effect.

Q   Words to that effect?

A   Yes.

Q   "Disperse and go back to the church or to your home"?

A   Yes.

Q   Now, was this audible; was it over a loudspeaker so that
    everybody in the area could hear it?

A   I couldn't speak for those at the end of the line, a line
    extended from the Trooper, the head Trooper, there, all the way
    to the top of the Edmund Pettus Bridge, but I would say at least
    half heard it.

Q   Now, at that time approximately how many State Troopers were on

494

the highway?

A    They were -- there was the -- the main group of Troopers were
     facing the marchers, I would say there were about fifty that
     were facing the marchers, but there were others facing
     Montgomery on the right side of the road, scattered at various
     intervals from the bridge to the main group of marchers -- main
     group of Troopers, excuse me.

Q    Were the Troopers in the form of a wedge, spread out?

A    No -- you mean a vee?

Q    Yes?

A    No.

Q    They were not.  Now, when Major Cloud gave the order which you
     mentioned and stated that, "I will give you two minutes," how
     much time elapsed between that utterance and the time that the
     State Troopers marched into the crowd?

A    I couldn't say definitely; I would have to give you my opinion
     or an estimate.

Q    That is what I am asking you for, just your opinion?

A    An opinion, I would say it was less than two minutes.

Q    Less than two minutes?

A    Yes, sir.

Q    Would you say it was less than a minute?

A    I would say, as an estimate, my opinion, approximately that.

Q    Approximately a minute?

A    (Nodded to indicate affirmative reply)

495

Q    Now, during the interval of the minute that you -- that you

     estimate --

A    (Nodded to indicate affirmative reply)

Q    -- did any of the marchers disperse?

A    As far as I could see; no.

Q    None of them -- did any of them turn in the direction of Selma?

A    As far as I could tell; no.

Q    As the Troopers approached the crowd, did any of the marchers

     kneel?

A    I didn't see any.

Q    Did any of them fall limp?

A    I did not see any of that.

Q    You did not?

A    No.

Q    And you say that the Troopers, as they first advanced with the

     billy clubs, were -- they were held in somewhat in this position?

A    Yes.

Q    And as they got more into the crowd they started pushing and

     prodding?

A    Prodding, yes; not all of them.

Q    I believe you said pushed and jabbed?

A    Yes, there were a few that were jabbing; yes, sir.

Q    Now, did this disperse the crowd?

A    No; it did not.

Q    It did not.  Did the marchers continue to refuse to disperse?

A    After this happened, this first line of Troopers that had advanced turned their back and began to return to the line from which they came; as they did this, the marchers -- some sat down, some knelt.

Q    Some of them sat down at that time?

A    Yes.

Q    And some knelt?

A    Yes.

Q    Did they sit down in the highway?

A    As far as I could tell, no; there was --

Q    Did the Troopers ask them to get up?

A    I didn't see or hear any conversation; no.

Q    You didn't see anybody sitting in the highway, or kneeling in the highway?

A    No; they were as close as they could get to the highway without being on it.

Q    In the confrontation between Major Cloud and the leaders of the marching group on Sunday, when Major Cloud gave the order which you have testified to, did you hear anything in response from anybody in the crowd of marchers?

A    Yes, I did, but --

Q    What did they say?

A    I could not hear what they were saying, but I could tell that there was some sort of conversation going on between, as you say, Major Cloud and the leaders of the march.

497

Q    You didn't hear anything?

A    No, sir; I didn't.

Q    Okay.  Did you overhear any of the conversation between Dr.
     King on -- on Tuesday and Marshal Fountain on the Selma side of
     the bridge?

A    Would you repeat that, please?

Q    I am directing your attention now to Tuesday --

A    Tuesday's march.

Q    -- Tuesday, the 9th --

A    All right.

Q    -- and on the Selma side of the Pettus Bridge.

A    Uh, huh.

Q    Did you overhear any of the conversation between the United
     States Marshal Fountain and Dr. King?

A    No, I did not; I was in the car immediately next to the group
     that was surrounding -- group of men and women who were
     surrounding Dr. King.

Q    As a law enforcement officer, can you give this court any
     opinion as to what it would require, law enforcement wise, to
     afford ordinary police protection for a group of marchers
     proceeding from a point in Selma to Montgomery?

A    This would be strictly my opinion.

Q    That is what we are asking?

A    I believe that the -- the Troopers acted with discretion when
     they used tear gas, but --

498

Q   Excuse me, I think you misunderstood --

A   Not this question -- they were justified in their use of the tear
    gas on the march---

            MR. GRAY:  Your honor, we object.

            THE COURT:  Not responsive; it was not responsive.

            MR. SMITH:  It is not responsive; I can understand

he may not understand what I am asking him.

Q   My question is -- how long have you been in law enforcement?

A   Six months.

Q   Six months?

A   Yes, sir.

Q   Did you have special training to become an Agent of the Federal
    Bureau of Investigation?

A   Yes, I did.

Q   Did you have any experience in law enforcement prior to becoming
    an F.B.I. Agent?

A   No, I did not.

Q   Have you attended -- a college graduate?

A   Yes.

Q   College or university?

A   Yes.

Q   Do you have a law degree?

A   No, I do not.

Q   Did you attend the F.B.I. Academy?

A   Yes, I did.

499

Q    And the Academy gives instructions in regard to various phases
     of law enforcement?

A    Yes, sir; they do.

Q    Now, do you have an opinion in regard to -- from a law
     enforcement standpoint -- as to the number of men it would
     require to furnish or to afford ordinary and adequate police
     protection for a group of marchers who proposed to march from
     a point in Selma, Alabama, along U.S. highway 80 east to the
     State Capitol in Montgomery, Alabama?

               MR. NABRIT:  Objection, your honor.

               MR. GREENBERG:  Objection.

               THE COURT:  Sustain objection; fails to hypothecate
sufficient facts; sustain objection.

               MR. SMITH:  I believe that's all.

               THE COURT:  Mr. Pitts.

               MR. McLEAN PITTS:  Did you sustain that objection
on the fact it wasn't sufficient facts in the hypothecation?

               THE COURT:  Sure; is your group of marchers ten or
ten thousand --

               MR. McLEAN PITTS:  That is what I wanted to ask.

               THE COURT:  -- day time or night time --

               MR. McLEAN PITTS:  I would like to ask him --

               THE COURT:  -- six abreast or one abreast?  It
doesn't hypothecate any facts that anyone could answer, much less
a six months old F.B.I. Agent.

BY MR. McLEAN PITTS:

Q   As I understand, you took the -- you were there and saw the
    tear gas cans rolled in; is that right?

A   Yes, sir.

Q   And they were rolled along the pavement?

A   The ones I saw; yes.

Q   In other words, they were released and just thrown out under
    the pavement; is that right?

A   Yes.

Q   All right, sir; now, from your -- what you saw there and your
    knowledge of it and what you -- the experience that you have
    had and being a graduate of the F.B.I. Academy and training
    you have had, is it your opinion that these Troopers acted with
    discretion --

               MR. GRAY:  Objection.

Q   -- in using tear gas on that occasion?

               MR. NABRIT:  Objection.

               THE COURT:  I will let him answer it.

               MR. McLEAN PITTS:  Sir?

               THE COURT:  I will let him answer it; objection is
overruled.

A   I would like to --

               THE COURT:  You can answer it if you can.

A   I think I -- I erred in using the word, "Discretion," like to
    change that --

501

Q    What is that?

A    I erred when I used the word, "Discretion"; maybe it was, maybe it wasn't, but I would say that in the interest of public safety, yes.

    MR. NABRIT:  Move to strike the answer, your honor.

    THE COURT:  Motion denied.

    MR. McLEAN PITTS:  That's all.

    THE COURT:  Mr. Doar, redirect?

        REDIRECT EXAMINATION:

BY MR. DOAR:

Q    Did you take into consideration in making that answer the power of the State Troopers to make arrests?  Just did you take that into consideration; just yes or no?

A    Yes, I think I did.

Q    You did?

A    (Nodded to indicate affirmative reply)

Q    Now, these white people that were -- you say were down at the church, were they friendly white people or hostile white people? You said there were about a thousand of them.

A    I would say the majority were friendly, since they had -- was this on --

Q    This was on Tuesday.

A    -- Tuesday?  On Tuesday, the majority were friendly since they were ministers and preachers and rabbis that were coming in from various parts of the country.

502

MR. DOAR:  Thank you.

THE COURT:  For the plaintiffs?

MR. NABRIT:  Thank you, your honor.

BY MR. NABRIT:

Q   Mr. Barko, you referred to a group of persons who staged a
    demonstration on Saturday, March 6; is it true -- is it true
    that these demonstrators were all white persons?

A   Yes; those that I saw were all white.

Q   And it was not a demonstration in which Negroes participated
    which you observed on Saturday, March 6?

A   That is correct; it was not.

Q   Now, referring to Sunday, March 7, Mr. Barko, were the -- at
    the time -- after -- I withdraw that.  After the Trooper in
    charge gave directions to the marchers to disperse, did they
    make any noise, the demonstrators?

A   No, not that I could tell.

Q   Were they quiet?

A   Yes.

Q   Were they still standing in their files?

A   Yes.

Q   Or -- they were in columns of twos on the shoulders of the
    road; right?

A   As far as I could see.

Q   Did -- did any -- did you observe any of them step out of the
    line of march or advance toward the officers?

503

A    No.

Q    They stood in place?

A    Yes.

Q    Quietly?

A    Yes.

Q    You testified that a section of the officers came toward them and pushed those in the front?

A    Yes, sir.

Q    Would you say that the pushing was gentle or violent or was it rough or what?

A    I would say it was sufficient to force the marchers to retreat rapidly.

Q    Was it sufficient to force some of them to fall to the ground?

A    Yes.

Q    And were some of them women?

A    I believe so.

Q    Those who fell to the ground?

A    Yes.

Q    And I believe you testified on direct examination that the officers stepped on or over some of those who fell; is that correct?

A    Whether intentionally or accidentally; yes.

Q    You said the pushing was sufficient; was the pushing rough or gentle?

A    I didn't feel it; I believe it was rough.

504

Q   You refer to a point -- withdraw it.

MR. NABRIT:  May I look at the photographs, Exhibit number -- may I have a moment, your honor, to find a particular photograph?

THE COURT:  (Nodded to indicate affirmative reply)

Q   Officer, would it be accurate to say about the group of demonstrators you saw kneeling that they were in a what might be described as an attitude of prayer or position one might take to pray?

A   Possibly, but they were **very** close to each other.

Q   I am going to show you a photograph which is part of the Government's Exhibit, it is marked B-213, and it is part of Exhibit -- Plaintiff-Intervenor's Exhibit 3, and ask you if this photograph depicts the marchers at about the time you are talking about when they were kneeling?

A   Yes, sir; it does.

Q   And it was while they were in the position represented by this picture that the State Police throwed tear gas at them?

A   Yes.

Q   Now, were these people who were kneeling, were these some of the people who had been pushed by the officers as you said fairly roughly?

A   It could have been the ones; those that were pushed might conceivably have gone to other sections of the line, but in my estimation, they were the ones that were originally pushed; yes.

505

Q   So it was after they had been pushed and some of them knocked to
    the ground that they knelt in this position indicated by this
    picture?

A   Yes.

Q   Now, Officer, you testified examined -- on cross examination
    by Mr. Smith, I believe, that you observed the march which took
    place Tuesday, March 9; is that correct?

A   Yes.

Q   And you followed the line of the marchers in an automobile, and
    I believe you stated that you saw Mr. Hosea Williams and Mr.
    John Lewis near the -- near Reverend King; I am going to
    address a question to you and ask you to reconsider that
    statement and think about it a moment, and I am going to give
    you this additional information; I am going to say to you that
    both of those gentlemen have denied on oath in this court room
    that they were present on that date; now, do you adhere to your
    former statement?

A   No, I do not; I now realize that, the best of my knowledge, John
    Lewis was in the hospital at that time. As for Hosea Williams,
    I couldn't say.

Q   You now have no specific recollection of seeing either of them
    in that group of marchers on Tuesday, March 9?

A   That -- that is correct.

Q   You were in an automobile, and you saw a group?

A   I saw Dr. King with a group of Negro leaders; yes.

506

MR. NABRIT:  Pardon me, your honor; may I have a
moment to confer?

THE COURT:  This is your second time around, so
wind it up.

MR. NABRIT:  Yes, sir.

THE COURT:  Terminate it.

MR. NABRIT:  I will do my best.

Q    Mr. Barko, what is it that you were taught at the F.B.I. Academy,
     or elsewhere, that makes -- that led you to think it was proper
     to throw tear gas on a group of people in that situation?

A    If a group of individual -- of individuals numbering as large
     as the crowd was on Sunday refuse to obey the law, then this --
     this force is justified.

Q    When you say, "Obey the law," you mean obey the policemen; is
     that correct?

A    Who were enforcing the law.

MR. NABRIT:  No further questions, your honor.

THE COURT:  Mr. Doar?

MR. DOAR:  No further.

THE COURT:  Mr. Smith?

MR. SMITH:  No.

THE COURT:  Mr. Pitts?

MR. McLEAN PITTS:  I want to ask him one more
question if I could, please, sir.

RECROSS EXAMINATION:

507

BY MR. McLEAN PITTS:

Q    Did you go down to the -- on Sunday afternoon, did you go down
     in the area of the Brown Chapel after the march was over with?

A    Yes, I did.

Q    And did you see any brickbats thrown down there?

          THE COURT:  I can't hear you.

A    I can't --

Q    Did you see any brickbats or bottles being thrown down there?

A    No; I did not, sir.

          MR. McLEAN PITTS:  Okay, that's all.

          THE COURT:  All right, call your next witness, Mr.
Doar.

          MR. DOAR:  Mr. Snodgrass.

          THE COURT:  Excuse the witness?  You can excuse the
witness.

          MR. DOAR:  This witness has been in the court room,
because he is the man that is going to run the film.

          THE COURT:  All right.

          MR. DOAR:  He doesn't have any testimony; I will just
identify the film through this witness.

          THE COURT:  All right.  How long is your film?

          MR. DOAR:  Oh, it is -- three minutes.

          THE COURT:  All right.

          MR. DOAR:  Very short.

          THE COURT:  All right.  Take the stand; swear him in

508

(Witness Phillip S. Snodgrass sworn by the Clerk)

****************

PHILLIP S. SNODGRASS, witness for the United States, having been

duly sworn, testified as follows:

DIRECT EXAMINATION:

BY MR. DOAR:

Q    Will you tell the court your full name, please?

A    Phillip S. Snodgrass.

Q    What is your occupation?

A    Special Agent, Federal Bureau of Investigation.

Q    Where are you stationed?

A    Montgomery, Alabama.

Q    Did you, at my request, report to the Court House today to run

a projector of a film that I desired you to run --

A    I did.

Q    -- in the court room?  And did you -- you have that film on the

projector that is in the court room now?

A    I do.

Q    And did you show that film to a witness named Pierce?

A    I did.

Q    And is that the same film that you showed to him up in a room

on the third floor here prior to -- during the -- prior to noon

time today?

A    It is.

MR. DOAR:  I would like your honor to have the Clerk

509

mark the film that is on the projector as Plaintiff-Intervenor's
Exhibit.

THE CLERK:  Plaintiff-Intervenor's Exhibit number 8.

THE COURT:  All right, he can mark it -- physically
mark it later.

MR. DOAR:  All right, that's all the questions I have
from this witness.

MR. McLEAN PITTS:  Who is -- I am sorry.

THE COURT:  Any examination from the plaintiffs?

MR. SMITH:  No, sir.

MR. NABRIT:  No questions, your honor.

THE COURT:  Mr. Smith?

MR. SMITH:  No questions.

THE COURT:  Mr. Pitts?

MR. McLEAN PITTS:  Yes, sir; I just wondered who is
this man, Pierce?

MR. DOAR:  Mr. Pierce is coming in next.

MR. McLEAN PITTS:  Huh?

MR. DOAR:  He is coming in next.

MR. McLEAN PITTS:  Oh.

THE COURT:  All right.  Marked for identification
Plaintiff-Intervenor's Exhibit 8.  You will be excused from the
witness stand.  Call your next witness.

MR. DOAR:  Mr. Pierce.  Have you been sworn?

WITNESS LAURENS WALTER PIERCE:  No, I have not.

510

MR. DOAR:  This witness has not been sworn.

THE COURT:  The Clerk will swear him.

THE CLERK:  Please raise your right hand.

(Witness Laurens Walter Pierce sworn by the Clerk)

MR. DOAR:  Will you step up to the witness chair,

please.

************

LAURENS WALTER PIERCE, witness for the United States, having been

duly sworn, testified as follows:

DIRECT EXAMINATION:

BY MR. DOAR:

Q    Will you tell the court your full name, please?

A    My name is Laurens Walter Pierce.

Q    Mr. Pierce, where do you live?

A    My home is Montgomery, Alabama.

Q    What is your occupation?

A    I am a cameraman with C.B.S. Television News.

Q    Were you on duty for C.B.S. News on Sunday, March 7, 1965, at

Selma?

A    I was.

Q    Was there any other cameramen from C.B.S. on duty with you?

A    Yes, sir.

Q    And how many people were in the crew?

A    We had three men in each crew; there is -- to each crew there is

a cameraman, a sound man, and an electrician, and there was --

Q    Then there were six people there from C.B.S., and what was your
     particular job?

A    I am a cameraman.

Q    And there were two cameras?

A    Yes, sir.

Q    And did you and your -- the other crew take pictures of the
     meeting between the marchers and the State Police and the
     dispersing of the marchers by the State Police on the Montgomery
     side of the -- of the bridge on that Sunday?

A    Yes, sir.

Q    And did you also take some film of the -- of the marchers as
     they left the church on Sylvan Street --

A    Yes, sir.

Q    -- and marched down through the streets in Selma -- at Selma?

A    Yes, sir.

Q    And is it -- is it -- is there sound in conjunction with that
     film?

A    Yes, sir.

Q    Now, have you, at my request, reviewed and viewed the film with
     Special Agent of the F.B.I. Snodgrass purporting to show a --
     these films, these pictures that you took on that Sunday?  Have
     you reviewed it and viewed it this morning?

A    Yes, sir; yes, sir.

Q    Now, is that -- are those pictures fair and accurate representa-
     tions of the march from the church on Sylvan Street out on

512

highway 80 until after they were dispersed by the State Police?

A    Yes, sir.

Q    And will you tell the court whether or not this particular film is in more than one strip?

A    Meaning from one camera alone or whether it has been cut?

Q    Yes, just how is it arranged on this film?

A    This film primarily is made up of two segments; one is made up of what is called outtakes, that is the film that is edited out of the film that will be presented for television viewing.  The second part of the film is primarily the film as it was edited for viewing on the air, and in the sequencing for the air presentation or the air cut.

Q    And does this film portray a fair and accurate representation of the scenes on that Sunday?

A    Yes, sir.

        MR. DOAR:  I would like to ask to -- permission to offer Plaintiff-Intervenor's Exhibit in evidence and show the film to the court.

            THE COURT:  Any voir dire examination?

            MR. SMITH:  Yes, sir.

            MR. McLEAN PITTS:  Yes, sir.

            MR. SMITH:  Excuse --

            MR. McLEAN PITTS:  Yes, sir; go -- excuse me; go ahead

            THE COURT:  Mr. Smith.

                VOIR DIRE EXAMINATION:

513

BY MR. SMITH:

Q   Mr. Pierce, you say this film is in two parts, one portion is
    a portion that was edited for C.B.S. Network News, and the other
    portion is a continuous portrayal or representation by picture
    of everything that you took on the day in question; is that
    correct?

A   No; no, sir; that was not my concurrence.

Q   All right, sir; my question is this; has -- has any portion of
    the film been spliced?

A   This is a print of a negative film.  The negative film was
    spliced together.

Q   How many times was it spliced?

A   I don't know, sir.

Q   Were any -- were any portions of the -- of the photographs,
    themselves, deleted from the spliced portion of the film?

A   You mean any portion of it, a single frame or an individual
    frame in the picture, itself; is that what you mean, sir?

Q   No, I mean a sequence?

A   Well --

Q   Sequence of moving pictures, were any portion of them taken out?

A   This -- this film, as well as I can identify, is made up, as I
    said, of two segments; one is that film which was taken out of
    the original film or so called outtakes, the other is the
    edited version which was presented for airing, for the television
    viewing, and that is a spliced together and edited piece of

negative from which this print was made.

Q    The combined film would be all of the pictures that you took,
     then, that is, both portions of it?

A    This would not -- I don't know this is all the portions of it,
     I do not; this is a good portion of what was taken.

Q    Do you know whether or not any portion has been taken out of it?

A    I would imagine that some of this has fallen by the wayside;
     it is fairly usual practice for some of it to fall uselessly to
     the floor and die a-borning.

Q    Actually, what you were portraying was for the purpose of -- of
     national network?

A    I am sorry; I didn't hear your complete statement.

Q    The film you were taking were for the purpose of national
     television production; is that correct?

A    I am a cameraman with C.B.S. News, and the film I took was
     primarily for C.B.S. News presentation.

                    MR. SMITH:  All right, sir.

                    THE COURT:  Mr. Pitts.

BY MR. McLEAN PITTS:

Q    Do I understand you to say that some of this film has been spliced
     and placed in different sequence from what it was taken?

A    Well, I don't think sequencing was the point in which I was des-
     cribing this; some of it is what we call outtakes.  The outtakes
     are film that has -- has been cut out of the original -- original
     film and is not used for the presentation on the air.  Then a

515

latter segment of this film is what is referred to as the air cut, and that is film put into edited version which is intended for presentation over the air.

Q    So that makes this film here not actually in the sequence that it was taken; isn't that right?

A    The sequence of the air cut would be in relationship to -- in relation to every segment in there would be exactly in the sequence to which it was taken.  Now, it may not represent the total time element involved, if that is what you are driving at, sir.

Q    I know, but some of the film is left out of what you put on the air; isn't that right?

A    Well, if you mean some of the actuality is left out, it is left out by virtue of the fact that some of the film is not included and some of the time the film was not running, that is, the cameras were not running.

Q    And it has been cut, too?

        THE COURT:  It is edited; he said it was edited, meaning portions of it taken out to serve their purposes.

        MR. McLEAN PITTS:  I was just -- I was honest, your honor, I didn't understand exactly how it was, sequence he was running it in; I object to it -- to it on the film -- on the ground that it is not true sequence in which it was taken, it is not a true representation, not all the film.

        THE COURT:  You have an objection?

MR. SMITH:  Same objection, your honor.

THE COURT:  All right, it purports to be an edited film that will be admitted as such.

MR. SMITH:  All right, sir.

THE COURT:  Your objection would be well taken if it was offered as a complete portrayal of what went on, but it is not offered as that, it isn't admitted as that; so it is admitted in evidence.

MR. DOAR:  May the film man show the court now?

THE COURT:  Yes.

MR. DOAR:  I think, your honor -- I don't know whether it would be better -- does the court wish to have the lights changed at all?

THE COURT:  I think we can see it.  We run a good bit of film in here; I don't believe you need to turn the lights off.

MR. DOAR:  Excuse me.  Have the sound up, set it on regular.

(At which time movie film, Plaintiff-Intervenor's Exhibit 8, was started to be projected, with sound, in the court room)

THE COURT:  Can you stop it?  Turn some of the top lights off, if you will, on this film; I can't see it well.

(Lights were changed)

THE COURT:  All right.

(The film was then projected for the court)

517

THE COURT:  All right, turn on the lights.  Anything further from this witness?

MR. DOAR:  Nothing further.

THE COURT:  For the plaintiffs?

MR. NABRIT:  No questions, your honor.

THE COURT:  Mr. Smith?

MR. SMITH:  No questions.

THE COURT:  Mr. Pitts?

MR. McLEAN PITTS:  No, sir.

THE COURT:  Mr. Pierce, in the film, if you know, from the time that the officer in charge of the Troopers gave the order that they had two minutes until they proceeded -- until the Troopers proceeded, was that in the proper sequence on your film, or can you tell whether that has been edited?

WITNESS:  The film was in the proper sequence; the total time was not.

THE COURT:  The total time was not?

WITNESS:  Yes, sir.

THE COURT:  All right, that is what I want to know. Anything else?  You can be excused.

WITNESS:  Thank you, sir.

MR. DOAR:  Reverend Reese; Reese.

THE COURT:  Who?

MR. DOAR:  Reverend Reese; I think he is in the back room.

518

THE COURT:  Is he a long witness or a short one?

MR. DOAR:  He is quite a long witness.

THE COURT:  We will recess.  How many more do you have?

MR. DOAR:  One, two, three or four witnesses at the minimum, not counting the witnesses with respect to conditions on voter registration.

THE COURT:  All right, we will recess until nine o'clock in the morning.  Any matter you wish to take up, gentlemen, before we recess?

MR. McLEAN PITTS:  What did you want me to do about our witnesses?

THE COURT:  Mr. Smith, how many witnesses do you have?  I take it you are going to put your witnesses on for the Governor and for Lingo next?

MR. SMITH:  Yes, sir.

THE COURT:  How many witnesses do you have?

MR. SMITH:  Your honor, I have about seven witnesses. Like to tell the court at this time I do not expect to use all of them; I will make an announcement in the morning or as soon as I have the opportunity further --

THE COURT:  I am trying to get some information for Mr. Pitts about time.

MR. SMITH:  Yes, sir; I will be glad to --

THE COURT:  Will you give him what information you

have, and you can be guided by that, and you will have all the information I have on it when you get that from Mr. Smith, and more.

MR. McLEAN PITTS: What I am trying to get, is it the intent of the court to run all day tomorrow or to noon or what?

THE COURT: I reckon we will run all day.

MR. AMAKER: Your honor, we still have two witnesses which I would like to ask Mr. Pitts if he would now like -- now excuse, or does he have any reason for holding them beyond --

THE COURT: What are their names?

MR. AMAKER: Annie Lee Cooper and Mr. Albert Turner.

MR. McLEAN PITTS: Wait just a minute, your honor, just one question.

THE COURT: All right.

MR. McLEAN PITTS: We will excuse them.

THE COURT: Counsel says those two witnesses may be excused.

MR. AMAKER: Are excused; thank you.

THE COURT: Any other matters you wish to take up before we recess for the day? Mr. Doar?

MR. DOAR: If all those orders aren't here by tomorrow, can we get them to you first thing Monday morning?

THE COURT: Yes.

MR. AMAKER: Your honor, I have the two that I referred to with me.

MR. DOAR: I will coordinate them.

THE COURT: You do that. All right. All right, we will recess until nine o'clock in the morning.

(At which time, 4:50 p.m., a recess was had until 9:00 a.m., March 13, 1965, at which time the hearing continued)

THE COURT: Before we continue for the taking of the testimony, do we have any preliminary matters to take up with the court?

MR. SMITH: May it please the court, at the request of the defendant, Mr. Lingo, himself, we respectfully request permission of the court to withdraw the appearance of our firm in his behalf and permission to continue in the capacity as counsel for the Governor. Mr. Lingo has eminently qualified counsel, Mr. Kohn, of the Montgomery bar, who will continue to represent him.

THE COURT: Mr. Kohn is present?

MR. SMITH: Yes, sir.

THE COURT: And are you ready to continue --

MR. KOHN: Yes, your honor.

THE COURT: -- in the representation of Mr. Lingo?

MR. KOHN: Yes, your honor.

MR. AL LINGO: That's right, your honor.

THE COURT: I take it there is no objection?

MR. HALL: No.

THE COURT: Then, Mr. Smith, you and your firm will be relieved from this point as -- as counsel for Mr. Lingo, and the court records will reflect the substitution of Mr. John Kohn as his

attorney.

   MR. SMITH: Thank you.

   MR. McLEAN PITTS: Your honor, I have a matter I
would like to bring up to the court this morning. I find -- I didn't
know to start out, but I find it is going to be necessary for me to
put Judge James A. Hare -- I want to put him on the stand, and Judge
Hare is Judge of the Circuit Court of Dallas County, and he's been
sitting here, I want to prove some of these writs issued out of
his court --

   THE COURT: Sure.

   MR. McLEAN PITTS: -- and I want to bring up to the
court this morning as soon as I found out it was necessary to put
him on the stand.

   THE COURT: I would be inclined to excuse Judge Hare
from the rule unless there is some real objection and some reason
supporting -- in support of the objection.

   MR. GREENBERG: (Shook head to indicate negative
reply)

   THE COURT: All right.

   MR. McLEAN PITTS: All right, sir.

   THE COURT: Anything else as a preliminary matter?
The case is with the intervenor; call your next witness.

   MR. DOAR: Mr. Frye.

   THE CLERK: Have you been sworn?

   WITNESS ROBERT L. FRYE: No.

522

THE CLERK:  Please raise your right hand.

(Witness Robert L. Frye sworn by the Clerk)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ROBERT L. FRYE, witness for the United States, having been duly

sworn, testified as follows:

DIRECT EXAMINATION:

BY MR. DOAR:

Q   Will you tell the court your full name, please?

A   Robert L. Frye.

Q   Mr. Frye, where do you live?

A   Selma, Alabama.

Q   What is your occupation?

A   Special Agent with the F.B.I.

Q   How long have you been a Special Agent for the F.B.I.?

A   I am in my fourteenth year.

Q   In connection with your official duties as an Agent of the

Federal Bureau of Investigation, were you on the scene on

highway 80 east of the Pettus Bridge last Sunday?

A   Yes, sir.

Q   And I want to ask you whether or not you were there at the time

that the Negro march came over the Pettus Bridge toward

Montgomery?

A   Yes, sir.

Q   How long had you been there prior to that time?

A   Approximately an hour.

Q    And did you stay there until the State Police and the local
     Sheriff's office left that area?

A    Yes, sir.

Q    Now, did you see Mr. Lingo, the head of the State Patrol, there?

A    Yes, sir; I talked to him.

Q    And when did you first see him?

A    About the time that I arrived there on the scene, which was
     approximately one -- a little bit after one, or one thirty.

Q    And can you tell me whether or not Mr. Lingo was present at that
     scene throughout the period of time that there was any police
     activity on the Montgomery side of the Pettus Bridge?

A    Yes, sir.

Q    He was?

A    Yes, sir.

Q    Was he in a car, or was he out on the highway?

A    He was in a car prior to the time that they came over the
     bridge, and I did see him out of the car two or three times.

Q    Where was the car located with respect to the -- that overhead
     sign, traffic sign, as you come toward Selma from Montgomery,
     approximately four hundred or five hundred feet from the bridge?

A    Almost opposite the sign on the -- going toward Montgomery on the
     right hand side.

Q    And where was it -- was that opposite the line that the State
     Troopers took across the highway?

A    Yes, sir.

524

Q    Now, let me ask you this; did you see Sheriff Clark there that
day?

A    Yes, sir.

Q    And did -- when did you first see Sheriff Clark there?

A    About one or one thirty.

Q    Where was Sheriff Clark?

A    When I arrived, he was walking around the area there near where
our cars were parked, and that was near Director Lingo's car.

Q    And did Sheriff Clark remain there throughout the time that
there was any police activity in that area?

A    Yes, sir.

Q    And were Sheriff Clark and Colonel Lingo directing the operations
as far as you could see?

A    They were on the scene; their superior officers were more or
less in the direct supervision.

Q    Now, you have been an F.B.I. Agent in this area, Selma area, for
a number of years?

A    Yes, sir.

Q    Do you know the -- many of the officers of the State Troopers
in the State Troopers?

A    Most of them; yes, sir.

Q    And as well as the Sheriff's deputies and Chief Deputies?

A    Yes, sir.

Q    Now, when you mentioned the superior officers that were
directing the operation there that day, to -- to whom are you

referring?

A   Major John Cloud, who is Chief of the Uniform Division, and Chief Deputy Sheriff Crocker, L. C. Crocker.

Q   And did you observe who was in charge of the Mounted Posse?

A   Captain George Stoves appeared to be in direct supervision of the Mounted Posse.

Q   Now, is Captain George Stoves a regular deputy of the Sheriff's Department?

A   Assistant Chief Deputy.

Q   So that the Sheriff was there and his two Chief Deputies were there throughout the afternoon?

A   Yes, sir.

        MR. DOAR:  Thank you.

        THE COURT:  For the plaintiffs.

        MR. NABRIT:  No questions, your honor.

        THE COURT:  Mr. Smith.

        MR. SMITH:  One minute, please.

        CROSS EXAMINATION:

BY MR. SMITH:

Q   As a Special Agent for the Federal Bureau of Investigation, you have been assigned to Selma for how long?

A   Since 1956, sir.

Q   And were you in Selma on Sunday, March 7?

A   Yes, sir.

Q   Are you familiar with the condition of traffic at or in the

526

vicinity of the Pettus Bridge on U.S. highway 80?

A    All I know, sir, it is a four lane highway in that vicinity there, and I don't know the amount of traffic that travels on that road; I have never had any occasion --

Q    Is it a heavily traveled thoroughfare?

A    Yes, it is a four lane highway.

Q    And does this highway come into the heart of downtown Selma?

A    Yes, sir; across Pettus Bridge.

Q    Would it or not, in your opinion, be the heaviest traveled area in the City of Selma?

A    Whether it is the heaviestly traveled area, I don't know; but it is very heavily traveled there in that respect.

Q    Is it the highway artery between Craig Air Force Base and the City of Selma?

A    Yes, sir.

Q    Now, where were you when Major Cloud first confronted the people marching on the afternoon of March 7?

A    I was standing behind the line of State Troopers to the -- the side that would be the right hand side going towards Montgomery.

Q    In distance, how far were you from the position that Major Cloud was taking?

A    I would estimate somewhere close to sixty or seventy feet.

Q    Could you overhear his conversation?

A    Yes, sir; he was on a loudspeaker.

Q    What did Major Cloud say to the people that were marching when

527

he first confronted them?

A  He told them on the loudspeaker that the march would not be
allowed to continue, that it was not conducive to the safety of
all concerned, that he was charging them, or he -- he told them
to disperse because of the fact that it was an unlawful assembly,
and he was going -- he was asking them at that time to disperse
peacefully and return to their church or their homes.

Q  Did the marchers disperse?

A  No.

Q  Did they make any effort to disperse?

A  No; not at that time.

Q  Was any mention made of a time limit by Major Cloud in regard
to the dispersal?

A  Two minutes; he requested them to disperse in two minutes.

Q  Now, from the time that he gave this order, in your judgment,
what was the time interval before any further action was taken?

A  There was a short space of time lapse there.

Q  Now, when you say, "Short" -- and I know this is a difficult
question, but can you be more definitive of the term, "Short"?

A  I would estimate one to two minutes.

Q  One to two minutes?

A  Uh, huh.

Q  How far at that time were the marchers from the position of the
State Troopers?

A  Approximately twenty yards.

528

Q    Twenty yards?

A    Uh, huh.

Q    Did any action take place in the interval between the order of
     dispersal and the lapse of the time that you have mentioned?

A    No, sir.

Q    Did the State Troopers do anything within that interval of time?

A    No, sir.

Q    Did you observe any group of white people in the area?

A    Yes, sir.

Q    Where were they with relation to the marchers?

A    They were located across the street on the right hand side of
     the street away from the area, but they were around the area of
     the Glass House Restaurant and the Chick-N-Treat.

Q    In your opinion, how many were there?

A    There was a crowd of a hundred to a hundred and fifty white
     persons there.

Q    Were they boys, men, women, or --

A    Many of them ranged in the age from twenty to twenty-five years
     of age.

Q    Did you know any of the white people in that group?

A    Some of them.

Q    Some of them?

A    Some of them; I didn't know them until after the --

Q    Did you observe the actions of this group of white people?

A    Yes, to some extent.

Q   Did they show any acts or signs of hostility toward the marchers?

A   Yes, sir.

Q   What signs or acts did they show?

A   Well, it was a type of catcalls and jeering, yelling.

Q   The crowd of white people, in your judgment, a dangerous crowd under the circumstances?

A   I think any crowd of people are dangerous under the circumstances

Q   Were you in Selma on Tuesday of this week?

A   Yes, sir.

Q   Were you in the vicinity of the Brown Chapel on Sylvan Street?

A   No, sir.

Q   Were you in the vicinity of the Pettus Bridge --

A   No, sir.

Q   -- at any time on Tuesday?

A   No, sir.

Q   Mr. Frye, did you know the late Malcolm X; did you know him by sight?

A   I knew him by sight; I could recognize him by sight.

Q   Since January of this year, was he in Selma?

A   On one occasion.

            MR. DOAR:   Object to that as beyond the scope of the direct examination.

            THE COURT:   Overrule.

A   On one occasion.

Q   When was he in Selma?

A   I don't recall the exact date; it was sometime the latter part of January or the first part of February, he came to Selma.

Q   Did he address a crowd of Negro citizens in Selma?

A   He addressed an audience at the Brown's Chapel A.M.E. Church.

Q   Do you have any -- any judgment as to the size of the audience that he addressed at Brown's Chapel or Church?

A   No, sir.

Q   Have marches and demonstrations in the streets of Selma continued over some period of time?

A   Yes, sir.

Q   Over what period would you estimate?

A   Since about the 1st of January we have had continuous type demonstrations and marches.

Q   They occur almost daily or weekly or how would you explain it?

A   They have occurred almost daily for awhile, and then they -- maybe two or three times a week.

Q   Have tensions and -- withdraw the question.  Has the situation in Selma since January, due to the marches and demonstrations, presented a law enforcement problem, in your opinion?

       MR. NABRIT:  Object.

       THE COURT:  If you can answer that question, I will permit it.

A   Yes, sir.

Q   Has it been a dangerous situation from the standpoint of the overall public?