IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

Hosea Williams, John Lewis
and Amelia Boynton, on behalf
of themselves and others
similarly situated,

                Plaintiffs,

United States of America,

                Plaintiff-Intervenor,

  vs

Honorable George C. Wallace, as
Governor of the State of Alabama;
Al Lingo, as Director of Public
Safety for the State of Alabama;
and James G. Clark, as Sheriff of
Dallas County, Alabama,

                Defendants.

Civil Action

No. 2181-N.

FILED

JUN 8  1965

R. J. JOHNSON, CLERK
By J. J. N.
Deputy Clerk

Before Hon. Frank M. Johnson, Jr., Judge, at Montgomery,

Alabama, March 11-12-13-15-16, 1965.

VOLUME III of three volumes.  (This volume contains pages
531 to 788, inclusive; see
Volume I for pages 1 to 265
see Volume II for pages 266
to 530.)

Glynn Henderson,
Official Court
Reporter.

MR. NABRIT: Object.

THE COURT: Overrule.

Q    Your answer was what?

A    Yes, sir.

MR. SMITH: I have no further questions.

THE COURT: Mr. Kohn.

BY MR. KOHN:

Q    Mr. Frye, I am going to ask you a question as to the -- that Sunday, I believe that was March 7, 1965?

A    Yes, sir.

Q    Standing where you were, I believe you testified that you observed a crowd; now, I would like for you, if you have an opinion, to state how many human beings were in that immediate vicinity; by that I mean law enforcement officers, bystanders, and paraders, or whatever we want to call those other people?

A    I would estimate between a thousand and fifteen hundred people.

Q    Mr. Frye, how far were you from the area where the tear gas exploded, if that is a good word, or where the tear gas was dispersed on this crowd; approximately how many feet away were you?

A    Between fifty and a hundred feet.

Q    After that tear gas was dispersed, was there a cloud immediately in front of you caused by that tear gas?

A    The wind was blowing -- facing the Pettus Bridge, the wind was blowing from left to right; I was standing to the left, and the

532

-- the cloud was going over the marchers and blowing to the
marchers further to the right.

Q    Would you say that that cloud partially set up a -- a block to
your complete vision of what -- of the details of what might be
occurring at that particular area at that time?

A    Where I was standing?

Q    Yes, sir?

A    Sir?  No, sir.

Q    The cloud at no time was between you and any of the marchers?

A    It was blowing away from me.

Q    Blowing away from there?

A    Uh, huh.

Q    Now, at the time that you were on this scene, did you see any
of the bystanders violating any law to your knowledge?

A    Not to my knowledge, sir.

Q    In this line of marchers, would you attempt to have an opinion
of the distance from the first man in the march, or the first
woman in the march, to the rear end of the march?  In other
words, how long was that march at this time at that place?

A    The march, when it first appeared on the scene and was confronted
would stretch for approximately a hundred and fifty to two
hundred yards.  Then it crowded together, much in the same
fashion as an accordian, and it was maybe fifty yards.

Q    I don't believe you testified that you observed or you could see
everything that was going on in that crowd, could you, Mr. Frye?

A    In what particular crowd, sir?

Q    The marchers?

A    The marchers?

Q    Yes, sir?

A    I could observe the whole line.

Q    The whole line?

A    Uh, huh.

Q    But you could not observe, after the tear gas was dispersed, what everybody in that line was doing, could you, sir?

A    That is correct; I could not.

Q    Mr. Frye, isn't it standard operation, operating procedure, or one of the acknowledged methods of dispersing a mob or a crowd under certain circumstances to use tear gas?

A    In --

       MR. AMAKER:  Objection, your honor, unless he defines circumstances.

       THE COURT:  Sustain the objection, as it is phrased.

A    In a crowd --

       THE COURT:  Just a minute; I have sustained objection to that, Mr. Frye.

       MR. KOHN:  You did, your honor?

       THE COURT:  Yes, sir.

Q    Have you ever participated in dispersing a crowd -- mob or crowd?

A    No, sir.

Q    Have you a manual put out by the F.B.I. or any branch of the

Government with directions as to what method to use in dispersing
a mob?

A    There is a -- such a manual.

Q    Is there anything in that manual covering the use of tear gas?

    MR. DOAR:  Objection; it is immaterial.

    THE COURT:  I sustain it.

    MR. KOHN:  No further questions.

    THE COURT:  Mr. Pitts.

BY MR. McLEAN PITTS:

Q    Mr. Frye, I believe you were -- you stated you were right behind
the line of the State Troopers; is that correct?

A    At the first confrontation.

Q    Well, now, did you stay there during the time or --

A    Yes, I walked up with the Troopers as they moved forward.

Q    All right, sir.  Now -- so, behind you -- in other words, you --
you and the State Troopers were facing Selma, weren't you, and
behind you is a traffic light, isn't it?

A    That is correct.

Q    What is known as the intersection of River Road -- I mean
old Montgomery highway and U.S. 80; is that correct?

A    That is correct.

Q    All right, sir; now, was traffic stopped at that point?

A    Yes, sir.

Q    On U.S. 80; is that right?

A    Yes, sir.

535

Q    Now, Mr. Frye, I'll ask you, did you -- and when you were
     estimating that there were fifteen hundred people in this area
     in reply to Mr. Kohn's --

A    Uh, huh.

Q    Yes -- did you know that there was a thousand to fifteen hundred
     white people being held back at that point by State Troopers?

A    I had no estimation of what was being held at that point.

Q    I am talking about behind you, now, is what I am talking about?

A    Yes, sir; I am talking about the immediate area.

Q    Well, did you know about those white people being held back at
     that point by --

A    I knew that traffic was stopped there.

Q    Well, did you know that there was a bunch of white people that
     was being held back by -- you know Lieutenant Etheridge, don't
     you?

A    Yes, sir.

Q    Being held by -- by Lieutenant Etheridge and six Troopers at
     that point?

A    I knew that traffic was stopped there; I had -- I don't have any
     idea of race or how many people were stopped there.

Q    I am talking about these people were on the ground, Mr. Frye --

A    Yes, sir.

Q    -- pedestrians is what I am talking about, not traffic --

A    Uh, huh.

Q    -- did you know they were out of the cars?

536

A   I knew they were stopped there at the traffic light.

Q   And did you know that there was approximately a thousand or
fifteen hundred there?

A   No, I didn't.

Q   You wasn't particularly concerned with that group back there, were
you?

A   That is correct.

Q   Now, Mr. Frye, as I understand you, you said that that was --
the onlookers there was an angry group of people; is that right?

A   Yes, sir.

Q   The onlookers?

A   Yes, sir.

Q   In fact, Mr. Frye, was one of your F.B.I. Agents attacked out
there?

A   Yes, sir.

Q   And was that by some of these -- some persons in this group?

A   Yes, sir.

Q   And how many -- do you know how many men attacked him?

A   At the present time three have been charged with the assault.

Q   Three were charged with --

A   Three were charged.

Q   All right, sir. Now, Mr. Frye, there is -- as in all cities,
in the City of Selma -- there is in the City of Selma and the
area, there is a rougher area than other parts of the city;
isn't that correct?

537

A    That is correct.

Q    And you know where Walker's Cafe is?

A    Yes, sir.

Q    And is that -- what area is that in; where is it?

A    That is on -- located on Washington Street, and would be considered a rougher area.

Q    And it's Negro area and white area, kind of; is that correct?

A    That is correct.

Q    In other words, north of that alley there is mostly white businesses; isn't that right; and then south of that alley is practically all Negro businesses in one block; is that right?

A    That is correct.

Q    And that is -- Walker's Cafe is where this minister was when he -- when he was -- or in that area he was -- was struck; is that right?

A    That is correct.

Q    And policing in that particular area is heavier than it is down on the downtown part of Selma, Broad Street and so forth, in there; isn't that correct?

A    That is correct.

Q    Now, Mr. Frye, do you know of any instances there at Selma in the last few days since all this has been going on where men have been arrested with firearms, and white men have been arrested with firearms by the police, or weapons?

A    Yes, sir.

538

Q    How many do you know of?

A    I know of one, specifically.

Q    And which one is that; can you name that specific one?

A    A William Eubanks.

Q    William Eubanks?

A    William Eubanks.

Q    Was -- what did he have?

A    He had a three fifty-seven Magnum, and a thirty-eight revolver was found in his car.

Q    Where is William Eubanks from?

A    Florida.

Q    Where?

A    Florida.

Q    Was he from Florida or Mississippi?

A    Well, he is from -- originally from Mississippi, but he works in Jacksonville, Florida.

Q    And he was -- he was taken into custody down there right on the -- a corner right opposite the Municipal Building; is that correct?

A    That is correct.

Q    Do you know of any other instances?

A    No; not right at the present time.

Q    Do you know of any other instances where police officers or law enforcement agencies have been attacked by Negroes or white people in this particular time?

A    During what particular time?

539

Q    All -- I -- we are talking about from Sunday on, say?

A    From Sunday on?

Q    Yeah -- or say from January, when all this trouble started at
     Selma, when all these demonstrations started?

A    I don't recall any right now.

          MR. McLEAN PITTS:  Would you mind -- just one minute.
That's all.

          THE COURT:  United States.

          MR. McLEAN PITTS:  Wait; wait.

          THE COURT:  Redirect.

          MR. DOAR:  No; no redirect.

          THE COURT:  Any other questions from this witness?

          MR. NABRIT:  I don't believe so, your honor; let me
ask.  No, your honor.

          THE COURT:  You are excused.  Call your next
witness.

          MR. McLEAN PITTS:  I would like to ask him just one
more question if you don't mind, your honor; I am sorry to keep
that -- but can I do that?

          THE COURT:  Go ahead.

Q (by Mr. McLean Pitts) Mr. Frye, has there been -- since Tuesday
     night have the police and State Troopers have a demonstration
     confined to area around the Brown's Chapel?

A    Yes, sir.

Q    And has that been a constant situation, twenty-four hours?

540

A    Continuous.

Q    Continuous?

A    Continuous demonstration.

Q    Has that taxed law enforcement to its fullest capacity in that area of Selma?

A    Yes, sir.

Q    Has that taken other officers off of -- what is the size of the City of Selma Police Department; do you know?

A    I don't know the exact figure; I would estimate somewhere around twenty-five men.

Q    And, Mr. Frye, in a situation like this, does that require the City of Selma taking off patrol cars and patrolmen that are down town and so forth --

        MR. NABRIT:  Objection, your honor.

Q    -- and bring them into an area like this, of this type?

        THE COURT:  Mr. Frye can answer these questions, he indicates he can, that he knows; he is responding.  I will permit him to continue to do so; your objection is overruled.

A    It causes a reassignment of personnel where you have to move personnel from other areas into a particular troubled area.

Q    All right, sir.  Now -- and this area where this minister was hit, there has been practically no policing in that area during this time; isn't that correct?

A    That --

Q    It is causing them to pull those policemen out of there; is that

541

correct?

A    That is located away from the scene where most of the officers are concentrated.

                    MR. McLEAN PITTS:  All right, sir; that's all.

                    THE COURT:  Anything further from this witness?

                    MR. NABRIT:  No, your honor.

                    THE COURT:  Call your next witness, Mr. Doar.

                    MR. DOAR:  Mr. Gabel, Carl Gabel.

                    THE COURT:  Have you been sworn?

                    WITNESS CARL GABEL:  No, I haven't.

                    THE COURT:  All right.

                    (Witness Carl Gabel sworn by the Clerk)

                        *****************

CARL GABEL, witness for the United States, having been duly sworn, testified as follows:

                    DIRECT EXAMINATION:

BY MR. DOAR:

Q    Will you state your full name, please?

A    I am Carl Gabel.

Q    What is your occupation?

A    I'm an attorney with the Justice Department in Washington.

Q    And what Division of the Justice Department?

A    The Civil Rights Division.

Q    And in connection with your duties as an attorney in the Civil Rights Division, can you tell me whether or not you are assigned

542

to the State of Alabama?

A    Yes, I am.

Q    And is one of your assignments to work on voting cases in the
State of Alabama?

A    Yes, it is.

Q    And have you, at my request, from records which the Department
of Justice has photographed -- inspected and photographed,
compiled certain statistics showing the registration statistics
and registration rate of -- by race in several counties, several
of the Black Belt counties, including Dallas County, Alabama?

A    Yes.

Q    Now, was these statistics compiled by you or under your
direction?

A    The majority of them were compiled under my direction; several
of them were by me directly.

Q    And was this done in the usual course of your official business
as an attorney working on voter discrimination cases in Alabama?

A    Yes.

THE CLERK:  Plaintiff-Intervenor's Exhibit number 9
for identification.

Q    I hand you Plaintiff-Intervenor's Exhibit number 9, and ask you
if you recognize it?

A    Yes, these -- yes, I do.

Q    And can you tell me what counties these statistics cover?

A    They cover Dallas, Perry, Hale, Marengo, Wilcox, and Choctaw.

Q   Do you happen to know what the voters -- voter registration

statistics are in Lowndes County, Alabama, with respect to

Negroes?

MR. McLEAN PITTS:  Your honor, I want to object to

anything pertaining to the Lowndes County or Choctaw County,

Marengo County; there is absolutely no connection between the City

of Selma or Dallas County and those counties, and I -- and they are

so far away from them, that is what I am getting at.

THE COURT:  Well, we are concerned, and we must not

lose sight of the primary issue in this case, and that is the

question as to whether the plaintiffs have a constitutional right

to demonstrate and protest against what they consider to be

grievances and discrimination, and as they phrase it, brutality,

on one hand, and the contention, as I understand it, on the part

of the defendants on the other that they have no right to march at

all.  And I have laid down some ground rules at the beginning of

this case, and I have recited several times that I would allow

certain amount of this testimony, and I have been allowing it up

to this point, and I am going to continue to allow it.

MR. McLEAN PITTS:  All right, sir.

MR. KOHN:  Your honor, we would like to voice an

objection to any statistics in a county that does not abut the route

from Selma to Montgomery.

THE COURT:  Objection is overruled.  Go ahead.

Q   You may answer?

A    There are no Negroes registered in Lowndes County.

        MR. DOAR:  I would like to offer in evidence Plaintiff-Intervenor's Exhibit 9.

        THE COURT:  Other than objections that have been ma and I take it that you address those objections to this Exhibit, any other objections?

        MR. KOHN:  No.

        MR. SMITH:  May I ask the witness on voir dire?

        THE COURT:  Yes.

        VOIR DIRE EXAMINATION:

BY MR. SMITH:

Q    Possibly Mr. Doar has covered it; the statistics which are offered in this Exhibit give the total number applied, accept rejected, and per cent?

A    Per cent rejected.

Q    Rejection?

A    Yes.

Q    Now, it dis--- well, I believe it does; does it enumerate bot white and Negro applicants?

A    It does; yes, when percentage -- when percentages are listed. The W on the top of the column and along the side stands for white, and the N indicates Negro.

Q    All right.  May I ask you, in addition to -- to the suits in the relative counties which are covered in this Exhibit, are is there also a suit on a statewide basis pending?

545

A    Yes, there is one filed; yes.

Q    What is the nature of that suit?

THE COURT: The court takes judicial knowledge of --
of the fact that there is a -- there is a case pending before a
three-Judge District Court in this District, the Middle District
of Alabama, styled United States against Baggett and the State of
Alabama; it is Civil Action number 2159-N.

MR. SMITH: I have no objection to this Exhibit.

MR. DOAR: I have no further.

THE COURT: Number 9, Intervenor's number 9, admitted
in evidence.

MR. KOHN: Are you through?

MR. DOAR: (Nodded to indicate affirmative reply)

MR. McLEAN PITTS: We are objecting to it on the
grounds I have just stated; that is all.

THE COURT: All right.

CROSS EXAMINATION:

BY MR. KOHN:

Q    I want to see if I understand your connection with these
     statistics; did you testify that you are an attorney for the
     Civil Rights Division of the Department of Justice?

A    Yes, I did.

Q    And how long have you been assigned to the State of Alabama?

A    Continually for almost two years, and before that for about a
     year and three or four months on a periodic basis.

Q    Now, relative to the statistics that you have introduced, did
     you compile them?

A    Some of them I -- were compiled by me, and others were compiled
     by other employees of the Department working under my supervision

Q    Under your direct supervision?

A    Yes.

Q    Were you present when they went into the Board of Registration
     to make these statistics?

A    Off of -- these statistics were not compiled in the Registrars'
     office, because the films of the registration records were sent
     to Washington, and they were compiled from those films.

Q    Now, relative to these statistics, let us take Lowndes County,
     for example; what do the statistics show concerning the number
     of Negroes registered in Lowndes County?

A    Our -- our statistics show that in Lowndes there were no Negroes
     registered.

Q    Have you any statistics as to why they are not registered?

A    No; I don't know.

               MR. NABRIT:  Objection, your honor.

               THE COURT:  Overrule.

Q    What is your answer?

A    I do not.

Q    Have you an opinion from the statistics as to why they are not
     registered?

A    No, I don't.

547

Q    Have you any knowledge, or has it come to your knowledge through
     someone else working under your direction or observation, as to
     why there are no NIGRES registered in Lowndes County?

A    Well, I do have knowledge that several Negroes have approached
     Board members in Lowndes County and -- and were told that there
     wasn't time to be registered.

Q    How many NIGRAS?

A    I know of two.

Q    Two out of the population -- how many NIGRAS in Lowndes County?

A    I don't have the population and statistics for Lowndes County
     available.

Q    As far as you know, those NIGRAS are not registered because
     they don't want to register; isn't that right.

          MR. NABRIT:  Objection, your honor, to counsel's
repeated use of the word, "Niggers."

          THE COURT:  You need not argue your objection; I am
sustaining it because his question is argument.  I am going to let
you argue these -- these matters at an appropriate time, not in
your objections.  If I need any grounds recited or arguments, I
will call for them.  Go ahead.

          MR. KOHN:  Did you sustain the objection to the
question?

          THE COURT:  Yes, sir.

          MR. KOHN:  No further questions.

          THE COURT:  Anything else from this witness?

REDIRECT EXAMINATION:

BY MR. DOAR:

Q    When you photographed the records in Lowndes County, did you
     find any rejected Negro applicants?

A    No, we did not.

        MR. DOAR:  Thank you.

        THE COURT:  Any other questions by the plaintiffs?

        MR. NABRIT:  I have no questions, your honor.

        THE COURT:  Mr. Pitts.

        MR. McLEAN PITTS:  I just -- like to ask him just one

question.

RECROSS EXAMINATION:

BY MR. McLEAN PITTS:

Q    Mr. Gabel, you said these Negroes were told in Lowndes County
     when they approached the Board about registration that there
     wasn't time to register; is that right?

A    Yes.

Q    Are you familiar with the fact that the Alabama law sets the
     voter registration days for each Voter Registration Board?

A    Yes, I am.

Q    You don't know whether they were applying on one of those days
     set or not; is that correct?

A    That is correct in that -- yes.

        MR. McLEAN PITTS:  All right, sir; that's all.

        THE COURT:  Anything else from this witness, gentlemen

549

All right, you can be excused.

       MR. DOAR:  Mr. Reese.

       THE COURT:  Take a short recess before we go any further; ten minute recess.

       (At which time, 9:41 a.m., a recess was had until 9:50 a.m., at which time the hearing continued)

       THE CLERK:  Please raise your right hand.

       (Witness Frederick Douglas Reese affirmed by the Clerk)

       THE COURT:  Have a seat.

\*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\*

NOTE:  For testimony of FREDERICK DOUGLAS REESE, witness for the United States, see excerpt transcript filed April 2, 1965.

\*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\*

       MR. DOAR:  John Carter Lewis.

       \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

JOHN CARTER LEWIS, witness for the United States, having been duly sworn, testified as follows:

       DIRECT EXAMINATION:

BY MR. DOAR:

Q   Will you tell the court your full name, please?

A   John Carter Lewis.

Q   Mr. Lewis, where do you live?

A   Marion.

Q   And how old are you?

A   Thirty-eight.

550

Q    What is your race?  Are you a Negro?

A    That's right.

Q    How long have you lived in Perry County?

A    Thirty-eight years.

Q    What is your job?

A    Dishwasher, Marion Institute.

Q    Were you in Marion on the 18th of February, 1965?

A    Yes.

Q    And were you at a church at a mass meeting there that night?

A    No.

Q    Where were you that evening?

A    Working.

Q    And where were you working?

A    Marion Institute.

Q    What time did you get off work?

A    Nine -- beg your pardon; ten twenty-five.

Q    After you got off work, what did you do?

                    THE COURT:  Give me the date again, please.

                    MR. DOAR:  February 18, 1965.

                    THE COURT:  Go ahead.

A    After I signed out from the job, I carried one of the guys home
     what was working with me that night which lived about two miles
     from the job.  And on the way back I stopped at Webb Cafe and
     and picked up Miss Lawson.

Q    Well, now, can you locate where Webb -- Webb's Cafe is with

respect to the jail and the City Hall in Marion?

A   Beg your pardon; beg your pardon?

Q   Is that down in the middle of the downtown Marion?

A   That's right.

Q   And after you picked up this lady, what did you do?

A   I carried her home.

Q   Did you see any State Troopers around down in the -- Marion that night?

A   Yes, I did.

Q   Did you see a great number of them?

A   Oh, me, that's right; lots of them.

Q   Did you participate in any kind of a demonstration that night?

A   No.

Q   Did you go to any kind of a mass meeting that night?

A   No.

Q   I will ask you, after you carried -- started to carry this lady home, what happened then?

A   Well, I carried her home, and she -- her helper, I picked up both of them at the same time, her helper didn't have a way to go home, her father was up there, so they say, but said he had run him out of town, and so she asked me would I take her home. So I carried Miss Fannie on home, and on the way to take her home, which we call it at the Greensboro highway, little west of Marion, and on the way to take her home and about a quarter of a mile on the -- out of from Marion, I met a State Trooper car,

and he turned around right after he met me, pulled in an intersection, turned around, and so I had idea he was going to stop me, so I just get prepared to stop. Well, he trailed me about a quarter of a mile. Then he turned the signal lights on, the red flashing lights, so I pulled aside and stopped, opened my door, and reached for my driving license, my billfold, and I met him at the back end of my car. And so he said, "I want to check your license." I say, "All right." And he looked down at me, he said, "You just off your job?" I say, "That's right." At that time another State Trooper drove up behind him. He say, "Who you got here?" He said, "This boy just off his job, he pretty good boy." He said, "Well" -- the second one asked the first one, says -- the second asked the -- "Where you work?" I say, "M.I." -- that is the short name called Marion Institute -- and so he say, "What M.I.?" So the first one, first Trooper, said, "Marion Institute." The second one say, "Well, let's beat him up, anyway," and so he pulled his stick out, but he didn't hit me then, and so I looked at the first one what had my license in his hand, and when I took my eyes off him, then he come right down across my head there with the stick and so that it knocked me off from him, you know, and I just staggering around, so he -- he -- while I staggered back, he hit me again. So he say, "Get in your car," so that time I spied my billfold on the ground, and I attempted to pick up by billfold. He popped me back of my head again. I stood there.

"Maybe I get my billfold," so I made another attempt to get my

billfold; he hit me back of my head again as I was going over,

then, so I just went on over, then, I got so weak then, the

first lick was just --

MR. SMITH:  Excuse me; excuse me; we object to this,

if the court please, move to exclude his entire answer; shows no

relationship to the demonstrations.

THE COURT:  Overrule; go ahead.

A   So the first lick just bust this open up here, see, he had a

good aim at that because I wasn't paying him any attention, you

see, I had took my eyes off him, I didn't have no idea he was

going to hit me for real, so I took my eyes off, he just bust

this open across here.

Q   Let me ask you this; was your arm injured that night?

A   Beg your pardon?

Q   Was your arm injured that night?

A   That's right.

Q   How did that happen?

A   I really don't know; I imagine I tried --

THE COURT:  Just a minute; just a minute; just tell

what you know.

A   All right; that is what I say, I don't know; I didn't discover

what happened to my arm until the next morning in the hospital;

I -- I mean the doctor say he going to keep me over to see

was it -- how it was, it was starting to swelling, and so after

554

he hit me after I went over on the ground, and I stayed there,
then he took his foot and pushed me over, and I -- I was --
really wasn't passed out, but I was so weak I couldn't get up.
And so then once I attempt to get in the car then, and so one
told the other one, "You better not leave him here side the
highway, lying side the highway, somebody might pass here and
see him," so then they opened the driving back door of my car
on the driving side and attempt to put me in there, and put me
body up in there, but left my legs hanging out in the highway,
left the door open, so they pulled off. And after they pulled
off, I was -- had been losing so much blood, so I just wasn't
able to stand it -- stand at that time, so I just laid back in
the highway like this, and waved for help, the first light I
saw coming over a hill, and so it happened to be a friend of
mine, his name Phillip Himes, so he stopped, and so I asked
him, I said, "Will you take this"--

   MR. SMITH:  We object to what he asked.

   THE COURT:  I sustain it.

Q Just tell what happened, Mr. Lewis, just tell what happened;
what -- were you taken anywhere then?

A Was I taken anywhere?

Q Yes?

A No, I -- I just left in the car.

Q Did you go to a hospital that night?

A That's right.

555

Q    What hospital did you go to?

A    Perry County Hospital.

Q    And how long were you in the hospital?

A    Five days.

        MR. DOAR:  Thank you.

        THE COURT:  For the plaintiffs.

Q (by Mr. Doar)  Is your arm -- your arm -- did you receive a broken
    arm?

A    That's right.

        MR. NABRIT:  No questions, your honor.

        THE COURT:  Mr. Smith.

            CROSS EXAMINATION:

BY MR. KOHN:

Q    I believe the occurrence that you were talking about was given
    as February 8, 1965; is that correct?

A    February --

Q    This -- this beating that you were talking about, did I under-
    stand you correctly that that occurred on February 18?

A    That's right.

Q    Nineteen what?

A    1965.

Q    Do you know the names of the two people that you claim beat you
    up on this occasion?

A    No, I don't.

        MR. KOHN:  That's all.

556

THE COURT:  Mr. Pitts.

MR. McLEAN PITTS:  I don't want to ask him any.

REDIRECT EXAMINATION:

BY MR. NABRIT:

Q    Were they in any kind of uniform?

A    Sure, they was State Troopers in uniform.

Q    What does the uniform look like?

A    What does it look like?

Q    Yes?

A    It was blue; blue uniform.

THE COURT:  Witness be excused.  Call your next witness, Mr. Doar.

MR. DOAR:  Sallie Rodgers.

THE COURT:  Have a seat, please.

** ** ** ** ** ** ** ** ** ** ** ** ** ** ** ** ** ** ** ** ** **

NOTE:  For testimony of SALLIE BETT RODGERS, witness for the United States, see excerpt transcript filed April 2, 1965.

** ** ** ** ** ** ** ** ** ** ** ** ** ** ** ** ** ** ** ** ** **

MR. DOAR:  George Douglas.  George Douglas.

MARSHAL:  George Douglas.  He is out here; he's gone after him.  Come on around this way.

MR. DOAR:  This witness, your honor, has not been sworn.

THE CLERK:  Please raise your right hand.

(Witness George Douglas sworn by the Clerk)

557

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

GEORGE DOUGLAS, witness for the United States, having been duly

sworn, testified as follows:

DIRECT EXAMINATION:

BY MR. DOAR:

Q    Will you tell the court your full name, please?

A    George Douglas.

Q    Mr. Douglas, could you speak up just a little louder, so everyone

in the court room can hear you?

A    George Douglas.

Q    Where do you live?

A    Selma, Route 1, Box 474, Selma.

Q    How -- for how long have you lived in Dallas County?

A    All my life.

Q    What is your job?

A    I work with Dallas County School Board, maintenance work.

Q    How long have you worked for the School Board?

A    Five years.

Q    Mr. Douglas, do you recall the afternoon of March 7, Sunday,

March 7, 1965?

A    Yes, sir.

Q    And where were you on that afternoon?

A    I was just across the River Bridge by Kayo Service Station.

Q    Now, you were just across the River Bridge; is that -- were you

on the Montgomery side of the bridge?

558

A    Yes, sir; that's right.

Q    And on which side of the road is the Kayo Service Station?

A    It is on the right.

Q    As you leave Selma toward Montgomery?

A    Yes, sir.

Q    What were you doing there?

A    I was just standing by, just standing there.

Q    Were you -- did you participate in any march that afternoon from Brown's Chapel?

A    No, sir.

Q    Did you see a group of Negroes coming over the bridge?

A    Yes, sir.

Q    Toward some Highway Patrolmen on the highway?

A    Yes, sir.

Q    Did you see the State Troopers release tear gas there that afternoon?

A    Yes, sir.

Q    Now, where were you standing when that happened?

A    Right between -- right by Kayo, near the highway there.

Q    And about how far off the highway were you?

A    About fifty feet.

Q    And was that service station the first service station over the bridge --

A    Yes, sir.

Q    -- on the right?

A    Yes, sir.

Q    So it is the first building as you come off the highway?

A    Right.

Q    Excuse me, as you come off the bridge?

A    Yes, sir.

Q    And after the -- after the tear gas was released, what happened?

A    Well, the marchers, they ran down the hill across the road, some of them, and some of them ran back towards town.

Q    And did you see any Mounted Possemen there that day?

A    It was some mens on horses; yes.

Q    And then what happened; what did you do?  What happened to you?

A    I stood there until the mens came around on the horses, and they ran after me, saying, "Go home, nigger, get in the house, go home," and I ran down to my sister-in-law's house.

Q    Where is your sister-in-law's house?

A    It's right down back of Kayo, back of John Deere place.

Q    And did any of the possemen chase you?

A    One chased me; yes, sir; to -- clean to the house.

Q    And did he -- was -- did he attempt to strike you in any way?

A    He was striking at me, but I dodged him all the way there.

Q    And about how far did you run; how far from the Kayo Service Station is your sister-in-law's house?

A    It's about a quarter of a mile there.

Q    Did you see any other Mounted Possemen chasing any other Negroes down in that area?

560

A    Well, all of them was up there, they chased all of them into
     houses, I mean was standing around.

Q    Were there a number of other Negro bystanders standing with you
     that afternoon?

A    Yes, sir; it was about twenty-five, something like that,
     standing around out there.

Q    Were any of those persons in the march?

A    Wasn't none of them in the march; no.

Q    And did you see any of the Mounted Possemen strike any of these
     Negro bystanders?

A    After I got home, I saw them hit one man.

Q    And just tell what you saw?

A    Well, as I was -- at -- after I got to the house, I saw them
     hit one man, just like that, not -- just mostly a beat lick,
     it wasn't just a one lick, it was mostly just a beat, you know,
     to the house, he ran on to the house.

Q    Just kept riding, and the man was running ahead of him --

A    That's right.

Q    -- and he was beating on him?

A    That's right.

            MR. McLEAN PITTS:  Wait a minute; we object to that.

            THE COURT:  Sustain it; it will be excluded.

            MR. McLEAN PITTS:  Yes, sir; all right, sir.

            THE COURT:  Mr. Doar's summarization of what he says

is excluded.

561

        MR. McLEAN PITTS:  Yes, sir.

        MR. DOAR:  May I see Exhibit 1.

Q  I want to show you a picture, and Plaintiffs' Exhibit --
Plaintiff-Intervenor's Exhibit 1, this picture is numbered
A-210, and ask you if you recognize --

        MR. KOHN:  Mind if I look?

        MR. DOAR:  No, not a bit.

Q  If you recognize anyone in that picture?

A  I recognize this man.

Q  Now, you are pointing to a --

A  The one with the white coat on.

Q  Yeah; who is that?

A  That is Jimmy Aycock.

Q  Jimmy Aycock; what is his race?

A  He's Negro.

Q  Okay; and you recognize anyone else?

A  That is me next to him.

Q  And is that picture taken while you were running from the
service station toward your sister-in-law's house?

A  Yes, sir; that's right.

Q  Now, do you know whether or not Jimmy Aycock was in the march?

A  He was not in the march; he was just standing by.

Q  Can you look at picture -- going back -- going back to A-209,
can you recognize anyone in that picture?

A  Yes, sir; all three of these.

Q    And who are those three people -- those the three people that
     are running?

A    Yes, sir; that is Jimmy Aycock and me, George Douglas, and Dan
     Williams.

Q    Now, are all those persons Negro?

A    Yes, sir.

Q    Were any of them in the march?

A    No, sir.

        MR. DOAR:  That is all the questions I have.

        THE COURT:  For the plaintiffs.

        MR. NABRIT:  Yes, your honor.

BY MR. NABRIT:

Q    Mr. Douglas, what were the officers striking at you with?

A    With a club.

        MR. NABRIT:  Thank you; that's all, your honor.

        THE COURT:  Mr. Smith.

        CROSS EXAMINATION:

BY MR. SMITH:

Q    You say you were standing at the Kayo Station there; that would
     be on Montgomery side of the Pettus Bridge?

A    Yes, sir.

Q    How far were you standing from the head of the marching group
     when the State Troopers were there in the road?

A    From the -- about -- about two hundred feet.

Q    Two hundred feet?

563

A     About that.

Q     Did you see the State Troopers there?

A     Yes, sir.

Q     Did you see the marching group as they came up?

A     Yes, sir.

Q     Could you overhear any of the conversation between any of the State Troopers?

A     No, sir.

Q     Troopers and the marching group?

A     No, sir.

Q     Did you hear a loudspeaker?

A     No, sir; I didn't.

Q     You didn't hear a loudspeaker?

A     (Shook head to indicate negative reply)

Q     You didn't hear -- do you know Major Cloud?

A     No, sir.

Q     Did you hear anybody from the State Trooper unit say anything over a public address system or a loudspeaker?

A     No, sir; I didn't.

Q     Did you hear anybody from the State Troopers tell the crowd to disperse, go back to the church, or to their homes?

A     No, sir; I wasn't that close; I didn't hear it.

Q     You didn't hear that?

A     No, sir.

                MR. SMITH:  I have no further questions.

564

THE COURT:  Mr. Kohn.

BY MR. KOHN:

Q    You were not able to identify any of these officers you have just
     testified about?

A    No, sir; I wouldn't know nary one of them, personally; no.

              MR. KOHN:  No further questions.

              THE COURT:  Mr. Pitts.

              MR. McLEAN PITTS:  Yes, sir.

BY MR. McLEAN PITTS:

Q    Out in this area where you talk about, you -- you say you were
     at the Kayo Service Station; is that right; right by the Kayo
     Service Station?

A    Yes, sir; it was a school bus stays parked there all the time,
     I was standing beside it.

Q    All right; now, back of that house, back of there is a group
     of houses; is that right?

A    Yes, sir.

Q    It is a road that goes right between those tractor companies
     there, isn't it, very narrow road that leads back to those
     houses?

A    Yes, sir.

Q    And in that particular area back there, all Negroes live there;
     is that correct?

A    Yes, sir.

Q    And were a good many of them up there around the Kayo Service

565

Station watching what was going on?

A    Yes, sir.

Q    And when did you hear about all that? I mean, when did you hear about it to go down there and look at it?

A    I brought a lady a load of wood up there, and I took and saw the mans went by on horses, about fourteen, and I said, "Where is these going?" And they says, "The march coming across."

Q    And that was when you heard about it, huh?

A    That's right.

Q    That was that morning?

A    That was that morning.

Q    All right, you went on and carried your load of wood -- you didn't have your horses down there, did you, or mules, did you?

A    No, sir; no, sir.

Q    Huh?

A    No, sir.

Q    All right; now, as I understand you, you wasn't hit, other than this man that was after you, say was just swinging like that, he wasn't -- he didn't actually hit you hard enough to hurt you; is that right?

A    He didn't even hit me.

Q    All right; and -- and they told everybody to get in the house; is that right?

A    Right.

Q    Uh, huh; and you were glad to get in that house, wasn't you?

A   Right; right then.

> MR. McLEAN PITTS:  All right, that's all.
>
> THE COURT:  Any further questions from this witness?
>
> REDIRECT EXAMINATION:

BY MR. NABRIT:

Q   What if anything did --

> MR. NABRIT:  May I ask, your honor?
>
> THE COURT:  Redirect; Mr. Doar.
>
> MR. DOAR:  No, sir.
>
> THE COURT:  All right.

Q (by Mr. Nabrit)  What -- when you were standing in the service
   station, did you see a group of white spectators standing there?
   Nearby somewhere?

A   I can't recall -- I can't recall; I didn't pay too much
   attention.

> MR. NABRIT:  That is all.
>
> THE COURT:  All right, you can be excused.
>
> MR. DOAR:  Leatha Stover, S-T-O-V-E-R.

** ** ** ** ** ** ** ** ** ** ** ** ** ** ** ** ** ** ** ** ** **

NOTE:  For testimony of LEATHA MAE STOVER, witness for the United
       States, see excerpt transcript filed April 2, 1965.

** ** ** ** ** ** ** ** ** ** ** ** ** ** ** ** ** ** ** ** ** **

> MR. DOAR:  James --
>
> THE COURT:  Let's take a ten minute recess before

we get on with the testimony.

567

(At which time, 10:54 a.m., a recess was had until 11:03 a.m., at which time the hearing continued)

THE COURT:  All right, this witness been sworn?

THE CLERK:  Please raise your right hand.

(Witness James Dobynes sworn by the Clerk)

THE CLERK:  Please be seated.

THE COURT:  Have a seat in the witness box, please.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

JAMES DOBYNES, witness for the United States, having been duly

sworn, testified as follows:

DIRECT EXAMINATION:

BY MR. DOAR:

Q    Will you tell the court your full name, please?

A    James Dobynes.

Q    Could you speak up in a large, loud, clear voice, please?

A    James Dobynes.

Q    Mr. Dobynes, would you spell your last name for the record?

A    D-O-B-Y-N-E-S.

Q    D-O-B-Y-N-E-S?

A    That's right.

Q    Where do you live, Mr. Dobynes?

A    I live in Marion, Alabama.

Q    How old are you?

A    I am thirty-eight.

Q    What is your job?  Where do you work?

568

A    I don't work nowhere.

Q    How long have you lived in Marion, Alabama?

A    Well --

Q    Where did you say you lived again?

A    Of course, I live out in the rural.

Q    In Perry County?

A    Perry County.

Q    How long have you lived in Perry County?

A    All my life.

Q    Were you in Marion, Alabama, on the night of February 18, 1965?

A    I was.

Q    And were you at a mass meeting at a church there that night?

A    I was.

Q    And did you leave the church and proceed toward the County Jail that night?

A    I did.

Q    And about how many people were with you?

A    Well, I don't know.

Q    Were you at the front of the people or were you at the rear or where were you?

A    Well, I -- I think it was about two deep, and ahead of me, two was in ahead of me.

Q    Were you walking two by two, or were you walking in a larger group?

A    Well, we was walking two by two.

Q    And did you meet the Sheriff that night near the County Jail?

A    I did.

Q    And then what if anything happened?

A    Well, they said we couldn't go no further.

Q    Then what happened?

A    Well, we turned around, so I bow down to pray.

Q    When you said you bowed and prayed, you --

A    Bow down, I fold my arm and bow down on my knees to pray.

Q    And were you on the sidewalk or on the street in Marion?

A    On the sidewalk.

Q    And were there any State Troopers around at that time?

A    It was.

Q    Were there many of them or not?

A    Oh, it was a big crowd of them.

Q    Then what happened next after you had bowed down to pray?

A    Well, that is all I remember, other than when I bowed down to
     pray when they hit me.

Q    Well, who hit you?

A    I don't know who hit me; I think the State Troopers and the
     Sheriff all standing around, but I forgot about them; I bowed
     down and talking to God about it.  So while I was down there,
     they hit me and drug me to jail.

Q    Were you taken to jail?

A    (Nodded to indicate affirmative reply)

Q    And how -- how long were you in jail?

A   I was in jail from Thursday night until Friday evening.

Q   Were you -- were any charges placed against you?

A   Well, say they charged me seven hundred fifty dollars bond.

Q   You know what the charge was; were you accused of having done --

A   Unlawful assembly.

Q   Did you have any stitches in your head or --

A   No.

Q   Did you have any cut in your head?

A   Sure; big cut, long cut.

Q   Did you -- did you go to a doctor about it?

A   Well, I felt like I didn't need no doctor; I should have went.

       MR. GAYLE:  We object.

       MR. McLEAN PITTS:  We object; we object to what he should have had done.

       THE COURT:  It will be excluded; it will be excluded. He asked you if you went to a doctor.

A   I didn't; did not.

       MR. DOAR:  Thank you.

       THE COURT:  For the plaintiffs.

BY MR. HALL:

Q   Mr. Dobynes, were you unconscious -- when did you first know you were in jail?

       MR. GAYLE:  May it please your honor, I think I object to leading there on the part --

A   They picked me --

MR. GAYLE: -- "Was you unconscious?" and then he follows right back with, "When is the first time you know you were in jail?"

THE COURT: Don't prompt the witness; go ahead, Mr. Hall.

Q   When did you first realize you were in jail after you were hit?

A   Oh, well, when I -- when they first got me there.

Q   You regained consciousness then?

A   All the blood was running down, when they put me in jail, I was on the floor, and I was bleeding so, and I was just thinking about the blood, like, "I can't stand much of this."

THE COURT: Just answer -- just answer his questions.

MR. McLEAN PITTS: We object to what he was thinking; move to exclude.

THE COURT: It will be excluded; motion granted.

Q   May I ask you this?

A   All right.

Q   Did the officers at the jail get a doctor for you or get any medical attention?

A   No, they did not; it made a big cut --

THE COURT: Just answer his question.

Q   Did they give you any first aid treatment there at the jail?

A   No.

Q   And you remained there how many days, how long?

A   From Thursday night until late Friday evening.

MR. HALL: That's all.

CROSS EXAMINATION:

BY MR. KOHN:

Q   I didn't exactly understand where you said you lived in Perry County?

A   Where I live?

Q   Yes?

A   Well, I live on a Rural Route 1, Box 90, Sellers, Alabama, is my home address.

Q   Sellers, Alabama?

A   Sellers, but at the present time I was living at 505 Clay Street.

Q   Montgomery?

A   Marion.

Q   Marion, Alabama?

A   Yes, sir.

Q   On February 18, 1965, where were you living?

A   I was in Marion.

Q   Living in Marion?

A   Sure, I was.

Q   What was your address?

A   505 Clay Street.

Q   Was that your own home?

A   That is my brother's home.

Q   Your brother's home?

A   That's right.

573

Q     Did I understand you to say that you are not employed?

A     I am not employed.

Q     What do you do for a living?

A     Well, I am a disabled veteran.

Q     Disabled veteran?

A     (Nodded to indicate affirmative reply)

Q     How long have you been drawing compensation?

A     Well, since -- since '45.

Q     1945; now, who brought you into this case; who brought you up
      here; were you subpoenaed by the Government?

A     Yes, sir; I was.

Q     How did you happen to participate in this demonstration on
      February 18?

A     How did I happen to participate?

Q     How did you happen to be in this demonstration at the scene
      where you testified you got hit?

A     Well, I was there.

Q     I know, but why were you there; who told you to go there, and
      how did you get there?

A     Didn't nobody tell me to go there.

Q     How did you know the demonstration was going to take place on
      that date?

A     I didn't know it; we went to the mass meeting.

Q     What was that?

A     I was to the mass meeting.

574

Q    You were at the mass meeting?

A    That's right.

Q    On what date?

A    18th.

Q    Who addressed that mass meeting?

A    I don't know.

Q    Well, some persons did address that meeting on February 18; is
     that correct?

A    I wouldn't exactly say.

Q    Well, did anybody talk to the mass meeting?

A    Of course, I was late, I was late coming in.

Q    I didn't ask you whether you were late; I asked you did anybody
     talk to the mass meeting -- I will ask you -- while you were
     there?

A    Mr. Turner talked.

Q    Who is he?

A    Mr. Albert Turner.

Q    Who is he; what does he do; identify him?

A    He is -- he is back there.

Q    Well, is he a lawyer?

A    Well --

Q    A preacher?

A    -- he is our leader.

Q    Our leader?

A    (Nodded to indicate affirmative reply)

Q    A leader of what, an organization?

A    Of citizens' rights; that's right.

        MR. HALL: Your honor please, we are going to object to this; Mr. Turner's been on the stand.

        THE COURT: Overrule; you need not argue your objection; overrule; go ahead.

Q    Now, Alvin Turner, did you say?

A    Yes, sir.

Q    Pointing back to somebody in the audience?

A    That's right.

Q    And he was your leader; what do you mean by the statement, your leader?

A    Well, he was -- I was under the supervis--- he was to tell us what to do.

Q    You were a supervisor?

A    He was; he was my --

Q    Supervisor of what?

A    Of this mass meeting of civil rights.

Q    Civil rights mass meeting?

A    That's right.

Q    Is he a native of Marion?

A    He is.

Q    What does he do over there?

A    I don't know what he do.

Q    Does -- had you known him before you saw him at this mass

meeting?

A    Sure, I know him.

Q    And you don't know where he works?

A    Of course, he was a brick mason.

Q    A brick mason in Marion, Alabama?

A    That's right.

Q    Now, you said your leader; do you mean of some organization like
     the Improvement Association or the Demonstrating Association
     or the N.A.C.P. or something like that; what organization do
     you have reference to?

A    Well, what organization do I have reference to? Well, I'll say
     this, the civil rights, probably I got it confused, but I know
     what I am trying to say, if I can't explain it.

Q    Go ahead and try to say it?

                THE COURT:  Do you have a voting organization for
Negroes in Perry County?

                WITNESS:  Do we have what?

                THE COURT:  A voting organization, an organization
to stimulate Negro registration and voting?

                WITNESS:  That's right; that's right.

                THE COURT:  Go ahead.

                WITNESS:  That is what I am trying to say; I couldn't.

                THE COURT:  That has been brought out yesterday and
the day before.

Q    Do you belong to any other organization, other than this local

organization in Perry County?

A    I don't.

Q    Do you belong to the N.A.C.P.?

A    I don't.

Q    Do you belong to CORE?

A    Court?

Q    CORE, C-O-R-E, CORE?

A    (Shook head to indicate negative reply)

Q    This Turner that -- this witness, Turner -- this witness, Turner, that you identified in the court room, he is the head, then, of this local civil rights organization in Marion; is that right?

A    That's right.

Q    And he did give you instructions as to what to do at this demonstration?

A    That's right.

Q    Did he?

A    He did.

Q    Did he tell you to jump up in the street, lie down in the street, or pray, or what did he tell you?

A    Now, he give us to what movement to take; he said, "Now, if you are stopped by the law, we don't go no further, if they ask us to stop"; so they had me employed where we offer prayer.

Q    He had you what?

A    To offer prayer while --

Q    Were you drawing compensation from this organization or expense money or anything?

A   Not a bit.

Q   You paid your own expenses?

A   That's right.

Q   Now, when you were down in the street and said you were praying and somebody hit you, are you able to identify anybody in that crowd that hit you?

A   I don't -- I don't know who hit me --

Q   You don't know whether it was --

A   -- because I was down on my knees, my eyes closed; I don't know who hit me.

Q   Well, were there a crowd of people surrounding you there at that occasion?

A   That's right; they were standing up all around me.

Q   Were they all white people?

A   They all white.

Q   All of them were white?

A   All white.

Q   But there were a lot -- some other people that were not whites down in the street with you, wasn't there?

A   Well, sure; there was some more around there.

Q   Right around, some other people that wasn't white?

A   That's right; like I say, I don't know who hit me.

Q   You have no idea of what race the people hit you belonged to, do you?

A   I don't have no idea who hit me, but I -- wait a minute, wait

before I say that; the men was had the clubs all standing

around, and they were white folks while I was down.

Q    But the man with the club, as far as you know, you don't know

whether the fellow hit you with the club or ax handle or hammer,

do you?

A    The folks what took me -- drug me to jail --

Q    But -- but you don't know whether a white man hit you or a

member of some other race hit you, do you?

A    White folks carried me --

Q    I asked you who hit you?

        THE COURT:  He answered that several times.

Q    You don't know?

A    That's right; I don't know who hit me.

        MR. KOHN:  That's all.

        THE COURT:  For the plaintiffs.

          REDIRECT EXAMINATION:

BY MR. DOAR:

Q    When you said --

        MR. McLEAN PITTS:  Your honor, wait just a minute.

        WITNESS:  But --

        THE COURT:  Just a minute; you have a question, Mr.

Pitts?

        MR. McLEAN PITTS:  No, sir.

        THE COURT:  Mr. Gayle; Mr. Wilkinson?

        MR. WILKINSON:  No, sir.

580

THE COURT:  Mr. Doar.

Q  (by Mr. Doar)  You said that these -- there were white people
around; were they in uniform or out of uniform?

A  Well, they was uniformed men.

Q  Were they members of the Sheriff's office, or were they State
Patrolmen, if you know?

A  Well, some of them was Sheriff's office, and some of them was
those Troopers.

Q  Troopers?

A  And further, like I say, I don't know who hit me, but, you know,
they was beating me, so I know who had me when I got to jail,
and I wouldn't say my brother did it.

MR. DOAR:  Thank you.

THE COURT:  Mr. Hall.

MR. HALL:  No, sir; no questions.

THE COURT:  Anything further from this witness?

MR. McLEAN PITTS:  I would like to ask him one

question.

THE COURT:  All right.

RECROSS EXAMINATION:

BY MR. McLEAN PITTS:

Q  That was in Marion, Perry County, wasn't it?

A  That's right.

Q  And who is your Sheriff?

A  Oh, Mr. -- Mr. Harris the high Sheriff.

Q  Mr. Harris is Chief of Police over there, isn't he, and Mr. Bill

581

Loftis is the Sheriff, isn't he?

A    Yeah, something like that.

MR. McLEAN PITTS:  All right, that's all.

THE COURT:  All right, you can be excused.  Call your next witness.

MR. McLEAN PITTS:  Your honor, we move to exclude all of this witness's testimony insofar as it pertains to Jim Clark.

THE COURT:  Motion denied; the basis for denying it as heretofore stated by the court --

MR. McLEAN PITTS:  We except.

THE COURT:  -- in -- in connection with a similar motion.  Call your next witness, Mr. Doar.

MR. DOAR:  I have no further witnesses, your honor. I have some of the defendants' records that I would like to offer, if I could get those organized at the noon recess --

THE COURT:  I will permit that.

MR. DOAR:  -- will that be all right?

THE COURT:  I will permit that.  And with that exception, you rest?

MR. DOAR:  Yes; there is one other exception, that is that we haven't -- the Police Commissioner, Wilson Baker, has not been here because of an agreement.  It may be that his testimony would be relevant; I would like to reserve the right to call him.

THE COURT:  In rebuttal?

MR. DOAR:  In rebuttal.

582

THE COURT:  All right.

MR. NABRIT:  We would like that same right, your honor.

THE COURT:  All right; you have the right to call any witness in rebuttal as long as it is rebuttal testimony.  All right, for Governor Wallace.

MR. SMITH:  General Harrison.

THE CLERK:  Judge, Defendant Wallace Exhibits 1 and 2 have been marked for identification.

THE COURT:  All right.  Have you been sworn?

WITNESS ALFRED C. HARRISON:  Yes, sir.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ALFRED C. HARRISON, witness for George C. Wallace, having been duly sworn, testified as follows:

DIRECT EXAMINATION:

BY MR. SMITH:

Q    Will you state your full name, please, sir?

A    Alfred C. Harrison.

Q    What is your occupation?

A    Adjutant General, State of Alabama.

Q    And your military rank?

A    Major general.

Q    General Harrison, were you in Selma on Tuesday of this week, March 9?

A    Yes, sir.

Q    What time did you reach Selma?

583

A    About nine forty-five, a.m.

Q    Had you been there before Tuesday of this week?

A    Briefly Sunday.

Q    Briefly Sunday?

A    (Nodded to indicate affirmative reply)

Q    And during what hours on the preceding Sunday had you been in
     Selma?

A    From about six, p.m., until eleven, p.m.

Q    All right.  Where did you go in Selma on Tuesday?

A    Initially?

Q    Yes, sir?

A    I initially rode to the Brown Chapel where the marchers were
     congregating.

Q    And again, about what time did you get to Brown Chapel?

A    About eleven o'clock.

Q    Do you have any opinion as to the number of marchers that were
     there at Brown Chapel, either in or around it?

A    At that time I would say seven to eight hundred.

Q    Seven or eight hundred?

A    Yes, sir.

Q    Now, did you observe any white people in the area of --

A    Yes, sir.

Q    -- Brown Chapel?

A    I did.

Q    Where were they standing?

584

A     They were mixed and mingled with the colored people.

Q     In addition to the crowd that were attending the church, or in
      and around the church, did you observe any other groups of people

A     No, sir.

Q     None other?

A     No, sir.

Q     Did you observe the march as it left Brown Chapel?

A     I did.

Q     Do you know Dr. Martin Luther King?

A     Yes, sir.

Q     You know him by sight?

A     By sight.

Q     Did you see him in the march?

A     I did.

Q     Did you follow the progress of the march down to U.S. highway 80?

A     Yes, sir.

Q     Or the bridge?

A     Yes, sir.

Q     Were you on the Selma side of the bridge as the marchers
      approached the bridge on U.S. 80?

A     No, sir.

Q     Where were you?

A     I was on the east side of the bridge.

Q     On the Montgomery side?

A     Yes, sir.

585

Q  Did you see the marchers as they approached the Selma side of
   the bridge?

A  No, sir.

Q  You did not?

A  No, sir.

Q  You didn't see them at all there?

A  Not on the Selma side.

Q  You did see them on the Montgomery side?

A  Yes, sir.

Q  Will you state to the court what you saw as the marchers
   approached the Montgomery side of the bridge?

A  They came down the -- the north side of the highway, which is
   the left side coming towards Montgomery.  The majority of them
   were using the sidewalk as they came across the crest of the
   bridge, but I would say that there were some people out five to
   six feet in the highway off of the sidewalk.

Q  Did you observe any State Troopers?

A  Yes, sir.

Q  And where were they, sir?

A  They were stationed on either side of the highway from the
   bridge -- from the east side of the bridge all the way to the
   red light, which is about three quarters of a mile; then --

Q  Do you have any opinion as to the number of Troopers?

A  -- in addition to that there were about fifty lined up across
   the highway.

586

Q   All right?

A   Blocking the highway and on each side, I would say that there
    would be approximately seventy-five to eighty.

Q   Did the marchers on this occasion cause any congestion of
    traffic on U.S. 80?

A   They did.

Q   Now, when I ask you that, I -- I want to ask the question; did
    the Troopers cause any congestion of traffic?

A   They did.

Q   Were the marchers, as they approached the Montgomery side of the
    bridge, on U.S. highway 80?

A   State that again?

Q   Well, I am asking, really, as they approached the Montgomery side
    of the bridge, were they in the street or on the side of the
    road?

A   About half and half.

Q   Half and half?

A   Yes, sir.

Q   Would you estimate the number of marchers at this point?

A   Fifteen to sixteen hundred.

Q   What if anything did the State Troopers do on this occasion?

A   When the marchers reached the crest of the bridge coming east,
    Montgomery -- coming towards Montgomery, they lined up across
    the -- the highway on both -- both lanes of the highway about
    one and in some cases two deep; I would estimate there were

fifty lined up across there.

Q  Did you hear any conversation between any State Trooper and the members of the group that were marching?

A  No conversation, although -- the only statement I heard was the statement Major Cloud made on the P.A. system.

Q  What statement did he make?

A  Said this was not a legal march, and he asked them to return to the church.

Q  Did the marchers return to the church?

A  Not instantaneously; no.

Q  What did they do?

A  The best of my recollection, they -- they prayed, and they sang a song; now, which came first, I am not sure.

Q  How much time elapsed between Major Cloud's order and the dispersal of the crowd?

A  You mean the return back to the church?

Q  Yes?

A  I would say eight to ten minutes.

Q  Did you see any acts of violence on Tuesday?

A  None whatsoever.

MR. SMITH:  Take the witness.

THE COURT:  For the plaintiffs.  Mr. Gray.

CROSS EXAMINATION:

BY MR. GRAY:

Q  General Harrison, what time did you say you arrived in Selma on

Sunday?

A    On Sunday?

Q    Yes, sir?

A    About six o'clock, I think.

Q    So when you arrived there on Sunday, the march was over; is that correct?

A    Yes.

Q    Did you go to Brown's Chapel Church when you arrived?

A    On Sunday?

Q    Yes, sir?

A    I am not sure.

Q    Did you on Sunday go -- did you see any of the marchers at all when you arrived on Sunday?

A    You mean physically marching or in a -- in a group or mob?

Q    In a group?

A    Yes.

Q    Where were they?

A    They were assembled in the vicinity of Brown's A.M.E. Church.

Q    So you did go in the vicinity of Brown's Chapel Church?

A    I did go in the vicinity, but I don't think I went immediately in front of it.

Q    Did you see any of the Sheriff's possemen there at the time of your arrival?

A    No.

Q    Did you see any State Troopers there?

A    I did.

Q    Approximately how many State Troopers did you see on Sunday, near
     Brown's Chapel Church?

A    Fifteen to twenty.

Q    Approximately what time was that?

A    I would say seven to seven thirty, p.m.

Q    Now, were you in Selma on Sunday's -- on official business?

A    Yes.

Q    Had you received any orders to go to Selma?

A    Yes.

Q    Where did you receive -- from whom did you receive those orders?

A    Mr. Cecil Jackson.

Q    Mr. Cecil Jackson?

A    Yes, sir.

Q    Who is he?

A    He is the Governor's Executive Secretary.

Q    When did you receive the orders from Mr. Cecil Jackson?

A    About five, p.m., that afternoon.

Q    Were they written or were they oral?

A    Verbal.

Q    What were the orders that you received?

A    To proceed to Selma and look over the situation and evaluate it
     and give them any opinions that I had on the situation.

Q    Did you follow those instructions?

A    I did.

Q   Did you make such a report?

A   I did.

Q   What report did you make?

A   I advised that at time -- at that time that the situation seemed

    to be in hand.

Q   When did you make that report?

A   About eight o'clock that night.

Q   To whom did you make the report?

A   Mr. Cecil Jackson.

Q   Now, did you receive any instructions -- what time did you leave

    Selma on Sunday?

A   About eleven, p.m.

Q   What -- did you go back to Selma Tuesday?

A   I did.

Q   Pursuant to whose instructions did you go on Tuesday, if any?

A   Mr. Cecil Jackson.

Q   When did you receive those instructions?

A   It must have been about nine, a.m., on Tuesday morning.

Q   And were they oral or written?

A   Oral.

Q   What were the instructions?

A   The same instructions as I received on Sunday.

Q   Did you make a report back to Mr. Jackson?

A   I did.

Q   What time did you make that report?

591

A   My first report was about eleven thirty, a.m.

Q   And what report did you give Mr. Jackson at about eleven thirty, a.m.?

A   As to the situation as I saw it at that time.

Q   And what was that?

A   That there were indications that there were going to be a march across the Pettus Bridge towards Montgomery.

Q   Did you receive any instructions from Mr. Jackson at that time?

A   I did.

Q   And what instructions did you receive from him?

A   To remain in Selma and continue my mission.

Q   All right, did you make a subsequent report?

A   I did.

Q   What time and to whom?

A   About one thirty; I made a report to Mr. Jackson again.

Q   And what was that report?

A   That I was in the vicinity of Brown Chapel on -- I cannot think of the name of that street.

        THE COURT:  Sylvan Street.

        WITNESS:  Sir?

        THE COURT:  Sylvan Street.

A   Sylvan Street.  I was approximately a block and a half away from the chapel, a block and a half to two blocks, and that the march looked like it had started.

Q   Did you receive any additional instructions from Mr. Jackson?

592

A    I did.

Q    What were those instructions?

A    To continue my mission.

Q    Did you continue your mission, sir?

A    I did.

Q    Did you make any subsequent report?

A    I did.

Q    What time?

A    At approximately between two and two thirty, I would say about two fifteen.

Q    Did you make that report to Mr. Jackson?

A    I did.

Q    And what was the report?

A    That the marchers had crossed the bridge and that they were stopped by the State Troopers at the first traffic light over the bridge, which was about three quarters of a mile from the crest of the bridge.

Q    Did you make any additional report?

A    I did.

Q    Now, the report you were just telling us about, did you also inform him that the marchers had turned around and were on their way back?

A    I did not.

Q    Had they at that time?

A    No.

Q    All right; what about the subsequent report, sir?

A    The subsequent report was that the marchers had returned -- they had turned around and had started back across the bridge.

Q    Was that the last report you made that day?

A    No.

Q    What additional report, if any, did you make?

A    I made an additional report, and when I returned to Montgomery late that night.

Q    Approximately what time was that?

A    About seven or eight o'clock.

Q    And what was -- what did you report?

A    I told Mr. Jackson -- I just gave a resume of what I had told him on each conversation on the telephone.

Q    Now, were any representatives or any of your subordinate officers in Selma on Sunday, and did any of them observe the march on Sunday?

A    No.

Q    No; you received no orders, and no one from your Department were there at this time to observe?

A    No.

Q    Sir, do you have any other position other than your position with the Alabama National Guard?  Is this a position -- a full time position?

A    It is a full time position; yes.

Q    And you have no other employment as such?

594

A   I have other business interests; yes.

          MR. GRAY:  No further questions.

          THE COURT:  Intervenor; Mr. Doar.

BY MR. DOAR:

Q   General Harrison, are you familiar with the highways between

    Selma and Montgomery?

A   Yes, sir.

Q   The main highway is highway 80?

A   Yes, sir.

Q   Would you tell me whether or not that is a four lane or a two

    lane highway?

A   From Selma to -- almost to Benton it is a four lane highway, and

    from Montgomery about ten or twelve miles west it is a four lane

    the balance is a single lane highway.

Q   How far is it single lane highway?

          THE COURT:  You mean the two lane?

Q   The two lane; you say it was a -- twenty miles?

A   You mean a total?

Q   Yes, sir?

A   I would say eighteen to twenty miles; yes.

Q   Are there any alternate routes between Selma and Montgomery?

    Highway net?

A   There is one that is quite a bit out of the way; yes, there is a

    alternate route; yes.

Q   And is that direct from -- except it is a little longer, it is

595

direct from Selma to Montgomery?

A    You have to go through Prattville.

Q    Is that north or south of highway 80?

A    North.

Q    How far north?

A    Well, it depends on the curvature of the road; it runs pretty close in places, and I would say it was eight or ten miles away in other places.

Q    Is that a two lane or a four lane highway?

A    It is a two lane.

Q    Is that hard surfaced road or not?

A    It is.

Q    Have you been on that road lately?

A    It has been five years since I have been on that road.

Q    Do you know whether it is open and in operation?

A    I do not know.

Q    How much of the highway did the persons that were on the march cover on Tuesday?

A    I would say one fourth of one lane.

Q    Well, I am talking now in -- that is in width now?

A    That's right.

Q    How about in depth?

A    About four or five hundred yards.

Q    Four or five hundred yards?

A    Right.

Q    And how many persons did you estimate were in the march at that

    time?

A    Fifteen to sixteen hundred.

Q    So would it be fair to say that with a group of fifteen to sixteen

    hundred people that -- that at that time they covered four to

    five hundred yards of highway?

A    After the column closed up; during the march it was longer than

    that.

Q    Well, do you have any idea of how long it was?

A    I would say half a mile.

Q    Now, are there service stations along the highway, highway 80?

A    Yes, sir.

Q    Are there a number of them along there?

A    Well, the -- they are rather dense right on the outskirts of

    Selma, but they are scattered after you leave Selma.

            MR. DOAR:  Thank you.

            THE COURT:  Mr. Kohn.

            MR. KOHN:  No questions.

            THE COURT:  Mr. Pitts.

            MR. McLEAN PITTS:  No, sir.

            THE COURT:  Any other questions from this witness?

Mr. Gray?

            MR. GRAY:  Yes, your honor.

BY MR. GRAY:

Q    I think you said earlier, sir, that when you arrived on Sunday

597

you were in the area of Brown's Chapel Church?

A  (Nodded to indicate affirmative reply)

Q  And I believe you testified that there were some Alabama State
Troopers in that general area?

A  (Nodded to indicate affirmative reply)

Q  Were they heavily armed?

A  Not other than their normal armament.

Q  Did you observe whether or not they were in the immediate
vicinity of the church?

A  What do you call immediate?

Q  Directly in front of the church?

A  I saw none directly in front of the church.

Q  Do you know whether or not they were prohibiting people from
entering or leaving the church?  At the time you were in the area?

A  They were allowing authorized people only, is my understanding,
to go in there.

Q  When you say, "Authorized people only," what do you mean, sir?

A  Well, people such as myself; now, I am -- I mean on the highway.
I did not walk; I rode through there.  But they were stopping
any unauthorized people.

Q  So then if a person -- if a Negro wanted to go in the church,
he couldn't go in; is that correct?

A  No, that is not correct, because I only went on one entrance.

Q  I mean the entrance that you were in front of, the only persons
who could enter there were authorized persons, and that would

598

exclude the average person who may have been going to the church?

A    This was by vehicle, now; walking lanes, I don't know.

MR. GRAY:  All right, no further questions.

THE COURT:  Any other questions from this witness by any lawyer?

MR. SMITH:  May this witness be excused?

THE COURT:  Just a minute, I want to ask him some questions.  General, when you were making these reports to the Governor's Secretary, Mr. Jackson, how were you making them?

WITNESS:  By telephone.

THE COURT:  Did you receive any instructions other than general instructions that you have related here?

WITNESS:  No, sir.

THE COURT:  Did you receive any instructions to be conveyed to anyone else in connection with -- with the State or county?

WITNESS:  No, sir.

THE COURT:  That's all I have.  Witness be excused, gentlemen?  Any objection to this witness being excused?

MR. GRAY:  He may be excused.

MR. SMITH:  You may be excused.  Mr. Villadsen; Villadsen.

THE COURT:  Have you been sworn?

WITNESS ARTHUR P. VILLADSEN:  Yes, sir.

*****************

599

ARTHUR P. VILLADSEN, witness for George C. Wallace, having been duly
    sworn, testified as follows:

DIRECT EXAMINATION:

BY MR. SMITH:

Q    Will you state your full name, please, sir?

A    Arthur P. Villadsen.

Q    Where do you live, Mr. Villadsen?

A    Montgomery.

Q    And what is your occupation?

A    Highway engineer.

Q    How long have you been employed by the State of Alabama Highway
    Department?

A    Since 1923; I believe that is forty-two years, forty-two or
    forty-three.

Q    Now, would you explain to the court the perimeter or area that
    the Eighth Division of the Alabama Highway Department serves?

A    It is the full area of five counties, Dallas, Autauga, Elmore,
    Montgomery, and Lowndes County.

Q    Would U.S. highway 80 east from a point in downtown Selma,
    Alabama, to the State Capital be within the Eighth Division?

A    It is; yes.

Q    And what position do you hold with the Eighth Division of the
    Alabama Highway Department?

A    I am the Division Engineer for the Highway Department in the
    Eighth Division.

Q   All right, sir.  Now, I show you Defendant Wallace's Exhibit 1,
    and ask if you can identify this Exhibit, Mr. Villadsen?  I
    believe if you will, if you will stand and hold that corner of
    the Exhibit -- hold it so that the court can see it -- what is
    this Exhibit?

A   This is a -- a map of the Eighth Division, showing all of the
    State highways within it.

Q   Is it an official map?

A   It is a print of an official map.

Q   Is it for the maintenance of the Eighth Division highways?

A   It was prepared for our use.  In main---

Q   Does this map show the route from Selma to Montgomery?

A   It does.

Q   Are there any alternate routes from Selma to Montgomery, other
    than U.S. highway 80 east?

A   There is U.S. -- Alabama 14.

Q   Would you point that out to the court, please?

A   14 -- this is Selma, and U.S. 14 goes out across here until it
    gets to what we call the Prattville cut off on U.S. 82, and
    then you can go across U.S. 31 and on into Montgomery.

Q   As to this alternate route, would you explain to the court the
    condition of the highway with reference to whether or not it is
    -- it is paved surface?

              THE COURT:  Any objection to the map going in

    evidence?

601

MR. GRAY:  No, sir.

MR. HALL:  No, sir.

THE COURT:  It will be admitted.

MR. SMITH:  We offer it.

Q    As to the alternate route, would you explain to the court the
condition of it as to whether or not it is a paved surface or
two or four lanes?

A    It's a -- it's a paved surface all the way, and it's two lanes
from -- from Selma on over until you get to U.S. 31, and it
goes four lanes on into the City of Montgomery.

Q    All right, sir.  Now, in regard to the maintenance of the
public highways within your Division, do you require, or does
the Department require, the conducting or obtaining of traffic
counts?

A    Actually we do not; that is done by the -- one of the central
organizations.

Q    From the State Highway Department?

A    Yes, sir.

Q    What is the purpose of traffic counts?

A    Well, the real purpose in it is for future planning in order to
be able to plan where your traffic is, where you have the
traffic and where the improvement for increased traffic is --
is needed; you just have to have the traffic counts to properly
develop a system.

Q    Has the Department made traffic counts from a point or points

602

between Selma and Montgomery along U.S. highway 80 east?

A   They have; yes, sir.

Q   Do you have access to those traffic counts?

A   We have from the central organization that makes them; at any time that we -- we need them, why, we can call for them and get them.

Q   At my request, have you placed on this Defendant's Exhibit traffic counts as to certain points along U.S. highway 80 east between Montgomery and Selma?

A   We have; yes, sir -- I have, rather.

Q   Now, would you look at the Exhibit, please, sir, and first give the court the latest traffic count at U.S. highway 80 east at its intersection with Water Street -- I think I am correct -- in the City of Selma; that would be, to use another phrase, Mr. Villadsen, on the Selma side of the Pettus Bridge on U.S. highway 80 east?

A   That would be fourteen thousand, eight hundred twenty-seven.

Q   Now, what does that mean?

A   That means average daily count, traffic count.

Q   Week day or week end?

A   No, that is average, all week.

Q   Average throughout the week?

A   That's right.

Q   All right. Now, would you give us the traffic count that you have at the next point along this route coming in the direction

603

of Montgomery?

A    Coming back towards Montgomery, the next one we have is beyond
     that first crossing, I believe there is a traffic light there,
     where the old highway goes around, the old original, and that
     is ten thousand, five hundred twenty-eight average daily.

            THE COURT:  In each instances these are indicated on
the map?

            MR. SMITH:  On the map --

            WITNESS:  I am reading from the map.

            MR. SMITH:  -- yes, sir.

Q    Would you give the court the traffic count at U.S. highway 80
     east at the intersection of the Southern Bypass in Montgomery?

A    Southern Bypass?

Q    Yes?

A    That is ten thousand, three hundred ninety.  Now, that is taken
     as you enter into it, down at Catoma Creek, right there.

Q    All right, coming --

A    Right there.

Q    Coming further west, what is the next traffic count in
     Montgomery?

A    If you come in --

            THE COURT:  That -- the last count include 31 coming
north --

            MR. SMITH:  That is what I am trying --

            THE COURT:  -- after they converge?

            WITNESS:  Sir?

604

THE COURT:  Is that after 80 and 31 converge?

WITNESS:  Yes, sir.

MR. SMITH:  All right.

WITNESS:  That is beyond the wye down there.

Q    And then your next one?

A    The next one is at -- going on into Montgomery on Fairview.

Q    All right, that is further within the city?

A    Yes, sir; that is seventeen thousand, a hundred sixty-five.

Q    All right.  Now, does this Exhibit also show the number of
bridges that exist on U.S. highway 80 east between Montgomery and
Selma?

A    Don't have it on this -- this map.

Q    All right, may I --

A    It is in the, I believe, other listing that Mr. --

Q    -- show you Defendant's Exhibit 2, and ask you if you can
identify this Exhibit?

A    This is the one that was prepared by Mr. Bates, and this --

Q    Speak loudly, now, so that everybody can hear you?

A    I say this is the list that was prepared by the -- Mr. Bates,
the Maintenance Engineer.

Q    All right, sir; how many bridges between Selma and Montgomery?

A    Count them, now.

THE COURT:  Just a minute.

MR. SMITH:  May I offer the Exhibit?

THE COURT:  You withdraw the question?

605

MR. SMITH:  Yes, sir.

THE COURT:  All right, and you offer the Exhibit?

MR. SMITH:  Yes, sir.

THE COURT:  Any objection to the Exhibit?

MR. HALL:  We object.

MR. GRAY:  Just a moment.  Your honor, we would like to take him on voir dire with respect to the --

MR. SMITH:  All right, sir.

MR. GRAY:  With respect to Exhibit 2.

THE COURT:  Just have a seat, please.

VOIR DIRE EXAMINATION:

BY MR. GRAY:

Q    I show you, sir, Exhibit 2 for the defendant, Governor Wallace, and ask you, sir, did you prepare that?

A    This list?

Q    Yes, sir?

A    Can I explain it, how -- how I went about it -- this list?

MR. SMITH:  Yes, sir.

A    In our records in the Division, we don't have the -- what we call the bridge records in there, and these were -- we got these from the Maintenance Department, where the bridge records are kept, see.

Q    So, now, that list was not prepared by you?

A    No.

Q    Neither was it prepared under your supervision?

606

A   No, this one wasn't.

Q   But it was supplied to you by someone else?

A   By the -- by the Maintenance Engineer; yes.

Q   Do you know whether or not those are in fact all of the bridges
    that are between here and Selma?

A   Yeah, I know they are; yes.

Q   I mean you know that from your own personal knowledge?

A   That's right.

Q   Do you know about each one of the bridges from your own personal
    knowledge, that those -- that each one of the bridges that is
    listed on that list is in fact a bridge that is on U.S. highway
    80 between Montgomery and Selma?

A   I do.

Q   You do?

A   (Nodded to indicate affirmative reply)

            MR. GRAY:  That's all.

                DIRECT EXAMINATION (cont'd):

BY MR. SMITH:

Q   In addition to --

            THE COURT:  Just a minute; any objection to number 2?

            MR. GRAY:  No, sir.

            THE COURT:  It will be admitted in evidence.

Q   In addition to Defendant's Exhibit 2, do you have the statistics
    as to the length and width of the bridges in question?

A   They are on this list, and that is opposite each --

607

Q    Does it show whether or not the bridges in question have
     sidewalks?

A    They do, because there is only two of them that does have.

Q    Does it show the width of the sidewalks?

A    You have to figure it out; you got two at twenty, two slab --
     roadway widths at twenty feet, that is forty, and the total
     width is fifty-two, so the two sidewalks, six foot sidewalks.

Q    Now, on Defendant's Exhibit 1, does this Exhibit show the portion
     of U.S. highway 80 east between Selma and Montgomery which is
     four lane?

A    It -- it is indicated on there; yes, sir.

Q    Indicated on this Exhibit?

A    Yes, sir.

Q    Does it indicate the size or the area of the shoulder of the
     road?

A    The shoulder of the road is indicated in the width of the
     roadway.  There are several types of the roadway in there.  The
     early -- the early ones and the improved ones and then the four
     lane, see.

Q    All of that is shown in this Exhibit?

A    All of that is shown in there.

Q    All right.  Mr. Villadsen, are -- of your own personal knowledge
     are there any public rest room facilities on U.S. highway 80
     east, other than private facilities furnished by filling
     stations?

A   Not any -- you mean supplied -- furnished by the Department --

Q   Yes?

A   -- Highway Department?  There is not any.

        MR. SMITH:  All right, sir; take the witness.

        THE COURT:  Anything further on direct?

        MR. SMITH:  No, sir.

        THE COURT:  Mr. Gray.

           CROSS EXAMINATION:

BY MR. GRAY:

Q   Now, sir, you have given us a list of bridges which is identified
    as Defendant's Exhibit 2, and you -- I would like for you to
    explain a couple of things about this Exhibit to us; for example,
    the first bridge is indicated as bridge number eight dash
    twenty-four dash twenty-five point three; where is that bridge?

A   That bridge is -- is indicated; eight stands for Eighth
    Division, highway division, twenty-four stands for the county
    number, these are identification numbers --

Q   Yes, sir.

A   -- for the bridges, and the distance of twenty-five -- is the
    figure -- twenty-five point three is the distance from a given
    point in which -- the roadway section that bridge is in.  Now,
    it could start -- it starts twenty-five miles and three tenths
    miles from the roadway section, and our roadway sections are
    in the -- identified pretty much in the same manner.

Q   Now, what is the particular length of that bridge?

A    The length of that bridge is stated right here, is twelve hundred
     forty-eight feet.

Q    All right.  Now, in -- and then your next column, what about --
     are there walks on the bridge at that point?

A    That's right, it says two; it means that there is two twenty-foot
     lanes, paving lanes, here, plus a sidewalk, plus sidewalk, and
     the total length is fifty-two feet; the two twenty-foot lanes,
     plus the middle in there, take that from the fifty-two feet, and
     the sidewalks are on -- the six-foot sidewalks on each side.

Q    Now, do you know -- from the first bridge that is indicated on
     this Exhibit to the next bridge, are you in a position to tell
     the condition of the shoulders of the road between those two
     points?

A    Between the two?

Q    Yes, sir?

A    Generally speaking; I don't look at them every day, but we are
     responsible -- I am responsible for the maintenance of these
     roads, and those shoulders are kept up, and they are inspected,
     and we have people that go over them at least twice a week and
     sometimes every -- every day, and if there is anything that
     develops that needs repairing, why, it is done immediately.

Q    Is there any uniformity in the size of the shoulders?

A    There is when they are first built and when they are maintained
     in that shape.

Q    What -- what is the -- the usual size, width of the shoulders of

610

the highway?

A   Well, there is varying difference in when the roads were built.
Now, in those in that area there, where we build them, you
might say the modern ones, now, we use a twenty-four foot
pavement, that is two lane road, and ten foot shoulder, or a
forty-four foot roadbed for it.

Q   Now --

A   Now, you have a half of that section, when you got four lanes,
other -- the shoulder on the outside.

Q   I direct your attention on that portion of highway 80 that is
in Dallas County; isn't substantially all of that highway four
lane, in Dallas County?

A   That is right, with the exceptions of a small area right on the
east end that we are -- we are now in the process of extending
it.

Q   And isn't it a fact that there is a large shoulder on both sides
of the road all the way on U.S. 80 at this particular point in
Dallas County?

A   Well, there is a ten-foot shoulder, is -- is what there is;
now, I don't know what you call --

Q   Now, when you say, "Ten-foot shoulder," you mean the State owns
that much right-of-way; is that right?

A   No; no, that is the shoulder.

Q   Does -- when you -- that does not mean that beyond the shoulder
there may be additional space that a person could walk on; is
that correct?

A     Well, you would be -- you would be on the -- in the ditch or
      down a slope of a fill or something like that, whichever the --
      kind of country you are going through there.

Q     Now, I direct your attention, sir, east of the Dallas County line
      into Lowndes County; now, what is -- how many lanes of highway
      do you have, say, just from Dallas County almost to you get to
      the highway going to Hayneville from Montgomery?

A     That is one of the older roads in there, and that has twenty-foot
      pavement, and the shoulders -- they were originally built --
      well, they are about four feet is what they -- what they run,
      about four feet.

Q     About four feet?

A     That's right.

Q     Now, at other points along that highway you do have some level
      land where you would be able to walk a greater distance than
      four feet?

A     Well, you would walk in the ditch.

Q     The ditch --

A     Because the shoulder, there is a road -- the drainage ditch
      wherever there isn't a fill section, where the fill sections
      are, where you have to elevate it, you have about a four foot
      shoulder there --

Q     And is it on --

A     -- and in the cut sections you have the same shoulder, and then
      you have a ditch for the water, and then your cut sections are

-- each could be anywhere from two or three feet up to forty or

fifty, if you --

Q    Did I understand you to testify on direct that this map shows

the width of the shoulders at each point along the way?

A    The shoulders are constant; yes.

Q    I didn't understand you?

A    The shoulder widths are constant without any regard to the --

to the terrain.

Q    So you are saying -- does this map show that?

A    It indicates the width of the pavement and the roadway.

Q    And when you say, "The roadway," does that include the shoulders?

A    Roadway does; yes.

Q    Now, are you familiar with any regulation with reference to

governing pedestrians' use of the highway?

A    Well, we -- in the Highway Department we are --

Q    Just one moment; just answer me whether you are familiar with

that, any regulations governing the use of the highway by

pedestrians?

A    I don't think we have any except in certain spots; there are

spots that there could be; I don't -- I don't know of any in

my Division.

Q    Prior to the time that Mr. Smith inquired of you to get the

material which is set out on the Governor's Exhibits 1 and 2,

had any official of the State of Alabama inquired of your office

what was the condition of these roads?

A   What the condition of them --

Q   Yes, sir?

A   No.

Q   Had anyone inquired about the shoulders or anything else with respect to pedestrians' use of these roads prior to the time Mr. Smith talked with you or someone in your office?

A   No, I was just asked to prepare this map; that is all.

Q   No inquiries from the Governor's office as far as you know?

A   No.

Q   Isn't it a fact that pedestrians do use these roadways or the shoulders of these roads in traveling to and fro along this highway?

A   I imagine they do; you see them as you drive along. Now, they are not made for pedestrian walkways; there are protections on the roadways and places for traffic to pull over in case they have trouble.

Q   I think you mentioned, sir, about certain daily counts, but I don't believe you told us -- if you did, I didn't get it -- the date that these daily counts --

A   They are on the map.

Q   They are indicated on the map by the --

A   They are in there with the month and the year.

Q   All right.

A   Not the date, but the month and the year.

Q   Oh, yes. Do you -- does the highway keep any type of records

614

of the number of the pedestrians who use these highways?

A    We don't; no.

                MR. GRAY:  I think that's all.

                THE COURT:  Mr. Doar, for the Intervenor.

                MR. DOAR:  Your honor, I would like to look at that

map.

BY MR. DOAR:

Q    What is the distance on that alternate route from Selma to
     Montgomery?

A    They are practically the same.

Q    Do you have any traffic count on the alternate route?

A    They are on there; yes, sir.

Q    And the alternate route, too?

A    Yes, sir.  You see them in red up there on it; see, here is that
     route.

Q    You have a traffic count at the -- at the county line between
     Dallas and --

A    That's right.

Q    -- I guess it is Autauga County?

A    That's right.

Q    Then you have another one over here when it goes into the four
     lane below Prattville?

A    That's right.

Q    I see.

A    Then another one just before you get into 31, and this figure

615

here is what is on 31, how many --

Q   Now, are there any other alternate routes between the Lowndes
    County line and the place where you get to the four lane west
    of Montgomery?

A   No State highways.

Q   Well, are there any county roads?

A   Not direct; there are the kind of roads that -- that -- well,
    it is just a network of county roads all over everywhere, but
    there is no direct routes in there by -- we -- we don't have
    those on this map here.

Q   You haven't shown those on this map?

A   No.

Q   You are not really familiar with the county road net?

A   I know where they are and everything, I know there is not any
    there, but there is not any on this map.

Q   But there are a network of roads, county roads --

A   Oh, yes.

Q   -- through here as well as the State highways?

A   Uh, huh; but they are not direct, though.

Q   I understand; I understand.  Now, on the four lane highways, can
    you tell me if there is a standard distance for bypasses across
    from one of the four lanes, one two lane to the other two lane?

A   You talking about crossovers?

Q   Yeah, crossovers; is that what you call them?

A   That's right; that is where you can turn back and go back the

other way.

Q     That's right?

A     There is no standard distance on those; it all depends on where the -- where the traffic comes in from the side roads and so forth.

Q     Well, if you are repairing one of the highways, a four lane highway, you don't -- you usually close it off from one crossover to another crossover; is that right?

A     That's right, because you wouldn't need any crossovers if it wasn't.

Q     No, but I mean sometimes you come along on a four lane highway and you find that you are routed over to the other two lane, and it's just a two lane highway for a few miles, and then you go back to the four lane highway?

A     Well, that is true; yes.

Q     Can you estimate the frequency of those crossovers on the road from Dallas to Montgomery where it is four lane?

A     No, I couldn't do that, because you may go a long -- good long ways, there is no occasion for any, and then you -- you get in the city sections or close into town, you have got more frequent side roads coming in where they would need a crossover to get over on the other lane to go the other direction from --

Q     I am not talking about just the crossovers over the highway with the bridge, I am talking about the maintenance roads that sometimes go through the middle island?

A    That is what I am talking about.

Q    That is what you are talking about, too?

A    Yeah.

Q    You can't tell me how frequently, or whether they are two or three miles or less than that or five miles average?

A    You might have -- you might go a half a mile without one at all, no occasion for it at all, and then again you may have one on every block as you go through a -- a developed area.

Q    But it would be unusual to go more than a couple of miles without one, wouldn't it?

A    No, it wouldn't be -- amount to -- unless you were in the mountains or something like that, or the swamps.  It is a matter of design, those things are.

Q    Now, these -- the right-of-way is the distance from the one fence line to the other fence line; is that correct?  Is that termed the right-of-way?

A    Well, it's -- we don't build fences at -- if there is a fence within -- there is not any fences within the right-of-way, I would say, but that is the amount of -- of land that has been acquired for the purpose of building this -- this highway or roadway.

Q    And the Highway Department maintains all the property, all the area that it acquires for highway purposes; isn't that right?

A    That's right.

Q    Cuts the grass for the ditches and takes care of washouts on

the sides of the road?

A    That is a part of the --

Q    What is the right-of-way on the four lane highway between Selma and Montgomery; is it standard?

A    It is standard; I -- it is a matter of design, when they -- the things are built and everything, but it is standard now.

Q    You know how many feet the right of way is?

A    I couldn't -- I wouldn't want to tell you that, because I don't -- out of seven hundred miles, I don't remember all those right-of-way widths.

Q    Well, do they vary a great deal; can you give me the general width of the right-of-way?

A    They vary considerable from a two to a four lane and with the type of country gone through, and the -- and the design of your -- your roadway section.  For instance, if you have a two lane -- four lane undivided, it doesn't take as much area as it does if it's got a median in there, and if you are in where you got high fills, why, the slopes reach way on out, or high cuts.

Q    And then when you spoke of the roadway, you were speaking of the pavement part of the road, or the black top, plus the shoulders; is that right?

A    That is what we consider the -- the roadway; yes.

                    MR. DOAR:  Thank you.

                    THE COURT:  Mr. Kohn.

                    REDIRECT EXAMINATION:

619

BY MR. KOHN:

Q   To clear up one thing, I believe you stated that the width of
the highway, the usable traffic part of the highway, is one
thing, and the right-of-way is another?

A   Yes, sir.

Q   The right-of-way, of course, is wider than the usable surface
of the highway?

A   That takes care of the foundation, the bottom of the fills, and
all.

Q   Independent of any map, do you think you are generally familiar
with the highway between Selma, Alabama, and Montgomery, Alabama?

A   Generally familiar?

Q   Yes, sir; with the terrain, the way the road is?

A   Yes, I do; yes, sir.  I am -- I am responsible for the maintenance
of it and everything.

Q   If I made it to you as a fact, would I be wrong or correct to
say that from Selma, Alabama, to Montgomery, Alabama, on this
highway 80 there are numerous curves?

A   There are, particularly on these two lane sections, there are
particularly in there.

Q   If I submit to you as a fact, and I do, that on that same
highway -- and I will ask you to affirm or deny it -- that there
are dips in that surface of that highway?

A   Particularly in that area, too.

Q   Sir?

A    Particularly in that area, there are a good many short sight
     distance, getting over the -- over the humps, as you call them,
     dips or the --

Q    Did I understand you to say in the beginning of your testimony,
     or right after you took the stand, or sometime while you were
     on the stand, that this highway was paved of a -- the surface
     of the highway was what is commonly called black top?

A    Yes, it is.

Q    Is it a fact that that particular highway from Montgomery,
     Alabama, to Selma, Alabama, while rain is on it, or immediately
     after rain has fallen upon it, from a safety standpoint would it
     be safer or more hazardous for traffic?

A    The -- the old original section there from Lowndes County line
     to the Hayneville road is the old section where you have short
     sight distance, and everything, and the old standards are in
     there, where we had a lip curve, and the shoulders are narrow,
     and it is a hazardous section there because of the short sight
     distances and the dips, as you say, down there.

Q    Would it be less hazardous or more hazardous while it was wet?

A    I think it would be more hazardous.

Q    Coming from Selma, Alabama, to Montgomery, Alabama, on this
     particular highway 80, I wish you would state for the record,
     if you know, the counties, inclusive of Dallas and Montgomery,
     that that highway goes through, abuts, or adjoins?

A    It goes through Lowndes, a portion of Lowndes County, other than
     Montgomery and Dallas.

621

Q    Just those three counties?

A    Yes, sir.

Q    Now, let us turn to the alternate or alternate road that you
     have been asked upon on the occasion since you have been on the
     stand; what counties does the alternate or alternate road go
     through?

A    Well, it goes -- other than Dallas and Montgomery, it would go
     through Autauga County.

Q    Autauga County?

A    Yes, sir.

Q    Are you generally familiar with this alternate route that Mr.
     John Doar asked you about?

A    Yes, sir; very much.

Q    Are there curves on that route?

A    There are lots of curves and lots of grade changes.

Q    Dips, do you mean?

A    Dips -- your dips and my humps; yeah.

                MR. KOHN:  Thank you, sir; that's all.

                THE COURT:  Mr. Pitts.

                MR. McLEAN PITTS:  No, sir.

                THE COURT:  Mr. Gayle, Mr. Wilkinson.

                MR. WILKINSON:  No, sir.

                MR. GRAY:  One question, your honor.

                THE COURT:  Just a minute; just a minute; redirect.

BY MR. SMITH:

Q    Mr. Villadsen, are you generally familiar with the businesses

622

along U.S. highway 80 between Montgomery and Selma?

A   Businesses?

Q   Business establishments or businesses?

A   Yes, generally; yes, sir.

Q   Are you familiar with the Dan River Mills plant that is in the
process of being constructed just off U.S. highway 80 between
Montgomery and Selma?

A   Yes, sir; that is being done under my jurisdiction -- supervision

Q   Is this a big plant; you know anything about the size of it?

A   Oh, it is a tremendous, big thing; I don't know just what the
size of it, they have lots of land, and from what I can see, they
are already building, the site that they prepared, it is a
tremendous, large thing, and I have seen the plans.

Q   Are there lumber mills between Montgomery and Selma along or
near U.S. highway 80, sawmills and lumber mills?

A   Are there other mills?

Q   Yes, sir?

A   None that I know of; no, I don't think there is any.

Q   Are there big farms between Montgomery and Selma, big farming
operations?

A   Yes, there is some large ones, large farming operations.

        MR. SMITH:  That's all.

        THE COURT:  Recross; Mr. Gray.

        MR. GRAY:  Just one question.

           RECROSS EXAMINATION:

623

BY MR. GRAY:

Q    Would you tell us whether or not, immediately after you cross
     the Pettus Bridge, on the Montgomery side of the Pettus Bridge
     is there a traffic light at an intersection, that first inter-
     section?

A    I think there is; I am sure there is; yes.

Q    And, of course, there is also a traffic light on the Selma side
     of the bridge?

A    Yeah, there is one at all the cross streets there.

                MR. GRAY:  That's all.

                THE COURT:  Mr. Doar, any other questions from this
witness?  You are excused.

                MR. SMITH:  Your honor, could you at this time
possibly recess, or would it be convenient to recess for lunch?  I
don't mean to inconvenience the court, but I feel if I could have
a short recess I may can save the court time in the presentation of
our case.

                THE COURT:  All right, it is time we recessed.  We
will recess for -- for the noon until one forty-five.

                (At which time, 12:20 p.m., a recess was had until
1:45 p.m., at which time the hearing continued)

                THE COURT:  Mr. Smith.

                MR. SMITH:  Mr. Thomas, were you sworn previously
with the other witnesses?

                WITNESS REX THOMAS:  Yes, I was.

624

*****************

REX THOMAS, witness for George C. Wallace, having been duly sworn,
    testified as follows:

DIRECT EXAMINATION:

BY MR. SMITH:

Q    Will you state your full name?

A    Rex Thomas.

Q    Where do you live, Mr. Thomas?

A    Montgomery.

Q    Your occupation?

A    I am the head of the Montgomery Bureau of the Associated Press.

Q    Were you in Selma, Alabama, on Tuesday, March 9, of this week?

A    Yes, I was.

Q    Did you see Martin Luther King on that date?

A    Yes.

Q    Where did you see him?

A    I saw him a number of places; I saw him leave the church, Brown's
    Chapel Church, and I saw him head out to the city, then I saw
    him come back to the church.

Q    Did you see him at the foot of the Pettus Bridge?

A    No, I stayed behind when the procession left the church --
    excuse me -- by the time I caught up with them, they had already
    crossed the bridge.

Q    Did he make a statement to you and other people in regard to
    the proposed march from Selma to Montgomery on that date?

A   He made a statement in response to questions at an impromptu
    press conference.

Q   Where did he make the statement?

A   It was on the steps of the church after they returned from the
    trip across the river.

Q   Approximately what time was it?

A   About four o'clock, four, p.m.

Q   To whom did he make the statement?

A   Well, it was a press conference; there were a number of reporters
    it was rather crowded.

Q   Were you present?

A   Yes, I was.

Q   What did he say?

A   You -- about what particular thing?  He said a number of things.

Q   What did he say in regard to the proposed march to Montgomery,
    if anything?

A   He said that they knew when -- they realized when they left the
    church that they would not get to Montgomery that day, they knew
    the Troopers, State Troopers, were there, and they knew they
    would be stopped.  He said they had decided -- and, "They," he
    referred to members of his staff -- had decided that at a
    strategy meeting that they would not attempt to go past the
    Troopers, that if they were stopped they would turn around and
    go back to the church.

Q   Did he say anything in regard to this court's orders?

A    He was asked that question; to the best of my recollection he
said he didn't know the legal implications, that he thought that
he could be in contempt of court or he could have subjected
himself to contempt of court, but -- and that they had considered
that possibility, but he said further that they felt that they
had to go on, he said it was a matter of conscience and morality,
they had to go at least to the point where they were stopped on
Sunday to, as he put it, to stand up to the Troopers and to have
a brief prayer session and then go back, but he said he felt
they had to go that far.

Q    Did he say anything further in regard to the court order?

A    He said he disagreed with the court order; he said he felt it
was an unjust injunction; he said that he thought they had a
constitutional right to march on the highway.

        MR. SMITH:  I have no further questions.

        THE COURT:  For the plaintiffs.

        MR. GREENBERG:  No questions.

        MR. HALL:  No questions, your honor.

        THE COURT:  Intervenor.

        MR. DOAR:  No, sir.

        MR. KOHN:  No, your honor.

        THE COURT:  Mr. Pitts.

        MR. McLEAN PITTS:  No, sir.

        THE COURT:  Mr. Thomas?

        WITNESS:  Yes, sir.

THE COURT: Is what you are saying that Dr. King told you is that they knew the Troopers were there, they knew they would be stopped, they intended to go to where the Troopers were and turn and return; is that what he said?

WITNESS: In essence; if they were stopped, he said that they had agreed that they would -- to return to the church.

THE COURT: Well, did I understand you to say that he knew they would be stopped?

WITNESS: Yes, sir; he said that he knew the Troopers were there and they would be stopped.

THE COURT: All right; that's all I had.

MR. SMITH: Governor Wallace rests.

THE COURT: Governor Wallace rests?

MR. SMITH: Yes, sir.

THE COURT: All right; with Mr. Lingo.

MR. KOHN: Colonel Lingo, take the stand.

** ** ** ** ** ** ** ** ** ** ** ** ** ** ** ** ** ** ** ** ** **

NOTE: For testimony of AL LINGO, Defendant, as witness in his own behalf, see excerpt transcript filed March 19, 1965.

** ** ** ** ** ** ** ** ** ** ** ** ** ** ** ** ** ** ** ** ** **

THE COURT: Recess court until nine thirty, gentlemen Monday morning; nine thirty.

COURT CRIER: Court will be in recess until nine thirty Monday morning.

MR. ADAMS: Your honor, I wanted to --

628

THE COURT:  Take that up with the lawyers; I have already talked to you about it.

(At which time, 4:18 p.m., a recess was had until 9:30 a.m., March 15, 1965, at which time the hearing continued)

THE COURT:  When we recessed Saturday afternoon, the case was with the defendant, Lingo; I take it you are ready to proceed.

MR. KOHN:  I didn't understand your honor.

THE COURT:  When we recessed Saturday, the case was with the defendant, Lingo.

MR. KOHN:  Yes; the defendant, Lingo, rests.

THE COURT:  Then the case is with the defendant, Clark.

MR. P. H. PITTS:  Your honor, Sheriff Clark asked me to convey to the court that due to pressing matters he is unavailable to be here, but will be on call.

THE COURT:  In civil cases it isn't necessary -- ordinary civil cases it isn't necessary, and it isn't necessary in this case; that is all right.

MR. P. H. PITTS:  State Trooper Roy Smith.

THE COURT:  Unless one of the parties wants to call him as an adverse witness; they have the right, of course, to do that, and I take it they will give you timely notice.

MR. P. H. PITTS:  Yes, sir.

THE COURT:  All right.

THE CLERK:  Have you been sworn?

WITNESS HARPER ROY SMITH:  No, sir.

THE CLERK:  Please raise your right hand.

(Witness Harper Roy Smith sworn by the Clerk)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

HARPER ROY SMITH, witness for James G. Clark, having been duly

sworn, testified as follows:

DIRECT EXAMINATION:

BY MR. P. H. PITTS:

Q    Would you state your name, please?

A    Harper Roy Smith, sir.

Q    And how long have you been with the Department of Public Safety?

A    Five years, sir.

Q    And in what capacity are you employed by the Department of Public Safety?

A    As a photographer.

Q    As a photographer?

A    Yes, sir.

Q    Are those your primary duties with the Department of Public Safety?

A    Yes, they are.

Q    And as your duties with the Department of Public Safety, have you been assigned to Selma and Dallas County during the months of January, February, and March of 1965?

A    I have, sir.

Q    And have you taken photographs of various scenes which have

occurred in Selma and Dallas County during these months?

A    Yes, sir.

MR. P. H. PITTS:  And, your honor, both the plaintiff and intervenor have stipulated as to the accuracy of these pictures and have admitted them into --

THE COURT:  Have they been marked for identification?

MR. P. H. PITTS:  Yes, sir.

THE COURT:  All right.

THE CLERK:  Defendant Clark's Exhibits 2 through 9 marked for identification.

Q    Trooper Smith, I show you here Defendant's Exhibit number 2, and ask you if you will look through this Exhibit and convey to us as to whether or not you took these photographs?

A    Yes, sir; I did.

Q    And what do these photographs depict, Trooper Smith?

A    Various scenes around the Dallas County Court House on the -- February 1, of 1965, showing the crowds across the street from the Court House around the Federal Building on Alabama Avenue, the Sheriff, Jim Clark, of Dallas County reading the proclamation to the group of demonstrators on the sidewalk.

Q    Now, right here, you say that Sheriff Clark read a proclamation to these demonstrators on the sidewalk; did you hear what Sheriff Clark said at that time?

A    Yes, sir; I heard what he said at that time.

Q    And what was the substance of this statement that he made to

them?

A    Sir, the best I remember at this time, it was a statement as to the fact that the court was in session and there had been an injunction issued against them parading and demonstrating there around the Court House, sir.

Q    Uh, huh.  Now, were there large groups of white people which would congregate across the street from the Dallas County Court House when these demonstrations were taking place?

A    Yes, sir; not only on the Alabama Street side, but on the Lauderdale Street side, also, sir.

Q    All right; and do these photographs which you have in Defendant's Exhibit number 2 -- do they show any of the entrances to the Dallas County Court House being blocked or obstructed?

A    Sir, not -- not in this group, actually showing the door; the -- they do show the sidewalk in front of the door, though, and showing people blocking the sidewalk.

Q    All right.  Now, Mr. Smith, I show you here Defendant's Exhibit number 3, and ask you as to whether or not you took these pictures, and if so, on what date these pictures were taken?

A    Yes, sir; on the 2nd of February, of '65, these pictures that you have here, sir, were made by Photographer Snead, another photographer with our Department, but I was with him there at the time the pictures were made.

Q    You were present when these pictures were taken?

A    Yes; we were working together, sir.

632

Q   All right; and just briefly, what do these pictures in
    Defendant's Exhibit 3 show?

A   Sir, they are showing the view from the front of the Court House
    on the Lauderdale Street side showing the people, the white
    people, across the street, also the people on the street there
    directly in front of the Court House, how they are congregating
    in the area, also the traffic congestion at that time, showing
    the demonstrators marching across the street, also showing them
    blocking the traffic at various times.

Q   Now, during this period that you were in Selma, was it necessary
    for the Selma Police Department to station a City Policeman at
    the corner of Alabama Avenue and Lauderdale Street to direct
    traffic?

            MR. HALL:  We object, your honor.

            THE COURT:  I sustain it.

            MR. HALL:  To the necessity.

            THE COURT:  You can ask him if they did it.

Q   All right, did they place a policeman at the corner of Alabama
    Avenue and Lauderdale Street?

A   Yes, sir.

Q   To direct traffic?

A   Yes, sir; on numerous occasions to direct traffic at those
    intersections, and also to direct traffic not only at the
    intersection, but up on Lauderdale Street, also.

Q   In other words, there was congestion and traffic jams in and

around the Court House on this particular date?

        MR. HALL:  Your honor, we object to leading.

        THE COURT:  Leading; I sustain it.

A   Your question again?

Q   All right.  Was there any numerous vehicles in and around the
    Court on this particular date?

A   Yes, sir; there was, and as the pictures depict, showing traffic
    policeman in the middle of the street working the traffic that --
    jam that was created there, sir.

Q   All right.  Now, Mr. Smith, as to these crowds which you have
    testified to which were across the street from the Court House,
    did you have an occasion to hear any remarks which were made by
    any of the people in these crowds?

A   Sir -- sir, at several occasions there was loud, boisterous talk
    from -- from the crowds, but as to exactly what they said; no,
    sir.

        MR. P. H. PITTS:  All right.

        THE CLERK:  Defendant Clark's Exhibits 10, 11, and
12 offered for -- or marked for identification.

        THE COURT:  You offer 2 through 9?

        MR. P. H. PITTS:  Yes, sir.

        THE COURT:  Any objection?

        MR. HALL:  No, sir.

        THE COURT:  2 through 9 admitted in evidence.

        MR. P. H. PITTS:  Also offer 10 through 12.

THE COURT:  Have you gentlemen seen them?

MR. SMITH:  I have not, but -- .

Q   Now, Mr. Smith, I show you here Defendant's Exhibit number 4,
and ask you as to what date these pictures were taken on, and
as to whether or not you took these photographs?

A   Sir, I see that part of these I have taken, part of them were
made by Officer Middlebrooks, with the Dallas County Sheriff
Department, but the same as before, I was there in the area when
these photographs were made, sir.

Q   All right.

A   We were working, all three of us were working together.

Q   And would you please convey to the court what these photographs
depict?

THE COURT:  Well, I don't believe -- I don't believe
he gave the date.

WITNESS:  Sir, they were February 3, '65.

MR. HALL:  Your honor please, we are going to object
to the witness testifying about a group of photographs conveying
something; I suggest that each photograph --

THE COURT:  I will admit it as a general question and
a general answer concerning the Exhibit; objection is overruled.

A   In these pictures, sir, you see the demonstrators blocking the
sidewalk, also across the street the traffic congestion on the
street, the large crowds of white people across the street from
the Court House, also the -- more of the crowds across the

635

street from the Court House, also some shots showing them on the
sidewalk facing the Court House blocking the sidewalk area, the
crowds as they -- the demonstrators as they lined up, as they
filled up the sidewalk in -- in the depth of the sidewalk
completely blocking it, the people across the street, some of
them which were rather close up shot for identification purposes.
And then more of them blocking the -- the general area -- area
on the sidewalk, showing them holding hands, lining up on the
sidewalk, showing the officers out directing traffic in the
general area, and more of them blocking the sidewalk and holding
hands, sir.

Q   All right; now, on February --

A   3rd.

Q   -- 3, 1965, could anybody who wanted to use the Dallas County
Court House walk down the sidewalk where these demonstrators
were?

        MR. HALL:  We object, your honor.

        MR. NABRIT:  Objection.

        THE COURT:  Sustain it.

Q   Was the sidewalk obstructed?

        MR. HALL:  We object, your honor.

        THE COURT:  Overrule.

A   Yes, sir; they were --

        THE COURT:  Just answer his question, please.

A   They were blocked, sir.

636

Q   All right; and were there large group of demonstrators on the
    sidewalk?

A   Yes, sir.

Q   And in this large group of demonstrators, were there any
    juveniles?

A   Yes, sir.

Q   And how much of the sidewalk did these demonstrators take up?

A   Sir, at times, as the -- as they first started coming in, they
    would form one line, and then numerous other lines until they
    had blocked the entire sidewalk.

Q   In other words, the whole sidewalk at times was blocked?

A   Yes, sir.

Q   All right; now, Mr. Smith, I show you here Defendant's Exhibit
    number 5, and ask you as to whether or not you took these picture
    and if so, on what date were they taken on?

A   February 5, of '64, sir, and part of them were made by me, by
    myself; part of them by Officer Middlebrooks again, sir; as I
    stated previously, we were working together on this detail, and
    I was in the area when these pictures were being made, sir.

Q   All right; now, when these demonstrators came to the Court
    House on February 5, 1965, where did they stand, if anywhere?

A   Sir, as they come to the Court House, they stood there on the
    sidewalk directly in front of the Court House on the Lauderdale
    side.

Q   And would there be just one line or two lines of them, or just

637

how many would there be?

A  Well, they started off with one, on one line near the parking meters there at the edge of the sidewalk, and before the group was -- I mean before the demonstration was over, they had completely covered the sidewalk.

Q  The whole sidewalk was blocked?

A  Yes, sir.

Q  Uh, huh; and do these pictures show the sidewalk in front of the Court House being completely blocked?

A  Yes, sir.

Q  All right; and on February 5, 1965, were there any juveniles in this line?

A  Yes, sir.

Q  All right.  Now, do the pictures which are in Defendant's Exhibit number 5, do they show any of the other conditions in and around the Dallas County Court House on this particular date?

A  Yes, sir; they show the area in the -- the general area, how it was blocked off, the white people congregating across from the street -- the street from the Court House; they also show some pictures that were made on the Alabama side of the Court House.

Q  All right; now, this picture that was taken on the Alabama side of the Court House, do you recognize the Negro whose picture is shown there?

A  Yes, sir; I do.

Q  And who is that?

A  C. T. Vivian, sir.

Q   And this is taken on the Alabama side of the Court House?

A   Yes, sir.

Q   And that would be the side facing the Federal Building?

A   Yes, sir.

Q   And on this particular date, do you remember C. T. Vivian coming to the Court House?

A   Yes, sir; I do.

Q   And were you present when he was there and had a discussion with Sheriff James G. Clark, Jr.?

A   I was, sir.

Q   And did you hear anything that he said to Sheriff Clark, if anything?

A   Yes, sir; I did.

Q   And what did he say?

A   Sir, he stated that he had -- had a group there and they were going to enter the Court House on that day. The Sheriff read him the proclamation, and I believe he stated that they wanted to go in the Court House, and the Sheriff, of course, read him the injunction. It also shows the group of people that he led there to the Court House; it also -- picture shows the congestion at the time, the blocking of the streets and the sidewalk, sir.

Q   All right; now, was the front entrance, which is the Alabama entrance to the Court House, was it blocked on this particular day?

A   It was completely blocked on that day and at that time, sir.

639

Q    All right; now, are you familiar with the Lauderdale entrance
     side of the Dallas County Court House?

A    Yes, sir.

Q    And on this particular day, was there a voter registration line
     on the Lauderdale side of the Dallas County Court House?

A    Well, sir, it was a group of demonstrators; I -- you couldn't
     refer to them as a voter registration line, I wouldn't believe.
     They were there with their -- their signs, and there was -- they
     were not lined up nor attempting to enter the Court House.

Q    All right; and you say they were lined up; where were they lined
     up?

A    They were lined up on -- on the sidewalk on the Lauderdale side
     completely covering the sidewalk at times.

Q    Uh, huh; and that is on the Lauderdale side?

A    On the Lauderdale side, sir.

Q    And C. T. Vivian was at the Alabama entrance to the Court House?

A    Yes, sir.

Q    All right; and so then on this particular day, in addition to
     C. T. Vivian being at the Alabama side of the Dallas County
     Court House, there were also demonstrators lined up on the
     sidewalk in front of the Lauderdale entrance?

A    Yes, sir; on that date.

Q    And was the Lauderdale entrance side to the Court House, was it
     blocked on this particular day?

A    Yes, sir.

640

Q   All right; and on February 5, 1965, do you remember as to whether
    or not there were any large congregations of white people
    accumulated on the other side of the street?

A   Yes, sir; at times there were.

Q   And was this a large group that was accumulated on the opposite
    side of the street?

A   A -- yes, sir; from a medium to a large size; it varied, sir.

Q   All right.  Now, Mr. Smith, I show you here Defendant's Exhibit
    number 6, and ask you as to whether or not you took any of those
    photographs, and if so, on what date they were taken?

A   Sir, these were made February 8, of '65; they were made -- this
    group was made by Officer Middlebrooks, with the Dallas County
    Sheriff Department; as I stated earlier, we were working together
    sir.

Q   All right.

A   On this detail.

Q   And was this on a voter registration day?

A   Sir, I am sorry on the date; I am not familiar with that, sir.

Q   All right; on this particular date, was there any traffic
    congestion in and around the Dallas County Court House?

A   Yes, sir; there was.

Q   And do any of these photographs depict this traffic congestion?

A   Yes, sir; they do.

Q   All right; and did the Selma Police Department place a policeman
    out there to direct traffic?

641

A     Yes, sir.

Q     And do these photographs show this policeman directing traffic?

A     They do, sir.

Q     All right; now, on this particular day, were any of the sidewalks to the Dallas County Court House blocked or obstructed?

A     Yes, sir; they were.

Q     All right; and do these pictures depict this?

A     Yes, sir.

Q     All right; and do you know as to whether or not the entrance to any business was obstructed on this particular day by the demonstrators?

A     Yes, sir; on several occasions, sir, the entrance and entrances to Ted Gentry Chevrolet, which is next to the Dallas County Court House, the doors were blocked, sir.

Q     All right; and do these pictures depict this?

A     They do.

Q     All right; now, Mr. Smith, I show you here Defendant's Exhibit number 7, and ask you as to whether or not you took these photographs, and if so, on what day were they taken?

A     Sir, these were made February 11, of 1965; again they were made by myself and Officer Middlebrooks, with the Dallas County Sheriff Department; as I stated earlier, we were working together on this detail, side by side, sir.

Q     All right; now, at any time, Trooper Smith, was the hallway to the Dallas County Court House blocked?

642

A    The hallway in the Court House was blocked, sir.

Q    All right; and this was on this particular date?

A    Yes, sir.

Q    And do you have a photograph showing the hallway to the Dallas
County Court House being blocked?

A    Yes, sir.

Q    All right.  And was this photograph taken by you?

A    Sir, these two photographs showing the blocking there were made
by Officer Middlebrooks.

Q    All right.

A    I was there at the time they were made, sir.

Q    All right; now, in this photograph does this -- do you see Sheriff
James G. Clark anywhere?

A    Yes, sir.

Q    And did you hear Sheriff Clark say anything to these people on
this particular date?

A    Yes, sir.

Q    And what did he say, if anything?

A    Sir, he stated, the best of my knowledge, that, I believe, the
day was not a voter registration day, and they stated that they
had come to register, and he told them that it was not a
registration day.

Q    Uh, huh; and did they subsequently leave?

A    Shortly thereafter; yes, sir.

Q    All right.  Now, on this particular day, which is on February

11, 1965, were the sidewalks or the entrances to the Dallas County Court House blocked or obstructed?

A   Yes, sir; they were.

Q   All right; and would it be possible for somebody to be able to use the entrances to the Dallas County Court House on these particular times when these demonstrators were there?

A   Sir, the Alabama Street side, these pictures that I have here at this time show that it would not have due to the fact that the sidewalk was completely blocked by the demonstrators.

Q   All right; and was it just one line of demonstrators or would it be several lines of demonstrators on the sidewalk on these particular dates?

A   Well, sir, it would vary from one line to five, six, seven lines, to the effect of completely blocking the sidewalk.

Q   In other words, then, there would be times when the whole passageway of the sidewalk would be obstructed?

A   Yes, sir.

Q   Now, Trooper Smith, I show you here Defendant's Exhibit number 8, and ask you as to whether or not you took these pictures, and if so, on what date?

A   Sir, these were also made by Officer Middlebrooks; this was February 12, of '65, and I was there; yes, sir; I was there with Officer Middlebrooks when these pictures were made.

Q   All right; and were the sidewalks or the passageways to the Dallas County Court House, were they blocked or obstructed on

644

this particular day?

A   Yes, sir; Lauderdale Street was blocked, and Alabama Street was blocked, sir.

Q   And those are the two main entrances to the Dallas County Court House; is that correct?

A   Yes, sir.

Q   Now, when these demonstrators arrived on this particular date, did they just stand there, or did they move on or just what did they do, if anything?

A   Sir, this day they -- they -- it was raining, they had signs, and they first congregated there and stopped, and then they held -- they knelt and held a prayer service.

Q   They held this prayer service, you said?

A   Yes, sir.

Q   And where was this prayer service held?

A   The prayer service was partially on Alabama and partially on Lauderdale, sir.

Q   And were they kneeling down in front of the Court House on this particular day?

A   Yes, sir.

Q   And where did this prayer service start and where did it end in reference to the Court House?

A   On -- on the sidewalk?  Sir, it extended down to the entrance on Alabama and then back around on Lauderdale, back to the -- at one time there was a group or partially up the street, and

645

then they -- I believe later on they did include the door on
the Lauderdale side -- yes, the Lauderdale side, sir.

Q    So then on this particular date, both entrances to the Dallas
County Court House were blocked?

A    Yes, sir; that is what our pictures show, sir.

Q    All right; now, Trooper Smith, I show you here Defendant's
Exhibit 9, and ask you as to whether or not you took these
pictures, and if so, on what particular day was this?

A    February 15, of '65, sir, and I was the photographer; also,
Officer Middlebrooks made part of these pictures, sir.

Q    All right; now, on February 15, 1965, do you remember as to
whether or not this was a voter registration day in Dallas
County, Alabama?

A    Yes, sir; it was.

Q    And were you present during the -- the day of February 15, 1965?

A    Yes, sir; I was.

Q    And did you observe any of the voter registration lines on this
particular day?

A    Yes, sir.

Q    And how far did this line extend from the Dallas County Court
House?

A    Sir, I believe it was approximately eight or nine blocks,
possibly further, down the Lauderdale Street side of the Court
House, sir.

Q    All right; that would be from the Dallas County Court House --

A    Court House.

646

Q  -- eight or nine blocks north?

A  Yes, sir.

Q  All right; now, on this particular day, was the Lauderdale
   entrance to the Dallas County Court House -- was it obstructed
   or blocked in any way?

A  Yes, sir.

Q  And were there large groups of applicants at the Lauderdale
   Street entrance?

A  Yes, sir; there were.

Q  All right; and you said that this line extended eight or nine
   blocks north from the Dallas County Court House?

A  Yes, sir.

Q  Now, are there any businesses located north of the Dallas County
   Court House?

A  Yes, sir; there are several businesses, sir.

Q  All right; and were any of the entrances or the sidewalks
   obstructed in front of these businesses on this particular date?

A  Sir, at times they were; yes, sir.

Q  All right; and on this particular date, which was February 15,
   1965, were there any gatherings of white people across the street
   from the Dallas County Court House?

A  Yes, sir; there were gatherings of white people across -- also
   Negro there that day, sir --

Q  And --

A  -- in a form of a -- of a demonstration, I believe by juveniles
   from the school, sir.

Q    All right; you said a form of demonstration, where did they --
     demonstration take place?

A    Across the street from the Court House on Lauderdale Street, sir.

Q    And --

             THE COURT:  All right, and when this demonstration
took place, about what time was it?

             WITNESS:  Sir, I -- I don't remember the time.

Q    All right; do you remember as to whether or not it was in the
     morning or the afternoon?

A    Sir, it -- are you referring now to the demonstration across
     the street?

Q    Right?

A    By the juveniles?  Sir, I believe that was in the afternoon.

Q    All right.

A    But as to the exact time, I don't know, sir.

             THE COURT:  May I see 2 through 9, please, sir?

             WITNESS:  2, 3, 9 --

             THE COURT:  All of them that you have testified about
up to this point.

             WITNESS:  Oh; yes, sir; yes, sir.

             THE COURT:  I take it you are through with these now?

             MR. P. H. PITTS:  Yes, sir.

             THE COURT:  All right.  Is that one of them?

             WITNESS:  No, sir; this is one -- are you through
with 9?

648

MR. P. H. PITTS:  Yes.

WITNESS:  Yes, sir.

Q    Mr. Smith, I believe you testified that you have been stationed
in Selma from January up to the present time; is that correct?

A    Yes, sir; I have been there, not full time, but most every day,
sir.

Q    All right; have you had occasion to watch the Dallas County
Sheriff's Department on -- while you were here, or observe them?

A    Yes, sir.

Q    And have you observed them in the performance of their official
duties?

A    Yes, sir; I have.

Q    All right; and while you have been in Selma, Trooper Smith,
have you ever seen a member of the Dallas County Sheriff's
Department or a member of the Dallas County Sheriff's Posse
abuse or intimidate any Negro citizen of that County?

MR. HALL:  We object to that.

MR. GREENBERG:  Object.

THE COURT:  I sustain objection to the question as
phrased, as it is phrased.

Q    Have you observed the Dallas County Sheriff's Department in
their official capacity?

A    Yes, sir; I have.

Q    And have you been with them on missions when around the Dallas
County Court House?

A  Yes, sir.

Q  And have you been assigned to the Dallas County Court House on
   these particular --

A  Yes, sir.

Q  While you were in Selma?

A  Yes, sir.

Q  And while you were there, have you seen any Negro citizen abused
   or intimidated?

            MR. GREENBERG:  Object.

            MR. HALL:  We object, your honor.

            THE COURT:  Sustained, as it is phrased.

Q  Have you seen any member of the Dallas County Sheriff's
   Department strike or hit any Negro --

A  No, sir.

Q  -- while you have been in Selma?

A  No, sir.

Q  And you said you have been there from January through March; is
   that correct?

A  Yes, sir; the latter part of January through March, sir.

Q  Wait just a minute.  Now, I believe you stated that on February
   15 there was a demonstration taking place across the street from
   the Dallas County Court House; is that correct?

A  Yes, sir.

Q  Now, are there any businesses located on the -- across the street
   from the Dallas County Court House?

650

A    Yes, sir; there are, sir.

Q    And on this particular date, was the sidewalk blocked?

A    The sideblock -- the sidewalk was not completely blocked; it was a matter of two -- one and two walking along in a -- a line one or two abreast and -- and blocking the doorways there to those buildings; yes, sir.

Q    To the businesses which were located across the street?

A    Yes, sir.

          MR. P. H. PITTS:  Your witness.

          THE COURT:  Do you have other Exhibits that you had him to identify, 10 through 12?

          MR. P. H. PITTS:  No, sir; he did not take those pictures.

          THE COURT:  All right.  Cross examination for the plaintiffs.

                    CROSS EXAMINATION:

BY MR. HALL:

Q    Mr. Smith -- your name is Smith, is it?

A    (Nodded to indicate affirmative reply)

Q    Mr. Smith, where did you say your home was?

A    Pardon?

Q    Where is your home?

A    I am here in Montgomery.

Q    Here in Montgomery, but you have been assigned to Selma for the last three months?

A    Yes.

Q    Is that correct?  When did you first go down to Selma?

        MR. KOHN:  Your honor, will you ask counsel to speak a little louder?

        THE COURT:  Yes; talk louder, Mr. Hall, please, so we can all hear you.

A    The exact date, I would have to refer back to my activity reports, I don't -- it was the latter part of January.

Q    The latter part of January?

A    Yes.

Q    I believe you say that you had been -- your duties were those of a photographer, more or less?

A    That's right.

Q    You had no other duties?

A    No, sir.

Q    Were you -- did you wear the Trooper uniform as such photographer

A    At times.

Q    At other times you did not?

A    That's right.

Q    Is that correct?  You dressed in plain clothes?

A    Civilian clothes.

Q    And did you take -- are these all of the pictures you took while you were there, or just some of them?

A    No, sir; these are not all of the pictures.

Q    These are just a few; these have been edited and selected?

652

A    Yes, sir.

Q    I see; and did you group these pictures at the time or make some
     note at the time as to what they depicted, or what was said;
     did you keep a notebook or list?

A    On the rolls of film there was notations made as to what was
     photographed on that date.

Q    You made that notation on the film?

A    Uh, huh.

Q    Did you make the notation as to what was said on that date?

A    No, sir.

Q    You just recall that?

A    Yes, sir.

Q    I believe you testified -- I am just interested in one item of
     your -- you are familiar with the streets north of Alabama on
     Lauderdale in Selma, are you?

A    Yes.

Q    Will you name these for us?

A    Familiar?

Q    Start with Alabama?

A    No, sir; I am not familiar with them.

Q    Well, does Lauderdale go straight on through Jeff Davis; you
     know where Jeff Davis is?

A    I am vaguely familiar with Jeff Davis.

Q    How many blocks would you say Jeff Davis is from Alabama?

A    I have no idea.

Q   Is it over four blocks?

A   I have no idea.

Q   I believe you testified that this line that was standing in front
    of the Court House on February 15 extended north of Alabama on
    Lauderdale eight or nine blocks; that physically possible?

A   I can't say, in the fact that my orientation of Selma, north,
    if that would be --

Q   The way the line --

A   -- toward the river -- north is not toward the river, is it?

Q   No, sir; that is south.

A   That is south, north is back the other way?

Q   Yes, sir?

A   Yes, it would be possible.

Q   Well, does Lauderdale run through Jeff Davis?

A   I have no idea of the name of the streets.

Q   And it does extend back eight or nine blocks; you are certain
    of that?

A   No, I am not certain; the pictures will -- will show.

Q   Do you have such a picture; do you recall?

A   The pictures will show the area covered by the -- by the group.

Q   Which picture would that be, Trooper Smith; do you recall?

A   The one dated second and fifteen.

            MR. NABRIT:  Exhibit 9.

            MR. HALL:  Your honor, may we --

            (Exhibit presented to Mr. Hall by the court)

654

MR. HALL:  Thank you.

Q    Now, will you show us that, please, sir?

A    Starting here; starting here.

Q    Isn't that the same scene; just a different aspect of the same scene?

A    This is the front of the line as they enter the Court House --

Q    This is the --

A    -- this is back further.

Q    This is Ted Gentry's?

A    That's right.

Q    That is not a half block; that is the same scene?

A    This is -- this picture here shows the front of the line.

Q    Thank you.

A    All right, this shows where this -- you cannot see the people back of this front of the group, this takes over showing this block, this is more of Ted Gentry.

Q    All right.

A    This is the Ted Gentry used car --

Q    Where is that, now; isn't that in the same block?

A    No, that is -- that is the second block.

Q    That is the second block; go ahead?

A    This is the -- this is -- is the same area, I believe.  This is the -- would this be the third -- third block?  This is the third block.  And this is the next -- next one, showing on down the -- the street, and on further down the street, and then on

655

on down, and I believe showing the -- the end of the line.

Q    How many blocks is that, Trooper Smith?

A    I have no idea; it can be measured by --

Q    Will -- will you -- you -- since you have identified the blocks,
     will you go back through there for us and count them and tell us
     how many it is?  Pardon me.

A    Now, there is several blocks in here that I am not familiar with,
     so I -- therefore, I can't count them.  Not being familiar with
     -- with the -- that area there, I cannot count the blocks.
     There are other pictures, I believe, that might show more of
     the line that would -- would help us do that.

Q    What were you looking at when you arrived at that eight or nine
     blocks conclusion?

A    I was walking down through the area and photographing it.

Q    Well, you don't have any pictures showing that, do you?

A    No; huh, uh.

Q    Before you?  I believe you testified that on some of these
     occasions there were City Policemen out directing traffic?

A    Yes.

Q    Is that correct?  Is it unusual for policemen to direct traffic?

A    No, sir; it is not unusual for policemen to direct traffic --

Q    I believe you testified --

A    -- unless there is a large amount of traffic there to be
     handled.

Q    Well, this is a city; Selma is a city, isn't it?

656

A    Yes; uh, huh.

Q    And there is quite a bit of traffic in Selma, isn't there?

A    I am not that familiar with Selma.

Q    You have been there three months, more or less, haven't you?

A    Yes; uh, huh; but I have been there under very unusual circumstances.

Q    Had you visited Selma before?

A    Yes.

Q    And you had not seen policemen directing traffic before you went there on this occasion?

A    I don't recall.

Q    I see, sir. Now, Mr. Smith, on any of the dates that you testified about and you took pictures, was it raining?

A    Yes.

Q    Was it raining on -- was it raining on the date that you said that the Reverend Vivian led a group to the Court House?

A    No.

Q    It was not raining on that date. Do you have that picture?

A    It is not in this. February -- I don't know what date it was.

Q    Do you have that picture?

A    I don't have them here.

        MR. GRAY:  5 -- 5, I believe.

Q    Do you recall what date that was?

A    No, I do not.

Q    And what Exhibit it was?

657

A     And I don't recall -- the picture will show whether or not it
      was raining at that time.

              MR. GRAY:  Exhibit 5.

              MR. HALL:  Your honor please, may we have Exhibit 5?

A     I can't recall.

Q     Will you find the picture showing the Reverend Vivian, please?

A     (Indicated)

Q     Now, on this particular date, was the Reverend Vivian arrested?

A     I do not recall.

Q     Were you there at the -- at the scene?

A     Yes, I was; and on this -- on this date I don't -- I don't
      recall whether he was arrested or not.  That was the second and
      fifth, of '65.

Q     Trooper Smith, you know that Judge Thomas in the court there in
      a case pending before him ordered the Board of -- the Registra-
      tion Board to make available a list for prospective registrants
      and that such a list was placed in the hallway of the County
      Court in Selma; you are familiar with that, are you not?

A     I have -- yes, I have heard of it.

Q     And that -- do you also -- is it possible that on some of these
      occasions that you have testified about that these people were
      there to sign this registration list?

A     On one of the days on this -- on the 15th, the people there,
      that was supposed to have been their intention to -- to sign
      the --

Q     That was a registration day, wasn't it?  That day?

A    The 15th --

Q    Day they could register?

A    I believe so.

Q    Now, on other days they could sign the book?

A    That's right; uh, huh.

Q    Judge Thomas so said. Did they go down there on various days
     for the purpose of signing that book?

A    I don't know what they went down there -- what their intention --

Q    You said demonstration; what did you mean?

A    Just as the picture shows; lining up in front of the Court House.

Q    All right, now, this is a picture showing the lining up in front
     of the Court House?

A    Uh, huh.

Q    Are there some other pictures which don't show this -- this is
     picture of juveniles, the pictures you have here, of course, do
     show that demonstration, but wasn't there occasions or times
     when persons went down there for the purpose of signing the
     registration book?

A    I do not know.

Q    Did you make pictures -- were you present in Selma on -- on
     February 16, 1965?

A    Sir, I don't recall the date; I would have to, as I stated, refer
     back to --

Q    Were you present in Selma on the date that the Reverend C. T.
     Vivian was knocked down by Sheriff Jim Clark and arrested?

A   I was.

        MR. P. H. PITTS:  I object to that question; there is
no evidence in here to --

        THE COURT:  I sustain it to the question as it is
phrased.

Q   Were you present -- do you know -- do you know that on February
16, 1965, that the Reverend C. T. Vivian was assaulted and
arrested; do you know that?

        MR. P. H. PITTS:  I object to that question.

        THE COURT:  I will permit it.

A   I do not know what happened; I was not there.

Q   You were not there on that date; you didn't take any pictures?

A   On that day I was not there.

Q   Were you ever present in Selma on any day when Negro citizens
went down to the Court House on a day other than registration
day for the purpose of signing the registration list?

A   Would you state your question again, please?

        THE COURT:  He has already stated he didn't know what
their purpose was in going down there.

        MR. HALL:  We will withdraw it, your honor.

        THE COURT:  I don't see any reason to belabor the
point.

        MR. HALL:  We will withdraw that question, your honor.

Q   Did you make any pictures on Sunday, March 7?

A   Pardon?

660

Q  Did you make any pictures on Sunday, March 7, 1965?

A  Yes; I did.

Q  Did you make pictures of the confrontation of the demonstrators with the State Troopers and the Sheriff's Possemen?

A  I would like to correct a point there; I was there, one of our other photographers made pictures there on that date.

Q  Did you see members of the Sheriff's Posse present on that date at the confrontation across the river?

A  Yes.

Q  Did you see them strike anyone?

A  I did not.

Q  Did you see them ride the horses against anyone?

A  I did not.

Q  You were there all through the time?

A  I was there.

Q  Where were you, Trooper Smith, with reference to the front of the line and the State Troopers; where were you stationed?

A  I was about the area; I was -- I was there with a camera, but did not make any of the -- the still pictures that were made there; I was about in the area.

Q  Were you in uniform?

A  Yes, I was.

Q  And did you -- were you at the front of the line, or did you move back toward about the middle of the line?

A  With -- being there with the camera, I was over the entire area

661

there, mostly near the front of the line over toward the median strip of the highway.

Q    Did you come back into Selma with the group after they went back?

A    I did not.

Q    What did you observe the members of the Sheriff's Posse do while you were there?

A    I saw them on the horses, and I saw them on one occasion ride up the highway toward the bridge and then back and around in the area.

Q    Just ride the horses around in the area?

A    Yes, sir.

Q    You didn't see them do anything else?

A    I didn't.

Q    Did you have a movie camera?

A    Yes, I did.

Q    Is this you --

            MR. HALL:  Is this in evidence?

            MR. NABRIT:  Yes; refer to it by number on the back.

Q    Trooper Smith, I show you Plaintiffs' Exhibit 2, which is in evidence, and direct your attention to --

            MR. NABRIT:  Photograph S-214.

Q    -- photograph S-214, and ask you to look at it?

A    Uh, huh.

Q    Do you see yourself there?

A    I do.

662

Q   Will you point it out?

A   Right here I am.

Q   You are right there?

A   Uh, huh.

Q   Did you make any motion pictures of what occurred out there?

A   Yes, I did.

Q   Do you have those motion pictures with you?

A   No, sir; I do not.

Q   Will you tell us what you have got in your right hand?

A   Yes, sir; I have -- I am in the process -- an officer dropped a tear gas canister, and I picked the tear gas canister up so no one would get it.

Q   But you have a tear gas canister in your right hand?

A   I most certainly do.

Q   I direct your attention to picture number S-215, and ask you to examine it and tell us if you see yourself there?

A   Yes, I do.

Q   Will you point it out to us, please; what are you doing there?

A   I cannot tell; I am -- I am standing there, evidently walking back toward the line where the Troopers were.

Q   Are there persons -- are there Negroes who had been in the line of march on the ground in your vicinity?

A   Yes, they are.

Q   Did you see them knocked to the ground?

A   I saw them fall to the ground.

663

MR. HALL: Your honor, I will leave this right here.

Q   Trooper Smith, going back to the participation of Sheriff
Clark, his deputies, or possemen, and the events of Sunday,
March 7; did you see Sheriff Clark present at the scene when the
line was stopped?

A   When the line was stopped, I don't recall -- I don't recall
seeing him.

Q   Did you see him at any time prior to that time, within any
reasonable time, in the vicinity?

A   Yes, I recall seeing him in the vicinity.

Q   Was he there when the line was stopped by Major Cloud?

A   I -- I have no idea; I was -- I had duties, and I was busy at
the time.

Q   Did you see him any time after that, the stopping of the line?

A   I don't recall.

Q   Did you see any of his deputies present?

A   After the line was --

Q   At the time the line was stopped, during the whole events?

A   Sir, with a movie camera trying to make pictures, you are viewing
through a finder that is not very bright, and I was trying to
make pictures of the scene, of the area, and there was a lot
took place, even though I was there, that I was not aware of
because of the -- of having the movie camera.

Q   Did you see any of the Sheriff's deputies present?

A   Yes, there were some present.

664

Q    What did you see them do?

A    They were on horseback, and they were there on foot, but as far as seeing them do anything, as I stated, I had the movie camera, and it is impossible to tell exactly what is going on.

Q    Did you make film at that time?

A    Yes, I did.

Q    Have you viewed that film?

A    I have not; it has not been processed.

Q    You don't recall them doing anything with reference to stopping the line; what did Sheriff Clark do; what did you see him do?

A    I didn't; I didn't see Sheriff Clark do anything.

Q    Did you, yourself, throw tear gas on the line?

A    I did -- I did not.

Q    What did you do with the canister that you picked up off the ground?

A    I picked it up and gave it to one of the other officers at the scene.

Q    Trooper Smith, when did you start taking the movie -- the motion pictures?

A    What day?

Q    On that date?

A    I started at the Brown's Chapel Church after the march -- well, there around the church is when I started taking movies.

Q    You took pictures of the entire march; is that correct?

A    I did.

Q    And where are the film now?

A    The film are in the pro---

Q    Where is all the film?

A    Are in the process of being processed.

Q    They have not been developed?

A    They have not.

Q    You took more than one reel?

A    Yes.

Q    How many?

A    I have no idea; I would have to refer back to the records.

Q    Where are they in process?

A    At our lab.

Q    This is the lab at -- the State Highway Patrol laboratory?

A    Yes.

Q    Who is processing them?

A    Raymond Griffin will process them.

Q    They have not been developed?

A    Not that I know of; we have been tied up with the other pictures

Q    What other pictures?

A    With these -- these still pictures that we have made.

Q    These were recently developed and edited and put in these albums for the purposes of bringing them to this hearing?

A    That's right.

            MR. HALL:  That's all.

            THE COURT:  Intervenor; Mr. Doar.

MR. DOAR:  No, sir; I have no questions.

THE COURT:  Mr. Smith.

REDIRECT EXAMINATION:

BY MR. SMITH:

Q  Did I understand you correctly to state that you as a State
Trooper had been assigned to work in and around the Dallas
County Court House since about February 3 of this year?

A  Yes, sir; and possibly previous to that.

Q  In your judgment, how much previous to February 3 have you
worked in and around the Dallas County Court House?

A  The latter part of January, possibly the 25th or -- or later, sir.

Q  Now, when did the demonstrations or marches to the Court House
commence in Dallas County, to your knowledge?

A  Sir, I do not remember.

Q  But you have been there over the entire period up through
February 15; is that correct?

A  I have been in and out of Selma; I have had other duties, and
I have been there most of the time.

Q  Now, in some of the photographs that have been introduced, it
is shown that sidewalks were blocked in the vicinity of the
Court House by Negro citizens; can you give the court an opinion
or estimate of the period of time that they were blocked?

A  Any -- any certain day; are you -- are you referring to a -- a
day or for over a period of days?

Q  Well, I am referring to a particular photograph that is shown

667

in Exhibits 2 through 9, and it was scenes on February 3; can you pick those out quickly, your photographs for February 3?

(Exhibits presented to witness by the court)

Q   That is not the one I had in mind; this is the picture I had reference to.

A   Yes; do I --

Q   How long -- how long did this condition exist?

A   Sir, I don't remember.

Q   You don't have any --

A   No, sir.

Q   -- any opinion as to the time?

A   No, sir.

Q   I have just one other question; how many other State Troopers have been assigned to work in and around Dallas County Court House up until February 15?

A   I have no idea, sir.

Q   Were any others assigned there?

A   I don't know whether any -- any were assigned or not.

Q   Did you see any others there while you were there?

A   On what days, now, sir?

Q   Well, at any time from January -- late January up until March 7

A   Sir, I have seen other Troopers there, but I don't know whether they were assigned to work there or not.

Q   Did you see any great number of Troopers?

A   No, sir.

668

Q   More than two or three or --

A   Now, up until when?

Q   Up until Friday of last week?

A   At various times it has been small groups, and there has been larger groups.

Q   Have you ever seen any State Trooper threaten or intimidate or coerce or attempt to intimidate, threaten, or coerce any person who was attempting to register?

        MR. NABRIT:  Objection.

        MR. GREENBERG:  Objection.

        THE COURT:  Objection sustained.

Q   Have you ever seen any State Trooper strike or hit any person who was attempting to register?

A   I have not.

Q   Have you ever seen any other law enforcement officer strike or hit any person who was attempting to register?

A   I have not.

Q   Now, as these crowds assembled in the vicinity of the Dallas County Court House, in addition to the orders which you have testified to that came from Sheriff Clark, have you overheard any other law enforcement officers request the crowds to disperse or to quit blocking the sidewalk or to quit blocking the streets?

A   Now, which orders by Sheriff Clark, sir?

Q   Well, have you heard any officers other than Sheriff Clark ask

Negro marchers or demonstrators to quit blocking the sidewalks or quit blocking the streets?

A   I don't recall of hearing anyone else.

Q   You don't recall any other officers asking them; do you recall Sheriff Clark asking that they quit blocking the sidewalks?

A   I recall --

Q   Or the streets?

A   I recall Sheriff Clark reading the injunction to them.

Q   That was Judge Hare's injunction?

A   So I understand; yes.

Q   This is what I am asking you; did any officer, to your knowledge, walk up to this group of people on the sidewalk and say, "Quit blocking the sidewalk"?

A   Yes, sir; I recall a couple of the Sheriff's deputies, when they were lining up, when they were coming in in single -- in single file there, and at times two and three, for them to -- these were the days they were coming in evidently to -- to sign the book or to register, according to the day, asking them to form a line and not block the sidewalk.

Q   When the officers asked them to do that, did they form a line and not block the sidewalk?

A   The officers would ask them to not block the sidewalk because at times they were blocking the sidewalk.

Q   My question now is what did -- what did the Negro citizens do when they were asked to do that?

670

A  At times they would move and form into a single line, and then
   they would move back and cover the sidewalk, and then they would
   ask them to move back again.

Q  At any time did they defy the officers, or did they refuse to
   obey what the officers asked them to do?

A  In defying they -- not necessarily; they were just rather seemed
   reluctant and slow to -- to clear the sidewalk.

Q  What about the lines that extended across the street; did any of
   them extend across the streets?

A  The lines extended a---

Q  Did any lines extend across the public street?

A  No; they used the public streets, of course, coming across to
   get to the Court House, and at times would block it, according
   to the light.

Q  Well, my question next is did they obey the traffic signal?

A  Not at all times.

Q  The marchers would disobey the traffic signal?

A  Quite often; on several occasions several of them liked to have
   been hit by cars, because they were going across the street on
   a red light when they should have been stopped.

Q  Have you ever intimidated or threatened or coerced or attempted
   to intimidate, threaten, or coerce any person --

            MR. GREENBERG:  Objection.

            MR. NABRIT:  Objection.

Q  Excuse me -- attempting to register in Dallas County?

671

MR. NABRIT:  Same objection.

A    I have not.

MR. GREENBERG:  Move to strike the answer.

THE COURT:  It will be stricken; the objections are sustained; question is improperly phrased.  Anything further, Mr. Smith?

Q    Were there any F.B.I. Agents in and around the Court House taking photographs at about the same time you were, and over the same period?

A    Yes, sir; numerous Agents, at times anywhere from one to three and four, were present making photographs, sir.

Q    Present on each occasion that you took photographs?

A    Yes, sir.

MR. SMITH:  All right, sir.

THE COURT:  Mr. Kohn.

BY MR. KOHN:

Q    Trooper Smith, I want to direct my questions to February 5, 11, and 12, 1965, your testimony on those days; I believe you testified on direct examination that the entrance to the Court House was blocked on 5 and 11 and 12?

A    Yes, sir.

Q    Now, I want to see if we agree on the term, "Blocked"; would obstruction be another good word?

A    Yes, sir.

Q    Would another interpretation of your statement mean that the

normal traffic to and from the Court House was paralyzed?

A  Yes, sir.

Q  Were there traffic signals in the close vicinity to the Dallas
   County Court House on February 5 and 11 and 12, 1965, that is,
   the automatic light signals?

A  Yes, sir.

Q  And did -- did I understand and conclude from your testimony
   that due to the scenes on February 5, 11, and 12, of 1965, it
   was necessary for City Policemen to personally direct the
   traffic?

               MR. HALL:  I object, your honor.

               THE COURT:  I will permit that; you can answer.

A  Yes, sir.

Q  Trooper Smith, the Dallas County Court House, does it have one,
   two, three, or four entrances and exits, to your knowledge?

A  Sir, I am familiar with two public entrances.

Q  Two public entrances?

A  Yes, sir.

Q  On February 5 and February 11 and February 12, 1965, registration
   was not taking place at that Court House, was it, Trooper Smith?

A  Sir, I -- those dates I have testified, but as far as -- as
   whether or not registration was taking place, I am not familiar
   with the registration days there.

Q  Isn't it a fact that on February 5 and February 11 and February
   12, 1965, at the Dallas County Court House that that Court House