was theoretically open for normal business in different

     departments of the County Government?

A    Yes, sir.

Q    Does the Dallas County Court House have a Circuit Court in it?

A    Yes, sir.

Q    Does it have a Tax Assessor's office in it?

A    Yes, sir.

Q    Does it have a Tax Collector's office in it?

A    Yes, sir.

Q    Does it have the governing body of the county in it?

A    Yes, sir.

Q    Can you think of anything else that it might have in it, to your

     knowledge?

A    The Sheriff's Department is in it, sir.

Q    The Sheriff's Department; would it be a fact that had I tried

     to go into the Probate Office, which is another facility of

     that building, I believe --

A    Yes, sir.

Q    -- and record a deed, my entrance to the normal way of going

     into that Court House would have been blocked?

            MR. NABRIT:  Objection, your honor.

            MR. HALL:  We object, your honor.

            THE COURT:  I will permit it.

Q    Would you answer?

A    Yes, sir; it would have.

674

Q    Now, you used the word, "Blocked"; do you mean that -- that
     primarily -- when you used the term, "Blocked," do you mean it
     was blocked by the so called demonstrators?

A    Yes, sir.

                MR. KOHN:  Thank you; no further questions.

                THE COURT:  Redirect; Mr. Pitts.

                MR. P. H. PITTS:  No further questions.

                THE COURT:  Recross, for the plaintiffs.

                    RECROSS EXAMINATION:

BY MR. HALL:

Q    Trooper Smith, were the demonstrators, as you called them,
     actually physically keeping other people from going in at the
     Court House?

A    When?

Q    Did you observe anyone attempting to go in the Court House and
     these people block their entrance?

A    On what day?

Q    On the dates -- on 5th, 11th, and 12th, the dates that you were
     testifying to about a moment ago?

A    On those specific days I cannot state whether anyone tried to
     enter and was blocked by the demonstrators or not.

Q    Did you see them physically block anybody or keep anyone from
     going into that Court House on any day?

A    On a few occasions people that had business in the Court House,
     you would hear them talking about the place blocked and how --

how were they supposed to get in there to transact their business

Q   Did you see them block physically anybody's entrance to that
Court House on any day?

A   What --

Q   Keep anyone --

A   What are you describing as physically?

Q   Did anyone attempt to go in and was blocked?

A   Yes, there was -- I specifically remember some lady, I have no
idea who she was, tried to go in, and there was the group in
front, and she could not get in.

Q   What you mean, she saw the group in front and turned around?

A   She walked up there, and the place -- the entire area there was
covered, and she walked up and looked and turned around and left.

Q   She didn't attempt to go in; she walked up and looked and
turned around?

A   And she walked --

Q   As far as you know --

            THE COURT:  That is argument; that is argument.
Don't argue with the witness; question him.

            MR. HALL:  All right, sir, your honor.

Q   But, Trooper Smith, is it possible that she went up there to
look, and after she had seen what she wanted to see, she turned
around and left?

A   Your question was --

Q   Is that possible?

A     -- is it possible?

Q     Yes?

A     I don't think so, under the circumstances; she made a remark that she wanted to go in and transact business, and it was blocked, and she couldn't get in.

Q     I see; she told you this?

A     No, I -- she just made a statement to everyone within hearing.

Q     Trooper Smith, directing your attention to your testimony about the traffic policeman and the blocking of sidewalks; do you know if the City Police arrested people for blocking sidewalks at any time?

A     I do not know what the City Police did.

Q     Do you know if the traffic policemen -- I believe you testified that some persons crossed the street, that they had traffic policemen at that time, did they?

A     Your question again?

Q     You testified that some people crossed the street, some of the demonstrators crossed the street against traffic signals?

A     Yes.

Q     Were there traffic -- were there policemen directing traffic at that point?

A     At that time I don't believe there was.

Q     You don't -- do you know of any of the demonstrators who have been arrested for violating traffic -- any of the traffic ordinances?

A    I don't know of any arrests.

Q    You know of no viol--- no arrests for blocking sidewalks?

A    I -- I am not familiar with what the city did.

Q    Do you know of any?

A    No, I do not know of any.

Q    You testified once or twice about a proclamation; what did you have in mind?

A    I -- I used the wrong word there; I should have stated injunction

Q    Well, would you tell us what you mean by that?

A    It was the injunction that the -- Judge Hare had issued.

Q    When did Judge Hare issue it?

A    I do not know when he issued it.

Q    Who was it directed to?

A    It was directed to the demonstrators and or anyone blocking or demonstrating in that area, so I understand.

Q    Have you seen -- were you present in court when the injunction was issued?

A    I was not.

Q    Do you know at what time it was issued?

A    I do not.

Q    Well, I mean how do you refer to it then?

A    I --

Q    What did you -- have you -- have you seen or heard; how did you come about to know about it?

A    Well, I believe it is public information with reference to

newspapers that such an injunction was issued.

Q  An injunction was issued by Judge Hare?

A  So I understand.

Q  You -- you don't know this, do you?

A  I do not know.

Q  At the times you testified to, specifically on the 5th, 11th, and 12th, and I will withdraw that question. Directing your attention to February 15, this was the voter registration day; is this correct?

A  I believe that is what was stated it was, sir.

Q  Now, on that occasion, were you present at the County Court House in uniform?

A  I do not remember whether I was in uniform or civilian clothes.

Q  Can you tell us whether or no there were any other State Troopers there in uniform?

A  I do not remember; the pictures should show whether or not there were.

Q  Can you tell us whether or no Sheriff Clark --

        THE COURT:  This is on recross.

        MR. HALL:  Yes, sir.

        THE COURT:  This is on recross; this is not your original examination --

        MR. HALL:  Yes, sir.

        THE COURT:  -- wind it up, Mr. Hall.

        MR. HALL:  That is all; thank you.

THE COURT: Anything further from this witness?

MR. DOAR: Your honor, could I ask one question?

THE COURT: Yes, sir.

BY MR. DOAR:

Q    Was it your intention, Trooper Smith, to leave the impression that on the 5th, 11th, and 12th, that both the Lauderdale Street entrance and the Alabama Street entrance to the Court House were blocked at the same time?

A    No, sir; it was not my intention.

Q    That wasn't your intention?

A    No, sir.

Q    Sometimes the pictures you took show that there were some demonstrators on the sidewalk in front of one of the entrances, but not both of the entrances?

A    It was various ones, first at times I believe it would be one blocked, and then at times the other one blocked.

Q    But not both?

A    I don't --

Q    You don't recall any instance?

A    I don't recall.

MR. DOAR: Thank you.

THE COURT: Mr. Smith.

REDIRECT EXAMINATION:

BY MR. SMITH:

Q    Over the period of time that you were working in and around the

Dallas County Court House, did you ever say anything to any one
of the Negro citizens in a threatening manner?

A    No, sir; I don't recall saying any -- anything to anyone in a
threatening manner.

Q    All right; have you, over this period of time, overheard any
other State Trooper say anything to any one of the demonstrators
in a threatening manner?

        MR. GREENBERG:  Object.

        THE COURT:  Overrule.

A    No, sir; I have not.

        MR. SMITH:  That's all.

        THE COURT:  You can go into what he means by that
if you want to.  Mr. Kohn.

        MR. KOHN:  (Shook head to indicate negative reply)

        THE COURT:  Mr. Pitts.

        MR. P. H. PITTS:  No, sir.

        THE COURT:  For the plaintiffs.

        MR. HALL:  No, sir.

        THE COURT:  Any further questions from this witness?
You can be excused from the witness stand.  Take a ten minute recess,
gentlemen.

        (At which time, 10:45 a.m., a recess was had until
10:55 a.m., at which time the hearing continued)

        THE COURT:  Next witness.

        MR. P. H. PITTS:  Barry Middlebrooks.

681

THE CLERK:  Please raise your right hand.

(Witness Asbury Middlebrooks sworn by the Clerk)

MR. P. H. PITTS:  Your honor, before I start, Judge B. A. Reynolds came in, and I have asked both parties, and I would like to have an exception to the rule so that he can remain in the court room.

THE COURT:  All right.

** ** ** ** ** ** ** ** ** ** ** ** ** ** ** ** ** ** ** ** ** **

NOTE:  For testimony of ASBURY MIDDLEBROOKS, witness for James G. Clark, see excerpt transcript filed March 30, 1965.

** ** ** ** ** ** ** ** ** ** ** ** ** ** ** ** ** ** ** ** ** **

THE COURT:  Any matter you wish to take up, gentlemen, before we recess for the noon hour?

MR. KOHN:  No, sir.

MR. P. H. PITTS:  (Shook head to indicate negative reply)

THE COURT:  All right, we will recess until one forty-five.

(At which time, 12:27 p.m., a recess was had until 1:45 p.m., at which time the hearing continued)

THE COURT:  Lieutenant Etheridge.  Have you called your next witness, Mr. Pitts?

MR. P. H. PITTS:  Yes, sir.

MARSHAL:  He has not been sworn.

THE CLERK:  Please raise your right hand.

(Witness R. E. Etheridge sworn by the Clerk)

682

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

R. E. ETHERIDGE, witness for James G. Clark, having been duly sworn,

testified as follows:

DIRECT EXAMINATION:

BY MR. P. H. PITTS:

Q    Will you state your name, please?

A    I am Lieutenant R. E. Etheridge.

Q    And how long have you been with the Department of Public Safety,

Lieutenant Etheridge?

A    About thirteen years, sir.

Q    And where are you stationed, Lieutenant Etheridge?

A    At Demopolis, Alabama.

Q    Demopolis?

A    Yes, sir.

Q    And is that in the Selma District?

A    That is in the Selma District.

Q    Now, Lieutenant Etheridge, were you present in Selma, in Dallas

County, Alabama, on Sunday, March 7, 1965?

A    I was; yes, sir.

Q    And where were you stationed?

A    I was stationed at the first traffic light on this side of the

River Bridge.

Q    All right; that would be on the Montgomery side --

A    That's right.

Q    -- of the Edmund Pettus Bridge?

A   The Montgomery side.

Q   Now, approximately what time did you go over to this traffic light, Lieutenant Etheridge?

A   Oh, I would say about two o'clock.

Q   Around two o'clock?

A   Yes, sir.

Q   And did you have any men with you at that time?

A   I had seven men with me.

Q   Pardon me?

A   Seven men.

Q   Seven men; and where were you in reference to Major Cloud?

A   I was about two hundred yards this side or toward Montgomery from Major Cloud.

Q   All right; and I believe you said that you were near the traffic lights on the other side of the Edmund Pettus Bridge, on the Montgomery side?

A   That's right; on the Montgomery side; yes, sir.

Q   Now, were there any large groups of people accumulating in and around this traffic light?

A   Yes, sir; it was, I would estimate, better than a thousand people there.

Q   All right; and were these mostly white people?

A   Yes, sir.

Q   And were there any Negroes accumulated in this area?

A   Yes, sir; there was some Negroes accumulated there.

684

Q    Now, did you take a photograph of this area while you were
     stationed out there?

A    Yes, sir; just before I left, I took a picture of the area.

               THE COURT:  Let it be marked.

               MR. P. H. PITTS:  Yes, sir.

               THE CLERK:  Defendant Clark's Exhibit number 14 for
identification.

Q    Lieutenant Etheridge, I show you here Defendant's Exhibit number
     14, and I will ask you as to whether or not you took that
     photograph?

A    Yes, sir; I took this picture.

Q    And does that accurately portray the scene at the time this
     photograph was taken?

A    That's right; yes, sir.

Q    And it is a true portrayal of the scene?

A    Yes, sir.

Q    And would you please relate to the court what this photograph
     depicts?

A    Well, this is just a picture I took just as I was getting in my
     car to leave after we had dispersed them people one time; these
     were some that had just walked back up.

Q    This was after you --

A    We were just fixing to open the lanes for traffic at the time
     I took this picture here; these were -- they had been sent off
     the road once, over to the side; these were people that were
     crossing the road, milling around out in the road.

Q    All right.

A    And after a lot of them had gotten back in their cars.

Q    Now, Lieutenant Etheridge, you said that this photograph was taken, I believe, after you had dispersed a large group?

A    Yes, sir.

Q    Now, did you disperse this large group of people before the marchers came over the river or over the River Bridge or after they came over the River Bridge?

A    This group was detained there until after the marchers had gone back across the bridge; then they were dispersed.

Q    All right; and what methods did you use to disperse them?

A    I used -- we just told them to get back in the cars, fixing to open the traffic, to unblock the driveways to all the businesses around there, and most of them did; most of them went back to their cars at that time.

Q    And did they disperse on your orders?

A    Yes, sir.

Q    All right.  Now, did you hear any members of this crowd say anything in reference to the march?

A    Yes, sir; I heard them say a lot while the march was coming over the bridge, during that time.

Q    What did they say, if anything?

A    They said that the Troopers should let them through, and they would take care of them.

Q    Now, I believe you testified that you had been with the

Department of Public Safety for thirteen years; is that correct?

A    Yes, sir.

Q    And did you have any previous law enforcement experience before you went with the Department of Public Safety?

A    On many occasions I had riot -- no, not -- not with -- not previous law enforcement experience; no, sir; I misunderstood your question.

Q    Now, in your opinion as a law enforcement officer, do you believe that it was necessary to have the State Troopers and members of the Dallas County Sheriff's Department across the river for the purpose of protecting the marchers?

A    Yes, sir; I definitely think so.

Q    All right; and in your opinion, if these Troopers and deputies had not been stationed across the river, do you believe that there would have been a serious, you might say the term, racial riot?

        MR. GREENBERG:  Object.

        MR. HALL:  Objection.

        MR. NABRIT:  Object.

        THE COURT:  Sustained.

Q    Do you believe that it was necessary for these deputies and Troopers to be stationed over there to contain the white people who were across the river?

        MR. GREENBERG:  Objection.

        MR. HALL:  Object.

THE COURT:  Well, you let part of it in without objection awhile ago, I will admit this; you can answer it.

A    Yes, sir; I believe so.

Q    All right; now, have you been in any other situations, Lieutenant Etheridge, where it was necessary to disperse crowds?

A    Yes, sir.

Q    And would you please explain to the court, what are some of the manners and methods in which crowds are -- that State Troopers use and law enforcement use to disperse crowds?

A    It depends entirely on the crowd, the mood of the crowd, but we use night sticks and tear gas.

Q    And did you observe this crowd that came across the River Bridge on Sunday, March 7, 1965?

A    From a distance I did; I didn't observe them closer than two hundred yards.

Q    Now, do you know as to whether or not there were any large groups of whites on the Selma side of the Edmund Pettus Bridge?

A    No, sir; I don't; I wasn't on the Selma side.

Q    You were not over there?

A    (Nodded to indicate affirmative reply)

Q    Now, were you in Selma, Alabama, on Tuesday, March 9, 1965?

A    Yes, sir; I was.

Q    And where were you stationed at that time?

A    Stationed at the corner of Broad Street and Water Street.

Q    All right; and was the -- was traffic blocked off on Broad

Street?

A   Yes, sir; it was.

Q   And where was it blocked?

A   It was blocked at -- it was blocked at Broad and Water Street.

Q   All right; and was there a -- large groups of white people gathering on the corners on this particular day?

A   We kept them dispersed on the corners that day, any large groups, we didn't let them gather.

Q   And did the State Troopers disperse any large groups in and around this area on this particular day?

A   Yes, sir; we did.

Q   And did you see the Dallas County Sheriff Department dispersing any of these groups on Broad Street on this particular day?

A   Yes, sir; I did.

Q   All right.  Now, going back to Sunday, March 6 -- 7, 1965, did you hear a call come over the State radio frequency asking that the Dallas County Sheriff Department be dispatched to Brown's Chapel?

A   I did; yes, sir.

Q   And do you know who this call came from?

A   It came from Sheriff's radio operator.

Q   From the Sheriff's radio operator?

A   Martha Yarn; I recognized her voice.

Q   And they were -- do you know what she said over this call?

A   She said, "Signal zero zero at Brown's Chapel Church."

Q    Said what?

A    "Signal double zero, zero zero, at Brown's Chapel Church."

Q    What does signal zero zero mean?

A    That means officer's in trouble, needs help.

Q    And did you go to Brown's Chapel?

A    No, sir; I didn't.

          MR. P. H. PITTS:  That's all I have of this witness.
I would like to offer Defendant's Exhibit number 14 into evidence.

          THE COURT:  Cross examination, for the plaintiffs.
Any objection to 14 going into evidence, gentlemen?

          MR. SMITH:  No objection.

          THE COURT:  14 --

          MR. HALL:  No objection.

          THE COURT:  It will be admitted.

            CROSS EXAMINATION:

BY MR. HALL:

Q    Lieutenant Etheridge, directing your attention to March 7, 1965,
    how much time elapsed between the time that the marchers reached
    the first traffic light and the throwing of tear gas; do you
    know?

A    The time the marchers reached the first traffic light --

Q    Yes?

A    From where, I mean; I don't understand.

Q    When they reached there, that is before Major Cloud said
    anything, when they reached the first traffic light, this was

the point of confrontation?

A    No, this -- this traffic light that I was at was two hundred

yards back, back this way from that point, the point --

Q    I see.

A    -- was at the signs hanging over the road there.

Q    They didn't quite reach that traffic light?

A    They lacked two hundred yards reaching that traffic light.

Q    You were in a position see the marchers in front of the line,

were you not?

A    I was in position to see the marchers coming over the bridge --

Q    Right.

A    -- but after they got down on the flat, it was a lot of people

between me and the marchers.

Q    You couldn't see?

A    I couldn't see.

Q    I believe you testified --

              MR. HALL:  May I see Defendant Clark Exhibit 14,

please?

Q    I believe you testified that there was a large crowd at or about

the scene of the occurrence?

A    Yes.

Q    On Sunday, March 7, and that purports to be a picture of that

crowd?

A    No, this is just a picture of the, so to speak, tail end of that

crowd.  This crowd had been dispersed; a lot of people were back

691

in the cars, a lot of people had -- had remained when we
dispersed this crowd, and I -- I didn't take this picture other
than for -- I am just a photographer, I just keep a camera on
my seat, that is the only picture I took that day, and just
snapped that picture just for -- I mean for no other reason
other than to take a picture.

Q    Do you know if there is a picture in existence --

A    I do.

Q    -- which shows this large crowd you testify about?

A    I didn't see a photographer in the area; I didn't see one,
except -- except some people there in the area taking pictures
back toward the bridge, is the only photographers I saw; I
believe I did see one or two taking pictures back toward the
River Bridge.

Q    Have you counted the people there in that picture?

A    No, I haven't; I haven't counted the people in that picture,
but that is not the picture of the crowd there, anyway.

Q    That is a very small group of people, isn't it?

A    I would say that is fifty people, more or less.

Q    And that includes women and children?

A    That includes one child, two children I believe there.

Q    You see two children, two very small children?

A    Two here is all I see; I don't see any women at all.

Q    And persons are standing around with their --

A    This crowd, I sort of took a -- it is about eighty-five per cent

grown white males in this crowd.

Q    In this picture here?

A    I would say that picture, also, or more than eighty-five per cent in that picture.

Q    Did you have any reason to believe that that crowd was armed or anyone in that crowd was armed?

A    I didn't see any weapons; no.

Q    Did you have any reason to believe that they were armed or anyone there was armed?

A    Well --

MR. GAYLE:  Object to that, what -- may it please your honor.

THE COURT:  Sustain it to that question as it is phrased.

Q    You heard someone say that the Troopers should let the marchers through, and they would take care of them?

A    I heard that a lot of times said.

Q    You understood that to mean that the crowd was hostile and was ready then to beset the marchers?

A    The word, "Kill," was used several times.

Q    The word, "Kill," was used several times?

A    (Nodded to indicate affirmative reply)

Q    Did you ascertain who used that word?

A    No, I didn't; I was busy keeping them back out of the area; I was -- had my hands full, I mean completely full.

Q  Did you conduct any investigation to find out who used that word?

A  No, I was called from the scene immediately after I let the traffic through.

Q  Was any report made to any higher authority?

A  Well --

Q  That that word had been used and you had reason to believe --

A  Not an official written report; no official written report made.

Q  You didn't make any report at all?

A  No; huh, uh.

Q  No arrests were made?

A  No arrests made.

Q  And at the time you heard it, was there any attempt made to disperse this crowd of what you understood to be hostile people?

A  We didn't have the manpower to disperse that crowd at the time; the only way I dispersed them when I did was with a threat to use tear gas; I broke loose two grenades.

Q  This, I believe you have said, was a crowd of fifty people there, and this is the crowd you are talking about when you heard this, and you didn't have enough men to disperse a crowd of fifty people including women and children?

A  We are not talking about a crowd of fifty men; we are talking about a crowd of over a thousand people; we are not talking about a crowd of fifty men at all.

Q  Well, this picture, then, does not indicate the crowd you are talking about, this --

694

A · This picture was taken, as I have explained twice, I believe,
  before, just before I left -- see, here is the hood of my car
  right here, I was standing with my foot in the car door when I
  took this picture, I was just fixing to leave the scene and open
  the traffic, we were just fixing to open the traffic, we had got
  orders to -- to assemble my group back down the road toward the
  bridge with the main group, and I was just leaving, and just
  before I shut the door, I just snapped this picture; we were
  just fixing to turn the traffic loose at that time.

Q  Was it the purpose --

A  My Troopers had already gotten in the car, that is their car
  right there, Troopers' car, with the Troopers inside of it.  The
  only reason I just took this picture, I just -- it is not an
  official picture, just a little cheap camera, and I took the
  picture as I was leaving.

Q  You didn't take it for the purpose of showing the large, hostile
  crowd?

A  I thought about it day before yesterday that I had that picture
  in my camera, and I gave it to the Sheriff's office, and they
  processed it just for this; I didn't take it for the purpose of
  showing the hostile crowd; I didn't.

Q  Isn't it a fact, Lieutenant Etheridge, that there were anywhere
  from, let's say, seven hundred to a thousand persons in the line
  of march?

A  I -- I would say it was a large -- about that; yes, sir; I would

say that.

Q  Do you think you had adequate force there to disperse that line
   of marchers?

A  I think we -- not and take care of all the other details, too;
   I don't think we had adequate force.

Q  You didn't have adequate force to disperse the -- this hostile
   crowd where you had heard the word, "Kill," used and the offer
   to take care of them?

A  Now, it would be impossible to know who said those words.

Q  Now, when you say a crowd of a thousand onlookers, we have
   attempted to distinguish the onlookers from the marchers by using
   the word, "Negro," and, "White"; but isn't it a fact there were
   some Negro onlookers, too?

A  That's right; there were some -- as I stated to the attorney
   awhile ago, there was a group of Negroes in the crowd.

Q  And isn't it a fact that there were some white marchers?

A  That's right.

Q  So you had Negroes and whites on both sides?

A  That's right.

Q  Although the marchers were predominantly Negro?

A  (Nodded to indicate affirmative reply)

Q  And the onlookers predominantly white; that is correct, isn't it

A  That's right.

Q  Now, none of the white onlookers were molested, dispersed, or
   arrested; is that correct?

A    Not where I was, not at the point I was, nor none of the Negroes

were dispersed where I was at the time.

Q    Do you know of any Negro onlookers, whether they were at the

point where you were standing or stationed or anywhere in the

vicinity, do you know whether any Negro onlookers were in any

way molested or arrested or chased?

A    Not on my personal knowledge; I don't.

Q    You did not see --

A    I did not see --

Q    -- them being chased?

A    -- any being chased or --

Q    What -- what exactly was your position on this day with

reference to chain of command?

            MR. GAYLE:  I didn't get that.

            THE COURT:  With reference to the chain of command.

A    I received my orders from Captain Moore, District Commander, my

District Commander, my immediate --

Q    Were you in charge of a group of Troopers?

A    I -- I was in charge -- I was in charge of a group of one

sergeant, one corporal, and five Troopers.

Q    And these are the seven people that you testified about just

a moment ago on direct examination?

A    That is the seven Troopers that I testified about.

Q    Major Etheridge, I ask you to look at this photograph here

marked Plaintiffs' Exhibit 11 for identification, and ask you

697

if you can identify that, tell us what it is?

A    It's -- that is some -- that is Troopers with gas masks on and

canisters, tear gas canisters, or evidently tear gas canisters,

gas canisters.

Q    Do you see yourself in that picture?

A    I am not in that picture.

Q    Do you know any of these Troopers?

A    Not with their masks on; I don't know.

Q    We ask you, sir, to look at Plaintiffs' Exhibit 3 --

          THE COURT:  Speak out, if you will, Lieutenant, so

everyone can hear you.

Q    What is that, if you know, Lieutenant?

A    It's a -- some mounted men and one State Trooper, evidently.

Q    Can you identify -- do you see yourself on that picture at all?

A    I am not in that picture; no, sir.

Q    Can you identify the Trooper?

A    I cannot identify that Trooper.

Q    Does that correctly portray a scene at the site of the occurrence

of March 7?

A    I don't know; I wasn't down there at that scene at that time.

Q    Yes, sir.  Lieutenant, we ask you to look at this book, this

bound volume here marked Intervenor's Exhibit 2, ask you to look

through it at the picture that is marked S-214, and ask you if

you can identify it for us?

A    You mean -- it is a picture of several Troopers, some news men.

Q    Do you see yourself?

A    I am not on that picture.

Q    Do you know any of the Troopers; can you identify any of those
     Troopers for us?

A    I can't identify any of those Troopers; we have a lot of new
     Troopers, several hundred, that I have never seen before.

Q    Will you look at the picture marked S-215 and tell us if you can
     identify anyone on that picture?

A    I can't make an identification on that picture.

Q    Will you look at the picture marked S-216 and tell us if you can
     identify anyone in that picture?

A    I can't identify this picture; this looks like someone I know,
     but he's got two gold stripes, it wouldn't be him; I mean he's
     a Trooper, and this is a lieutenant.

Q    You don't see yourself in that picture?

A    I am not in that picture.

Q    Will you look at the picture marked S-217 and tell us if you can
     identify any of the Troopers on that picture?

A    I can't identify any of the Troopers in that picture.

Q    Thank you.  Lieutenant, directing your attention to the crowd of
     onlookers that you have been testifying about today, we ask you
     if it isn't true that this was just a group of curious people
     who got out of their automobiles to see what was going on?

A    In my opinion, that is not true.

Q    You think they deliberately came to the scene to make trouble?

A    I think some of them did; I don't think all of them did; some
     of them were tourists, just stopped on the road that couldn't
     get through.  Some of them were.

Q    Were you able to identify anyone in that crowd of onlookers that
     you had reason to believe came to the scene expressly for the
     purpose of making trouble?

A    I am not from Selma, and I didn't know any of the people there.

Q    Did anything occur to convince you that some one of that group
     came to the scene expressly for the purpose of making trouble?

A    Well, I was convinced that some of them were there to make
     trouble, now -- now about -- by the mood of the crowd, the talk
     that I could hear from the crowd, and the way some of the crowd
     was trying to break through us; in fact, we had to send get
     some of them twice, on two occasions.

Q    Had any plan been evolved by the State Troopers or by the Dallas
     County Sheriff's office to stop such trouble if it did occur?

A    Now, I am not in on the planning; all I do is receive orders
     to -- and I carry out those orders; I don't know what was planned

Q    Did you have any orders?

A    I had orders to --

Q    Dealing with stopping such trouble from onlookers or other
     persons?

A    I had definite orders to stop such trouble from onlookers.

Q    What were your orders, sir?

A    To keep any of the onlookers out of the area, don't let any of

them into the area where the -- where the -- the marchers were
going to be stopped.

Q    Well, weren't they in the area?

A    Not -- none from my end wasn't in the area; I cleared out the --
everything from the end of them back this a-way, there wasn't
none in the area except a few that came out of a store, standing
out in front of a little store, a group of women.

Q    When you say you cleared them out, you mean you dispersed them,
caused them to move on, and not let them stand there?

A    Moved back beyond the crossroad beyond the traffic light; I
moved them all back beyond the traffic light and detained them
at that point.

Q    Were they difficult to move or to handle?

A    They were difficult to move.

Q    Were they arrested or threatened?

A    It wasn't necessary to arrest them; there were both white and
Negro there, and I had to move them all back, and they were --
they were not difficult, they were slow moving, some of them
were, and -- and a lot of mumbling and talking and threatening
talk going on and -- but we did get them moved back beyond the
point, and we did detain them there.

Q    Were the white and Negro onlookers standing together?

A    No, they wasn't; the Negroes were in a group by themselves.

Q    Were they closely together -- close together or -- or separated
by some physical barrier?

701

A    They were -- they were standing right -- right beyond my patrol
     car on the side where my patrol car was parked.

Q    Was it necessary to use -- you did not use any tear gas?

A    Did not use gas.

Q    Or nausea gas?

A    I didn't have a gas mask, myself.

Q    Or smoke bomb?

A    I would have had to gas myself to get them out of there; I didn't
     have a gas mask.

Q    You didn't have a gas mask?

A    (Shook head to indicate negative reply)

Q    Lieutenant Etheridge, I hand you a bound book of photographs
     labeled Plaintiff-Intervenor's Exhibit 1, and ask you to open it
     and turn to picture marked A-203, and ask you to examine that
     picture and tell us what it depicts?

A    Well, I would say it depicted the march Sunday.

Q    Is that an aerial photograph?

A    Or maybe Tuesday, I don't know; I would presume -- I would say
     it was an aerial photograph.

Q    Of the march on Sunday, March 7?

A    Sunday or Tuesday; I don't know which march it would be, but I
     would say --

Q    Assuming that is a picture, an aerial photograph, of the marchers
     and the vicinity of the march --

A    (Nodded to indicate affirmative reply)

Q    -- which occurred on Sunday, March 7; examine it and point out

for us that large crowd of onlookers you have been talking about?

A    That part is not --

Q    Can you point the marchers out?

A    -- it is not on the picture.

Q    You see the marchers, do you not?

A    I see the marchers, but the point I was stationed is not on the

picture.

Q    Do you see a few --

A    It is two hundred yards up the road this way from this line right

here.

Q    Do you see a few people standing around looking?

A    I see some people here.

Q    Do you see as many as a hundred people altogether?

A    That is not the crowd discussed at all that --

Q    We ask you to turn the page, sir, and look at the picture marked

A-204?

A    It is not on there; the point is not on there.

Q    You see no large crowd of onlookers?

A    I don't see the point I was stationed at; no, sir; I don't see it.

Q    We ask you, Lieutenant, where -- you were stationed at a traffic

light?

A    Two hundred yards beyond this point here back toward Montgomery.

Q    Back toward Montgomery?

A    That's right; yes.

703

Q    Will you examine this picture, A-205, and tell us if at this

point of the marchers, assuming this is an aerial photograph

of the marchers and the vicinity of the march which occurred on

March 7, is there any large crowd of onlookers there or any

other persons?

A    No.

Q    Other than marchers?

MR. P. H. PITTS:  Your honor, I object to that

question; he has already stated he was not stationed at that area.

THE COURT:  I can see; I can see the photograph; I

sustain objection to that question.

MR. HALL:  All right, sir.

Q    Lieutenant, we are going to ask you to look through this book

of aerial photographs of that march and see if you can find for

us the point at which you were stationed?

A    The point which I was stationed is not in that -- in that folder.

Q    All right, Lieutenant.  Lieutenant, we ask you to examine this

bound volume of photographs which is march -- which is marked,

rather, Intervenor's Exhibit 3, and ask you to look at the

photograph marked B-203, this is B-20 -- and ask you if you can

tell us what that picture depicts?

A    A line of Troopers.

Q    A line of Troopers; do you see yourself in that picture?

A    I am not in that picture.

Q    Can you identify any of the Troopers for us?

704

A    The backs are all to me.

Q    Will you examine the picture marked B-205; tell us what this
     picture depicts?

A    A bunch of Troopers and some marchers, evidently.

               THE COURT:  You will have to speak so these people
can hear you.

               WITNESS:  I am sorry, Judge, I'm sort of little bit
hoarse, I got a cold today.

A    But this is a bunch of Troopers, and I would presume -- I would
     -- I would say those were marchers and these were Troopers.

Q    Assuming this was a picture of Sunday's event, March 7?

A    Yes.

Q    Do you see yourself in that picture, Lieutenant?

A    I am not in the picture; I wasn't in that area at all during
     this time; in fact, I was never out of my car in that area where
     this was taken.  The only time I came through this area, I was
     in my car going over to the point and coming back across the
     bridge; that is the only time that I -- and I was never out of
     my car except to stop in front of a little drive in and go and
     get a cup of coffee through the window and come back to the car,
     got two cups of coffee and came back to the car and sat in my
     car over there until I was called back to -- across into Selma.

Q    Were any of the Troopers under your -- in your detachment ever
     in this area?

A    None of the Troopers in my detachment -- I kept my detachment

at all times -- at all times were in three -- four cars, and I
kept them together, and we went back across the river together;
we came over together, and we went back across the river together

Q   You never actually came in physical contact with the marchers?

A   Not at any time; see, I was detailed to this one intersection,
and I -- and I went to that intersection in my car, and I -- I
came back -- the only time I stopped was to get a cup of coffee,
that was after everything was over over there, and then I went
back across the river in my car, is the only time I was out of
my car except at this point, that -- that I was -- that I was
telling you about, that is the only time.

Q   Lieutenant Etheridge, did you follow the marchers when they
retreated back to Selma?

A   No, I didn't; I -- I mean in a -- I would say forty-five minutes
after they had gone back to Selma I came back across the bridge
into Selma, about forty-five minutes, and at least forty-five
minutes.

Q   Did you go at that time to the vicinity of Brown's Chapel Church?

A   No, I didn't; I didn't go to the vicinity of Brown's Chapel; we
went to the vicinity of -- we went to the armory.

            THE COURT:  I can't hear him.

A   My group went to the --

            THE COURT:  I just can't hear you, and I know these
lawyers can't hear you.

A   My group went to the armory, Judge; the group went to the armory.

WITNESS:  I am sorry, sir.

Q  Do you know of any orders to the Troopers to assemble in Sylvan
   Street in front of Brown Chapel Church?

A  I didn't -- I didn't get any orders to assemble on Sylvan Street
   in front of Brown's Chapel Church; if --

Q  You know of no such orders?

A  If a group got those orders, they were given while I was out of
   the car; I had my radio on.

Q  I ask you, sir, to look at this picture marked Plaintiffs'
   Exhibit 9 for identification, and ask you if you can tell us
   what it depicts; identify it for us?

A  I -- I -- I am not on that picture; I have never been to that --
   I have never been in front of Brown's Chapel Church on foot; I
   have driven by there in a car, but never on foot.

Q  You recognize the building as Brown's Chapel Church?

A  I recognize that.

Q  Situated on Sylvan Street in Selma, Alabama?

A  That's right; I do recognize the building as Brown Chapel Church.

Q  Do you recognize the men in the picture as State Troopers?

A  As Troopers; I recognize them as Troopers.

Q  Do you know any of the men in this picture?

A  I couldn't make a positive identification on none of those men
   in that picture, not a positive identification with those helmets
   on; I can't identify anybody with the helmets on.

Q  Can you identify the arms which the Troopers are carrying?

707

A   Well, they --

Q   Will you tell us what the Troopers have, how they are dressed,
    how they are armed?

A   They are armed with -- with -- some of them have what is
    apparently carbines.

        MR. SMITH:  We object to this, if the court please;
the photograph speaks for itself.

        THE COURT:  Well, I can tell, but it is proper
evidence if he wants to put it in evidence.

A   And some of them have night sticks.

Q   Do they have the carbines at the ready?

A   What do you mean, "At the ready"?

Q   Prepared to shoot, sir?

A   Some of us haven't even got ammunition for the carbines.

Q   Do they have the carbines held in a ready position?

        THE COURT:  I can see that.

A   One does; one does --

        THE COURT:  I can see that.

A   -- have a carbine --

        THE COURT:  I am afraid you are wasting a lot of time,
Mr. Hall.

        MR. HALL:  All right, sir.  Your honor, may we --
have you seen this picture?  We are going to offer it in evidence.

        MR. P. H. PITTS:  I have no objection.

        MR. HALL:  Any objection?  Your honor, we offer --

708

THE COURT: Plaintiffs' 9 admitted in evidence without objection.

Q One or two other questions, Lieutenant; you testified to some signal, double zero, coming from somebody?

A That's right; yes.

Q And you heard this signal?

A I did hear this signal.

Q And you said it meant officers in trouble?

A That's right; that was the signal for officers in trouble.

Q They were dispatched where, to Sylvan Street?

A This wasn't a dispatch; this was a call for help from over the radio from the dispatcher at the Sheriff's office.

Q You didn't go down there?

A I didn't go, no; I wasn't assigned, I mean, to go.

MR. HALL: I believe that's all, sir.

THE COURT: For the United States.

BY MR. DOAR:

Q You said that you were detailed to that intersection; who detailed you?

A Captain Moore.

Q Captain Moore?

A District Commander.

Q What was his relationship to Colonel Lingo? Is he second in command; Major Cloud, then Captain Moore?

A Captain Moore is a District Commander; he's -- he works under the major, under Major Cloud.

Q    Under the major?

A    Under Major Cloud.

Q    What instructions did you have with respect to dispersing the crowds?

A    I -- I only had instructions to detain the crowd at that point, not to let -- not to let them get any further down, that is the orders I had up until then, and to keep --

Q    What if -- what if a person wouldn't obey your order; what was your instructions?

A    Well, I didn't have no specific instructions what to do if a person wouldn't obey my order; I mean I -- that is the reason they put a man in charge; I mean, I had been there long enough to know what to do, I mean let each situation take care of itself; I didn't have a specific order, Mr. Doar, as to what to do if a person didn't obey my order.

Q    Were you -- did you have any instructions not to make any arrests

A    No, sir; I didn't have any instructions not to make any arrests.

Q    And you were dealing with white crowds?

A    No, sir; I was dealing with largely a white crowd.

                    MR. DOAR:  Thank you.

                    THE COURT:  For Governor Wallace.

                         REDIRECT EXAMINATION:

BY MR. SMITH:

Q    What would you have done had a member of the white crowd disobeyed your order?

710

MR. GREENBERG:  Objection.

MR. NABRIT:  Objection.

THE COURT:  Sustained.

Q   As I understand, you were approximately two hundred yards in the
    direction of Montgomery from the position of Major Cloud on
    Sunday, March 7?

A   That's right.

Q   And it is your opinion and judgment that approximately, or I
    believe you used the term, in excess of, a thousand people had
    lined the area where you were located?

A   That's right.

Q   Now, did all of these people come from automobiles?

A   I don't know, sir, where they came from; I couldn't tell where
    they were coming from.

Q   Did some of them come from automobiles?

A   Yes, sir; some of them came from automobiles.

Q   Was traffic backed up in the direction of Montgomery?

A   It was back -- it was backed up as far as I could see toward
    Montgomery.

Q   And what extent would that be in distance?

A   Oh, well, half a mile.

Q   Half a mile.  Had you been in Selma in and around the Dallas
    County Court House since February on any occasion when
    demonstrations or marches were taking place?

A   Not while they were taking place; no, sir.

711

Q    Are you familiar with the highway, generally, from Selma, Alabama
     to Montgomery, Alabama?

A    Yes, sir.

Q    Is it a black topped road?

A    Yes, sir.

Q    Is it four laned in part and double or -- or two laned in other
     parts?

A    Yes, sir.

Q    In your judgment, what portion of the highway from Selma to
     Montgomery is four lane?

                    MR. GREENBERG:  Objection; it is a map --

                    THE COURT:  Sustained; we have a map in evidence, you
put it in evidence --

                    MR. SMITH:  All right, sir.

                    THE COURT:  -- shows it to the mile.

Q    Are you familiar with the terrain, that is, the up and down
     portions of the highway?

                    MR. NABRIT:  Objection; repetitious.

                    THE COURT:  Overrule.

A    I travel it about once a month, average of once a month.

Q    About once a month?

A    Yes, sir.

Q    Is it hilly terrain?  I am speaking now of the surface of the
     road.

A    Yes, sir; it's -- for the most part it is hilly terrain until

712

you get closer to Montgomery, and it flattens out some.

Q    Are there many bridges?

A    Yes, sir; it is quite a few bridges.

Q    Are the bridges --

       THE COURT:  Your engineer's evidence on that is the best -- the best evidence; I am going to accept it until it is controverted.

       MR. SMITH:  I will withdraw it; all right, sir.

Q    Are you familiar, generally, with the shoulders of the road?

       MR. GREENBERG:  Same objection.

       MR. AMAKER:  Objection.

       THE COURT:  Sustained.

Q    Are you familiar with any area between Montgomery and Selma that may be swampy?

A    Yes, sir; I am.

Q    Now, let me ask you this question; in your opinion -- how long have you been with the Highway Patrol?

A    Thirteen years, sir.

Q    In your opinion, would it be dangerous for a large group of people to march along the shoulder of the road from Selma to Montgomery?

       MR. NABRIT:  Objection.

       THE COURT:  I sustain it; doesn't hypothecate enough facts.

Q    In the day time?

713

MR. GREENBERG: Same objection.

THE COURT: Sustained. What do you mean by large? Hypothecate your facts if you want to pursue it.

MR. SMITH: All right, sir.

THE COURT: In detail.

Q   In your opinion, would it be dangerous for a group of seven hundred people to march along the shoulder of the road from Selma to Montgomery in the day time?

MR. GREENBERG: Objection --

MR. HALL: Objection.

MR. GREENBERG: -- word, "Dangerous," not defined.

MR. NABRIT: Further, doesn't define how they conduct themselves.

THE COURT: I sustain it; I sustain it; you are not hypothecating enough facts; you are not defining your terms. If you want to get into that, I am going to let you, because it is proper as to what is reasonable.

MR. SMITH: I am just not sure I know how, Judge, I will be frank with you. Your honor says that is not properly hypothecated?

THE COURT: Oh, yes; it is necessary to hypothecate it.

MR. SMITH: I mean the way the question is framed is not --

THE COURT: Insufficient hypothecation.

Q   Are you familiar -- and let me first ask you this way --

THE COURT:  We are reaching the main point in this law suit now --

MR. SMITH:  Yes, sir.

THE COURT:  -- as to what is reasonable and what is unreasonable, and I am going to let you go into it --

MR. GREENBERG:  Your honor --

THE COURT:  -- provided you do it in the proper way.

MR. GREENBERG:  -- in view of the fact this line of testimony is developing, I would like to hear a little more about this witness's qualifications.  We know he's been --

THE COURT:  Take him on voir dire if you want to before -- before he goes on into it, if that is what you are asking to do.

MR. GREENBERG:  -- in the Highway Patrol -- well, I -- perhaps counsel would want to develop him as an expert; then we can see whether we want to do anything further.

THE COURT:  He objects on the ground it doesn't appear he is sufficiently qualified to answer this question.

Q   Lieutenant Etheridge, how long have you been with the Highway Patrol?

A   Thirteen years.

Q   And have you been assigned to traffic duties over that period of time?

A   Full time; yes, sir.

Q    You had any special courses in -- in regard to traffic problems?

A    I have.

Q    What training have you had?

A    I have -- I have been to four of the Department of Public Safety

     Training Schools, for a total period of, oh, six months, I guess.

                    MR. AMAKER:  We can't hear him.

A    Six months.

Q    And over the --

A    Four schools.

Q    Over the thirteen year period, have you been assigned to active

     duty, that is, to patrolling the highways?

A    That's right; I have been assigned to the traffic -- the Trooper

     Division, what is the Trooper Division now, for the full time

     I have been with the Highway Patrol.

Q    You ever patrolled the area between Montgomery and Selma?

A    No, sir.

Q    You have not.  You say you have traveled over this area?

A    Yes, sir; I come to Montgomery to get supplies once a month, and

     only a small portion of that area is in my territory; that is to

     the Lowndes County line, this side of Montgomery.

Q    Well, do you patrol to the Lowndes County line?

A    I do patrol to the Lowndes County line.

Q    You go on the road every week?

A    Well, I wouldn't say I would make it once a week; I have seven

     counties I have to cover; I would say I make it once every two

weeks on the average over there to the Lowndes County line.

Q    In your opinion --

MR. GREENBERG:  We object to the witness answering
this question as an expert.

THE COURT:  I will permit it; overrule.

MR. HALL:  We would like to take him a little further,
if we may, your honor, at this point.

THE COURT:  All right; wants to question him on voir
dire as to his qualifications.

MR. SMITH:  All right, sir.

VOIR DIRE EXAMINATION:

BY MR. HALL:

Q    Lieutenant Etheridge, have you ever made a study of the highway
between Selma and Montgomery?

A    No, I haven't; I haven't ever made a study of it.

Q    You have never gone -- you are not familiar with the highway
beyond -- beyond the Lowndes County line; is that correct?

A    Other than going over it once a month.

Q    Going over it; and did you particularly pay any attention to the
highway when you went over the highway once a month for your
supplies?

A    Well, I always pay attention to a highway.

Q    I didn't mean it quite that broad; I meant with a view toward
familiarizing yourself with the highway to any great degree or
extent?

717

A   Well, I can generally picture the highway all the way from Selma
    to Montgomery; I -- I mean as to the filling stations along the
    road.

Q   Did you familiarize yourself with the number of bridges along
    that highway?

A   I don't know the exact number of bridges; no, I don't.

Q   Do you distinguish between bridges as such and grade separations?

A   Well, I -- I would say a bridge is something got a -- railings
    along it and is built up, not a covered type, I am not talking
    about covered.

Q   Are you familiar with the number of running streams that cross
    the highway between Selma and Montgomery?

A   I couldn't tell you exactly the number of running streams; I know
    there is one large swamp area that has got three bridges in it.

Q   The highway goes across the swamp area; is that correct?

A   That's right.

Q   And it has been cleared along that side; are you familiar with
    the shoulders, the width of the shoulders, and the -- the amount
    of the right-of-way along the road?

A   No, I am not; I am not familiar --

            THE COURT:  All right, that is sufficient; he can't

answer your question if he is not familiar with those facts.  He

doesn't know the right-of-way, width of shoulders, number of bridges;

if he doesn't know that, he can't answer the question, with any

intelligence.

718

## REDIRECT EXAMINATION (cont'd):

BY MR. SMITH:

Q    Have you investigated accidents within the perimeter of your area on U.S. highway 80 east?

A    I don't investigate accidents, myself.

Q    Do accident reports come to your Division?

A    Yes, sir.

Q    Is this a heavily traveled highway?

A    It is; what time I have been on it, it is heavy traffic on the highway.

Q    Do you know the general type of traffic that is on the highway?

A    Well, I -- I don't know what type -- what do you mean by type, what it is -- tourist traffic or local traffic?

Q    Well, are any trucks --

A    Truck traffic; there is truck traffic on the highway.

Q    Do trucks heavily travel this area?

A    They do travel it heavily; several big truck stops in that area on that road.

Q    Yes, sir. I want to show you Defendant's Exhibit 1, which purports to be an official map of the Alabama Highway Department, Maintenance Division, showing U.S. highway 80 east from Selma to Montgomery; would you examine this Exhibit?

MR. CROOK:  Want to hold it out, Maury?

A    This is 80 coming here from Selma to Montgomery -- I tell you the truth, just --

Q   Let me first call your attention to the portion of this Exhibit
    which shows the divided four lane highway from a point in Selma
    to this point just this side of the Lowndes County line --

A   (Nodded to indicate affirmative reply)

Q   -- are you familiar, generally, with the traffic in this area?

A   I am familiar with the traffic in that --

Q   Where is Craig Air Force Base with relation --

A   Craig Air Force Base --

Q   -- to this area?

A   -- is about right here in this area, right -- right about here,
    about half way between the two, that area out there.

Q   Assume that the shoulder of this four lane highway on either side
    is six feet in width; assume further that seven hundred to a
    thousand marchers or demonstrators proceeded in an orderly manner
    of -- manner on either side of this four lane highway in single
    file fashion; in your opinion, would this present any hazardous
    traffic condition in this area?

            MR. GREENBERG:  Object.

            MR. GRAY:  Objection.

            THE COURT:  I will permit it; that is not the
    determining factor, but I will permit him to answer that question.

A   The distraction to the motorists alone would make it --

            THE COURT:  Just answer the question; don't elaborate
    on it.

A   Yes, sir; yes, sir.

Q   From this point on Defendant's Exhibit 1, which is at approximate-
    ly the Lowndes County line, to this point -- can you identify
    this point?

A   No, I don't believe I can identify that point; that is in --

Q   That would be just this side of the Montgomery County line; this
    is the Montgomery County line shown on the map.

A   This is where the four lane ends, right here?

Q   That's right; assume that this area of U.S. highway 80 east is
    two lanes, and that the shoulders on either side of the highway
    were approximately three feet in width, and assume further that
    approximately seven hundred and fifty marchers or demonstrators
    proceeded in single file off the black top and within the
    shoulder area of the right-of-way in an orderly fashion; in your
    opinion, would this present any hazardous condition on this
    portion of the highway?

            MR. GRAY:  Objection, your honor.

            MR. NABRIT:  Objection.

            THE COURT:  Well, I will let him answer it; you can
    go into it further if you want to.

A   Yes, sir.

Q   Did you say that you had not been in Selma prior to March 7?

A   No, sir; I didn't say I hadn't been there; I said that I hadn't
    been there at the time they were demonstrating at the Court House.

Q   On any occasion prior to March 7?

A   That's right; yes, sir.

721

Q   In your opinion, based on what you saw Sunday, March 7, in Selma
    on U.S. highway 80 east, would marchers or demonstrators along
    U.S. highway 80 between Montgomery and Selma attract large
    crowds of people, or crowds of people?

A   I would say so.

Q   Do you know the speed limit along U.S. highway 80 east between
    Montgomery and Selma?

A   Yes, sir.

Q   What is it?

A   Sixty miles an hour in the day time; fifty at night.

            MR. SMITH:  That's all.

            THE COURT:  Mr. Kohn.

BY MR. KOHN:

Q   Lieutenant Etheridge, I direct my question to March 7, which I
    believe was on Sunday, 1965; I believe you testified that you
    were on what is commonly called for the purpose of this trial
    the Montgomery side of the Senator Pettus Bridge --

A   That's right, sir.

Q   -- is that correct?

A   Uh, huh.

Q   Approximately how far was the closest person from the onlookers
    on the south side of the bridge to the closest person in the
    demonstrators' march; or in other words, what radius or length
    separated the two groups of people on this particular occasion?

A   Two hundred yards.

722

Q    Two hundred yards?

A    Yes, sir.

Q    Did you receive any reliable information, or information that
     you believed reliable, that alerted you that that crowd was
     going to become more hostile on your side of the bridge over
     your radio?

A    No, sir; I didn't receive any information over my radio.

Q    Did you receive it from anybody?

A    No, sir.

Q    You didn't get any information about anybody coming there in a
     -- in a Volkswagen or anything?

A    Oh, we got dispatches on the Volks--- on the small red sports
     car, but they didn't put him right in that area; he was just
     in the general area.

Q    In the general area?

A    Yes, sir.

Q    Area -- would you tell us what that dispatch said?

A    It said it was --

                    MR. NABRIT:  Objection, your honor.

                    THE COURT:  Sustain it.

Q    Now, when you talk about the general area, can you be a little
     more specific?

A    That was the general Selma area at that time.

Q    Did it say anything about coming down that highway?

A    No, sir; it didn't specifically mention that highway, that the

723

car was coming down that highway.

Q   As an officer of the Department of Public Safety, is it factual that besides having practical experience in traffic direction and control, that you have gone to schools and lectures and training units to study or to receive instructions in methods of traffic control?

A   Traffic control; yes, sir.

Q   And crowd control?

A   Yes, sir.

Q   And crowd dispersal?

A   Yes, sir.

Q   Based on your experience as a traffic officer, or as an officer of the Alabama Department of Public Safety, do you think you have an opinion whether or not had a major proportion of the demonstrating crowds been allowed to continue along that highway and pass, if it would have, in close conjunction to this one thousand people that were standing onlookers, that that would have increased or decreased the condition from a safety standpoint of traffic control and law and order and peace?

       MR. GREENBERG:  Objection.

       MR. NABRIT:  Objection.

       THE COURT:  Overruled.

A   I do think I have an opinion; I do have an opinion.

Q   What is your opinion, sir?

       MR. GREENBERG:  Object.

724

THE COURT: Overrule.

A   My opinion is it would have been extremely dangerous both ways,
    law and order -- I mean it would -- it wouldn't --

Q   Then is this a fair conclusion, or is this a fact; I will submit
    this to you as a fact and ask you to affirm or deny that the
    dispersing and stopping of that crowd on this occasion on March
    7, 1965, on the Montgomery end of the Senator Pettus Bridge
    decreased a dangerous situation from traffic control and safety
    and peace and law and order?

A   Yes, sir.

              MR. NABRIT: Objection.  Your honor, may I be heard?

              THE COURT: Yes.

              MR. NABRIT: Your honor, the evidence is that the
crowd was stopped because the -- the patrolmen blocked -- blocked
the traffic.

              THE COURT: Yes.

              MR. NABRIT: Object to the hypothesis.

              THE COURT: Objection is overruled; the answer will
stay in the record; he said, "Yes."

Q   Answer the question?

              THE COURT: He --

A   Yes.

              THE COURT: He has already answered it.

              MR. KOHN: No further questions -- one moment.

Q   On the occasion, March 7, 1965, on Sunday at the place where you

725

were stationed, according to your direct testimony, you were not

under the control of the Sheriff's Department of Dallas County

and they were not under your control; is that correct?

A    That is correct.

Q    Each unit of law enforcement activity was under its respective

control on that occasion as far as you know; is that correct?

A    That is correct.

   MR. KOHN:  No further questions; thank you.

   THE COURT:  Redirect, Mr. Pitts.

   MR. P. H. PITTS:  No further questions.

   THE COURT:  Any further cross for the plaintiffs?

     RECROSS EXAMINATION:

BY MR. HALL:

Q    Major Etheridge, you -- directing your attention to the last

question Mr. Kohn asked, do you mean to say that there was no

coordination?

A    Now, as I have said before, I don't know what was going on on

the higher levels --

Q    On the higher levels.

A    -- I just received my orders not from anyone but my direct

commander.

Q    So you don't know whether these persons were operating on their

own or not, do you?

A    I -- I don't know; I just don't.

Q    You really don't know?

A    I don't know; I wasn't taking orders from them; no.

Q    Directing your attention to testimony about dangerous situation

     and the fact that dis--- stopping and dispersing the crowd

     decreased this situation; isn't it a fact that the stopping and

     dispersal of the crowd, itself, brought about many injuries?

A    Well, I don't know; I -- I wasn't at the scene.

Q    You did not see any injured persons?

A    I did not see any injured persons.

Q    You have not been informed that seventeen people were hospital-

     ized?

               MR. GAYLE:  We object to that, may it please the

court, what his information is --

               THE COURT:  That is argument.

               MR. GAYLE:  -- hearsay and argument.

               THE COURT:  It is argument, something to address to

me later.

               MR. HALL:  Thank you, your honor, but may I ask --

               THE COURT:  Go right ahead.

Q    Have you been informed that there were any injuries at all?

A    Yes, I have been informed --

               MR. GAYLE:  We object to that.

               THE COURT:  Overruled; he has answered it; go ahead.

Q    Well, you do know at this time that there were injuries?

               MR. GAYLE:  We object, unless he knows of his own

personal knowledge and not what someone has told him.

           MR. HALL:  Your honor please, I was going to add to that, "By way of report."

           THE COURT:  What is the purpose of it?

           MR. HALL:  It may be --

           THE COURT:  What is the purpose of it, if you have a purpose?

           MR. HALL:  I withdraw it.

           THE COURT:  If you have a purpose, pursue it; if you are just agging the matter, drop it.

           MR. HALL:  All right, sir.

Q    Lieutenant, is there any -- going back and directing your attention to your traffic light where you were; now, I, myself, am wondering if there is not a road that leads off of highway 80 at this traffic light, a side road of some type?

A    Well, there is a four lane, then it is a service road on each side.

Q    What is meant by service road?

A    Well, you know, a little road that you go from one store to the other that keeps you from getting on the highway, it is just --

Q    I see.

A    -- service road that goes parallel with the highway.

Q    Are those roads by which you could have directed traffic otherwise --

A    Not around the bridge.

Q    -- into Selma?

728

A    On account of the bottleneck at the bridge I couldn't have.

Q    At the point where you --

A    Except to Montgomery.

    MR. HALL:  Thank you.

    THE COURT:  For the United States.

    MR. DOAR:  No questions.

    THE COURT:  Any further questions?

    MR. P. H. PITTS:  No, sir.

    THE COURT:  Witness be excused.  We will take a ten
minute recess.

    MR. P. H. PITTS:  Your honor, before we take this
recess I would like to make a statement.

    THE COURT:  We've recessed.

    (At which time, 2:48 p.m., a recess was had until
3:00 p.m., at which time the hearing continued)

    THE COURT:  All right, now, Mr. Pitts has advised me
during the recess that he wants to offer in evidence and show the
court a training film on crowd control.

    MR. P. H. PITTS:  Yes, sir.

    THE COURT:  I have advised him that I would -- if it
is properly identified and made to appear material, that I would
admit it in evidence.

    MR. P. H. PITTS:  (Nodded to indicate affirmative
reply)

    THE COURT:  We will hear it later this afternoon, and

I will see it later this afternoon --

          MR. P. H. PITTS:  (Nodded to indicate affirmative reply)

          THE COURT:  -- provided you are going to run that long

          MR. P. H. PITTS:  Yes, sir.

          THE COURT:  All right.

          MR. GREENBERG:  Is this the point at which to make an objection, or that would be some later point?

          THE COURT:  Wait until he offers it.  Next witness.

          MR. P. H. PITTS:  Trooper Chuck Weber.

          MARSHAL:  Witness has not been sworn.

          (Witness Charles H. Weber sworn by the Clerk)

          ****************

CHARLES H. WEBER, witness for James G. Clark, having been duly sworn, testified as follows:

          DIRECT EXAMINATION:

BY MR. P. H. PITTS:

Q    Would you state your name, please?

A    Trooper Charles H. Weber.

Q    And where are you from, Mr. Weber?

A    Selma, Alabama.

Q    Where were you from prior to the time you moved to Selma, Alabama?

A    Scranton, Pennsylvania.

Q    And how long have you been living in the State of Alabama?

A    Current residenceship since 1956.

Q    And how long have you been employed by the Alabama Department of Public Safety?

A    Nineteen months.

Q    All right; and prior to the time you were employed by the Alabama Department of Public Safety, did you have any previous law enforcement experience?

A    Yes, sir.

Q    And what was this experience?

A    Deputy Sheriff.

Q    And how long were you a Deputy Sheriff?

A    Four years.

Q    And so then you have been in law enforcement for the past five and a half years?

A    Yes.

Q    All right; now, Mr. Weber, were you in Selma on Sunday, March 7, 1965?

A    Yes.

Q    And where were you stationed?

A    I was at the intersection of Broad Street and Water Avenue.

Q    And that is on the Selma side of the bridge?

A    Yes.

Q    And what time did you arrive at this intersection?

A    Approximately twelve thirty.

Q    All right; and when you arrived at twelve thirty, were there any

731

large groups of people congregating on the streets of Selma in
this vicinity?

A    There was; there was.

Q    And how many, what -- could you estimate what the -- how many
people were in these crowds?

A    I would say, a rough estimate, about a hundred to a hundred and
fifty.

Q    All right; and where were these people standing?

A    One group was standing at Water and Broad, and another group was
standing at Alabama and Broad.

Q    All right; and this was around twelve thirty?

A    Yes.

Q    All right; and did this crowd increase, say, around one thirty?

        MR. GRAY:  Your honor, we object to leading.

        THE COURT:  Do not lead the witness; sustain it.

Q    All right; were you there at one thirty?

A    Yes.

Q    And was there -- was this -- was the crowd still on the street
at this time?

A    They had moved to the -- to the side.

Q    They had moved?

A    Yes.

Q    And who moved them?

A    The Selma Police Department.

Q    All right; and were the streets blocked off in Selma on this

732

particular day?

A    Yes.

Q    And where were they blocked off at, Mr. Weber?

A    They were blocked off at Alabama and Broad, Washington and Water,
     Lauderdale and Water.

Q    All right; and was anybody allowed in this area besides somebody
     who -- a law enforcement official?

A    No.

Q    Now, were you still at your station when the marchers went
     across the Edmund Pettus Bridge?

A    Yes.

Q    And did you stay at your station the entire time until they came
     back across the bridge?

A    I left the exact intersection a couple of times, but I was there
     when --

Q    Did you ever go over on the Montgomery side of the bridge?

A    No, I did not.

Q    All right; now, Mr. Weber, while you were at this intersection
     and in this general area, did you see any members of the Dallas
     County Sheriff's Posse?

A    Yes.

Q    And where were they?

A    At the location of the Selma Times-Journal Building.

Q    And who was in charge of them?

A    I don't know.

733

Q    All right; were they in a -- a group or just what were they doing
     there, if anything?

A    They were in a bus.

Q    In a bus; now, did they ever get off of this bus?

A    Yes.

Q    And at what time was this?

A    I don't know the exact time.

Q    Uh, huh; was it after the marchers had started back across the
     bridge --

A    Yes.

Q    -- or before they went -- it was before the marchers came back?

A    Yes.

Q    And after they got off of the bus, what did they do, if anything?

A    They contained this group on the corner of Water and Broad.

Q    Contained this group; what do you mean by this?

A    Hecklers and et cetera.

Q    Now, did you observe the marchers as they came back off of the
     Edmund Pettus Bridge?

A    Some.

Q    All right; and did you see any member of the Dallas County
     Sheriff's Department at that time?

A    When the  first group came across; no.

Q    All right; at any time during the afternoon did you see any
     member of the Dallas County Mounted Posse?

A    I saw members of the mounted group.

Q    Did you see any member of the Dallas County Sheriff's Posse abuse

     or intimidate any Negro citizens?

               MR. NABRIT:  Objection.

               MR. HALL:  Object.

               THE COURT:  Sustained.

Q    Did you see any member of the Dallas County Sheriff's Posse hit

     or strike any Negro?

A    No.

Q    You did not?

A    No, I did not.

Q    Now, when the -- the marchers came off of the bridge after they

     had -- were coming back from the proposed march, did they go

     straight down Broad Street, or did they go down Water Avenue?

A    They turned right on Water.

Q    Turned right on Water?

A    Yes.

Q    And did they -- did they go on back to the church, or did they

     congregate, or just what did they do?

A    They stopped approximately one block from the bridge.

Q    From the bridge?

A    Yes.

Q    And at what intersection is this?

A    That would be Washington and Water.

Q    All right; and that would be -- is that one block east of the

     Edmund Pettus Bridge?

735

A    Yes.

Q    All right; and how large a group would you say was congregating
     down there at this intersection?

A    I would say approximately two hundred.

Q    And was it necessary for you to go into this area?

        MR. HALL:  I object, your honor.

        THE COURT:  Sustained, to that question.

Q    Did you go into this area, Trooper Weber?

A    No.

Q    Did you see any member of the Dallas County Sheriff's Posse go
     into this area?

A    No.

Q    Did you see the City Police go into the area?

A    Yes.

Q    All right; and did you observe their actions while they were in
     this area?

A    No.

Q    Now, did this crowd subsequently break up and return to Brown's
     Chapel?

A    Yes.

Q    All right; and did you go to Brown's Chapel?

A    No.

Q    Uh, huh; now, Mr. Weber, based on your opinion, on your knowledge
     as a law enforcement officer, and the crowds that you saw in the
     general downtown Selma area, would you say that it was a

736

hazardous condition from a standpoint that if they had -- if
these marchers had been allowed to go into the downtown area of
Selma?

> MR. GRAY:  Objection.

> THE COURT:  I will permit it; overrule.  You can
answer it.

Q    Go ahead and answer it?

> THE COURT:  You can answer it.

A    I would say it was highly explosive.

> THE COURT:  That wasn't what he asked you.

Q    Highly explosive?

> MR. NABRIT:  Move to strike.

> THE COURT:  That wasn't -- just a minute; did you
understand that question, as to whether it was hazardous or not?
Just answer his question.

Q    Would it be hazardous, Trooper Weber?

A    Yes.

Q    And would it be -- was it conducive to law and order, this
situation which existed down town in Selma?

A    Would you repeat that?

Q    Was it conducive to law and order, this situation --

> MR. HALL:  I object.

> THE COURT:  Overrule.

Q    -- which existed?

> THE COURT:  Overrule; he can answer it.

A    Yes.

Q    And also, Trooper Weber, based on your observations at this area,
     is it your opinion that if it had not been for proper law
     enforcement that there was a possibility that someone might be
     injured?

                MR. GRAY:  We object to the form of the question.

                MR. AMAKER:  Objection.

                THE COURT:  Leading; objections both sustained.

Q    Is it -- is it your opinion that, based on your knowledge of the
     situation and observing the crowds which were located in the
     downtown area of Selma, and the crowds which were directly around
     you, is it your opinion that if it had not been for proper law
     enforcement officials being there that there was a chance that
     someone could be injured?

                MR. NABRIT:  Object.

                THE COURT:  Sustain it.

                MR. P. H. PITTS:  No further questions from this
witness.

                THE COURT:  Mr. Hall.

                MR. HALL:  Yes, sir.

                     CROSS EXAMINATION:

BY MR. HALL:

Q    Trooper Weber, I believe you said you were stationed at all
     pertinent times on March 7, Sunday, at the intersection of Broad
     and Water Street; is that correct?

738

A   Would you repeat that?

Q   I believe you testified on direct examination that on Sunday,
    March 7, during all periods of time under inquiry you were
    stationed at the intersection of Broad and Water --

A   Yes.

Q   -- in Selma; is that correct?

A   (Nodded to indicate affirmative reply)

Q   And did you testify that the City Police were there, too; were
    the City Police there, also?

A   Yes.

Q   Was Captain Wilson Baker there?

A   Yes.

Q   He was there?

A   (Nodded to indicate affirmative reply)

Q   He was there in person at all pertinent times during this march?

A   No.

Q   When they went across the bridge?

A   At the time they went across; yes.

Q   Was he there when they returned?

A   Yes.

Q   Did you see Sheriff Clark at this intersection at or about the
    time the marchers returned across the bridge?

A   Yes.

Q   Did you hear any conversation between Sheriff Clark, the defen-
    dant, and Captain Wilson Baker?

A    No.

Q    Were you standing close to them?

A    No.

Q    Did they converse?

A    I don't know.

Q    Was there anything said about controlling --

       THE COURT:  I believe, Mr. Hall, you are having difficulty with your witnesses speaking loud; if you will stand back yonder, I think that they will be more inclined to raise their voice.

       MR. HALL:  All right, sir, Judge.

Q    Was there anything said about controlling the marchers or directing the marchers or handling traffic, either by the City Police or Sheriff Clark's deputies or Sheriff Clark, himself, or any member of the State Troopers?

A    I don't know.

Q    You didn't hear anything at all?

A    No, sir.

Q    You, yourself, didn't leave their corner; when did you leave there?

A    I didn't catch that.

Q    When did you leave that corner?

A    About five; approximately five o'clock.

Q    Did you go down near the church?

A    No.

       MR. HALL:  That's all.

THE COURT:  Mr. Doar.

BY MR. DOAR:

Q    Where were you a Deputy Sheriff?

A    Dallas County.

Q    For who?

A    Sheriff Clark.

Q    For how long?

A    Four years.

Q    When did you quit?

A    August 11, 1963.

Q    August 11, 1963?

A    Yes, sir.

Q    And you worked from 1959 to '63 for Sheriff Clark?

A    Yes, sir.

Q    Were you his Chief Deputy?

A    No.

Q    One of his deputies?

A    Yes.

                MR. DOAR:  Thank you.

                THE COURT:  Mr. Smith.

                    REDIRECT EXAMINATION:

BY MR. SMITH:

Q    Since August 11, 1963, you have been a State Trooper?

A    Since August 12.

Q    August 12 --

A    Yes, sir.

Q    -- '63?  How long, during the period of time from August 12, '63,
     to the present time, have you been assigned to the Selma
     Division of the State Troopers?

A    December of 1963.

Q    Since December of 1963?

A    Yes.

Q    Did your duties include patrolling the portion of U.S. highway
     80 east up to the Dallas County line?

A    Yes.

Q    Approximately what distance is it from the Edmund Pettus Bridge
     in Selma to the Dallas County line coming east in the direction
     of Montgomery?

A    Approximately twelve miles.

Q    Twelve miles; do you travel this area of the highway daily?

A    Yes, sir; yes.

Q    Or weekly or over a periodic schedule?

A    Yes.

Q    Did you say that you go over it daily?

A    Yes, sir.

Q    Are you familiar with the type traffic in this area of U.S.
     highway 80 east?

A    Yes.

Q    What type traffic travels this area of the highway?

A    Very heavy traffic.

742

Q   Now, when you say, "Heavy," can you distinguish that from
    automobile, or to truck, or heavy traffic?

A   Well, it is considerable amount of both.

Q   Where does U.S. highway 80 east come from and go to with relation
    to Selma?

A   It's coast to coast.

Q   Coast to coast?

A   (Nodded to indicate affirmative reply)

Q   Are many out of state tourists directed or routed through Selma
    on U.S. highway 80 east from Montgomery?

A   Yes.

Q   You generally familiar with the shoulder or shoulders of U.S.
    highway 80 east from Selma to the Dallas County line?

A   Yes.

Q   Are you generally familiar with the area contiguous to the
    highway of U.S. highway 80 east from Selma to the Dallas County
    line?

A   Yes.

Q   Are there many wooded areas?

A   Yes.

Q   Are there any swamp areas?

A   No.

Q   Are there any bridges?

A   Yes.

Q   Do you have any judgment or opinion as to how many bridges there

exists between the area we have defined?

A    Approximately three.

Q    Approximately three?

A    Yes.

Q    Are there sidewalk areas traversing the stream that it covers --

A    No.

Q    -- within the bridge?

A    No.

Q    Is there any provision for pedestrian traffic on these particular three bridges?

A    No.

Q    Do you investigate traffics over the area that I have defined?

A    Yes.

Q    Excuse me, I mean accidents --

A    Yes.

Q    -- traffic accidents --

A    Yes; yes.

Q    -- is what I am asking?

A    Yes.

Q    You do investigate them?

A    Yes.

Q    Do traffic accidents commonly occur in this area or not?

A    Yes.

Q    Is it a curved portion of highway with dips and fills, embankments, and what have you?

A    Would you rephrase that; repeat it?

Q    It is not a clear question.  In regard to the area from Selma to the Dallas County line --

A    (Nodded to indicate affirmative reply)

Q    -- what about the terrain of the highway, is it up and down, blind portions in it, or not?

A    Yes.

Q    Any embankments?

A    Yes.

Q    Many steep curves?

A    No.

Q    Would you describe it as a hazardous area or portion of highway?

A    Yes.

Q    Now, Mr. Weber, assume that seven hundred marchers proceeded in an orderly manner on the shoulder of U.S. highway 80 east from a point in Selma to the Dallas County line; would this, in and of itself, in your opinion, create any traffic hazard?

A    Yes.

Q    Now, as a law enforcement officer, if you were called upon to provide ordinary police protection to this group of marchers in single file, how would you protect them?

          MR. GRAY:  Objection.

          THE COURT:  Overruled; you can answer it.

A    By patrolling the highway.

Q    Would that present any police problem from the standpoint of the

745

wooded areas, assuming -- assuming there were hostile -- assuming
there were persons who were hostile to those marching?

      MR. GREENBERG: Objection.

      MR. HALL: Object.

      THE COURT: I sustain it to that.

Q  Let me come back to the question as to how you would provide
ordinary police protection for them; you said by patrolling the
highway?

A  Yes.

Q  How many men would it take?

A  I don't know.

Q  Would it be necessary, in your opinion, to block either lane of
traffic?

A  Yes.

Q  Which lane would you block?

A  Eastbound.

Q  That would be assuming they are walking on the opposite lane?

A  Yes.

Q  You have been in Selma over the period February through up until
today?

A  Yes.

Q  Have you observed the marches and demonstrations in and around
the Court House in Selma by Negro citizens going to the Court
House?

A  Yes.

Q    Have these demonstrations attracted large crowds of white people?

A    Yes.

Q    In your opinion, would the proposed march of these demonstrators
     from a point in Selma to the Dallas County line attract numbers
     of white people?

A    Yes.

Q    Mr. Weber, assuming that on Sunday, March 7, that the proposed
     march from the Edmund Pettus Bridge to a point just beyond it on
     the Montgomery side attracted approximately a thousand people;
     in your opinion, would a continuation of that march to points
     further east attract that many people?

                MR. GREENBERG:  Objection.

                MR. NABRIT:  Objection.

                THE COURT:  I will let him answer it.

                MR. NABRIT:  May I be heard, your honor?

A    Yes.

                THE COURT:  Yes.

                MR. NABRIT:  There is no indication that the witness

is an expert on the ability of a parade to attract a crowd, and that

is the reason we --

                THE COURT:  Well, that doesn't -- I will permit him

to give his opinion on it; you can examine him on the weight, if any,

to be attached to that testimony.

                MR. NABRIT:  All right.

Q    Your answer was?

A    Yes.

Q    Yes.

        MR. SMITH:  That's all.

        THE COURT:  For Colonel Lingo.

BY MR. KOHN:

Q    Trooper Weber, as the crow flies, which is a common expression,
how far is Selma from Montgomery?

A    Fifty miles.

Q    How far?

A    Fifty.

Q    How far is it on highway 80?

A    I don't know; I have never clocked it?

Q    Well, is it forty, forty-five?

A    Forty-five.

Q    Is it factual that the fastest man or woman in this crowd of
demonstrators on the Edmund -- Senator Edmund Pettus Bridge on
March 8 had continued his or her march toward Montgomery that
night would have overtaken him or her before either reached
Montgomery?

        MR. NABRIT:  Objection.

        THE COURT:  I will take judicial knowledge of that;
you don't have to prove that; I know that.

        MR. KOHN:  I know that, your honor, but I am laying
it as a basis for a question I am getting ready to ask him; that is
the reason.  I knew that the court knew that, would take judicial

748

knowledge of it; I am trying to keep these lawyers from not letting
my question in by your proper ruling.

Q    Trooper Weber, isn't it a fact that on this specific highway on
     March 8, 1965, that it would have been much more difficult from
     a standpoint of traffic safety, safety of the participants on
     the highway, whether in vehicles or walking, to handle such a
     crowd at night than in the day time from the standpoint of publi
     safety? Or in other words -- that is a long question -- is it
     harder and more difficult as a rule to handle traffic at night
     than in the day time?

A    Yes.

Q    As a matter of fact, the State law for driving a vehicle across
     that highway at night is a lower rate of speed than in the day
     time, isn't it?

A    Yes.

                    MR. KOHN:  Thank you.

                    THE COURT:  Any redirect, Mr. Pitts?

                    MR. P. H. PITTS:  No, sir.

                    THE COURT:  Any further questions, interrogation; Mr

Hall?

                    MR. HALL:  Yes, sir -- no questions, your honor.

                    THE COURT:  Mr. Doar?

                    MR. DOAR:  No, sir.

                    THE COURT:  Any party? Call your next witness.

                    MR. P. H. PITTS:  Call Mrs. Thacker.

749

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

GRACE THACKER, witness for James G. Clark, having been duly sworn,

testified as follows:

DIRECT EXAMINATION:

BY MR. GAYLE:

Q    Have you been sworn, please, ma'm; have you been sworn?

A    Yes.

Q    Have you been sworn?

A    Yes.

Q    Would you state -- and speak out, please; what is your full nam

A    Grace Thacker.

Q    Mrs. Thacker, where do you live?

A    Selma.

Q    Whereabouts in Selma?

A    216 Green.

Q    Do you remember an occasion on Sunday afternoon about -- March

7, 1965, about three p.m.?

A    Yes, I do.

Q    Would you state to this court where you were and just what too

place there at your home if you -- if -- it was at your home,

I believe?

A    Yes, it was.

Q    Would you state what took place, please?

A    Yes; I was at home with my grandbabies, and so as the people

came marching back through Selma, some came down the street I

750

was living on, the cut--- colored people was coming down the
street I was living, and so I was standing in the kitchen by my
sink and saw them throwing at my dog, so I ran out to -- and
asked them to not be throwing at my dog, and they just started
throwing at me.

Q    Were you hit?

A    Yes, I was.

Q    Was it necessary, or did you go to a physician for treatment?

A    Well, the doctor said it wasn't necessarily in -- anyhow, my
sister insisted on me to go, because she was afraid that I was
hurt bad, and I told her I didn't seem to be hurt so bad, and
so she insisted on me to go to let the doctor see, and so I went
the next morning, and I couldn't see the doctor, and it still
didn't seem that I was hurt so bad, and it hurt me a little bit
to breathe --

MR. GRAY:  Your honor, we are going to object; this
isn't responsive.

THE COURT:  It is not responsive.

A    And so I went on --

Q    Just -- just wait; I will ask a question, please, Mrs. Thacker.
Mrs. Thacker, had you recently been in the hospital?

A    I just --

Q    Prior to this -- I beg your pardon?

A    I just got out of the hospital last --

Q    You had just gotten out of the hospital?

752

MR. GAYLE:  Thank you.

MR. HALL:  May it please the court, we move -- we object to all this testimony, move to strike it; it hasn't been connected with anything in -- in issue here.

THE COURT:  Well, I permitted -- you offered evidence on lack of police protection in this area at this time, and I will let this stay in on what was going on generally as part of the overall picture in Selma and the area on that occasion; the motion is denied.

CROSS EXAMINATION:

BY MR. HALL:

Q   Mrs. Thacker, let's see, you live on 216 Green Street?

A   Yes, I do.

Q   How close is that to Alabama Avenue?

A   Oh, it's the -- it is the only -- it is the next door, you know, they tore down -- it was the second door, now it is the first, because they tore down --

Q   It is right around the corner from Alabama Avenue?

A   Uh, huh.

Q   I see; and what time did you say this was on Sunday?

A   I think it was between two and three.

Q   Between two and three?

A   I think so.

MR. HALL:  I see; that's all.

THE COURT:  Mr. Doar.

753

MR. DOAR:  No, sir.

THE COURT:  Mr. Smith.

MR. SMITH:  No, sir.

THE COURT:  Mr. Kohn.

MR. KOHN:  No, sir.

THE COURT:  Mr. Pitts; redirect.

MR. P. H. PITTS:  No, sir.

THE COURT:  Mr. Gayle, I should have said.

MR. GAYLE:  I just like to ask her one question.

THE COURT:  All right.

MR. GAYLE:  Excuse me, your honor.

REDIRECT EXAMINATION:

BY MR. GAYLE:

Q   Mrs. Thacker, did you call the Sheriff's Department?

A   No, sir; I didn't; there is a -- a lady across the street did
    that, all the going on, they saw it when they hit me, so she
    called the policeman.

Q   Policeman?

A   Yes.

Q   What happened when the police came down?

A   I didn't see him; I went on in the house; if they came, I didn't
    see them.

Q   You did not see them?

A   No.

MR. GAYLE:  Thank you.

754

THE COURT:  Mr. Hall.

RECROSS EXAMINATION:

BY MR. HALL:

Q   Was you -- have you talked with any policeman about this since
    that time, Mrs. Thacker, that occurrence?

A   Nothing only when they would ask me questions about it.

Q   I see; they have been out to your house and talked to you about
    it?

A   Oh, you mean the officers?

Q   Yes, ma'm?

A   No; there was one came after -- out last Saturday morning to get
    me and talk with me some about it, a deputy.

Q   This past Saturday morning?

A   Uh, huh.

Q   And asked you to come over here and testify?

A   Yes.

Q   This is some member of Sheriff Clark's office, some deputy?

A   Yes.

Q   But before that time, you hadn't talked to any officer?

A   No; no, I hadn't.

Q   And all they have done is ask you to come over here and testify
    in this case?

A   Yes.

            MR. HALL:  Thank you; that's all.

            THE COURT:  Next witness.

MR. P. H. PITTS:  Judge James A. Hare.

(Witness James A. Hare sworn by the Clerk)

\*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\*

NOTE:  For testimony of JAMES A. HARE, witness for James G. Clark,
    see excerpt transcript filed April 1, 1965.

\*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\*

THE COURT:  How many more witnesses do you have for
Sheriff Clark, Mr. Pitts?

MR. P. H. PITTS:  Sir?

THE COURT:  How many more witnesses do you have for
Sheriff Clark?

MR. P. H. PITTS:  We have six back here, your honor.

THE COURT:  How many more do you plan on putting on?

MR. P. H. PITTS:  It is hard for me to say at this
time; I would say somewhere between -- between six and ten, maybe
not that many.

THE COURT:  Then with the exception of seeing your
training film, your War Department training film, which I will see
after a ten minute recess, we won't take any more evidence or
testimony today.

MR. GREENBERG:  May we --

THE COURT:  Prior to the recess I will hear you on
your objection.  Now, if you will, make a recitation for the record
in the presence of opposing counsel as to exactly what you propose --

MR. P. H. PITTS:  Yes, sir.

THE COURT:  -- how you propose to identify it and make it relevant.

MR. P. H. PITTS:  We propose to show a film and to offer as evidence the contents this film, a film which has been produced by the United States Air Force and approved by the War Department; this film is a training film which shows the generally accepted method of dispersing a crowd and the manner and the methods in which the United States Air Force teaches their air police and other people who would be concerned to disperse a crowd.

THE COURT:  All right, do you have a witness to identify the film?

MR. P. H. PITTS:  We have Mr. Glass, who is the custodian.

THE COURT:  In substance, will that -- is that what he will testify to?

MR. P. H. PITTS:  Yes, sir; at Maxwell Air Force Base.

THE COURT:  Make your objection.

MR. GREENBERG:  Your honor, I -- the rule as I thought it was -- I got a book down just to read it -- I think it is clearly inadmissible; this obviously comes under the rule of admissibility of a textbook, except it happens to be a film, and I just would read one sentence from Corpus Juris on evidence: "Except as permitted by statute, medical and other works of science or learning, at least books of inductive as distinguished from exact science, are, although accepted as standard authorities, ordinarily,

inadmissible as independent evidence of the theories and opinions therein expressed, or as evidence for any purpose except to some extent in connection with the examination of an expert, as an aid to the memory of the court in defining scientific terms, or to show the state of the art, or the world's knowledge on the subject." This hasn't been authenticated, there is no expert here; just like coming up and giving your honor a textbook on evidence and making it a part of the record.  The court can read it or -- I wouldn't suggest the court do it -- if the court wants to the court might see it in chambers for his own information, but it is certainly not admissible as evidence.  Quite clearly the rule.

THE COURT:  Mr. Pitts.

MR. P. H. PITTS:  Your honor, we propose to offer this film into evidence as rebuttal testimony on the charges that the State Troopers and the Dallas County Sheriff's Department used excessive force --

THE COURT:  I understand.

MR. P. H. PITTS:  -- on March 7, 1965.

THE COURT:  I understand that, and I will see the film.

MR. P. H. PITTS:  Yes, sir.

THE COURT:  The court will be in recess ten minutes.

(At which time, 4:34 p.m., a recess was had until 4:45 p.m., at which time the hearing continued)

THE COURT:  All right, show your film, and then I

758

will rule on whether it is admissible or not.

MR. P. H. PITTS:  Would you like us to put Mr. Glass on the stand first, your honor?

THE COURT:  No.  I will accept your representation as to what it is --

MR. P. H. PITTS:  Yes, sir.

THE COURT:  -- without him testifying.

THE CLERK:  The film is marked as Defendant's Exhibit number 18.

MR. SMITH:  Your honor, the projector operator says it would be better if we could cut some of the lights.

THE COURT:  Let's see how it works first.

MR. SMITH:  All right, sir.

(At which time movie film, Defendant Clark's Exhibit 18, was projected for the court)

THE COURT:  All right, gentlemen, it is not admissible; it doesn't have anything to do with any of the issues that have developed in this case up to this point.  Let it be marked; it will be in custody of the Clerk; tendered Exhibit 18 for the defendant, Clark, not admitted in evidence.  Gentlemen, I am going to recess now until nine o'clock in the morning; recess until nine o'clock in the morning.  I would like to see you lawyers in my chambers, if you will, please.

(At which time, 5:15 p.m., a recess was had until 9:04 a.m., March 16, 1965, at which time the trial continued)

THE COURT: All right, gentlemen, the case is with the defendant, Clark.

MR. GAYLE: I will go in and tell them, Judge.

MR. P. H. PITTS: Mr. Pyron.

THE CLERK: Have you been sworn?

WITNESS THOMAS L. PYRON: No, sir.

THE CLERK: Please raise your right hand.

(Witness Thomas L. Pyron sworn by the Clerk)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

THOMAS L. PYRON, witness for James G. Clark, having been duly sworn, testified as follows:

DIRECT EXAMINATION:

BY MR. P. H. PITTS:

Q   Would you state your name, please?

A   Thomas L. Pyron.

Q   By whom are you employed, Mr. Pyron?

A   City of Selma Police Department.

Q   And how long have you been so employed?

A   Twenty-four years.

Q   And what rank are you in the City of Selma Police Department?

A   Captain.

Q   And what are your specific duties with the Selma Police Department?

A   I am the commander of the three to eleven shift.

Q   Now, Captain Pyron, were you on duty with the Selma Police

Department on March 7, 1965?

A   Yes, sir.

Q   And where were you stationed on this particular day?

A   Broad and Water.

Q   Broad and Water?

A   Yes, sir.

Q   And what time did you go to the intersection of Broad and Water?

A   Oh, I -- I don't -- I don't remember exactly the time.

Q   Was it in the morning?

A   We stayed up there so long, it was -- I say we got up there ten thirty or eleven o'clock, somewhere in there.

Q   Now, were you in charge of the traffic in this general area on Sunday --

A   Yes, sir.

Q   -- March 7?

A   Yes, sir.

Q   And was it necessary for you to block off any traffic on this particular day?

          MR. AMAKER:  Objection.

Q   Did you block off any traffic on this day, Captain Pyron?

A   I did.

Q   And where did you block this traffic off?

A   We blocked from the intersection of Water and Broad, we blocked one block each way, which were three streets that we blocked off.

Q   And was any spectators or was any traffic allowed into this area

761

which was blocked off?

A   There was not.

Q   Now, this was, I believe you said, on Sunday, March 7, that we are talking about now?

A   That's right.

Q   Now, Captain Pyron, I call your attention to Tuesday, March 9, 1965 --

A   (Nodded to indicate affirmative reply)

Q   -- and ask you where you were stationed on this particular day?

A   Same place.

Q   And did you block any traffic off this day?

A   We did.

Q   And where was the traffic blocked off on this particular day?

A   From the intersection of Broad and Water, three streets each way.

Q   Were there any -- were there large -- were there any groups of people in this general area?

A   There were.

Q   All right; now, do you remember when the marchers came -- were starting to go across the River --

A   I do.

Q   -- Bridge?

A   (Nodded to indicate affirmative reply)

Q   And where were you at this particular moment?

A   In the middle -- in the center of the street.

Q   In the center of the street?

A   That's right.

Q   And did you notice a man standing on the corner of -- in front
    of the Cable Vision which is at this intersection?

A   He was standing to the side of the Cable -- Cable Vision Company
    in a doorway that leads upstairs.

Q   All right; and would you please relate to this court what called
    your attention to this person?

A   I just happened to look around and look over there to that
    corner, and there was a man with a gun bringing it down like
    this, and I started over there, and some fellow behind him hit
    him on the arm, and I was running by that time, and it knocked
    the pistol out of his hand, and it hit the pavement, and when
    he picked it up, well, then I had him.

Q   And did you make an arrest?

A   Yes, sir.

Q   All right; and was he charged by the City of Selma?

A   He was; yes, sir.

Q   Uh, huh; and do you know what he was charged with?

A   I believe presenting firearms on -- no, careless and reckless
    handling of firearms.

Q   All right; and -- and this was on Tuesday, March 9, 1965?

A   That's right.

Q   Now, was this man that was arrested by the City of Selma Police
    Department, was he a white man or a Negro?

A   He was a white man.

Q   All right; now, Captain Pyron, do you know the march which was taken by the marchers on Tuesday, March 9, 1965?

A   Do I know the route?

Q   Uh, huh?

A   Yes, sir.

Q   Would you please relate to this court the route that was taken on this particular day?

A   They left Brown's Chapel Church and came up Sylvan Street to Water Street and straight down Water Street to Edmund Pettus Bridge and across the bridge.

Q   All right; and did you have any of your men stationed along this route?

A   We had one man at each intersection from the church up to the bridge.

Q   All right; in your -- you are familiar with the city streets in the City of Selma, Alabama, aren't you?

A   Yes, sir.

Q   All right; and you -- at one time you were in charge of the Traffic Division of the Selma Police Department; is that correct?

A   That's right.

Q   Now, assuming that a march was to be made from Brown's Chapel to the Edmund Pettus Bridge, what would -- some, say, twenty-five hundred people or three thousand people, what would be the feasible route as far as providing police protection that these marchers could take in the City of Selma?

A    Well, we figure the route that we had mapped out for them was the best.

Q    And what route was that?

A    That was from Sylvan, leaving the Brown Chapel Church, going south on Sylvan to the intersection of Water and Sylvan, then turning right, which would be west, and going to the Edmund Pettus Bridge and turn left, which would be back south across the bridge.

Q    And that would be the shortest route that they could take?

A    That's right; it would be the shortest.

Q    And do you know the route that was followed on Sunday, March 7, 1965?

A    That was the same, via the same route.

Q    And on this route that was taken, I believe that you have stated that it would be -- that they could be provided more protection along this route than any other route that they could take?

A    Yes.

            MR. P. H. PITTS:  That's all.
                CROSS EXAMINATION:

BY MR. HALL:

Q    Captain Pyron, I -- directing your attention to the route that you just testified to, would that route down Sylvan towards -- and Water to Broad and then across the bridge be shorter?

A    Well --

Q    Than going down Sylvan to Alabama and then down Alabama to Broad

765

and then across the bridge?

A Well, no; I don't see where it would be any different.

Q Actually, it would be the same distance?

A No, it wouldn't be any shorter.

Q Down Sylvan to Water and then across Water and then across the bridge would be something of a back route, wouldn't it?

A How is that now?

Q That would be directed around downtown Selma?

A That's right, it would be --

Q And assume that would be -- this -- this is what you had in mind?

A That's right, just to keep it out of the downtown area.

Q Well, is there any reason why it wouldn't be feasible for a line of marchers such as you have discussed coming down Sylvan, that is south on Sylvan, to Alabama --

A Uh, huh.

Q -- then west on Alabama to Broad, and then south on Broad to the bridge; is there any reason why you could not provide adequate protection along that route?

A I think we could have.

Q Captain Pyron, directing your attention to Sunday, March 7, 1965, I believe on direct you testified you were standing at the corner of Water and Broad at the time of the attempted march from Selma to Montgomery?

A That's right.

Q And you were in charge of traffic?

A   We had, you know, several men.

Q   Was Commissioner Baker there at some time?

A   How is that now?

Q   Was Commissioner Baker there with you at some time?

A   After the marchers started to cross the bridge, I don't know how many had got across there, he drove up in his car.

Q   Yes, sir; did he stay there through some period of time?

A   Well, he stayed there -- I don't know whether he stayed there all the time, but he was there for quite a while; yes.

Q   Was he there when the marchers returned from across the bridge?

A   He was; uh, huh.

Q   Incidentally, how long were these marchers across the bridge? If you know?

A   Well, I don't rightly know; I didn't -- I didn't have time to look --

Q   Do you have a judgment?

A   It was well over an hour, maybe two hours --

Q   Maybe two hours?

A   -- to get over and back, something like that.

Q   Did you see Sheriff Clark there in the vicinity of Broad and Water on this occasion?

A   I did not.

Q   You did not?

A   I did not.

Q   You did not talk with Sheriff Clark?

A    No, I didn't.

Q    You did not observe him have a conversation with Captain Baker?

A    I did not.

Q    Did you see any of Sheriff's possemen or deputies at this time?

A    They were there.

Q    They were there; they were there, were stationed there with you?

A    No, they didn't --

Q    Or did they come by there?

A    They did not have any -- anything to do with this detail that we had, and they did not assist us any way at that intersection.

Q    Do you -- did you observe any of the Sheriff's deputies or any of the possemen -- I will withdraw that question.

      MR. HALL:  That's all.

      THE COURT:  Mr. Doar.  Mr. Smith.

      MR. SMITH:  No questions.

      THE COURT:  Mr. Kohn.

      MR. KOHN:  No questions.

      THE COURT:  Redirect.

          REDIRECT EXAMINATION:

BY MR. P. H. PITTS:

Q    I believe you stated that you did see the -- some of the Sheriff's Posse at this intersection, Captain Pyron?

A    That's right; they were.

Q    Were they on a bus, or were they standing around, or just how were they?

A    They were most of them on the bus, and some of them were standing beside the bus.

Q    All right.  Now, Mr. Hall has asked you as to whether or not march could be taken down Broad Street; now, I ask you, isn't Broad Street the principal business area in Selma, Alabama?

A    It is.

Q    And isn't that where most all of the downtown businesses are located?

A    Quite -- yes, sir; it is the main part of town.

Q    Now, on Alabama Avenue, are there any businesses located on Alabama Avenue?

A    There are; yes.

Q    Now, Water Avenue, is it predominantly business, industrial, or what type of business is located along Water Avenue?

A    Well, most -- most any kind; most of it is wholesale businesses and manufacturing company or two down in there.

Q    All right; and how about the -- the -- is there -- the traffic on Broad Street, would you say that it would be greater than the traffic which is on Water Avenue?

A    It would be.

Q    All right; and would it be easier to control the traffic on Water Avenue than it would be to control it on Broad Street?

A    I think so.

Q    Now, do you know the width of Alabama Avenue?

A    I do not.

Q    All right; do you know the width of Water Avenue?

A    I do not.

Q    All right; do you -- is Water Avenue -- is it larger, widthwise, than Alabama Avenue?

A    I believe Alabama may be a little -- in -- in sections there it may be a little wider or practically the same thing as Water Avenue, since they widened it out.

> MR. P. H. PITTS:  That's all.
>
> THE COURT:  Any further examination, Mr. Hall?
>
> MR. HALL:  I just like to ask him.
>
> RECROSS EXAMINATION:

BY MR. HALL:

Q    Dr. Pyron, how far is it from Alabama Avenue to Water Street?

A    From Alabama to Water?

Q    Yes, sir?

A    One block.

Q    One city block?

A    That's right.

Q    So if you marched down -- now, when you referred to the traffic on Broad Street, you meant along the entire width and breadth, I mean the entire length of Broad Street?

A    That's right; going --

Q    And Broad Street, as it runs through Selma, is U.S. highway 80, is it not?

A    That's right; that's right.

MR. HALL:  Thank you.

THE COURT:  Any further questions from this witness?

MR. McLEAN PITTS:  Just one minute.

REDIRECT EXAMINATION:

BY MR. P. H. PITTS:

Q    Captain Pyron, does the City of Selma have a parade statute?

A    I -- yes, sir; they do.

Q    All right.

MR. P. H. PITTS:  And mark this right here.

THE CLERK:  Defendant Clark Exhibit number 19 for identification.

MR. McLEAN PITTS:  Offer that; let them see it.  That is a copy of the parade statute of the City of Selma.

MR. P. H. PITTS:  Like to offer this into evidence as Defendant Clark's Exhibit number 19.

THE COURT:  Any objection to it?

MR. P. H. PITTS:  You seen it, Mr. Doar?

MR. DOAR:  I have no objection.

MR. HALL:  No.

THE COURT:  It will be admitted.

MR. McLEAN PITTS:  That's all.

MR. P. H. PITTS:  That's all.

THE COURT:  All right, you can be excused, Captain, from the witness stand.

WITNESS:  Thank you, sir.

771

MR. P. H. PITTS:  Billy Bobo.

THE CLERK:  Please raise your right hand.

(Witness Billy Mack Bobo sworn by the Clerk)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

<u>BILLY MACK BOBO</u>, witness for James G. Clark, having been duly sworn,

testified as follows:

DIRECT EXAMINATION:

BY MR. P. H. PITTS:

Q    Would you state your name, please?

A    Billy Mack Bobo.

Q    And by whom are you employed, Mr. Bobo?

A    City of Selma Police Department.

Q    And how long have you been so employed?

A    This time, two and a half years.

Q    And were you employed previously with the Selma Police Department?

A    Yes, sir; I was.

Q    And have you had any other previous law enforcement experience?

A    Yes, sir; with the Sheriff's Department.

Q    And how long were you with the Sheriff's Department?

A    Three and a half years.

Q    All right; now, Mr. Bobo, do you remember the march which took

place in Selma on Tuesday, March 9, 1965?

A    I am familiar with all of them, but I was working twenty-four

hours a day, and I get confused on which one was which; now,

where did this one go, if I can ask?

Q   This one was -- are you familiar with the march -- the second
    march which went across the Edmund Pettus Bridge?

A   Yes, sir.

Q   And on this particular day, which is Tuesday, March 9, 1965, did
    you receive a call to go to the front of the Selma Supply Company

A   Yes, sir.

Q   And did you go to Selma Supply Company?

A   Yes, sir.

Q   And what did you find when you arrived there?

A   I found an automobile parked there at the curb with the doors
    locked on it, a man standing by the side of the car, and a gun
    in the front seat, pistol.

Q   And was this a white man or a Negro?

A   It was a white man.

Q   All right; and do you know where this man was from?

A   It was Florida, somewhere in Florida; I don't remember the exact
    town.

Q   All right; and did you apprehend this person?

A   Yes, sir; I placed him under arrest.

Q   All right; and do you know what he was charged with?

A   Carrying an unlicensed pistol in an automobile, I believe.

Q   All right; now, the Selma Supply Company, where is it located?

A   Cater-cornered across from the City Hall, which would be on the
    northwest corner.

Q   All right; is this -- what street is this on?

A    It would be on Alabama and Frank--- Franklin; yes.

Q    Alabama and Franklin; and do you know as to whether or not this was on the -- the route -- the proposed route which the marchers were going to take?

A    Yes, sir; it was.

Q    On March 9?

A    (Nodded to indicate affirmative reply)

Q    And was this the route that you were informed that they were going to take on this particular day?

A    Yes, sir.

Q    And do you know as to whether or not they took this route?

A    I believe they did take the route that day.

            MR. P. H. PITTS:  That's all.

            MR. HALL:  Your honor please --

            MR. McLEAN PITTS:  Just a minute.

            THE COURT:  Wait just a minute.

Q (by Mr. P. H. Pitts)  Mr. Bobo, do you remember what type of gun this man had with him in his car?

A    Yes, sir; it was a brand new three fifty-seven Magnum.

Q    Three fifty-seven Magnum?

A    Yes.

            MR. P. H. PITTS:  That's all.

            THE COURT:  Mr. Hall.

            MR. HALL:  May it please your honor, we object to

all these questions and answers; they are already in, but we do move

774

to exclude them and strike; they don't seem pertinent and material,
it hasn't been connected.

    THE COURT:  Motion denied.

    MR. HALL:  Thank you.

     CROSS EXAMINATION:

BY MR. HALL:

Q Mr. Bobo, where is the Selma Supply Company?

A Beg your pardon; I didn't understand?

Q Where is the Selma Supply Company?

A In Selma, Alabama.

Q On what street, please, sir?

A Franklin and Alabama.

Q Franklin; what number, please?

A I don't know the exact number of the --

Q Your best judgment about what -- I will withdraw that, sir.
Near what street is the Selma Supply Company; it is on Franklin
near what?

A It is on Franklin and Alabama; it is on the northeast corner.

Q On the northeast corner?

A Northwest corner, northwest corner; excuse me.

Q Northwest corner of Franklin and Alabama; now, I believe you
told Mr. Pitts that you were familiar with the Tuesday, March 9,
march, attempted march to -- from Selma to Montgomery?

A Yes.

Q You are; can you tell us the route that march took from the
church?

A    Repeat your question; I don't know whether I understood it right
     or not.

Q    We -- directing your attention to the Tuesday, March 9, march,
     or attempted march from Selma to Montgomery, we wanted you to
     tell us what route the marchers took from Brown's Chapel Church
     to highway 80, what route through Selma; down what street?

A    Now, was that the night that they did go across the bridge, I
     mean the afternoon they did go across the bridge that day?

Q    Yes, sir; they went across the bridge.

A    They went from Sylvan Street in Selma to Water --

Q    All right, sir.

A    -- from Water west to the Pettus Bridge, and across the bridge.

Q    At what point did they pass Alabama and Franklin?

            MR. McLEAN PITTS:  Wait a minute; I object to that
question because Alabama and -- that route, what point did they pass
Alabama and Franklin, is -- is two streets apart; I object to it
on the reason it is an impossible question.

            MR. HALL:  Your honor please, his testimony that it
was on the parade route; we just wanted to see where, how.

            THE COURT:  Well, your objection is overruled.  If
you can answer the question, answer it; if you can't, say you can't.

            MR. McLEAN PITTS:  Your honor, what I am objecting
to is two -- there were two --

            THE COURT:  I understand your objection.

            MR. McLEAN PITTS:  -- two marches across the river.

THE COURT:  I understand.

MR. McLEAN PITTS:  That is what I am getting at.
He hasn't specified which one it is, if he is talking about two,
whether it was Tuesday or whether it was Sunday.

THE COURT:  I understand.

MR. McLEAN PITTS:  All right, sir.

THE COURT:  If the lawyer wants to insist on
propounding that question, he has a right to do so.

MR. HALL:  We will withdraw that, your honor; we will
withdraw that question.

Q    But, Mr. Bobo, are you sure that this car was parked along the
parade route or route of Tuesday, March 9?  After refreshing
your recollection?

A    The two marches that I recall that consist of going across the
River Bridge both took the Sylvan Street; now, what is proposed
march at that time, as to where the car was parked ---

Q    Mr. Bobo, we want to direct your attention, if we may, to the
route taken by the marchers and the place where the car was
parked, and ask you if it is a fact that the car was parked on
the route that was taken by the marchers?

WITNESS:  Your honor, I am going to have to say that
I don't know at that time.  What has got me confused here is the
fact that we have had so many marches and so many days, and I have
been working three shifts, and I didn't know one day from the other
as far as that was concerned, and we had several marches to the

Court House, and we had several -- two marches across the River

Bridge, and as to which date exactly I can't recall.

        THE COURT:  All right.

Q  Well, in order to try to clarify that point, Mr. Bobo, Franklin

    and Alabama would be approximately one city block --

A  It is one block.

Q  -- from where the marchers actually passed along?

A  That is correct.

Q  Is that correct?

A  That is correct; it is one block from the route that goes across

    the River Bridge.

Q  All right; now, was this man -- after the man was apprehended --

    before he was apprehended, was he at or near his car?

A  He was not in the car at the time; he was standing beside it.

Q  He was not in the car; were there other persons arrested in or

    near Selma on the date in question for carrying concealed weapons?

A  Were other people --

Q  Yes, sir?

A  -- arrested in that --

Q  Yes, sir?

A  I don't know.

Q  But people are frequently arrested in and around Selma for

    carrying arms or having concealed weapons?

A  That is true.

Q  It is not unusual to arrest a man for having an authorized gun;

is that correct?

A    If he has an authorized gun, we won't arrest him.

Q    An unauthorized gun?  I am sorry.

            MR. McLEAN PITTS:  Let him answer the question.

            THE COURT:  Well, he has changed his question.  He
said, "Authorized," unintentionally; he is now saying, "Unauthorized
gun"; go ahead and answer it.

A    We do not make arrests for authorized --

Q    Well, I am sorry.

A    -- and as far as unauthorized, if it comes to our attention that
     there is a gun, we would make the arrest; that is true.

Q    All right, sir.  Now, what I meant to ask you, Mr. Bobo, if it
     was not a fact that you frequently make arrests of colored and
     white persons in and about Selma for having unauthorized firearms
     in that connection?

A    Well, I wouldn't say it was frequent; it was very few arrests
     we make.

Q    You do sometimes?

A    Yes, and point of arresting someone we might find a gun on them
     and charge them with concealed weapon at that time.

Q    You do conduct a search?

A    Sometimes.

            MR. HALL:  I believe that's all.

            THE COURT:  Mr. Doar.

            MR. DOAR:  No, sir.

THE COURT:  Mr. Smith.

MR. SMITH:  No questions.

THE COURT:  Mr. Kohn.

MR. KOHN:  No questions.

THE COURT:  Mr. Pitts.

MR. P. H. PITTS:  No further questions, your honor.

THE COURT:  Next witness.  You can be excused from the witness stand.

WITNESS:  Thank you.

MR. McLEAN PITTS:  Would you give us just one minute?

THE COURT:  Yes, sir.

MR. McLEAN PITTS:  Will you just let us check to see if one witness is here; if he is -- if they are not, we are ready to be through, your honor.

THE COURT:  All right.

MR. McLEAN PITTS:  Can those two police officers go?

THE COURT:  Any objection to the last two witnesses being excused, gentlemen?

MR. GRAY:  No objection.

THE COURT:  They may --

MR. McLEAN PITTS:  We would like to get -- would you let them go just as soon as we can, if we could.

THE COURT:  Yes, sir.

MR. McLEAN PITTS:  Your honor, the defendant, Clark, rests.

780

THE COURT:  All right.  Case is with the plaintiffs on rebuttal.

MR. AMAKER:  Could we have a moment?

MR. NABRIT:  Can we have a conference, your honor?

THE COURT:  Yes; court will be in recess ten minutes.

(At which time, 9:34 a.m., a recess was had until 9:43 a.m., at which time the hearing continued)

THE COURT:  All right, rebuttal.

MR. GREENBERG:  We have no rebuttal, your honor.

THE COURT:  All right, you want to formally file as evidence in the case your proposed plan?

MR. GREENBERG:  Yes, we would like to do so.

THE COURT:  It should be; it has been presented informally, copies have been furnished to the lawyers, but it should be filed as evidence.

MR. GREENBERG:  I have a copy here signed by counsel and signed by plaintiffs.

THE COURT:  Let it be filed.

MR. McLEAN PITTS:  That is the plan that he submitted?

THE COURT:  Yes.  You just keep this; I have a copy of it.  Any rebuttal for the United States?

MR. DOAR:  Yes, sir; we have one witness.  Before that, however, I would like to hand to the court the documents, the orders of Judge Thomas in the Southern District; would the court like me to recite them?

THE COURT:  No.

MR. DOAR:  Just hand them as a group?

THE COURT:  That is all right.

MR. McLEAN PITTS:  Could we see those?

THE COURT:  Yes, let counsel see them.

MR. McLEAN PITTS:  He can mark them; go ahead and mark them.

THE COURT:  Mark them as Government's Exhibit.

THE CLERK:  Plaintiff-Intervenor's Exhibit number 13.

MR. DOAR:  The documents, your honor, that were furnished by Colonel Lingo and Sheriff Clark have been marked as Plaintiff-Intervenor's Exhibits 11 and 12, and I would like to offer those in evidence.

THE COURT:  Any objection, gentlemen?

MR. McLEAN PITTS:  Mr. Doar, yeah, we agreed --

MR. DOAR:  Do you agree?

MR. McLEAN PITTS:  As I understood the court, they were going to be the orders that have been entered since the Federal Supplement; is that right?  As I understood the court, all that was to be offered was the orders that have been entered by Judge Thomas since the Federal Supplement.

THE COURT:  That have not been published.

MR. McLEAN PITTS:  That haven't been published.  You got -- you got a good many in here that was -- I think was after that, isn't it?  I mean before that.

782

MR. DOAR:  I don't know what he means.

THE COURT:  I have no objection to them; if they are orders that have been entered by Judge Thomas in these voting cases and in these other cases over there, then let them go on in, whether they have been published or not.

MR. McLEAN PITTS:  That was what we agreed to; it is all right with me to let them all go in.

MR. DOAR:  You want to see them?

MR. KOHN:  No objection.

MR. DOAR:  Now, there were --

THE COURT:  13 is admitted.

MR. DOAR:  With respect to Exhibit 11, among the pictures that were furnished by the defendant, Lingo, there appears to be eight or nine pictures missing as numbered, and counsel for Mr. Lingo -- and Mr. Kohn has asked Mr. Lingo to check that, and if they are available, if they are there, he will furnish them to me, and by stipulation we can add these to the Exhibit; is that correct?

MR. KOHN:  That is correct, your honor.

MR. DOAR:  We are checking on that right now.

THE COURT:  Any objection to 11 and 12 going into evidence?  It will be admitted.

MR. DOAR:  I would like to call Major Cloud.

THE CLERK:  Have you been sworn?

WITNESS JOHN CLOUD:  Yes, sir.

** ** ** ** ** ** ** ** ** ** ** ** ** ** ** ** ** ** ** ** ** **

NOTE:  For testimony of JOHN CLOUD, witness in rebuttal for the
       United States, see excerpt transcript filed March 29, 1965.

** ** ** ** ** ** ** ** ** ** ** ** ** ** ** ** ** ** ** ** ** **

    MR. DOAR:  We have no further witnesses.

    THE COURT:  Government rests on rebuttal?

    MR. DOAR:  Government rests.

    THE CLERK:  Was 14 admitted?

    THE COURT:  Yes, 14 is admitted.  Further evidence
for the -- on behalf of the Governor in rebuttal?

    MR. SMITH:  Not for the Governor.

    THE COURT:  Colonel Lingo in rebuttal?

    MR. KOHN:  Nothing further.

    THE COURT:  Sheriff Clark?

    MR. McLEAN PITTS:  No, sir.

    THE COURT:  All parties rest?

    MR. GRAY:  Yes, sir.

    THE COURT:  All right, do you have any written
authorities you wish to present that have not been submitted?

    MR. GREENBERG:  (Shook head to indicate negative
reply)

    THE COURT:  You gentlemen have any written authorities
you want to call to my attention, legal authorities, that you
consider to be appropriate and controlling in this instance?

    MR. McLEAN PITTS:  Judge, other than Cox versus
Louisiana, I think you are familiar with that.

784

THE COURT:  Yes.

MR. McLEAN PITTS:  All right.  Opinions and any

authorities that would be in this brief that I believe you already

have a copy of as pertains to police officers and so forth.

THE COURT:  All right.

MR. AMAKER:  What is that?

MR. GREENBERG:  What is that?

MR. AMAKER:  What is that?

MR. McLEAN PITTS:  This is the brief in a three-Judge

District Court.

THE COURT:  That is a brief that has been submitted

on behalf of Sheriff Clark in the three-Judge District Court that

I am sitting on in Selma where the plaintiff, the United States,

prayed for relief, one of the things they seek is an injunction

against Sheriff Clark from interfering with -- with the exercise of

certain rights.

MR. McLEAN PITTS:  Yes, sir.

MR. SMITH:  May it please the court, I know it isn't

necessary to call these authorities to the attention of the court,

and I will so -- in written form if you so desire, but I call to

the attention of the court the all writs statute, which is Title

28, Section 1651; also in regard to the temporary restraining

order, the case of Mora versus Mejias, cited 206 F.2nd 377; Section

1433 of Barron-Holtzoff, Volume 3, Federal Rules of Practice and

Procedure.  The other cases, I believe, have been called to the

attention of the court in other brief, your honor.

THE COURT:  All right, gentlemen, I will take this matter under submission; I will give you -- I will give you an order in it as soon as possible.

MR. SMITH:  May the court please, on behalf of the defendant, Governor Wallace, we would like to file formally with the Clerk this defendant's objection to the proposed plan which was this morning submitted.

THE COURT:  Let it be filed.

MR. KOHN:  Your honor, I have drawn one for the defendant, Lingo, and Mr. Pitts --

THE COURT:  Have you furnished opposing counsel copies of this?

MR. GREENBERG:  We object to them.

MR. KOHN:  We are -- I will write one out right now and give him a copy, it is very short.

MR. McLEAN PITTS:  Judge, it is short.

THE COURT:  This is just a notation on the bottom of it that the defendant, Governor Wallace, objects to the within proposed plan.

MR. SMITH:  That's right.

THE COURT:  All right.

MR. GREENBERG:  We don't need that.

MR. KOHN:  And ours is a little different; ours is that we do not accept the plan or agree to it.

THE COURT:  All right.  You need not file it in writing; that statement is sufficient for me to understand your position.  You may, if you wish, file it in writing.

MR. KOHN:  We have already written it; if you don't mind, we will file it.

THE COURT:  It is all right.  And I take it the -- that Sheriff Clark also objects to it?

MR. McLEAN PITTS:  Same wording as Colonel Lingo's.

THE COURT:  All right, you can file it, if you wish, file it with the Clerk.  And is there anything further in this case at this time, gentlemen?  On behalf of either of you?

MR. McLEAN PITTS:  Judge, as to -- just out of curiosity, as to us as to the future, does the court consider this case in issue in every way, and other than filing any pleading to the bill of complaint, this was on --

THE COURT:  I am sorry, I didn't follow you?

MR. McLEAN PITTS:  You were hearing this on motion for a permanent injunction; is that right?

THE COURT:  Motion for a preliminary injunction.

MR. McLEAN PITTS:  For preliminary injunction?

THE COURT:  (Nodded to indicate affirmative reply)

MR. McLEAN PITTS:  Now, technically, you could have another hearing, or you could have the main case tried later on?

THE COURT:  If -- if necessary, unless the parties wish by agreement to submit this matter permanently on this

evidence; if it is submitted permanently, then it must be by agreement; otherwise, it is just submitted upon the motion for preliminary injunction.

MR. McLEAN PITTS: And I would -- I was just inquiring as to whether it was necessary to file any additional pleadings, that is what I was inquiring about.

THE COURT: Well, upon this submission --

MR. McLEAN PITTS: All right, sir.

THE COURT: -- I take it the matter is closed.

MR. McLEAN PITTS: All right, sir.

MR. NABRIT: If it please the court, I think counsel was inquiring whether he was still required to file an answer to the complaint.

MR. McLEAN PITTS: That is the substance of it, yes, but we will --

THE COURT: I take it he joined the issue without filing a formal answer; the matter was set for a hearing --

MR. McLEAN PITTS: Yes.

THE COURT: -- within just a few days after the motion was filed, and I haven't stood on formality in this case as far as the pleadings are concerned.

MR. McLEAN PITTS: That is the reason I was inquiring; I understand.

THE COURT: You have advanced your -- your defense on the matter, as I understand it.

788

MR. McLEAN PITTS: Yes, sir; that's right.

THE COURT: All right. We will recess court until further order.

** ** ** ** ** ** ** ** ** ** ** ** ** ** ** ** ** ** ** ** **

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

I, Glynn Henderson, Official Court Reporter of the United States District Court for the Middle District of Alabama, do hereby certify that the foregoing 788 pages, together with excerpt transcripts referred to in index hereto, contain a true and correct transcript of proceedings had before the said Court held in the City of Montgomery, Alabama, in the matter therein stated. In testimony whereof I hereunto set my hand on this the 3rd day of June, 1965.

Official Court Reporter.